ACCEPTED
03-14-00738-CV
4853036
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/10/2015 5:50:17 PM
JEFFREY D. KYLE
CLERK

**Oral Argument Requested**

## No. 3-14-00738-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/10/2015 5:50:17 PM
JEFFREY D. KYLE
Clerk

**In The Court of Appeals For The
Third District of Texas**

| | | |
|---|---|---|
| **Elness, Swenson, Graham Architects, Inc.** *Appellants and Cross-Appellees,* | § § § § | **From the 200th District Court** |
| **v.** | § § | |
| **RLJII-C Austin Air, LP, RLJ II-C Austin Air Lessee, LP and RJL Lodging Fund II Acquisitions, LLC** *Appellees and Cross-Appellants.* | § § § § § § | **Of Travis County, Texas** |

## CROSS-APPELLANTS' BRIEF

**MUNSCH, HARDT, KOPF
& HARR, P.C.**

**Michael W. Huddleston**
State Bar No. 10148415
**J. Stephen Gibson**
State Bar No. 07866000
3800 Ross Tower
500 North Akard Street
Dallas, Texas 75201
214-855-7500 telephone
214-855-7584 facsimile
Email: mhuddleston@munsch.com
Email: sgibson@munsch.com

**Benton T. Wheatley**
State Bar No. 24015171
**Tracy McCreight**
State Bar No. 24037064
401 Congress Avenue
Suite 3050
Austin, TX 78701
512-391-6100 telephone
512-391-6149 facsimile
Email: bwheatley@munsch.com
Email: tmccreight@munsch.com

**ATTORNEYS FOR APPELLEES,
CROSS-APPELLANTS**

MHDocs 6062453_7 12690.2

# IDENTITY OF PARTIES AND COUNSEL

The undersigned counsel of record, pursuant to Texas Rule of Appellate Procedure 38.2, certifies that the following persons have an interest in the outcome of this case:

| | |
|---|---|
| Appellants, Cross-Appellees:<br>Appellants, Cross-Appellees'<br>Counsel on Appeal: | Elness, Swenson, Graham Architects, Inc.<br>Weston M. Davis<br>Gregory N. Ziegler<br>Matthew Mumm<br>Macdonald Devin, P.C.<br>1201 Elm Street<br>3800 Renaissance Tower<br>Dallas, TX 75270 |
| Appellants, Cross-Appellees'<br>Counsel at Trial: | Weston M. Davis<br>Gregory N. Ziegler<br>Matthew Mumm<br>Macdonald Devin, P.C.<br>1201 Elm Street<br>3800 Renaissance Tower<br>Dallas, TX 75270 |
| Appellees, Cross-Appellants: | RLJ II-C Austin Air, LP<br>RLJ II-C Austin Air Lessee, LP<br>RLJ Lodging Fund II Acquisitions, LLC |
| Appellees, Cross-Appellants<br>Counsel on Appeal: | Michael W. Huddleston<br>J. Stephen Gibson<br>Munsch Hardt Kopf & Harr, P.C.<br>3800 Ross Tower<br>500 North Akard Street<br>Dallas, Texas 75201 |

i

Appellees, Cross-Appellants
Counsel at Trial:

Benton T. Wheatley
Tracy McCreight
Munsch Hardt Kopf & Harr, P.C.
401 Congress Avenue
Suite 3050
Austin, TX 78701

By: _/s/ Michael W. Huddleston_

Attorney for Appellees, Cross-Appellants

ii

MHDocs 6062453_7 12690.2

## STATEMENT CONCERNING ORAL ARGUMENT

Appellees and Cross-Appellants respectfully request oral argument in this case. Appellees and Cross-Appellants respectfully submit that oral argument will help the Court in evaluating the issues necessary to the resolution of this appeal.

MHDocs 6062453_7 12690.2

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ...........................................................i

STATEMENT CONCERNING ORAL ARGUMENT............................................ iii

TABLE OF CONTENTS..................................................................................iv

INDEX OF AUTHORITIES..........................................................................ixx

I.     STATEMENT OF THE CASE .................................................................1

II.    ISSUES PRESENTED ..........................................................................4

III.   STATEMENT OF FACTS......................................................................6

       A.     Separate Contracts With Separate and Distinct Promised
              Performances on the Project.....................................................7

       B.     Separate and Distinct Acts and Omissions Breaching Separate and
              Distinct Contractual Obligations...............................................9

       C.     Suit and Settlements By the Soils Engineer and the General
              Contractor...........................................................................11

       D.     The Trial Court Rules That the One Satisfaction Rule Applies..........12

       E.     Attorney's Fees Allowed Only for Breach of Contract Claim Against
              the Architect. ......................................................................13

       F.     The Trial Court Renders Final Judgment....................................13

IV.    SUMMARY OF ARGUMENT................................................................14

       A.     The One Satisfaction Rule Does Not Apply. .................................14

       B.     RLJ Entitled To Attorney's Fees For the Presentation of the Breach of
              Contract Claims Against the Architect, General Contractor, and Soils
              Engineer *Either* If These Parties Shared a Joint and Several
              Contractual Duty *Or* If the Damages Were "Indivisible."..................15

V.     ARGUMENT AND AUTHORITIES .......................................................16

       A.     The One Satisfaction Rule Does Not Apply. .................................17

MHDocs 6062453_7 12690.2

1. This Case Involves *Contractual*, Not Tort, Liability.................18

2. The One Satisfaction Rule Was Developed to Address Settlements In Tort Cases With Less Than All Defendants After the Legislature Authorized Joint and Several Liability. ...........19

    a. Generally There Was No Joint & Several Tort Liability at Common Law.......................20

    b. There Was No General Right of Contribution at Common Law.......................20

    c. Statute Allowed Collection of All Damages From Any Defendant and Gave Defendant the Right to Contribution from the Other Tortfeasors, But Fails to Address Settlement With Less Than All Tortfeasors. ...................21

    d. The One Satisfaction Rule Was Designed to Address Joint and Several Liability In Tort Cases Only. .................22

3. The One Satisfaction Rule Only Applies In Cases Involving *Joint* Liability..........................23

    a. Unlike Tort Cases, Joint Liability in Contract Cases Requires More Than Common, Indivisible Damages. ...................25

    b. Without a Joint Contractual Obligation, Settlement Credit Under the One Satisfaction Rule Allowed the Architect to Do Indirectly What It Could Not Do Directly. .................31

    c. This Court Has Rejected Application of the One Satisfaction Rule to Contractual Liability Without a Joint Contractual Obligation. .................32

MHDocs 6062453_7 12690.2

d.   Applying the One Satisfaction Rule Without Joint Contractual Liability Obliterates the Collateral Source Exception. ............................33

e.   This Case Involved No Joint Contractual Liability of the Architect and the Settling Defendants. ...................................................34

   1)   The Performance Could Not Be the Same by Operation of Law: General Contractors Legally Precluded From Preparing Plans & Specifications..........................34

   2)   The Performance of the Architect and the Settling Defendants Was Not Alleged To Be the Same......................................35

   3)   The Architect Argued That Its Duty Was Different From Those of the Settling Defendants. .............................38

4.   The One Satisfaction Rule Does Not Apply Because the Jury's Verdict Did Not Award Damages for an "Indivisible" Injury..39

a.   The Charge Submitted Apportioned Damages. ...................................................40

   1)   The Plain Language of the Question Asked Determines What the Jury Found. ........................................................41

   2)   The Plain Language of the Question Limited Damages to Those Resulting from the Architect's "[F]ailure to [C]omply [W]ith the Architectural Contract." ........................................................42

b.   The Jury Was Asked To Apportion and in Fact Apportioned Damages. ...........................45

MHDocs 6062453_7 12690.2

5. No Right to Application of One Satisfaction Rule or Contribution Exists In Contract Cases In Light of Section 33.001 ..............................................................48

6. Applying the One Satisfaction Rule in Contractual Liability Cases Impairs Contract Obligations In Violation of Texas Constitution Article I, §16. ...............................53

    a. Texas Public Policy Strongly Favors Freedom of Contract. ......................................53

    b. The One Satisfaction Rule Impermissibly Impairs Contractual Obligations. ..................54

    c. Freedom of Contract Outweighs One Satisfaction's Questionable Objectives. .............55

7. The Architect Is Procedurally Barred From Asserting the One Satisfaction Rule. ....................56

    a. Waived by Failure to Specially Except. ..........56

    b. Waived by Failure to Request Question or Instruction. ...................................56

    c. Waived By Failure to Plead as an Affirmative Defense. .............................57

    d. Barred By Laches. ...................................58

B. No Segregation of Attorney's Fees Was Required. .............................59

1. There Is No Need to Segregate Fees For Claims Requiring Proof of the Same Facts. ..................60

2. If the One Satisfaction Rule Applies, It Requires Proof of Breach of the Same Promised Performance *and* an Indivisible Injury. ..........................................61

3. Alternatively, If Proof of Indivisible Injury Alone is Enough for the Application of the One Satisfaction Rule, Segregation of Fees Was Still Not Required. ...............................61

MHDocs 6062453_7 12690.2

VI.    CONCLUSION AND PRAYER ................................................................62

CERTIFICATE OF COMPLIANCE ....................................................................64

CERTIFICATE OF SERVICE ............................................................................65

APPENDIX IN SUPPORT OF CROSS-APPELLANTS' BRIEF ..........................66

MHDocs 6062453_7 12690.2

# INDEX OF AUTHORITIES

**Page(s)**

### CASES

*Allan v. Nersesova,*
307 S.W.3d 564 (Tex. App.—Dallas 2010, no pet.) ............................................44

*Amco Trust, Inc. v. Naylor,*
159 Tex. 146, 317 S.W.2d 47 (1958) .................................................................32

*AMX Enters., Inc. v. Bank One, N.A.,*
196 S.W.3d 202 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) ...............49

*Austin Road Co. v. Pope,*
147 Tex. 430, 216 S.W.2d 563 (1949) ...............................................................21

*Bejjani v. TRC Servs., Inc.,*
No. 14-08-00750-CV, 2009 WL 3856924 (Tex. App.—Houston [14th
Dist.] Nov. 19, 2009, no pet.) ............................................................................57

*Bonniwell v. Beech Aircraft Corp.,*
663 S.W.2d 816 (Tex.1984)................................................................................48

*Bradshaw v. Baylor University,*
126 Tex. 99, 84 S.W.2d 703 (1935) ...................................................................22

*Brewer & Pritchard, P.C. v. AMKO Res. Int'l, LLC,*
No. 14-13-00113-CV, 2014 WL 3512836 (Tex. App.—Houston [14th
Dist.] July 15, 2014, no pet.) (mem. op.)............................................................57

*Brewer v. Nationsbank of Texas, N.A.,*
28 S.W.3d 801 (Tex. App.—Corpus Christi 2000, no writ) ..............................58

*Brown v. Am. Transfer and Storage Co.,*
601 S.W.2d 931 (Tex. 1980) ..............................................................................33

*Buccaneer Homes of Alabama, Inc. v. Pelis,*
43 S.W.3d 586 (Tex. App.—Houston [1st Dist.] 2001, no pet.)........................37

*Buckner Orphans Home v. Berry,*
332 S.W.2d 771 (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.)....................26

MHDocs 6062453_7 12690.2

*Bullock v. Regular Veteran's Ass'n of U.S.*,
  806 S.W.2d 311 (Tex. App.—Austin 1991, no writ) ..........................................56

*Byer Custom Builders v. Franks*,
  389 S.W.3d 880 (Tex. App.—Houston [14 Dist.] 2012, no pet. hist.).........39, 43

*C.H. v. Dep't of Family & Protective Servs.*,
  No. 01-11-00385-CV, 2012 WL 586972 (Tex. App.—Houston [1st.
  Dist.] Feb. 23, 2012, pet. denied) (mem. op.).......................................................41

*City of Fort Worth v. Johnson*,
  388 S.W.2d 400 (Tex. 1964) ..............................................................................58

*Coleman v. United Savings Ass'n of Texas*,
  846 S.W.2d 128 (Tex. App.—Fort Worth 1993, no writ) ...................................51

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
  284 S.W.3d 851 (Tex. 2009) ..............................................................................42

*Crown Life Ins. Co. v. Casteel*,
  22 S.W.3d 378 (Tex. 2000)..................................................................24, 39, 49

*CTTI Priesmeyer, Inc. v. K&O Limited Partnership*,
  164 S.W.3d 675 (Tex. App.—Austin 2005, no pet.)....................................*passim*

*Dalworth Restoration, Inc. v. Rife-Marshall*,
  433 S.W.3d 773 (Tex. App.—Fort Worth 2014. pet. dism'd w.o.j.) .................58

*Deal v. Madison*,
  576 S.W.2d................................................................................................ 21-22

*Dick's Last Resort of West End, Inc. v. Market/Ross, Ltd.*,
  273 S.W.3d 905 (Tex. App.—Dallas 2008, pet. denied)....................................56

*Duncan v. Cessna Aircraft Co.*,
  665 S.W.2d 414 (Tex. 1984) ........................................................................*passim*

*El Paso Natural Gas Co. v. Berryman*,
  858 S.W.2d 362 (Tex. 1993) ..............................................................................50

*Energy Reserves Group v. Kansas Power & Light*,
  459 U.S. 400 (1983)...........................................................................................54

MHDocs 6062453_7 12690.2

*Export Worldwide, Ltd. v. Knight*,
No. SA 05 CA 647 XR, 2007 WL 628746 (W.D. Tex. Feb. 27, 2007) .............27

*Fairfield Insurance Co. v. Stephens Martin Paving, LP*,
246 S.W.3d 653 (Tex. 2004) ................................................................53

*First Title Co. of Waco v. Garrett*,
860 S.W.2d 74 (Tex. 1993)..................................................................24

*Fortenberry v. Cavanaugh*,
No. 03-07-00310-CV, 2008 WL 4997568 (Tex. App.—Austin Nov. 26,
2008, pet. denied) (mem. op.)................................................................61

*Galle, Inc. v. Pool*,
262 S.W.3d 564 (Tex. App.—Austin 2008, pet. denied) ............................. 28-29

*Gattegno v. The Parisian*,
53 S.W.2d 1005 (Tex. Comm'n App. 1932, holding approved)..................20, 22

*GE Capital Commercial Inc. v. Worthington Nat'l Bank*,
754 F.3d 297 (5th Cir. 2014) ....................................................*passim*

*Green v. Flournoy*,
No. 03-10-00299-CV, 2011 WL 3435735 (Tex. App.—Austin Aug. 5,
2011, no pet.) (mem. op.)....................................................................41

*Gym-N-1 Playgrounds, Inc. v. Snider*,
220 S.W.3d 905 (Tex. 2007) ...............................................................53

*Haygood v. DeEscabedo*,
356 S.W.3d 390 (Tex. 2012) ...............................................................33

*Hoffmann v. Dandurand*,
180 S.W.3d 340 (Tex. App.—Dallas 2005, no pet.) ...................................50

*Hudspeth v. Enter. Life Ins. Co.*,
358 S.W.3d 373..............................................................................49

*Hunt v. Ellisor & Tanner*,
739 S.W.2d 933 (Tex. App.—Dallas 1987, writ denied) ...................... 36-37, 43

*Hunter v. Fort Worth Capital Corp.*,
620 S.W.2d 547 (Tex. 1981) ...............................................................51

MHDocs 6062453_7 12690.2

*In re Sewell*,
   413 B.R. 562 (Bankr. E.D. Tex. 2009) ................................................26

*InvestIn.com v. Europa Int'l , Ltd.*,
   293 S.W.3d 819 (Tex. App.—Dallas 2009, pet. denied)...................27

*Jim Walters Homes v. Reed*,
   711 S.W.2d 617 (Tex. 1986) ...............................................................18

*K-Bar Servs., Inc. v. English*,
   No. 03-05-00076-CV, 2006 WL 903735 (Tex. App.—Austin Apr. 7,
   2006, no pet.) ......................................................................................27

*Landers v. East Texas Salt Water Disposal Co.*,
   151 Tex. 251, 248 S.W.2d 731 (1952) ........................................*passim*

*Langever v. Miller*,
   124 Tex. 80, 76 S.W.2d 1025 (1934) ..................................................54

*LJ Charter, LLC v. Air America Jet Charter, Inc.*,
   No. 14-08-00534-CV, 2009 WL 4794242 (Tex. App.—Houston [14th
   Dist.] Dec. 15, 2009, pet. denied) ...................................... 24, 26, 30-31

*Mancorp, Inc. v. Culpepper*,
   802 S.W.2d 226 (Tex. 1990) ...............................................................50

*McCarty v. Wani Venture, A.S.*,
   251 S.W.3d 573 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ...............57

*McClellan v. Scardello Ford, Inc.*,
   619 S.W.2d 593 (Tex. Civ. App.—Amarillo 1981, no writ)...........................26

*Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*,
   171 S.W.3d 727 (Tex. App.—Corpus Christi 2005, pet. denied) ......................46

*Medina v. Hart*,
   240 S.W.3d 16 (Tex. App.—Corpus Christi 2007, pet. denied) .......................38

*Merit Drilling Co. v. Honish*,
   715 S.W.2d 87 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) ................48

*Minn. Min. & Mfg. Co. v. Nishika*,
   953 S.W.2d 733 (Tex. 1997) ...............................................................41

MHDocs 6062453_7 12690.2

*OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*,
   234 S.W.3d 726 (Tex. App.—Dallas 2007, pet. denied)....................................31

*Osborne v. Jauregui*,
   252 S.W.3d 70 (Tex. App.—Austin 2008, pet. denied) ............................. 29-30

*Osterberg v. Peca*,
   12 S.W.3d 31 (Tex. 2000).................................................................................41

*Oyster Creek Fin. Corp. v. Richwood Investments II, Inc.*,
   176 S.W.3d 307 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ......... 49-50

*Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*,
   323 S.W.3d 203 (Tex. App.—El Paso 2010, pet. denied)..................................57

*Paschall v. Peevey*,
   813 S.W.2d 710 (Tex. App.—Austin 1991, writ denied)...................................49

*Pilgrim's Pride Corp. v. Smoak*,
   134 S.W.3d 880 (Tex. App.—Texarkana 2004, pet. denied)..............................46

*Price Pfister, Inc. v. Moore & Kimmey, Inc.*,
   48 S.W.3d 341 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)...............38

*Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*,
   336 S.W.3d 764 (Tex. App.—Houston [1st Dist.] 2011, no pet.)......................41

*RenewData Corp. v. eMag Solutions, LLC*,
   No. 03–05–00509–CV, 2009 WL 1255583 (Tex. App.—Austin May 6,
   2009, pet. denied)..............................................................................................57

*Robertson v. ADJ Partnership, Ltd.*,
   204 S.W.3d 484 (Tex. App.—Beaumont 2006, pet. denied) ................. 39, 43-44

*Shoemake v. Fogel*,
   826 S.W.3d 933 (Tex. 1992) .............................................................................24

*Snyder v. Eanes Indep. Sch. Dist.*,
   860 S.W.2d 692 (Tex. App.—Austin 1993, writ denied).................................35

*Stewart Title Guar. Co. v. Aiello*,
   941 S.W.2d 68 (Tex. 1997).........................................................................46, 60

MHDocs 6062453_7 12690.2

*Stewart Title Guar. Co. v. Sterling*,
    822 S.W.2d 1 (Tex. 1992).................................................24, 39, 58, 60

*Sugar Land Props., Inc. v. Becnel*,
    26 S.W.3d 113 (Tex. App.—Houston [1st Dist.] 2000, no pet.)........................57

*Sun Oil Co. v. Robicheaux*,
    23 S.W.2d 713 (Tex. Comm. App. 1930)......................................20, 22

*Szczepanik v. First S. Trust Co.*,
    883 S.W.2d 648 (Tex. 1994) ...............................................41

*Tesfa v. Stewart*,
    135 S.W.3d 272 (Tex. App.—Fort Worth 2004, pet. denied)..........................42

*Tex. & Pac. Ry. v. Levi & Bro.*,
    59 Tex. 674 (1883)........................................................33

*THPD, Inc. v. Cont'l Imports, Inc.*,
    260 S.W.3d 593 (Tex. App.—Austin 2008, no pet.)..............................41

*Tony Gullo Motors I, L.P. v. Chapa*,
    212 S.W.3d 299 (Tex. 2006) ...........................................46, 60

*Travelers Ins. Co. v. Joachim*,
    315 S.W.3d 860 (Tex. 2010) ..............................................31

*Western Technologies, Inc. v. All-American Golf Center, Inc.*,
    139 P.3d 858 (Nev. 2006)..................................................44

*White Budd VanNess P'ship v. Major-Gladys Drive Joint Venture*,
    798 S.W.2d 805 (Tex. App.—Beaumont 1990), *writ dism'd*, 811 S.W.2d
    541 (Tex. 1991), *cert. denied*, 502 U.S. 861 (1991).....................23, 37

*Wood Motor Co. v. Nebel*,
    150 Tex. 86, 238 S.W.2d 181 (1951) ......................................54

*Zidell v. Bird*,
    692 S.W.2d 550 (Tex. App.—Austin 1985, no writ) .........................26

MHDocs 6062453_7 12690.2

**STATUTES**

TEX. OCCUP. CODE §1051.701 ........................................................................35

TEX. CIV. PRAC. & REM. CODE §§32.001.....................................................50

TEX. CIV. PRAC. & REM. CODE §33.0001 et seq. .........................................48

TEX. CIV. PRAC. & REM. CODE §§33.002......................................................29

TEX. CIV. PRAC. & REM. CODE §33.012.............................................30, 50, 52

TEX. CIV. PRAC. & REM. CODE §33.013........................................................30

Chapter 38 of the Texas Civil Practice and Remedies Code..................................59

**OTHER AUTHORITIES**

Article 2212............................................................................................... 21-23

Hodges, *Contribution and Indemnity Among Tortfeasors*, 26 Tex. L. Rev.
150, 151 n.11 (1947)..........................................................................21

House Bill 4 ................................................................................................52

Senate Bill 890 ...........................................................................................52

TEX. R. CIV. P. 90.......................................................................................56

TEX. R. CIV. P. 94.................................................................................. 57-58

TEX. R. CIV. P. 278.....................................................................................56

Article I, §16 of the Texas Constitution ................................................5, 14, 53, 56

Wigmore, *Joint Tortfeasors and Severance of Damages: Making the
Innocent Party Suffer Without Redress*, 17 Ill. L. Rev. 458, 459) (1922)..........21

*Williston on Contracts*, §§ 36:1 .....................................................................26

## I.       STATEMENT OF THE CASE

This is a breach of contract case involving a local Courtyard by Marriott Hotel (the "Project"), located on East Ben White Boulevard, near Bergstrom International Airport. (CR187; App. A).[1] The foundation of the Project failed in numerous respects and resulted in varied injuries to the property, resulting in **$7,536,624.00** of claimed past, present, and future damages. (7RR48; 9RR123-124, 136; 7RR16-18, 26-39; 3RR133-136; PX-151, 16RR1-1145; 10RR29-31). As the original owner's successor in interest and assignee, RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC ("RLJ" collectively),[2] alleged that the general contractor, EBCO General Contractor, Ltd. (the "General Contractor"), the geotechnical engineer, Terracon Consultants, Inc. (the "Soils Engineer"), and the architect, Elness, Swenson, Graham, Inc. (the "Architect") failed to perform as specifically and individually promised in three separate and independent contracts. (CR184-218; App. A).

After the trial court entered rulings on various pre-trial motions, the only claims being prosecuted were for breach of contract against the Architect, the General Contractor, and the Soils Engineer. (CR1057-62; 1063-64; 1083-84; CR1708-1710). The Soils Engineer settled its contractual liability with RLJ before

---

[1] The Clerk's Record is cited as "CR"; First Supplemental Clerk's Record as "1SCR"; Second Supplemental Clerk's Record as "2SCR"; Third Supplemental Clerk's Record as "3SCR".
[2] White Lodging Services Corporation, Inc. "assigned the contracts and causes of action in this lawsuit to the RLJ Plaintiffs in this case." (CR1124; App. B.)

1

trial. (CR1080-81; CR1710). The General Contractor settled during trial. (7RR105-108; CR1710).[3] Trial proceeded on RLJ's breach of contract claim against the Architect.

The jury found that the Architect "fail[ed] to comply with the Architectural Contract regarding the structural engineering services required by the contract" in answer to Question 2 (the "Structural Engineering Question") (CR1126; App. B). The jury then determined the amount that would reasonably compensate for damages "that resulted from [the Architect's] failure to comply with the Architectural Contract" as found in the Structural Engineering Question. (CR1125-27; App. B). The total amount of damages found by the jury was $700,000 for the difference in value from the hotel as constructed and the value had the Architect complied with the Architectural Contract, $70,000 for the cost of barrier remediation resulting from the Architect's failure to comply, and $15,000 for the reasonable and necessary cost of repairs to the hotel due to the Architect's failure to comply. (*Id.*)

After trial, the Architect moved for credit under the "one satisfaction rule" for sums the General Contractor and the Soils Engineer ("Settling Defendants" collectively) paid in settlement of the contract claims against them. (CR1173-1228). The trial court deemed the credit applicable because it concluded the

---

[3] The Reporter's Record is cited by "[*Volume Number*]RR." Exhibits are cited to page or pages of the Reporter's Record on which they or the pertinent parts thereof appear.

MHDocs 6062453_7 12690.2

damages were indivisible, despite the fact the court submitted and the jury found damages limited to those "that resulted from [the Architect's] failure to comply with the Architectural Contract **. . . ."** (CR1437-41; CR1127; App. B, C). Moreover, the trial court concluded that the absence of contractual joint and several liability did not render the one satisfaction rule inapplicable. (CR1437-41; App. C).

Applying the one satisfaction rule, the Court ordered that RLJ recover the from the Architect **$516,650.96**, which was the sum of the jury's award of **$785,000** as actual damages resulting from the Architect's breach of contract and the attorney's fee award of $901,650.96, less $1,170,000, which was the amount of the settlements of the Settling Defendants. (CR1711; App. D).

The parties agreed to try the attorney's fees to the court instead of the jury. RLJ presented evidence of its reasonable and necessary attorney's fees for asserting the contractual claims against the Architect, the General Contractor, and the Soils Engineer. (3SCR3-611; 2SCR1603-05). However, the trial court only awarded fees for the contractual claim against the Architect and rendered judgment according to its application of the one satisfaction rule and its segregation of attorney's fees. (CR1708-1712; App. D). The Architect timely filed its notice of appeal (CR1907-13) and RLJ timely perfected its cross-appeal (1SCR3-4).

MHDocs 6062453_7 12690.2

## II.    ISSUES PRESENTED

A.    Whether the trial court erred in applying the one satisfaction rule and thus reducing the damages found to have resulted from the specific breach of the Architectural Contract by the Architect by the amounts received in settlement for damages resulting from the breach of the different contractual duties owed by the Soils Engineer and the General Contractor (CR1173-79, 1437-41; 2SCR1578-97, 1637-1745) including but not limited to the following sub-issues:

1.    Whether, in addition to an indivisible injury, joint and several liability is required for application of the one satisfaction rule, and, if so, whether the liable and settling parties must have contracted for the same performance to deem a contractual liability joint and several?

2.    Whether the one satisfaction rule does not apply due to the absence of an "indivisible injury" because: (a) the damages found by the jury were specifically limited to those caused by the contractual breach of the non-settling defendant; (b) the non-settling defendant in its closing argument advised the jury that it should not include damages it deemed attributable to the Settling Defendants; or (c) both?

3.    Whether the one satisfaction rule does not apply unless the liability of the non-settling defendant is based on a non-contractual theory?

4

4. Whether application of the one satisfaction rule violates article I, §16 of the Texas Constitution guaranteeing freedom of contract by depriving a party of the benefit of a contractual agreement with another and applying those benefits to offset the liability of a third-party?

5. Whether the Architect waived the right to seek application of the one satisfaction rule by any one or more of the following: (a) failing to specially except to a lack of settlement allocation; (b) failing to plead the rule as an affirmative defense, (c) inviting the jury to exclude from its damage finding damages caused by the Settling Defendants; or (d)failing to object to a jury question that permitted the jury to only find damages attributable to the Architect's breach of contract?

B. *Either* if there was a joint and several contractual liability between the Architect and the Settling Defendants *or* if the damages were awarded for an indivisible injury, whether the trial court erred in refusing to award RLJ reasonable and necessary attorney's fees incurred in the presentation of the breach of contract claims against the Architect, the General Contractor and the Soils Engineer and in awarding those fees attributable only to the presentation of the claim against the Architect? (3SCR3-611; 2SCR1603-05, 1600-01, 1711).

MHDocs 6062453_7 12690.2

## III.   STATEMENT OF FACTS

The record in this case does not support the application of the one satisfaction offset against the damages found caused by the Architect. First, the evidence shows separate contractual duties, not common or overlapping duties. Thus, there is no basis for joint and several liability, a sine qua non for application of the one satisfaction rule. Second, the jury, in answer to Question 3, determined the damages caused by the Architect. The jury did not find an indivisible amount of damages caused by the settling defendants and the Architect. Third, the Architect invited the jury to reduce the damages finding based on damages caused by the settling defendants. Indeed, the Architect did not raise the issue of one satisfaction until after the trial, failing to plead it, specially except regarding it, and failing to object to either the omission of a segregated damages question or to Question 3, which focused on damages caused by the Architect only. Finally, Question 3 and the record show that the jury reduced the amount of damages it awarded resulting from the Architect's breach to remove amounts caused by the non-settling parties. Thus, the record shows that recovery of the full amount awarded in answer to Question 3 did not present even the possibility of a double recovery or more than one satisfaction.

Having suffered over $7 million in damages, receiving settlement funds of $1,170,000 for the damages caused by the breaches by the General Contractor and

6

Soils Engineer, plus the jury award of $785,000 for the damages caused by the Architect, certainly would not amount to more than one satisfaction. Indeed, despite three contracts for millions of dollars and separate and distinct promised performances, RLJ received a building with serious deficiencies that have caused loss and will continue to do so. Yet, RLJ is forced to accept the Architect benefiting from the other's breaches of contract to which it was not a party by receiving two damage reductions or offsets: one by the limited damage inquiry in the jury charge and a second from the application of the one satisfaction rule.

## A.     Separate Contracts With Separate and Distinct Promised Performances on the Project.

The contracts with the Architect, the General Contractor, and the Soils Engineer did not promise the same performance.

- The Soils Engineer agreed to assess site conditions and recommend specific foundation design parameters based on the same. (PX-3; 12RR6-11; 3RR161; App. E).

- The General Contractor agreed to build the structure designed by the Architect with the assistance of its Structural Engineer, and comply with the plans and specifications of the Project. (PX-48; 12RR569-75; App. F).

- The Architect, with the assistance of its Structural Engineer, agreed to prepare an appropriate foundation plan. (PX-15; 12RR30, 35, 47, 49; App. G).

The Architectural Contract (PX-15; 12RR26-77; App. G) provided, among other things, that the Architect's design services "include normal structural,

mechanical and electrical engineering" (12RR39) along with "[s]tructural [e]ngineering design, document preparation and coordination" through "[o]ur Structural Engineering firm...Marlin Bridges Associates, Inc." (12RR47). In conjunction with its retained Structural Engineer (PX-15; 12RR28), the Architect promised to provide a foundation design for the Project. (PX-15; 12RR30, 35, 47, 49; PX-13; 12RR17-25).

The original owner White Lodging Services Corporation, Inc. contracted for the services of the Soils Engineer to provide "geotechnical services" including evaluating soil conditions and providing recommendations which would address "[f]oundation design and construction." (PX-3; 12RR6-11; App. E). This information was to be supplied to the Architect and its Structural Engineer in connection with the Project's foundation design. (PX-15; 12RR48; App. G).

The original owner also separately contracted with the General Contractor to build the Project according to the Architect's plans and specifications. (PX-48; 12RR569-75; App. F). The General Contractor agreed "that materials and equipment furnished will be of good quality[,]…that the work will be free from defect…and will conform to the requirements" (PX-48; 12RR616; App. F) of the Architect's plans and specifications. (PX-48; 12RR610-11).

After the construction was completed, the Project was found to have cracks in the slab and grade, shifting door frames, cracks in partition walls, cracks in the

MHDocs 6062453_7 12690.2

swimming pool, and perimeter drainage problems. (3RR118; 4RR78-79; 7RR47).

Investigation revealed that the Project suffered from geotechnical engineering deficiencies, foundation design defects, and construction defects (DX-147; 17RR514; 7RR49-62), in breach of the separate contractual duties undertaken by the Architect, the General Contractor, and the Soils Engineer.

**B.      Separate and Distinct Acts and Omissions Breaching Separate and Distinct Contractual Obligations.**

The Soils Engineer allegedly breached its contract by, among other things, failing to account for the amount of necessary site excavation. This breach resulted in soil expansion greater than the estimate in the Soils Engineer's report. (CR192-93, 197-98, 200-01, 209-12). The Soils Engineer miscalculated the potential vertical rise (PVR) of the soil and failed to recommend that enough of the soil be dug out and replaced with special engineered soil that did not have the expansive properties of the native soil, called "select fill." (DX-147; 17RR510).

The Architect breached its contract by failing to provide a foundation design that was adequate for the site. Specifically, the Architect's Structural Engineer improperly designed the foundation and other structures by, among other things, failing to account for the limitations and recommendations in the Soils Engineer's report, including designing a foundation insufficiently robust for the conditions reported by the Soils Engineer. (4RR122-124; 4RR150-151). The Architect's Structural Engineer further failed to follow the Soil Engineer's recommendations

concerning the appropriate type of foundation design. (4RR122-124; 4RR150-151).

The General Contractor was alleged to have failed to build according to the plans and specifications supplied and provide a building free from defects, contrary to its promised contractual performance. (CR188-89). Richard Reeves, a construction manager expert, testified concerning the General Contractor's specific construction omissions and defects, meaning that certain construction failed to comply with the plans and specifications provided by the Architect. (7RR49-62). These included:

- A missing foundation grade beam (7RR53-54),

- Reinforcement of the concrete slab with welded wire mesh lacking polypropylene fibers (7RR58),

- Unconnected and improperly constructed drains (7RR49-51, 55-58, 60-62),

- Improperly constructed "clean-out" access points to drains, sewer lines and vents that were covered with flooring and drywall (7RR51-53, 56-57), and

- Concrete overpours that improperly encased pipes in concrete. (7RR58-60).

Under Question 3 in the charge, the jury was asked to determine the amount of damages caused by the Architect, and thus it was allowed and indeed encouraged

MHDocs 6062453_7 12690.2

to reduce its damages award based on breaches of contract by the Settling Defendants. (CR1127; App. B).

**C.   Suit and Settlements By the Soils Engineer and the General Contractor.**

As the original owner's successor in interest and assignee, RLJ sued, among others, the Architect, the Soils Engineer, and the General Contractor for damages to the Project resulting from various breaches of contract that caused foundation and drainage problems. (CR188-218; App. A). Through pre-trial summary judgments and non-suits, the suit was confined as matter of law to RLJ's contract claims against the General Contractor, the Soils Engineer and the Architect. (CR1708, 1710; 2SCR42; App. D). Before trial, and after the trial court restricted the case to contract claims, the Soils Engineer settled the contract claim against it for $70,000. (CR1080-81; CR1710; App. D). During trial, RLJ settled its contract claims against the General Contractor for $1.1 million. (7RR105-08; CR1710, 1226; App. D). As noted, the evidence showed that the damages to the Project from all contractual breaches of the Architect and Settling Defendants was at least $7,536,224. (7RR48; 9RR123-124, 136; 7RR16-18, 26-39; 3RR133-136; PX-151, 16RR1-1145; 10RR29-31). During closing arguments, RLJ argued that only $6,029,299 in damages was attributable to the Architect, the rest being attributable to the Settling Defendants and other responsible parties. (10RR29-31). The Architect similarly argued that the portion of RLJ's damages attributable to the

MHDocs 6062453_7 12690.2

Architect was "zero," because the fault was attributable to other parties. (10RR54-56).

RLJ's contract claims against the Architect were then submitted to the jury. (CR1121-29; App. B). The jury found that the Architect breached its contract "by failing to comply … regarding the structural engineering services required." (CR1126; App. B). Finding that the Architect breached the Architectural Contract in response to the Structural Engineering Question, the jury awarded $785,000 in damages that resulted from the Architect's breach. (CR1125, 1127; App. B).

## D. The Trial Court Rules That the One Satisfaction Rule Applies.

Four days later, the Architect claimed for the first time a credit for the General Contractor's and Soils Engineer's settlements under the one satisfaction rule. (CR1173-79). After entertaining RLJ's response (2SCR1578-97), the trial court ruled that the one satisfaction rule applied solely because it deemed the claims against the Architect, the General Contractor, and the Soils Engineer all to be for one "indivisible injury." (CR1439). It presumed the General Contractor's and Soils Engineer's settlements were payment for the same injury for which the jury awarded damages against the Architect. (CR1438). The trial court further reasoned "RLJ needed to identify that category of [divisible] damages [against the

General Contractor] and state the amount apportioned to it."[4] (CR1438). RLJ sought reconsideration of the trial court's letter ruling via a Motion for Judgment (2SCR1606-1636) and a Motion for Reconsideration (2SCR1637-1745). The trial court denied both motions. (CR1905; 2SCR2102).

**E.      Attorney's Fees Allowed Only for Breach of Contract Claim Against the Architect.**

Per stipulation, RLJ submitted its attorney's fees claim for resolution by the court. The trial court's letter ruling suggested that RLJ was entitled to recover fees for presenting the contractual claims against the Architect, the General Contractor and the Soils Engineer. (CR1400; App. C). RLJ filed an amended application for those attorney's fees in the amount of $1,388,019. (3SCR3-611; 2SCR1603-05). The trial court, however, ultimately decided to award attorney's fees only for the breach of contract case against the Architect. (CR1711; App. D).

**F.      The Trial Court Renders Final Judgment.**

The trial court rendered judgment for RLJ in the principal sum of $551,650.96, being the difference between the sum of the damage and attorney's fees award against the Architect, less the sum of the settlements from the Settling Defendants. (CR1711; App. D).

---

[4] The trial court was not clear whether this identification needed to be contained in the settlement agreements themselves or be presented in the evidence to the jury. (CR1438). RLJ was not given the opportunity to segregate or apportion damages to satisfy the trial court's reasoning before the case was submitted to the jury.

MHDocs 6062453_7 12690.2

## IV.   SUMMARY OF ARGUMENT

### A.   The One Satisfaction Rule Does Not Apply.

The one satisfaction rule applies if, and only if, the liability of judgment debtor and settling defendants is joint and several. Indivisible injury alone is only sufficient to establish joint and several *tort*, not contractual, liability. If the one satisfaction rule applies at all, it applies in this case only if there is joint and several *contractual* liability. To have such liability, the Architect and the Settling Defendants must each have breached a promise to provide the same performance. Here, the promised performances were not the same, so the one satisfaction rule does not apply. Even if "indivisible" damages alone somehow is assumed arguendo to have created joint and several *contractual* liability, the jury's damages finding was limited to the damages resulting from the *Architect's* failure to comply. (CR1127; App. B).

Further, RLJ would urge that the one satisfaction rule simply should not apply in contract cases such as this. The one satisfaction rule was judicially created to address a problem created by a statute that only applied to tort liability. Applying it in contract cases deprives the injured party of the benefit of its settlement agreement and transfers that benefit to the wrongdoer in violation of the freedom of contract guaranteed by Texas Constitution article I, section 16.

MHDocs 6062453_7 12690.2

In any event, the Architect waived application of the one satisfaction rule. It failed to plead this affirmative defense, was guilty of laches in waiting until after the verdict to assert it, failed to object to the failure of the damages question to segregate damages as it contends should have been done, and argued for the apportionment of damages in its closing argument.

For all these reasons, as more fully articulated below, the trial court's decision to credit RLJ's settlement with the General Contractor and Soils Engineer to the damages the jury assessed against the Architect was erroneous. Accordingly, the judgment must be modified to restore the damages awarded to RLJ by the jury for the Architect's breach of contract.

**B.      RLJ Entitled To Attorney's Fees For the Presentation of the Breach of Contract Claims Against the Architect, General Contractor, and Soils Engineer *Either* If These Parties Shared a Joint and Several Contractual Duty *Or* If the Damages Were "Indivisible."**

If multiple defendants breached the *same* contractual duty, RLJ was entitled to recover attorney's fees for the presentation against all those defendants because the preparation and proof would have been necessary for the case against any one of them. RLJ maintains that the Architect and the Settling Defendants here did *not* breach contractual undertakings to perform the same duties and, therefore, there was no joint and several contractual liability among the Architect and the Settling Defendants. However, if this Court holds otherwise, then it necessarily follows that RLJ is entitled to recover its attorney's fees for cases against the Architect, the

15

General Contractor *and* the Soils Engineer because the same preparation and proof would have been necessary for the case against any one of them. If so, there was no need to limit the recoverable attorney's fees only to those attributable to the breach of contract case against the Architect.

The same is also true if the trial court correctly ruled that the damages for the Architect's breach were indivisible from those allegedly caused by the Settling Defendants. Again, RLJ maintains that the damages here were necessarily segregated by the nature of the damages question and under the arguments of the parties to the jury and presents this contention only if this Court determines that the one satisfaction rule applies.

## V.   ARGUMENT AND AUTHORITIES

The one satisfaction rule is intended under appropriate circumstances to prevent a plaintiff from receiving a double recovery. It was never been intended to be used to reduce damages found to have been *caused by the remaining defendant* by the amount of settlements entered with settling defendants. As applied in this case, the one satisfaction rule does not achieve the purpose of defeating a double recovery absent joint and several liability and indivisible damages. In fact, as applied, the rule violates Texas public policy encouraging settlement and the freedom to contract. The application here provides a strong disincentive to partial settlements, particularly in construction contract cases. In any event, the rule was

16

not timely and appropriately raised by the Architect through timely pleading, exceptions, objections to the charge, and indeed the Architect invited the jury to do its own reduction in answering the damages question prior to applying the one satisfaction rule.

## A.     The One Satisfaction Rule Does Not Apply.

The decision to apply the one satisfaction rule was erroneous for many reasons. First, the rule requires at a minimum joint and several liability of the defendants. Here, the Architect was tried only on a breach of contract theory. Joint and several liability is limited to tort law. There was no evidence here of a joint and common contractual duty among the settling defendants and the Architect. Second, the damages reduced by the trial court here were not so-called common or indivisible damages. Instead, the jury found only "damages that resulted from *[the Architect's] failure* to comply with the Architectural Contract . . . ." Finally, the record does not in any way support the notion that RLJ would be getting a double recovery absent application of the one satisfaction rule. The damages sought and as to which evidence was presented involved a claim of over $7 million. The jury was permitted and invited by counsel for the Architect to reduce its damage finding as to damages caused by others based on the fact the Court's charge required that the damages had to have resulted from the Architect's breach of contract. The jury is presumed to have read the charge and followed it. Thus, this is *not* a case of a

MHDocs 6062453_7 12690.2

double recovery; instead, with application of the settlements relating to separate contractual duties under the one satisfaction rule, it is the Architect who is unfairly receiving a double reduction.

### 1. This Case Involves *Contractual*, Not Tort, Liability.

Because of pre-trial rulings and non-suits, the only claims pending before trial were RLJ's contract claims against the General Contractor, the Soils Engineer and the Architect. (CR1708,1710; 2SCR42; App. D). Before trial, RLJ settled with the Soils Engineer for $70,000. (CR1080-81; CR1710; App. D). During trial, RLJ settled with the General Contractor for $1.1 million. (7RR105-08l; CR1226, 1710; App. D). Only RLJ's contract claims against the Architect were submitted to the jury.

Not only was the Architect's liability purely contractual, the damages sought were only recoverable in contract. (CR1127; App. B). The alleged harm was economic loss to the subject of the contract itself – i.e., the Project. "When the injury is only the economic loss to the subject of a contract itself, the action sounds in *contract* alone." *Jim Walters Homes v. Reed*, 711 S.W.2d 617, 617-18 (Tex. 1986).

After trial, the Architect asserted for the first time it was entitled to credit under the one satisfaction rule for the Settling Defendants' settlements. (CR1173-1179). The trial court agreed (CR1710; 1437-41; App. C, D), conflating the *tort*

18

joint and several liability with contract. According to the trial court, "Each party is liable for its own [contractual] breach which by itself results in indivisible damages[, *j*]*ust as with tortfeasors* who breach different common law duties that each proximately cause an indivisible damage." (CR1439; App. C; emphasis added).

>   **2.    The One Satisfaction Rule Was Developed to Address Settlements In Tort Cases With Less Than All Defendants After the Legislature Authorized Joint and Several Liability.**

More than sixty years ago, the Texas Supreme Court deemed the risk of a double recovery no justification for depriving a plaintiff of a favorable settlement.

> [O]ur courts seem to have embraced the philosophy … that it is better that the injured party lose all of his damages than that any of several wrongdoers should pay more of the damages than he individually and separately caused. *If such has been the law, from the standpoint of justice it should not have been ….*

*Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (1952) (emphasis added). Fully understanding when the one satisfaction rule should and should not apply requires an appreciation of its history and why it was created in the first place.

The one satisfaction rule was developed to correct a statutorily-created anomaly. In the early Twentieth Century, the Legislature attempted to alleviate the harshness of the common law prohibition of contribution claims by creating a contribution cause of action against other tortfeasors when a defendant was held

MHDocs 6062453_7 12690.2

liable for more than its *per capita* share of liability. But the statute did not address what happened if the plaintiff settled with one of the other defendants. The courts responded by creating the one satisfaction rule. If a defendant is subject to liability through joint and several liability for more than the damages he or she caused, a settlement by that defendant involves something that overlaps with a remaining non-settling joint and several defendant, thus allowing consideration of double recovery issues. Therefore, outside the context of joint and several tort liability, there is no other recognized justification for imposing the one satisfaction rule.

### a. Generally There Was No Joint & Several Tort Liability at Common Law.

At common law, a tort suit could not be asserted against multiple defendants for damages to which each defendant contributed *unless the defendants acted according to a common plan or scheme*. *Sun Oil Co. v. Robicheaux*, 23 S.W.2d 713, 715 (Tex. Comm. App. 1930) (judgment adopted). Otherwise, there could be no joint tort liability. Instead, the plaintiff had to sue each defendant separately and establish that particular part of the injury that particular defendant caused. *Id.*

### b. There Was No General Right of Contribution at Common Law.

Also, defendants were not permitted a right of contribution generally under Texas common law. *Gattegno v. The Parisian*, 53 S.W.2d 1005, 1007 (Tex. Comm'n App. 1932, holding approved). It was "against the policy of the law to

20

adjust equities between wrongdoers, or to allow a [liable] person to found an action on his own wrong." *Austin Road Co. v. Pope*, 147 Tex. 430, 216 S.W.2d 563, 564-65 (1949).

### c. Statute Allowed Collection of All Damages From Any Defendant and Gave Defendant the Right to Contribution from the Other Tortfeasors, But Fails to Address Settlement With Less Than All Tortfeasors.

The Legislature passed article 2212 (now Texas Civil Practice & Remedies Code chapter 32) to change these two perceived deficiencies. First, article 2212 allowed a tort defendant to be liable for all damages even if the common result of multiple actors' independent torts. A plaintiff no longer bore the "intolerable burden" of proving particular damages attributable to a particular tort defendant in common injury cases. Hodges, *Contribution and Indemnity Among Tortfeasors*, 26 Tex. L. Rev. 150, 151 n.11 (1947); Wigmore, *Joint Tortfeasors and Severance of Damages: Making the Innocent Party Suffer Without Redress*, 17 Ill. L. Rev. 458, 459 (1922). Instead, the plaintiff could recover all tort damages from a single defendant. *Deal v. Madison*, 576 S.W.2d at 414.

Article 2212 also created a right of action so that the defendant who was held liable for the total common damages and, thereby, paid more than its *per capita*[5] share of the total tort liability could sue to collect the excess payment from

---

[5] At the time, liability was established by judgment and statutorily allocated equally among joint tortfeasors so the amount of potential contribution liability was fixed. Accordingly, there was no need to plead the one satisfaction rule. The rules concerning contribution are today vastly

21

the other jointly liable defendants. *Id.*; Hodges, 26 Tex. L. Rev. at 151 n.11. Article

2212, however, made no provision for cases in which fewer than all tortfeasors

settled. *Deal*, 576 S.W.2d at 414. (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.).

To address a situation unique to *tort* claims involving defendants *jointly and

severally liable* for common injuries from independent torts, the courts created the

one satisfaction rule. Under it, a plaintiff who settled with less than all tortfeasors

for more than the settlors' share of damages could not recover from the non-

settling tortfeasors more than the difference between total damages and the sum of

all settlements. Hodges, 26 Texas L. Rev. at 171-72; *see Gattegno*, 53 S.W.2d at

1007; *Bradshaw v. Baylor University*, 126 Tex. 99, 84 S.W.2d 703, 705 (1935).

### d.     The One Satisfaction Rule Was Designed to Address Joint and Several Liability In Tort Cases Only.

After the one satisfaction rule was adopted, the Texas Supreme Court

abolished the common-law rule in *Robicheaux*, 23 S.W.2d at 715, that prevented

joining multiple defendants in a single suit to impose joint and several liability for

independent torts. In *Landers v. East Texas Salt Water Disposal Co.*, the court

ruled that when

> tortious acts of *two or more wrongdoers join to produce an indivisible
> injury*, that is, an injury which from its nature cannot be apportioned
> with reasonable certainty to the individual wrongdoers, *all of the
> wrongdoers will be held jointly and severally liable for the entire*

---

different, but cases continue, we would respectfully submit, to incorrectly recite that it is
unnecessary to plead the one satisfaction rule though the reason why no longer exists.

MHDocs 6062453_7 12690.2

*damages* and the injured party may proceed to judgment against any one separately or against all in one suit. If fewer than the whole number of wrongdoers are joined as defendants to plaintiff's suit, those joined may by proper cross action under the governing rules bring in those omitted.

248 S.W.2d at 734 (emphasis added). *Landers* abolished *Robicheaux*'s concerted action requirement for establishing joint and several *tort* liability. Under *Landers*, indivisible injury *alone* was enough ***in tort cases*** to establish joint and several liability. A party had to be jointly and severally liable for the entire damages, not just its share. Thus, when that party settled, they theoretically could have settled for more than just their individual liability for just the damages they caused. Accordingly, in that setting, the plaintiff had the opportunity to ultimately settle with multiple defendants for an amount greater than the plaintiff's overall injury.

### 3. The One Satisfaction Rule Only Applies In Cases Involving *Joint* Liability.

The one satisfaction rule's historical development demonstrates it was intended to address a problem unique to settlements with less than all jointly and severally liable defendants in *tort* cases – the only cases to which article 2212 applied. Even assuming for the sake of argument that the one satisfaction rule applies in a contract case, which RLJ disputes, the one satisfaction rule does not apply unless the liability of the liable defendant and the settling defendant is joint and several. *GE Capital Commercial Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 306 (5th Cir. 2014); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex.

23

2000); *First Title Co. of Waco v. Garrett*, 860 S.W.2d 74, 78 (Tex. 1993); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1992); *CTTI Priesmeyer, Inc. v. K&O Limited Partnership*, 164 S.W.3d 675, 684 (Tex. App.—Austin 2005, no pet.); *LJ Charter, LLC v. Air America Jet Charter, Inc.*, No. 14-08-00534-CV, 2009 WL 4794242 at *9 (Tex. App.—Houston [14th Dist.] Dec. 15, 2009, pet. denied). Joint and several liability is essential, *Garrett*, 860 S.W.2d at 79; *Sterling*, 822 S.W.2d at 8, because the contribution right is *derivative* of the plaintiff's right to recover from the contribution defendant. *Shoemake v. Fogel*, 826 S.W.3d 933, 935 (Tex. 1992). A non-settling defendant may successfully urge the one satisfaction rule *only* to reduce damages for which all the defendants are jointly liable. *Casteel*, 22 S.W.3d at 391; *Garrett*, 860 S.W.2d at 78. In other words, if the plaintiff could not impose joint and several liability, it would have no right to sue for damages other than those caused by a particular defendant. Accordingly, a non-settling defendant would have no right to seek an offset or credit from a settling defendant since the plaintiff had no right to do so against the settling defendant or the non-settling defendant.

Just last summer, the Fifth Circuit was persuaded by *Garrett*, *Sterling*, and this Court's reasoning in *CTTI* that joint and several liability was essential to the application of the one satisfaction rule. *GE Capital*, 754 F.3d at 306. The suit arose when a predecessor's employee fraudulently induced wire transfers to a bank that

24

accepted them in bad faith in violation of a Texas statute. GE Capital sued the predecessor for contractual remedies under the purchase and sale agreement and sued the bank for statutory tort. *Id*. at 300. GE Capital settled its contractual claims with the predecessor, but successfully tried the statutory tort claim against the bank. *Id*. at 301. The bank asserted the one satisfaction rule applied and GE Capital should recover nothing because its contract damages were for the same loss settled by the bank. *Id*. at 303.

The Fifth Circuit held there was no legal duty shared by the settling and liable defendants and, therefore, the one satisfaction rule did not apply. *Id*. at 306-07, 309. *A common factual origin for the damages claimed against the settling and liable defendants was not enough*.

> [The settling defendant's] alleged contractual breach and the TUFTA action against [the liable defendant] may share common underlying facts – the three fraudulent transfers …. But such factual commonality does not suffice … *to render [the settling defendant] a joint tortfeasor for one-satisfaction rule purposes*.

*Id*. at 309 (emphasis added). The Fifth Circuit agreed with *CTTI*'s analysis that the one satisfaction rule did not apply in any case where the duty allegedly breached by the liable and settling defendants was not the same. *Id*. at 306-07.

### a. Unlike Tort Cases, Joint Liability in Contract Cases Requires More Than Common, Indivisible Damages.

Tort duties are universal; contractual duties are not. *Landers* implicitly recognized the joint duty requirement would necessarily be satisfied in tort cases so that joint and several *tort* liability need only focus on existence of a common,

25

indivisible injury. 248 S.W.2d at 734. For purposes of *tort* liability, "the law imposes on all persons a duty to act as a reasonably prudent person would act under same or similar circumstances, considering any reasonably foreseeable risks or probability of injury to others." *Zidell v. Bird*, 692 S.W.2d 550, 553 (Tex. App.—Austin 1985, no writ).

Undertakings in a contract, however, are binding only on the contracting parties and their privies. *McClellan v. Scardello Ford, Inc.*, 619 S.W.2d 593, 597 (Tex. Civ. App.—Amarillo 1981, no writ); *Buckner Orphans Home v. Berry*, 332 S.W.2d 771, 776 (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.). Thus, joint and several *contractual* liability requires *more* than indivisible injury. It also requires that the parties separately ***promise the same performance***,[6] whether under the same or separate contracts. 12 Richard A. Lord, *Williston on Contracts*, §§ 36:1; *In re Sewell*, 413 B.R. 562, 568 n.5 (Bankr. E.D. Tex. 2009); *CTTI*, 164 S.W.3d at 679, 684 (joint and several contractual liability under separate contracts requires promise of the same performance); *LJ Charter*, 2009 WL 4794242 at *9. But not all undertakings for the same performance are necessarily joint.

> Under the common law doctrine of joint, joint and several, and several obligations in a contract, the question is whether multiple promisors of the same performance have promised as a unit (jointly), or have

---

[6] Whether the performance promised by the both parties must be *exactly* the same for the liability to be joint is not an issue that need be resolved here. As will be discussed in greater detail below, the Architect's deficient performance concerned obligations that were not and could not lawfully have been undertaken by others.

26

promised the same performance separately (severally), or both as a unit and separately (jointly and severally).… *The problem does not arise, however, unless the promises relate to the same performance*.

*InvestIn.com v. Europa Int'l , Ltd.*, 293 S.W.3d 819, 828 (Tex. App.—Dallas 2009, pet. denied); *accord K-Bar Servs., Inc. v. English*, No. 03-05-00076-CV, 2006 WL 903735 at *3 (Tex. App.—Austin Apr. 7, 2006, no pet.).

In other words, to be jointly liable under contract, the parties must effectively promise the same performance. *Export Worldwide, Ltd. v. Knight*, No. SA 05 CA 647 XR, 2007 WL 628746 (W.D. Tex. Feb. 27, 2007) (joint promises); *InvestIN.com Corp.*, 293 S.W.3d at 829; *English*, 2006 WL 903735 at *3.

The Texas Supreme Court has not yet decided whether joint and several liability is necessary for application of the one satisfaction rule to a *contractual* liability. *GE Capital*, 754 F.3d at 305. This and other courts, however, have concluded that it does not apply unless both the liable and settling defendants' alleged liability arises out of the breach of a common contractual duty.

Like this case, *CTTI* involved a contract suit by an owner against the architect and general contractor for a new building's foundation defects. 164 S.W.3d at 679. The *CTTI* architect's contract required design and "supervisory services." 164 S.W.3d at 685. A separate contract required CTTI, the general contractor, to build according to the architect's plans and specifications. 164

27

S.W.3d at 678. Before trial, the owner settled with several parties involved in the building's construction and settled with the architect during trial. *Id.*

After the jury returned its verdict, the general contractor sought to have its contractual liability reduced by the other defendants' settlement payments. *Id.* at 680. After carefully reviewing Texas Supreme Court authorities, this Court held the one satisfaction rule inapplicable unless the liable and settling defendants ***breached the same contractual duty***. *Id.* at 685. It concluded the architect's and general contractor's promised performances differed so that the one satisfaction rule did not apply. *Id.*

Necessity of a joint liability is also illustrated by this Court's decision in *Galle, Inc. v. Pool*, 262 S.W.3d 564, 574 (Tex. App.—Austin 2008, pet. denied). *Galle* involved a suit by an insured homeowner against his insurer and a mold remediator, alleging contractual and tort liabilities against both. *Id.* at 568, 570. The homeowner settled all claims against the insurer before trial. *Id.* at 569. Post-verdict, the homeowner elected to recover in tort against the remediator. *Id.* at 570. The remediator claimed a credit for the insurer's settlement because the damages allegedly caused by the insurer and the remediator were indivisible. Implicitly recognizing indivisible injury alone is sufficient for the joint and several tort liability under *Landers,* this Court held the one satisfaction rule applied. It further ruled that the entire amount of the insurer's settlement must be credited against the

28

tort damages because the plaintiff did not segregate the settlement between "separate and joint damages" or between the tort and contractual liability theories. *Id*. at 574.

*Osborne v. Jauregui*, 252 S.W.3d 70, 74 (Tex. App.—Austin 2008, pet. denied), presented the obverse situation to *Galle*. In *Osborne*, it was the liable defendant, not the settling defendant, who allegedly had a contractual liability in addition to joint tort and DTPA liability with the settling defendants. *See also GE Capital*, 754 F.3d at 307 n.9. The *Osborne* jury found *no liability for breach of contract,* only for negligence and breaches of implied warranties actionable under the DTPA. 252 S.W.3d at 74. Because the case involved alleged DTPA claims, unlike the verdict in *Galle*, the jury determined the percentage responsibility of the liable and settling defendants. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE §§33.002 (proportionate responsibility applicable to "any action brought under the DTPA"); 33.012 (under 2005 version, defendant had option of percentage reduction or dollar credit for settlement). The jury also decided the ***total amount of the plaintiff's damages attributable to both the liable and settling defendant*** in an amount less than the amount paid by the settling defendants. The liable defendant elected the dollar-for-dollar credit which more than offset the total amount of damages awarded by the jury. The plaintiff apparently elected to recover under the DTPA because the issue before the court was whether attorney's fees could be recovered

29

when the total amount of settlement exceeded the amount of the total damages awarded by the jury for the injuries caused by both the liable and settling defendants. *Id.* at 75-76.

Thus, *Osborne* is a straightforward application of Civil Practice and Remedies Code chapter 33 to a case to which it explicitly applies: a DTPA/tort claim for which the liable and settling defendants were jointly liable involving an injury this Court deemed indivisible. ***The joint and several liability in that case was created by statute, not common law.*** TEX. CIV. PRAC. & REM. CODE §33.013, and the amount of damages awarded in that case were for the amount of damages caused by all responsible persons. TEX. CIV. PRAC. & REM. CODE §33.012.

The distinctions between *Osborne* and this case are manifold. Here, there was no joint and several tort liability. Indeed, there was no joint and several liability of any description. *See* V.A.3.e., *infra*. Further, the damages awarded in *Osborne* were those found to have been caused by both the liable and settling defendants. Here, the damages awarded were explicitly limited to those caused by the Architect. *See* V.A.4., *infra*. Nevertheless, this Court's decision in *Osborne* confirms that the application of either a common law or statutory credit for settlement hinges on joint and several liability.

Four years after *CTTI*, the Houston Fourteenth Court of Appeals also refused to apply the one satisfaction rule absent a shared contractual duty. In *LJ Charter*,

No. 14-08-00534-CV, 2009 WL 4794242 at **8-9 (Tex. App.—Houston [14th Dist.] Dec. 15, 2009, pet. denied), the plaintiff received a judgment against the liable defendant for damages for breach of contract, breach of fiduciary duty and fraud. *Id.* at *6 n.12. The plaintiff previously settled claims for the alleged breach of two contracts by two other parties. The liable defendant was not a party to either of the contracts that were the basis of the settled claims. *Id.* at 9. The court refused the liable defendant's request for credit under the one satisfaction rule because the liable defendant was not a party to, and could not have been liable under, those contracts. *Id. When there was no joint liability, the one satisfaction rule did not apply*.

> **b.** **Without a Joint Contractual Obligation, Settlement Credit Under the One Satisfaction Rule Allowed the Architect to Do Indirectly What It Could Not Do Directly.**

*CTTI* correctly observed if an indivisible injury alone created a joint and several liability between contract and tort defendants, applying the one satisfaction rule would permit "hold[ing] a person not a party to a contract liable for the breach of that contract." *Id.* at 685. Such result is legally impermissible because contractual privity is necessary for standing to sue. *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.*, 234 S.W.3d 726, 738 (Tex. App.—Dallas 2007, pet. denied). Standing to sue is essential to subject-matter jurisdiction. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 865 (Tex. 2010). No privity of contract exists

31

between persons not parties to the same contract without promises of the same performance. *See Amco Trust, Inc. v. Naylor*, 159 Tex. 146, 150, 317 S.W.2d 47, 50 (1958).

Under these circumstances, a contractually liable defendant who shared no contractual obligation would have no standing to recover from the settling defendant. The liable defendant is a stranger to the contract between the plaintiff and the settling defendant. If credit under the one satisfaction rule were permitted absent a shared performance obligation, the liable defendant could achieve indirectly what could not have been achieved directly; a stranger without privity could in effect wrest a credit based on settlement of that contractual obligation. Regardless of whether the injury was "indivisible," the one satisfaction rule could not apply without a common promise to perform the same contractual duty. *Id.* at 684.

### c. This Court Has Rejected Application of the One Satisfaction Rule to Contractual Liability Without a Joint Contractual Obligation.

The trial court in this case applied the one satisfaction rule solely on the basis of perceived "indivisible" damages. (CR1438-39). In *CTTI*, this Court:

> acknowledge[d] that there are cases in which the courts have applied the one satisfaction rule and granted settlement credits or required an election of remedies ***where there are co-existing tort and contract claims***. . . .In those cases, *the courts have focused on the indivisible nature of the injury to the plaintiffs, and **have not discussed the requirement of joint liability. We find that focus to be misplaced and***

32

*decline to follow those decisions*.… If we were to hold that, due to the indivisible nature of the resulting injury, breach of contract defendants and tort defendants are jointly and severally liable for all damages, *we would be forced to hold a person not a party to a contract liable for the breach of that contract*.

(164 S.W.3d at 684-85; emphasis added). The same rationale applies when the liable and settling defendants' liability rests on distinct contractual obligations under different contracts. Therefore, the trial court erred in applying the one satisfaction credit based solely on perceived "indivisible" damages.

### d. Applying the One Satisfaction Rule Without Joint Contractual Liability Obliterates the Collateral Source Exception.

The collateral source rule is an exception to the one satisfaction rule. *Brown v. Am. Transfer and Storage Co*., 601 S.W.2d 931, 936 (Tex. 1980). If indivisible injury alone were enough for applying the one satisfaction rule, this exception would be meaningless. Under the collateral source rule, a wrongdoer cannot reduce its liability because of benefits the plaintiff independently procures from another to which the wrongdoer was not privy. *Haygood v. DeEscabedo*, 356 S.W.3d 390, 395 (Tex. 2012); *Tex. & Pac. Ry. v. Levi & Bro*., 59 Tex. 674 (1883). Typically, the collateral source is an insurer's contractual obligation to pay for all or part of same damages sought from the defendant. *Brown v. Am. Transfer & Storage Co*., 601 S.W.2d 931, 934 (Tex. 1980). If an indivisible injury or the "same damages" alone triggered the one satisfaction rule, such insurance benefits would serve to

reduce the liable defendant's liability and prevent a double recovery. Thus, the existence of the collateral source exception belies the notion that indivisible injury alone is sufficient for application of the one satisfaction rule. For this additional reason, a joint and several liability is essential for application of the one satisfaction rule to contractual liabilities.

### e. This Case Involved No Joint Contractual Liability of the Architect and the Settling Defendants.

Because joint and several contractual liability is essential, the question here narrows to whether the Architect's contractual liability was joint with that of the Settling Defendants; i.e., was the liability imposed on the Architect for the same contractual promise or promises also made by each Settling Defendant. As acknowledged in *CTTI*, the contractual obligations of an architect are distinct from those of a general contractor. 164 S.W.3d at 685. Only the Architect's contractual liability was submitted to the jury. (CR1125-26, 1708-10). There could be no common promised performance between the Architect and the Settling Defendants.

### 1) The Performance Could Not Be the Same by Operation of Law: General Contractors Legally Precluded From Preparing Plans & Specifications.

Neither the Soils Engineer nor the General Contractor in this case were a registered architect and were not retained to perform architectural duties. (PX-15; 12RR26-77; PX-48; 12RR569-75; App. F, G). As a matter of Texas law, the obligations of an architect cannot be undertaken by one who is not a registered

34

architect. TEX. OCCUP. CODE §1051.701. This statute is part of the contracts as if written in explicitly because the parties are conclusively presumed to know and contract with reference to existing law. *Snyder v. Eanes Indep. Sch. Dist.*, 860 S.W.2d 692, 697 (Tex. App.—Austin 1993, writ denied). By operation of law, therefore, the Architect's duties *were not and could not be* the same as those of the Settling Defendants.

### 2) The Performance of the Architect and the Settling Defendants Was Not Alleged To Be the Same.

According to the live portions of the petition on which the case was tried, the General Contractor "agreed to construct the Project free from defects" (2SCR44; App. A), but failed to do so. It was alleged the General Contractor did not comply with the Project's plans and specifications and contract documents, the promise to build free from defects, and the duty perform in a good and workmanlike manner. (2SCR43-44, 47; App. A).

RLJ alleged that the Soils Engineer[7] was retained by the owner to "conduct a geotechnical engineering study," provide "geotechnical engineering services," and "materials testing and construction inspection services." (2SCR45; App. A). RLJ alleged that the Soils Engineer breached these undertakings by failing to properly estimate the potential of the soil at the site for swelling and underestimating the

---

[7] Terracon, a settling defendant, was the successor-in-interest to HBC, a party to the Geotechnical Study Contract. (CR186; App. A).

amount of soil that needed to be replaced to control soil expansion. (2SCR66-67; App. A).

The allegations against the Architect, on the other hand, were that it agreed to "provide overall architectural, civil, and structural engineering design, document preparation, and coordination for the Project." (2SCR44; App. A). RLJ alleged the Architect "breached the Architectural Contract by deviating from the applicable standard of care, failing to produce design plans free from defects, and failing to properly administer the construction of the Project." (2SCR47; App. A).

The legal injury sustained when an architect breaches its contractual obligation to provide appropriate building plans and supervisory services is separate from that sustained when a general contractor fails to build in accordance with those plans and specifications. *Hunt v. Ellisor & Tanner*, 739 S.W.2d 933, 936, 938 (Tex. App.—Dallas 1987, writ denied). "The [architect's] obligation was non-construction; the general contractor's obligation was construction." *Hunt*, 739 S.W.2d at 938.

Because of the lack of a joint or common contractual undertaking, the court in *Hunt* ruled:

> [W]hen the situation is pure contract, the special issues ***should not include comparative causation*** [under the Uniform Comparative Fault Act]…[because] if the acts of others (whether wrongful or not) are contributing factors, *those others are not thereby joined with the defendant as having committed the breach* of the contract.

MHDocs 6062453_7 12690.2

(Emphasis added; *quoting* 5 A. Corbin, Corbin on Contracts §§ 999 n.21 & 999 - 1,000 (1964)). The court in *White Budd VanNess P'ship v. Major-Gladys Drive Joint Venture*, 798 S.W.2d 805, 819 (Tex. App.—Beaumont 1990), *writ dism'd*, 811 S.W.2d 541 (Tex. 1991), *cert. denied*, 502 U.S. 861 (1991), followed *Hunt*'s reasoning to conclude that want of joint liability prevented submission of comparative fault to reduce the architect's contractual liability. Under *Hunt* and *White Budd*, the architect's liability arose from the architect's unique contractual obligations, not a promise to perform the same duty as the general contractor. Just as there can be no comparative submission of a general contractor's fault, the one satisfaction rule cannot be invoked to reduce the Architect's liability with the General Contractor's settlement.

The same is true for the Architect's particular failings concerning the foundation design detailed in the certificate of merit. (2SCR60-61; App. A). The duty breached is the same if the evidence supporting the various causes of action is the same. *Buccaneer Homes of Alabama, Inc. v. Pelis*, 43 S.W.3d 586, 590 (Tex. App.—Houston [1st Dist.] 2001, no pet.). It is not the same if different evidence would be required to prove the breach. These included failing to follow the various recommendations and reports of the Soils Engineer. (2SCR61; App. A). Here, the promised performances of the Architect could not have been the same because the evidence necessary to prove the Architect's breach differed from that which would

MHDocs 6062453_7 12690.2

have been necessary to prove the alleged breaches of the Soils Engineer and the General Contractor. Thus, the claims settled were for breaches of *differing* and *separate* contractual duties from those of the Architect, both as a matter of fact and by operation of law.

### 3) The Architect Argued That Its Duty Was Different From Those of the Settling Defendants.

The Architect emphasized to the jury in closing arguments that the duties of the Architect and the other participants were different. The Architect urged the jury that it should not be found liable because the breaches of duties undertaken by others, not the Architect, caused the damage. The Architect argued it was not serving as an engineer or a general contractor. (10RR33-34). It essentially denied any common duty, arguing it could not second-guess the Soils Engineer's predictions about the potential vertical rise or provisions groundwater drainage at the Project. (10RR34-37). According to the Architect, the foundation design was "doomed from the start" due to the Soils Engineer's faulty performance. (10RR39). Such clear, deliberate and unequivocal assertions during closing arguments are judicial admissions foreclosing application of the one satisfaction rule. *See Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 349 (Tex. App.—Houston [14th Dist.] 2001, pet. denied); *see also Medina v. Hart*, 240 S.W.3d 16, 23 (Tex. App.—Corpus Christi 2007, pet. denied).

In summary, the Architect and Settling Defendants did not promise the same performance. Therefore, the one satisfaction rule does not apply because the contractual liability of the Architect and the Settling Defendants was not joint.

### 4. The One Satisfaction Rule Does Not Apply Because the Jury's Verdict Did Not Award Damages for an "Indivisible" Injury.

The one satisfaction rule also requires an indivisible injury common to the wrongdoing of the liable and settling defendants. *Sterling*, 822 S.W.2d at 7; *Landers*, 248 S.W.2d at 734. The one satisfaction rule is inapplicable in this case also because the damages were not for an "indivisible" injury as the trial court supposed. (2SCR1599-1600; App. C). "Under the one satisfaction rule, the non-settling defendant may only claim a credit based *on the damages* for which all tortfeasors are jointly liable." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 391 (Tex. 2000). Where the jury charge limits its inquiry to damages caused by the non-settling defendant, there is no basis for application of the one satisfaction rule. *Robertson v. ADJ Partnership, Ltd.*, 204 S.W.3d 484, 485 *(*Tex. App.—Beaumont 2006, pet. denied)*; accord Byer Custom Builders v. Franks*, 389 S.W.3d 880, 881 (Tex. App.—Houston [14 Dist.] 2012, no pet. hist.) (holding that because the finder of fact, an arbitrator, "did not award any damages against the non-settling defendant for any of the alleged damage he plaintiffs claimed was caused by the alleged settling defendant, there could be no violation of the one-satisfaction rule if

39

the [plaintiffs] received compensation on those claims from [the settling defendant].").

The jury was not asked to and did not assess damages to the Project as a whole. Rather it was asked to assess only those damages for the Architect's particular breach.

> What sum of money, if any, if paid now in cash, would *fairly and reasonably* compensate [RLJ] for its damages, if any, *that resulted from [the Architect's] failure to comply with the Architectural Contract that you found in answer to Question*[] 2 [concerning the required structural engineering services]?

(CR1127; App. B; emphasis added). The trial court acknowledged the narrow focus of this question in its letter ruling.

> The damage question in the Charge asked for damages "due to [the Architect's] failure to comply." The question had to ask specifically about damages resulting from [*the Architect's*] *failure* to inquire about cause-in-fact.

(2SCR1599; App. B; emphasis in original). Nevertheless, the trial court concluded specification of the particular party and contractual breach did "not mean, without more, that the damages found were divisible and attributable only to [the Architect]." (2SCR1599; App. B).

### a. The Charge Submitted Apportioned Damages.

The trial court's analysis is irreconcilable with the principle that, without a sufficient charge objection to the question's form, the effect of the answer is measured by the question actually asked, not the question that ought to have been

asked. *See THPD, Inc. v. Cont'l Imports, Inc.*, 260 S.W.3d 593, 608 (Tex. App.—

Austin 2008, no pet.); *see also Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

The Architect did not object to the damages question's form, and never objected

that the question was improperly limited to those damages caused by the

*Architect's* breach of *its own* contract. The Architect only complained there was no

legally and factually sufficient evidence to support a damage award.[8] (9RR140,

143-44, 153).

### 1) The Plain Language of the Question Asked Determines What the Jury Found.

Absent objection, whether the damages were necessarily attributable to the

Architect alone is governed by the plain meaning of the language in the question.

*See Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d

764, 788 (Tex. App.—Houston [1st Dist.] 2011, no pet.). This presumption applies

whenever the charge does not include a different definition. *C.H. v. Dep't of*

*Family & Protective Servs.*, No. 01-11-00385-CV, 2012 WL 586972, at *6 (Tex.

App.—Houston [1st. Dist.] Feb. 23, 2012, pet. denied) (mem. op.). When the

---

[8] This objection did not assert there was no evidence of allocation or segregation. (9RR153). If it had, the objection was meritless. Unsegregated damages evidence is legally sufficient evidence of segregated damages. *Minn. Min. & Mfg. Co. v. Nishika*, 953 S.W.2d 733, 739 (Tex. 1997). The factual insufficiency objection preserved nothing. *Green v. Flournoy*, No. 03-10-00299-CV, 2011 WL 3435735, at *4 (Tex. App.—Austin Aug. 5, 2011, no pet.) (mem. op.). Such complaints must be presented in a new trial motion. The court is required to submit charge questions on any issue if legally sufficient evidence supported an affirmative answer, *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994), even if the evidence was factually insufficient. The Architect filed no new trial motion.

MHDocs 6062453_7 12690.2

question limits the subject of the jury's consideration, the court must presume compliance unless the record shows otherwise. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 861-62 (Tex. 2009).

Under circumstances similar to those here, in *Tesfa v. Stewart*, 135 S.W.3d 272, 273 (Tex. App.—Fort Worth 2004, pet. denied), the court held that this presumption applied to discharge a segregation requirement when the question asked the amount of damages "for injuries prior to [plaintiff's] death, if any, that reasonably resulted from" the doctor's negligence. The case was one for medical malpractice case during treatment of auto accident injuries. The doctor did not object to the form of the question but nonetheless asserted the charge did not segregate damages caused in the auto collision from those caused by the alleged malpractice. *Id.* at 274. Finding nothing to rebut the presumption of compliance, the court held the jury's damages finding was "limited in accordance with the trial court's express instruction" and determined damages "for injuries attributable to Dr. Tesfa's negligence alone." *Id.* at 279.

> **2)    The Plain Language of the Question Limited Damages to Those Resulting from the Architect's "[F]ailure to [C]omply [W]ith the Architectural Contract."**

Concerning the effect of the damages finding, this case is indistinguishable from *Tesfa*. The damages question here clearly limited its inquiry to the Architect's "failure to comply with the Architectural Contract …." (CR1127; App. B).

MHDocs 6062453_7 12690.2

Similarly, in *Hunt*, 739 S.W.2d at 940, an owner sued an architect for design deficiencies and various contractors for construction defects in a parking deck. All but the Architect settled before trial. *Id.* at 935. The Architect claimed credit under the one satisfaction rule. The damages question was:

> What sum of money, if any, if paid now in cash will fully compensate [the owner] for any permanent diminution in market value of [the shopping center and office complex] which was *caused by the acts or omissions of the defendant(s)*, despite the completion of all reasonable repair procedures?

(*Id.*; emphasis in original). The Architect urged that the question permitted a double recovery because it included damages for the settled claims. *Id.* at 940. The court denied the credit because

> the jury compensated [the owner] *only for the separate wrong … by* [*the Architect's*] breach of []its duties …. [T]he consideration received under the prior settlement compensated [the owner] for acts and omissions of *others*…. [The Architect] was not a party to the settlement agreement. Therefore, the present case presents the situation where *each wrongdoer pays separately for its own acts or omissions*.

(*Id.*; emphasis added).

Similarly, in *Robertson v. ADJ Partnership, Ltd.*, 204 S.W.3d at 485, the court held that where the jury charge limits its inquiry to damages caused by the non-settling defendant, there is no basis for application of the one satisfaction rule. The same conclusion was reached in *Byer Custom Builders v. Franks*, 389 S.W.3d at 881. In that case, the finder of fact, an arbitrator, "did not award any damages

43

against the [non-settling defendant] for any of the alleged damage the [plaintiffs] claimed was caused by [the alleged settling defendant], there could be no violation of the one-satisfaction rule if the [plaintiffs] received compensation on those claims from [the settling defendant]."

Like the damages questions in *Tesfa, Hunt* and *Robertson*, the plain language of the damage question here removed any possibility the damages included those for breaches of a different contract or party. For this reason alone, there could have been no finding of damages common to those caused by the Settling Defendants.

Contrast these decisions with *Allan v. Nersesova*, 307 S.W.3d 564, 574 (Tex. App.—Dallas 2010, no pet.), penned by *CTTI*'s author. In *Nersesova*,

> the jury charge contained a *single damages question for damages "resulting from the occurrences in question."* The jury did not make separate damages findings for the negligence and breach-of-contract claims. [Plaintiff]'s injuries, as found by the jury, included the damage to her unit and personal property and the additional living expenses she incurred. [Plaintiff] alleged these injuries were caused by both the settling defendants and appellees. Nothing in the settlement agreement shows the settlement amount was for anything other than the damages found by the jury. If appellees were not given credit for the settlement, [the Plaintiff] would receive a double recovery for her injuries.

*Id.* (emphasis added); *accord Western Technologies, Inc. v. All-American Golf Center, Inc.*, 139 P.3d 858, 862 (Nev. 2006) (charge did not limit damages to those caused by a particular party's breaches; presumed the jury awarded all damages

MHDocs 6062453_7 12690.2

sustained from all parties' breaches). *A verdict that allocates damages eliminates any risk of double recovery. See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 431 (Tex. 1984). The damage question here itself allocated damages; a "double recovery" was impossible.

### b. The Jury Was Asked To Apportion and in Fact Apportioned Damages.

The Architect, not RLJ, is getting the double dip here. The Architect invited the jury in closing argument for, and in fact received, a damages reduction in the jury verdict before obtaining another by raising the one satisfaction rule for the first time post-verdict.[9] Counsel for both parties urged the jury in closing arguments to adjust its damages award. RLJ suggested without objection that the jury could and should make a 20% reduction for the damages attributable to the Settling Defendants. (10RR29). In light of the evidence, the jury clearly limited the damages to those caused by the Architect. The Architect went further, suggesting the jury "in Question 3 … answer zero" if it believed "there's no causal connection" between the Architect's breaches and RLJ's damages. (10RR54). The Architect devoted much of its argument faulting Terracon for the too-light

---

[9] RLJ's evidence supported damages in excess of $7 million. (7RR48; 9RR123-124, 136; 7RR16-18, 26-39; 3RR133-136; PX-151, 16RR1-1145; 10RR29-31). Had the architect pleaded the one satisfaction rule or asserted it before submission to the jury, RLJ could have elected to submit damages based on the total amount of all damages and risk the application of one satisfaction rule. It did not have this option, however, because the architect first asserted that it was entitled to settlement credit under the one satisfaction rule long after the jury returned its verdict.

45

foundation design and urging the reasonableness of its blind reliance on Terracon's work. (10RR36-39, 44-48, 50-51). The jury clearly understood from both the charge and closing arguments it should limit damages to those specifically caused by the Architect's breach.[10]

The jury usually may decide causation when general experience and common sense enable a layperson to fairly determine that relationship between event and result. *Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 894 (Tex. App.—Texarkana 2004, pet. denied). The damages awarded were significantly reduced from the total costs of repair and residual diminution in value. RLJ provided evidence and sought over $7 million in total damages. (7RR48; 9RR123-124, 136; 7RR16-18, 26-39; 3RR133-136; PX-151, 16RR1-1145; 10RR29-31). The jury awarded much less.

Indeed, the trial court commented on this reduction: "The source of RLJ's disappointment regarding damages is the jury verdict…." (2SCR1600; App. C). The jury clearly used its skill and common sense to apportion damages. The jury was asked to determine the amount that would fairly "compensate" RLJ for

_____

[10] There can be no complaint that the jury's apportionment was not sufficiently precise. Segregation by "rough percentage" is sufficient. *Chapa*, 212 S.W.3d at 314 n. 83; *see, e.g.*, *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997) (testimony based on percentage of attorney and paralegal time); *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 738 (Tex. App.—Corpus Christi 2005, pet. denied) (fee segregation based percentage time attribution).

46

damages caused by the Architect. Applying a further reduction does not assure one satisfaction; instead, it assures less than one satisfaction.

For all these reasons, the damages question required apportionment and the jury's verdict reflects the apportionment the charge required.

The jury was also asked to apportion damages by both parties. Based on the evidence and the trial court's own observation, the jury must have responded to the instructions of the Court and the party's requests to do so. "[T]he reasoning of the one recovery rule no longer applies" if the jury is "allow[ed] allocation of liability between the parties, *even when the injury is indivisible*." *Duncan*, 665 S.W.2d at 431 (emphasis added). The one satisfaction rule is not an insuperable barrier to plaintiff benefitting from a favorable settlement.

> [T]he one recovery rule does not prevent … adopting a system that reduces the plaintiff's recovery and the non-settling defendants' liability by the percentage of causation assigned to any tortfeasor with whom plaintiff has settled. [Such reductions] leave defendants unaffected by settlements in which they do not participate.... ***Allowing plaintiffs to keep the excess from a good settlements may violate the one recovery rule, but no one is harmed [if the jury allocates the damages]***.

*Id.* at 432 (emphasis added). The same is no less true here. The charge permitted and the parties invited and the jury's answer provided the necessary damage allocation. Therefore, "the reasoning of the one recovery rule no longer applies" and its application here cannot be justified. *See Duncan*, 665 S.W.2d at 431.

47

**5. No Right to Application of One Satisfaction Rule or Contribution Exists In Contract Cases In Light of Section 33.001.**

RLJ acknowledges that there are some cases suggesting that tort liability does not necessarily have to be present in order for the one satisfaction rule to apply. As we have demonstrated above, even assuming the rule could be applied in a breach of contract case, the rule is inapplicable in the present case because there is no basis for joint and several contractual liability and because the damages found were those resulting from the breach of contract by the Architect. RLJ would further show that the cases suggesting tort liability is not necessarily required are distinguishable in light of a complete analysis of the authority relied upon to make that suggestion. Moreover, the history and subsequent adoption of TEX. CIV. PRAC. & REM. CODE §33.0001 et seq., strongly suggests that the rule was applicable only in tort and was in any event abolished by the statutory scheme adopted in section 33.001.

The Texas Supreme Court refused to permit the one satisfaction rule to prevent its adoption of a pure comparative causation scheme or requiring an injured person to prove the precise damages caused by a particular defendant. *Landers*, 248 S.W.2d at 734; *Duncan*, 665 S.W.2d at 431-32. By statute, contribution is allowed only among joint tortfeasors. *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 818 (Tex.1984); *see also Merit Drilling Co. v. Honish*,

48

715 S.W.2d 87, 89 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) (suggesting one satisfaction rule survived *Duncan* only to the extent necessary under former article 2212a, now TEX. CIV. PRAC. & REM. CODE ch. 32).

As explained, the one satisfaction rule was created to address a problem unique to tort cases created by article 2212. *GE Capital*, 754 F.3d at 305; *see* V. B., *supra.* Indeed, the Texas Supreme Court has only applied the one satisfaction rule to joint tort liability. *Id.* at 306; *Casteel*, 22 S.W. 3d at 391-392 ("the non-settling defendant may only claim a credit based on the damages for which all tortfeasors are jointly liable."). This Court has suggested on more than one occasion that the credit is only available in tort cases. *CTTI*, 164 S.W.3d at 684; *Paschall v. Peevey*, 813 S.W.2d 710, 712 (Tex. App.—Austin 1991, writ denied) ("The non-settling tortfeasor may only claim a credit based on the damages for which all tortfeasors are jointly liable.").

RLJ is aware there are cases stating "the absence of tort liability does not preclude the application of the one satisfaction rule." *See, e.g., Hudspeth v. Enter. Life Ins. Co.*, 358 S.W.3d 373, 383 (Tex. App.—Houston [1st Dist. 2011, no pet.); *AMX Enters., Inc. v. Bank One, N.A.*, 196 S.W.3d 202, 206 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Insofar as research reveals, this proposition first appeared in *Oyster Creek Fin. Corp. v. Richwood Investments II, Inc.*, 176 S.W.3d 307, 327 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). The only support

49

*Oyster Creek* cited, however, was the *per curiam* opinion in *El Paso Natural Gas Co. v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993). However, *Berryman* involved whether an alleged *alter ego* could be liable for a judgment against a corporate entity after the corporation's settlement extinguished the judgment. *Id.* at 326. The alter ego doctrine applies when there is such unity between two entities that they are, in law, are one and the same. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990); *Hoffmann v. Dandurand*, 180 S.W.3d 340, 347 (Tex. App.—Dallas 2005, no pet.). *Berryman* did not involve any question of joint liability between two *different* parties, but rather whether there was any liability remaining against what was, in legal effect, the *same* party. Thus, *Berryman* did not involve an application of the one satisfaction rule at all and cannot support its application in non-tort cases.

This conclusion is further confirmed by the legislative history of section 33.012 of the Texas Civil Practice and Remedies Code. Chapters 32 and 33 codify not only contribution rights, but also the common-law one satisfaction doctrine. In doing so, the Legislature explicitly limited the application of the one satisfaction rule generally to tort and DTPA cases. TEX. CIV. PRAC. & REM. CODE §§32.001 ("applies only to tort actions;" 33.002 applies to any cause of action based on tort or any action under the DTPA).

MHDocs 6062453_7 12690.2

It follows from the plain language of the statute that when the Legislature generally limited contribution and settlement credits to tort cases, it precluded other common-law contribution and settlement credits in other cases. When the Legislature expressly provides for an exclusive remedy, it pre-empts the common law. *Coleman v. United Savings Ass'n of Texas*, 846 S.W.2d 128, 132 (Tex. App.—Fort Worth 1993, no writ).

For example, when the Legislature abolished the common law equitable trust fund theory for pre-dissolution claims to protect corporate directors, officers and shareholders, the Texas Supreme Court ruled that the statute preclude further application of the previous common law doctrine. *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 551 (Tex. 1981). Part of the court's reasoning was that application of the doctrine outside the restrictions imposed by the statute would render the statute meaningless and impermissibly presume the Legislature intended to do something that was effectively useless. *Id.*

The same is no less true here. Chapters 32 and 33 and their rules for settlement credits are explicitly limited to tort and DTPA claims. If the Legislature had intended to include other claims, it could have easily done so. By not including breach of contract actions, it must be presumed that the Legislature intended to limit application of the one satisfaction rule to the cases and methods specified in the statute.

51

Legislative history confirms this intent. In 2005, the Legislature enacted Senate Bill 890 to amend section 33.0012 to restore the dollar-for-dollar credit. This credit was eliminated in 2003 when the Legislature enacted "tort reform" by adopting House Bill 4. Senate Bill 890 was accompanied by a statement of intent from the author and sponsor stating,

> Since the 1930s, Texas has recognized that an injured party is entitled to recover only once for an injury. (*Bradshaw v. Baylor*, 126 Tex. 99, 101; 84 S.W.2d 703, 704 (1935)). The "one-satisfaction" rule was codified by the Legislature in Chapter 33, Civil Practice and Remedies Code, in 1987…. ***The settlement credit scheme created by H.B. 4 eliminates the one-satisfaction rule that has been part of Texas law for more than 70 years, except in medical liability cases.***

Senate Committee on State Affairs, Bill Analysis, Tex. S.B. 890, 79th Leg. R.S. (2005) and Senate Committee on State Affairs, Bill Analysis, Tex. C.S.S.B. 890, 79th Leg. R.S.(2005) (emphasis added); available at Capitol Research Services., The Legislative History of Tex. S.B. 890, 79th Leg., R.S. (2005), Regarding Settlement Credit 20, 82, 89 (App. I).

The Legislature's declaration that the 2003 tort reform bill "eliminate[d]" the common-law one satisfaction rule confirms that, except as permitted by statute, the common-law one satisfaction rule had otherwise been "eliminate[d]" when House Bill 4 was passed. Its continued application by the courts outside the scope of chapters 32 and 33 is legally erroneous. The error is understandable because the courts were likely unaware of the not-readily-available declaration of Legislative

intent in the legislative history of the statute. Thus, they naturally continued to resort to case law antedating H.B.4 without fully appreciating the historical reason why the one satisfaction rule was developed or fully realizing that chapters 32 and 33 of the Civil Practice and Remedies Code supplanted the common-law one satisfaction rule after September 1, 2003. It is, nonetheless, erroneous to apply the one satisfaction rule outside the statutory parameters of chapters 32 and 33.

**6.      Applying the One Satisfaction Rule in Contractual Liability Cases Impairs Contract Obligations In Violation of Texas Constitution Article I, §16.**

Applying the one satisfaction rule outside tort cases where it is ostensibly still necessary threatens to impair contractual obligations in violation of article I, §16 of the Texas Constitution.

**a.      Texas Public Policy Strongly Favors Freedom of Contract.**

The Texas Supreme Court has "long recognized Texas' strong public policy in favor of preserving the freedom of contract." *Fairfield Insurance Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 664 (Tex. 2004). This constitutionally guaranteed contractual freedom strongly favors the parties' right to "bargain for mutually agreeable terms and [to] allocate risks as they see fit." *Gym-N-1 Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007). It outweighs court-created general policies, such as that prohibiting insuring punitive damages. *Fairfield Insurance Co.*, 246 S.W.3d at 664.

53

> [I]f there is one thing which more than another public policy requires it is that [persons] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice. Therefore, you have this paramount public policy to consider – that *you are not lightly to interfere with this freedom of contract*.

*Wood Motor Co. v. Nebel*, 150 Tex. 86, 238 S.W.2d 181, 185 (1951) (quoting *Printing & Numerical Registering Co. v. Sampson*, LR 19 Eq 462, 465, 1874 WL 16322 (1875)). This freedom outweighs application in contract cases of a judicial doctrine to remedy a conundrum unique to tort actions.

### b. The One Satisfaction Rule Impermissibly Impairs Contractual Obligations.

Whether a law violates the freedom of contract depends on three-part test: (1) it must not substantially impair a contractual relationship; (2) it "must have a significant and legitimate purpose behind the regulation, such as the remedying of a broad and general social or economic problem"; and (3) it must be reasonable and appropriate for its intended purpose. *Energy Reserves Group v. Kansas Power & Light*, 459 U.S. 400, 410, 411-13 (1983).

The one satisfaction rule cannot satisfy the first test because it substantially impairs a contractual relationship. It effectively takes from the injured party the benefit of its settlement with another defendant to reduce the wrongdoer's liability. *See*, *e.g.*, *Langever v. Miller*, 124 Tex. 80, 76 S.W.2d 1025, 1028 (1934) (law reducing collectible amount of deficiency judgments to difference between actual

MHDocs 6062453_7 12690.2

property value and foreclosure price void as a substantial contractual impairment). In contract cases, the one satisfaction rule's reduction of damages by credit for another's settlement substantially and unconstitutionally impairs contractual freedom. It also creates, as applied here, a disincentive to settle, which is contrary to the strong Texas public policy in favor of settlements.

### c. Freedom of Contract Outweighs One Satisfaction's Questionable Objectives.

The Texas Supreme Court has refused to accept that preventing recovery of more than the jury's damage assessment is a more important than preventing a wrongdoer from escaping its full liability. *Landers*, 248 S.W.2d at 734. It justified overruling *Bradshaw*'s one satisfaction rule the extent it conflicted with its creation of a purely comparative negligence system because the one satisfaction rule unfairly allowed the non-settling defendant to unfairly "benefit from a generous settlement in which they refused to participate" for this reason. *Duncan*, 665 S.W.2d at 431. It recognized that settlement consideration includes benefits other than relief from paying damages. *Id.* "There is no conceptual inconsistency in allowing a plaintiff to recover more from a settlement or partial settlement than he could receive as damages." *Id*. "Plaintiffs will benefit from good settlements and bear the risk of bad ones, just as they do in single-tortfeasor cases. Allowing plaintiffs to keep the excess from a good settlements may violate the one recovery

55

rule, *but no one is harmed" when the jury apportions liability*. Allowing plaintiffs to keep the excess from a good settlement is not overpayment of damages.

The one satisfaction rule has a questionable objective based on questionable reasoning. It ought to be and is trumped by the freedom of contract guarantee in Texas Constitution article I, §16.

### 7. The Architect Is Procedurally Barred From Asserting the One Satisfaction Rule.

#### a. Waived by Failure to Specially Except.

The Architect's post-verdict motion urging credit under the one satisfaction rule for the first time asserted "Plaintiff's damages resulted from 'the breaches of contract' Plaintiffs alleged were committed by [all remaining defendants]" and that RLJ failed to allocate those damages. (CR1174). Complaint about the damages allegations was waived by failure to urge them in writing before charge submission. TEX. R. CIV. P. 90; *Bullock v. Regular Veteran's Ass'n of U.S.*, 806 S.W.2d 311, 314 (Tex. App.—Austin 1991, no writ).

#### b. Waived by Failure to Request Question or Instruction.

Neither did the Architect object to the charge on this ground. Failure to object to the charge's failure to segregate failure to request an instruction requiring allocation waives complaint about failure to segregate. TEX. R. CIV. P. 278 (failure to request properly worded question); *see Dick's Last Resort of West End, Inc. v. Market/Ross, Ltd.*, 273 S.W.3d 905, 919 (Tex. App.—Dallas 2008, pet. denied);

56

*McCarty v. Wani Venture, A.S.*, 251 S.W.3d 573, 585 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (failure to request instruction).

### c. Waived By Failure to Plead as an Affirmative Defense.

A party must affirmatively plead "accord and satisfaction, arbitration and award, … discharge in bankruptcy, … payment, release … and any other matter constituting an avoidance or affirmative defense." TEX. R. CIV. P. 94. Each of these involves prior payment or other discharge that is waived if not pleaded. *Bejjani v. TRC Servs., Inc.*, No. 14-08-00750-CV, 2009 WL 3856924, at *5 (Tex. App.—Houston [14th Dist.] Nov. 19, 2009, no pet.) (right to offset); *Sugar Land Props., Inc. v. Becnel*, 26 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (payment of medical expenses). Settlement credit under the one satisfaction rule, though not specifically named, is an "other matter constituting an avoidance or affirmative defense" that must be pleaded. This Court specifically acknowledged that the one satisfaction rule is in the nature of an affirmative defense. *RenewData Corp. v. eMag Solutions, LLC*, No. 03–05–00509–CV, 2009 WL 1255583, at *1 n. 1 (Tex. App.—Austin May 6, 2009, pet. denied) (mem. op.; unasserted one satisfaction rule could not be considered as alternative summary judgment ground); *accord Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, 323 S.W.3d 203, 217 (Tex. App.—El Paso 2010, pet. denied); *Brewer & Pritchard, P.C. v. AMKO Res. Int'l, LLC*, No. 14-13-00113-CV, 2014 WL 3512836, at *1 (Tex. App.—Houston

MHDocs 6062453_7 12690.2

[14th Dist.] July 15, 2014, no pet.) (mem. op.). Cases holding otherwise are irreconcilable with rule 94 because the opponent must be notified of the need to prove damages allocation plus the elements of the asserted claims. *See Dalworth Restoration, Inc. v. Rife-Marshall*, 433 S.W.3d 773, 783-84 (Tex. App.—Fort Worth 2014. pet. dism'd w.o.j.). The Architect did not plead this affirmative defense (CR46-79; App. H) and RLJ was given no notice or opportunity to present evidence meeting any allocation requirement before the jury was discharged.

### d.    Barred By Laches.

The post-verdict assertion of the one settlement rule is also precluded by laches. The one satisfaction rule developed as an equitable principle, *Sterling*, 822 S.W.2d at 6, subject to equitable defenses. *See Brewer v. Nationsbank of Texas, N.A.*, 28 S.W.3d 801 (Tex. App.—Corpus Christi 2000, no writ), and is subject to equitable defense for unreasonable delay and another's good faith detrimental change in position. *See City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964). By the Architect's failure to raise the one satisfaction rule prior to verdict, RLJ had no reason whatsoever to anticipate any need to adduce any evidence segregating damages. Similarly, the Architect waived any argument on the one satisfaction rule by specifically asking the jury to apportion damages and award only those damages caused by the Architect. (10RR54-56).

58

For any one or all of the foregoing reasons, the one satisfaction rule did not and could not apply to reduce the Architect's liability to RLJ. The trial court erred in concluding otherwise. Accordingly, the judgment must be reformed to restore recovery for the damages awarded by the jury together with interest.

## B.    No Segregation of Attorney's Fees Was Required.

RLJ sought its reasonable and necessary attorney's fees under chapter 38 of the Texas Civil Practice and Remedies Code. (CR201; App. A). The parties agreed to submit the attorney's fees claim to the court rather than the jury. After the jury's verdict, RLJ moved for its attorney's fees and submitted its proof by affidavit and supporting documents showing RLJ expended a total of $1,388,019 in reasonable and necessary attorney's fees to prosecute the breach of contract claims against the Architect, Soils Engineer, and the General Contractor. (3SCR3-611; 2SCR1603-05).

However, the trial court determined for purposes of attorney's fees it was necessary to segregate those expended on RLJ's claim against the Architect from those on its claims against the Settling Defendants. (CR1711; App. D). The trial court awarded attorney's fees attributable to the prosecution of the breach of contract claim against the Architect only, even though it considered the damages "indivisible." (CR1711; 2SCR1600; App. C, D). Accordingly, of the $1,388,019 in attorney's fees for presenting all its contract claims, the trial court allowed RLJ

MHDocs 6062453_7 12690.2

only $901,650.96 as fees attributable to the contract claim against the Architect only. (CR1711; App. D). RLJ timely moved conditionally to modify the judgment so that, if the one satisfaction rule applied, it could recover its unsegregated attorney's fees for breach of contract claims against the Architect and the Settling Defendants. (CR1747-48). The trial court denied this motion. (CR1905).

RLJ continues to maintain that the one satisfaction rule does not apply. If and only if this Court decides otherwise, RLJ was not obliged to segregate its attorney's fees for the breach of contract claims against the Architect from those for the breach of contract claims against the Settling Defendants.

### 1. There Is No Need to Segregate Fees For Claims Requiring Proof of the Same Facts.

Generally, reasonable and necessary attorney's fees requires proof of the fees incurred for suit on a claim for which such fees are recoverable. *Sterling*, 822 S.W.2d at 10. If the causes of action depend upon the same facts or circumstances, they may be "intertwined to the point of being inseparable." *Id.* Attorney's fees should be allowed for inseparable claims even if some issues also relate to matters for which attorney's fees are not recoverable, *Aiello*, 941 S.W.2d at 73; *Sterling*, 822 S.W.2d at 11, provided the underlying services advance both. *Chapa*, 212 S.W.3d at 314.

Whether fees can be segregated is a mixed question of law and fact. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006). For example,

when an attorney testified that the issue common to all claims was the right of control over a corporation, this Court deemed the recoverable and unrecoverable claims so interrelated that it was unnecessary to segregate fees. *Fortenberry v. Cavanaugh*, No. 03-07-00310-CV, 2008 WL 4997568, at \*12 (Tex. App.—Austin Nov. 26, 2008, pet. denied) (mem. op.).

## 2. If the One Satisfaction Rule Applies, It Requires Proof of Breach of the Same Promised Performance *and* an Indivisible Injury.

The one satisfaction rule may apply in contract case only if there was a joint and several contractual liability, which in turn requires a promise of the *same performance* by the settling and liable defendants, *see* V.A.3., *supra*., and an indivisible injury. *See* V.A.4., *supra.* If the Architect and Settling Defendants breached a promise for the same performance causing an indivisible injury, then the activities of RLJ's attorneys to prove the Settling Defendants' liability would have necessarily also served as proof of the Architect's liability. If the one satisfaction rule applies at all, no segregation could have been required.

## 3. Alternatively, If Proof of Indivisible Injury Alone is Enough for the Application of the One Satisfaction Rule, Segregation of Fees Was Still Not Required.

Regardless of whether the one satisfaction rule otherwise applies, if the trial court correctly determined that there was an indivisible injury or damages in this case for purposes of the one-satisfaction analysis, then segregation of fees was not

MHDocs 6062453_7 12690.2

required. The Architect, General Contractor and Soils Engineer undertook different duties. (CR192-93, 197-98, 200-01, 205-18). For these breaches to coalesce in an "indivisible" injury would necessarily require RLJ to have proved each breach to establish the full scope of its damages.

"Where the tortious acts of two or more wrongdoers join to produce an indivisible injury, … all of the wrongdoers will be held jointly and severally liable for the entire damages ….". *Landers*, 248 S.W.2d at 734 (1952). If the one satisfaction rule applies at all and if only an indivisible injury is required, as the trial court reasoned, the breaches of the Settling Defendants were sufficiently conjoined with those of the Architect, then proof of the harm resulting from the breaches of the Settling Defendants were also essential and no segregation was required.

## VI. CONCLUSION AND PRAYER

For the foregoing reasons, RLJ asks the Court to:

1) reverse the trial court's judgment applying the one satisfaction rule and delete the credit for the amount of the Settling Defendants' settlements;

2) if and only if the one satisfaction rule applies, reverse the trial court's judgment concerning the award of attorney's fees and either reform it to award RLJ unsegregated fees or remand the case to the trial court solely for a

determination of reasonable and necessary attorney's fees for the prosecution of all contract claims against the Architect, and the Settling Defendants; and

3) any one or more of 1) – 2) above subject to the conditions prescribed. RLJ further requests such other relief to which they are justly entitled, provided such relief requested does not include a retrial on the merits of its claims against the Architect.

Respectfully submitted,

MUNSCH HARDT KOPF & HARR PC

/s/ Michael W. Huddleston
Michael W. Huddleston
State Bar No. 10148415
J. Stephen Gibson
State Bar No. 07866000
3800 Ross Tower
500 North Akard Street
Dallas, TX 75201
(214) 855-7500 Main Tel.
(214) 855-7584 Main Fax
mhuddleston@munsch.com
sgibson@munsch.com

**Attorneys For Appellees and Cross-Appellants**

MHDocs 6062453_7 12690.2

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief of Cross-Appellants was prepared using Microsoft Word 2010, which indicated that the total word count (exclusive of those items listed in Tex. R. App. P. 9.4(i)(1)) is 13,844 words.

*/s/ Michael W. Huddleston*

MHDocs 6062453_7 12690.2

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the foregoing document upon counsel listed below on this 10th day of April, 2015 by e-file:

Weston M. Davis
Gregory N. Ziegler
Matthew Mumm
Macdonald Devin, P.C.
1201 Elm Street
3800 Renaissance Tower
Dallas, TX 75270

*/s/ Michael W. Huddleston*

MHDocs 6062453_7 12690.2

# APPENDIX IN SUPPORT OF CROSS-APPELLANTS' BRIEF

| TAB | DESCRIPTION OF DOCUMENT | CR/RR |
|---|---|---|
| A | Plaintiffs' Seventh Amended Original Petition | CR184-218<br>2SCR39-73 (duplicate) |
| B | Charge of the Court | CR1121-29<br>2SCR1563-71 (duplicate) |
| C | June 13, 2014 Letter from Hon. Judge Yelenosky | CR1437-41<br>2SCR1598-1602 (duplicate) |
| D | Final Judgment | CR1708-12<br>CR1905-09 (duplicate) |
| E | Contract with Soils Engineer | PX-3; 12RR6-11 |
| F | Contract with General Contractor | PX-48; 12RR567-651 |
| G | Contract with Architect | PX-15; 12RR26-128 |
| H | Architect's Second Amended Answer | CR46-79<br>2SCR5-38 (duplicate) |
| I | Report of SB 890 (2005) | n/a |

MHDocs 6062453_7 12690.2

# APPENDIX A

**CAUSE NO. D-1-GN-10-002325**

| | | |
|---|---|---|
| RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; and RLJ LODGING FUND II ACQUISITIONS, LLC, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § § | |
| EBCO GENERAL CONTRACTOR, LTD; EBCO/WARRIOR MANAGEMENT LLC; ELNESS, SWENSON, GRAHAM ARCHITECTS, INC.; MARK SWENSON, Individually; TERRACON CONSULTANTS, INC.; TODD E. SWOBODA, P.E., Individually; and ALCADIO CHAPA, JR. formerly D/B/A JR'S CONCRETE CONSTRUCTION, | § § § § § § § § § § | TRAVIS COUNTY, TEXAS |
| Defendants and Third-Party Defendants. | § § | 200TH JUDICIAL DISTRICT |

## PLAINTIFFS' SEVENTH AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiffs RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC (collectively, "Plaintiffs" or "RLJ") file their Seventh Amended Original Petition, and make allegations and complaints against EBCO General Contractor, Ltd.; EBCO Advanced Building Systems, Ltd.; EBCO/Warrior Management LLC; Elness, Swenson, Graham Architects, Inc.; Mark G. Swenson, individually; Terracon Consultants, Inc.; Todd E. Swoboda, P.E., individually; MBA Structural Engineers, Inc.; DaVinci Pools, LLC; Bridgeview Plumbing, Inc.; and Champion Site Prep, L.P. (collectively, "Defendants") as follows:

### I. DISCOVERY CONTROL PLAN

1.     Discovery is intended to be conducted pursuant to Rule 190.4, Texas Rules of Civil Procedure.

---

## II. PARTIES

2.      Plaintiff RLJ II-C Austin Air, LP ("RLJ Austin") is a Delaware limited partnership authorized to do business in Texas, and is the current fee owner of the "Project" as defined in paragraph 14 of this Petition.  Plaintiff RLJ II-C Austin Air Lessee, LP ("RLJ Austin Lessee") is a Delaware limited partnership authorized to do business in Texas, and is the current leasehold owner of the Project.  Plaintiff RLJ Lodging Fund II Acquisitions, LLC ("RLJ Lodging") is a Delaware limited liability company which entered into a contract to purchase the Project, and assigned the fee ownership rights and obligations of that purchase contract to RLJ Austin, which now owns the Project and leases it to RLJ Austin Lessee.

3.      Defendant EBCO General Contractor, Ltd. is a limited partnership authorized to do business in Texas.  Defendant EBCO Advanced Building Systems, Ltd. is a predecessor limited partnership previously authorized to do business in Texas.  Defendant EBCO/Warrior Management, LLC is the general partner of EBCO General Contractor, Ltd.  These defendants will hereafter collectively be referred to as "EBCO."  EBCO has been served with process and answered herein.

4.      Defendant Elness, Swenson, Graham Architects, Inc. ("ESG") is a foreign for-profit corporation authorized to do business in Texas.  This court has long-arm jurisdiction over ESG because the actions brought against it in this suit arise from ESG's business in this state.  *See* Texas Civil Practice & Remedies Code Ann. § 17.042(1) and (2).  ESG has been served with process and answered herein.

5.      Defendant Mark G. Swenson ("Swenson") is a nonresident individual.  This court has long-arm jurisdiction over Swenson because the actions brought against him in this suit arose from or are connected with his purposeful acts committed in Texas.  These purposeful acts are described more fully below but mainly entail signing and sealing plans and specifications for the

construction of the Project in Austin, Texas. Swenson has been served with process and answered herein.

6. Defendant Terracon Consultants, Inc. ("Terracon") is a foreign for-profit corporation authorized to do business in Texas. Terracon has been served with process and answered herein. On information and belief, Plaintiffs allege that Terracon, Inc. purchased the stock of HBC Engineers, Inc. ("HBC") in 1998 and merged HBC with Terracon, Inc. in 2001. On further information and belief, Terracon, Inc. merged with Terracon in 2004.

7. Defendant Todd E. Swoboda, P.E. is a Texas resident and has been served with process and answered herein.

8. Defendant MBA Structural Engineers, Inc. f/k/a Marlin, Bridges & Associates, Inc. ("MBA") is a foreign for-profit corporation authorized to do business in Texas. This court has long-arm jurisdiction over MBA because the actions brought against it in this suit arose from or are connected with the purposeful acts MBA committed in Texas. These acts are described more fully below but mainly entail contracting to provide structural plans and specifications for the construction of the Project in Austin, Texas. MBA has been served with process and answered herein.

9. Defendant DaVinci Pools, LLC ("DaVinci") is a Texas limited liability company which is a party to this action. DaVinci has been served with process and has answered herein.

10. Defendant Bridgeview Plumbing, Inc. ("Bridgeview") is a Texas corporation which is a party to this action. DaVinci has been served with process and has answered herein.

11. Defendant Champion Site Prep, L.P ("Champion") is a Texas limited partnership which is a party to this action. Champion has been served with process and has answered herein.

## III. VENUE AND JURISDICTION

12.     Venue is proper in Travis County, Texas under Texas Civil Practice & Remedies Code Ann. §§ 15.002(a)(1), 15.005, 15.011, 15.035 and 15.092 (a) & (b), which require that this suit be brought in the county where the Project (as defined below) is located.

13.     Defendants ESG, Swenson, EBCO, Terracon, Swoboda, MBA, DaVinci, Bridgeview, and Champion are either residents of Texas or purposely availed themselves to the jurisdiction of Texas by entering into contracts involving real property and improvements to real property in Texas and/or by signing and sealing plans, specifications, or other reports for real property or constructing improvements to real property in Texas that is the subject of this lawsuit. Furthermore, assumption of jurisdiction by Texas would not offend traditional notions of fair play and substantial justice. Finally, RLJ's damages are within the jurisdictional limits of this court and do not exceed $10,000,000.00.

## IV. FACTS

14.     This action arises from construction of the Courtyard Austin Airport Hotel located at 7809 East Ben White Boulevard in Austin, Texas (the "Project").

15.     As set forth below, Plaintiffs assert the following:

    a.     Breach of contract against EBCO, ESG, Swenson, Terracon, and Swoboda;

    b.     Suit for declaratory relief against Terracon;

    c.     Breach of warranty against EBCO;

    d.     Equitable subrogation against EBCO, ESG, Swenson, MBA, Terracon, Swoboda, DaVinci, Bridgeview, and Champion, including a direct equitable subrogation claim, and equitable subrogation claims for breach of contract, negligence, negligent undertaking, and negligent misrepresentation that were directly assigned, or assigned as a matter of law, to RLJ; and

e. A tort/negligence claim against EBCO for breach of a fiduciary duty arising from EBCO's failure to construct the Project in a manner consistent with the owner's interests and with the contract documents, which are the source of the fiduciary duty.

16. Except for MBA, DaVinci, Bridgeview, and Champion, Defendants all entered into valid and enforceable contracts with the Project's developer, White Lodging Services Corp. ("White"), to perform the services listed below.

17. White, as developer, delivered and assigned the Project, the contracts, fiduciary duties, intangibles and all of the warranties, representations, and causes of action related thereto, to a White affiliate, South Ausaircourt, L.P., as owner ("Ausaircourt"). Ausaircourt then assigned the Project, the contracts, fiduciary duties, intangibles, and all of the warranties, representations, and causes of action related thereto, to RLJ Lodging, which purchased the Project, and then assigned its rights and obligations under the Project contracts to RLJ Austin.

18. EBCO was the general contractor and/or construction manager on the Project. EBCO performed work on the Project, and also retained subcontractors who performed work on the Project. EBCO and its subcontractors failed to construct the Project free from defects, including, but not limited to, the following:

(a) Failed to construct the Project foundation free from defect or in compliance with the Project plans and specifications, including missing beams and improper placement of wire reinforcing mesh. Plaintiffs allege that the damage from this negligent work began to occur during construction and continues to this day. Plaintiffs also allege that not only was the foundation itself damaged, but this negligent work caused significant damage to other component parts of the Project;

(b) Failed to provide "select fill" soils which complied with the Project specifications. Plaintiffs allege that the damage from this negligent work began to occur during construction and continues to this day. Plaintiffs also allege that this negligent work caused significant damage to other component parts of the Project;

(c) Failed to construct the pool and its drains free from defect. Plaintiffs allege that the damage from this negligent work began to occur during construction and

---

continues to this day. Plaintiffs also allege that not only was the pool itself damaged but this negligent work caused significant damage to other component parts of the Project;

(d) Failed to construct the under-slab plumbing free from defect. Plaintiffs allege that the damages from this negligent work began to occur during construction and continues to this day. Plaintiffs also allege that this negligent work caused damage to other component parts of the Project; and

(e) Failed to construct the Project site work in a manner consistent with the Project plans and specifications. Plaintiffs allege that the damages from this negligent work began to occur during construction and continues to this day. Plaintiffs also allege that not only was the site work itself damaged but this negligent work caused significant damage to other component parts of the Project.

19. The terms of the contract between EBCO and White (the "General Contract") created a "fiduciary relationship of trust and confidence." Pursuant to the General Contract, EBCO agreed to construct the Project free from defects in a "manner consistent with the interests of the Owner." EBCO failed to construct the Project free from defects and in a manner consistent with the interests of the owner, thereby breaching its fiduciary duty, which is a tort in Texas. *See Douglas v. Aztec Pet. Corp.*, 695 S.W.2d 312, 318 (Tex. App.—Tyler 1985, no writ).

20. ESG contracted for architectural services with White (the "Architectural Contract"), and Swenson signed and sealed the architectural plans and drawings for the Project. Under the Architectural Contract, ESG agreed to, among other things, provide overall architectural, civil, and structural engineering design, document preparation, and coordination for the Project. This work was to be performed expeditiously and consistent with professional skill and care. Because Texas does not allow corporations to sign or seal architectural plans or specifications, Swenson could not have been acting as an agent of ESG when he signed and sealed the architectural plans and drawings, as an agent can only act to the extent of the

189

principal's legal authority. Therefore, ESG constructively assigned portions of the Architectural Contract to Swenson, without first obtaining written consent from White.

21. ESG consented to the assignment of the Architectural Contract between White and Ausaircourt, in writing. This assignment provided Ausaircourt with all of the interests referenced above, but none of the obligations.

22. Pursuant to a written contract dated October 30, 2000 (the "Geotechnical Study Contract"), HBC was retained to conduct a geotechnical engineering study (the "Geotechnical Engineering Study"). Swoboda signed, sealed, and submitted the Geotechnical Engineering Study to White on November 21, 2000. Because Texas does not allow corporations to sign or seal architectural plans or specifications, Swoboda could not have been acting as an agent of HBC when he signed and sealed the Geotechnical Engineering Study, as an agent can only act to the extent of the principal's legal authority. Therefore, HBC constructively assigned portions of the Geotechnical Engineering Study contract to Swoboda, without first obtaining written consent from White.

23. The Geotechnical Study Contract was completed sometime in late 2000 or early 2001, when White made final payment to HBC for these services.

24. Pursuant to an oral agreement or undertaking, which was separate and distinct from the Geotechnical Study Contract, Terracon provided geotechnical engineering services to White and its affiliates during construction of the Project in 2005 and after the Project's completion. No written contract for such services between Terracon and any White affiliate exists.

25. Terracon entered into a written contract to provide materials testing and construction inspection services for the Project in 2005 (the "Materials Testing Contract").

26.     MBA performed the structural engineering for the Project and Andrew Marlin signed and sealed the structural plans MBA provided to ESG.

27.     DaVinci constructed the Project pool pursuant to a subcontract between it and EBCO.

28.     Bridgeview constructed the Project plumbing system pursuant to a subcontract between it and EBCO.

29.     Champion provided site preparation services, labor, and materials pursuant to a subcontract between it and EBCO.

30.     On March 16, 2006, Plaintiff RLJ Lodging entered into the "New Hotels Purchase and Sale Agreement" (the "New Hotels PSA") between Whiteco Industries, Inc., numerous sellers identified on Exhibit A of the PSA, and White.  This PSA was one of two PSA's executed concerning the purchase of the Project and 99 other similar projects.  One PSA concerned projects that were already constructed, and the New Hotels PSA concerned projects, like the Project,  that were in various stages of construction.

31.     Pursuant to the New Hotels PSA, Plaintiff RLJ Lodging was legally obligated to take possession of the Project on or about December 20, 2007, a few months after it was completed.

32.     Plaintiffs noticed property damage, including foundation movement, a cracked swimming pool, cracks in the slab and grade, shifting door frames, cracks in partition walls, and drainage issues on the perimeter of the building in the Project.

33.     EBCO, ESG, Swenson, Terracon, Swoboda, MBA, DaVinci, Bridgeview, and Champion provided services, labor, or materials that were defective, or deviated from the

applicable standards of care, and that either caused, or contributed to cause, damages to the Project and RLJ.

34.    These defective and damaging services, labor or materials all had certain characteristics which prevented Plaintiffs from immediately discovering the damage, and it was not until verifiable issues with the Project were physically made manifest that Plaintiffs knew of or should have known of the damages to the Project.  As such, the Discovery Rule applies to effect accrual of all of Plaintiffs' causes of action.

## V. CAUSES OF ACTION

### A.    *Breach of Contract*

35.    Plaintiffs incorporate the foregoing paragraphs.

36.    EBCO breached the General Contract by failing to perform said contract in a good and workmanlike manner, failing to construct the Project according to the contract documents, and failing to construct the Project in a manner consistent with the interests of the owner.

37.    ESG and Swenson breached the Architectural Contract by deviating from the applicable standard of care, failing to produce design plans free from defects, and failing to properly administer the construction of the Project.  *See* Exhibit A, Certificate of Merit of John Nyfeler, FAIA, describing ESG and Swenson's negligent acts, or acts in breach of the Architectural Contract, pursuant to the Certificate of Merit requirements of applicable state law.

38.    HBC and Swoboda breached the Geotechnical Study Contract as set forth in Kirby Meyer's Certificate of Merit, attached as Exhibit B, pursuant to the Certificate of Merit requirements of applicable state law.  Terracon is responsible for HBC's and Swoboda's negligent acts, errors, or omissions as a result of its merger with HBC.

39.    Terracon breached the Materials Testing Contract, as set forth in Exhibit B.

40. Terracon breached its oral contract with White for geotechnical engineering services, as set forth in Exhibit B.

41. Defendants ESG, Swenson, and EBCO assert that anti-assignment clauses contained in the Architectural Contract and the General Contract prohibit RLJ from asserting these contract claims.

42. The anti-assignment clause in the Architectural Contract and the General Contract have no force or effect on the assignments between White and RLJ because these contracts were no longer executory at the time of assignment.

43. To the extent that Terracon or Swoboda assert contractual anti-assignment clauses, those clauses have no force or effect on the assignments between White and RLJ because these contracts were no longer executory at the time of assignment.

44. In the alternative, the anti-assignment clauses do not render the Contract assignments void. Instead, they merely potentially entitle ESG, EBCO, or Terracon to a breach of contract claim. However, because ESG, HBC, and Terracon materially breached their contracts prior to the date of the assignments, as more fully described below, White and RLJ are excused from performance.

45. Specifically, ESG committed the first material breach of the Architectural Contract with White when it assigned the signing and sealing function of its contract to Swenson, without White's express written consent, while those obligations were still executory. Because corporations are not authorized to sign or seal construction documents in Texas, Swenson could not have been acting as ESG's agent. As a result of these actions, ESG is estopped from enforcement of the referenced anti-assignment clause, and White and RLJ are thereby excused from performance of its contract obligations concerning consent of assignment. In the

alternative, ESG relinquished a known right and therefore waived enforcement of the anti-assignment clause, by virtue of the referenced constructive assignment.

46. Specifically, HBC committed the first material breach of the Geotechnical Study Contract with White when it assigned the signing and sealing function of its contract to Swoboda, without White's express written consent, while those obligations were still executory. Because corporations are not authorized to sign or seal construction documents in Texas, Swoboda could not have been acting as HBC's agent. As a result of these actions, Terracon (on behalf of HBC) is estopped from enforcement of the referenced anti-assignment clause, and White and RLJ are thereby excused from performance of its contract obligations concerning consent of assignment. In the alternative, HBC relinquished a known right and therefore waived enforcement of the anti-assignment clause, by virtue of the referenced constructive assignment.

47. Specifically, Terracon committed the first material breach of the Materials Testing Contract with White when it assigned the signing and sealing function of its contract to others, without White's express written consent, while those obligations were still executory. Because corporations are not authorized to sign or seal construction documents in Texas, the individuals who signed and sealed testing reports could not have been acting as Terracon's agent. As a result of these actions, Terracon is estopped from enforcement of the referenced anti-assignment clause, and White and RLJ are thereby excused from performance of its contract obligations concerning consent of assignment. In the alternative, Terracon relinquished a known right and therefore waived enforcement of the anti-assignment clause, by virtue of the referenced constructive assignment.

48. Plaintiffs also challenge the applicability of the purported "waiver of consequential damages" clauses contained in the Architectural Contract, General Contract, the

Geotechnical Study Contract, and/or the Materials Testing Contract. Plaintiffs seek to recover the difference between the value of the Project as constructed, and its value had it been designed and constructed in accordance with the respective Contracts. This is not a consequential damage as defined by the Contracts, but instead is the primary measure of damages in a breach of contract action under Texas law.

49.     As a direct, natural, probable, and foreseeable consequence associated with breaches of contract by EBCO, ESG, Swenson, HBC, Swoboda, and Terracon, Plaintiffs have sustained damages for which they sue herein.

**B.      *Declaratory Judgment and Suit for Declaratory Relief***

50.     Plaintiffs incorporate the foregoing paragraphs.

51.     Pursuant to the Uniform Declaratory Judgment Act, Texas Civil Practice & Remedies Code §37.001 *et seq.*, Plaintiffs are interested parties whose rights are affected by a contract or contracts with Terracon or HBC.

52.     Issues and disagreements currently exist between Plaintiffs and Terracon concerning whether Terracon's geotechnical engineering services provided in 2005 and thereafter are the subject of any contractual limitations of liability. Terracon asserts that limitations of liability contained in either the Geotechnical Study or Materials Testing Contract apply to the geotechnical engineering services provided by Terracon in 2005 and thereafter.

53.     By way of a declaratory action, Plaintiffs seek certainty regarding the respective parties' rights and obligations under the Geotechnical Study Contract with HBC and the Materials Testing Contract with Terracon at issue in this lawsuit. Specifically, RLJ seeks a declaration that: (a) the scope of the Geotechnical Engineering Study contract with HBC was to provide a Geotechnical Engineering Study, which was provided on November 21, 2000 and which was completed shortly thereafter; (b) the Materials Testing Contract specifically excludes

geotechnical engineering services; and (c) the geotechnical engineering services provided by Terracon in 2005 and thereafter were provided pursuant to an oral contract separate and distinct from the Geotechnical Study or Materials Testing Contract, or in the alternative pursuant to a negligent undertaking by Terracon, but in either event the 2005 and beyond geotechnical engineering services provided by Terracon are not the subject of contractual limitations of liability contained in either the Geotechnical Study or Materials Testing Contract.

54.     Based on the foregoing, there is presently an actual, justiciable controversy between and among the parties.

### C.     Breach of Warranty

55.     Plaintiffs incorporate the foregoing paragraphs.

56.     Plaintiffs assert that EBCO expressly represented and warranted that the Project, and all of its incorporated elements and materials, would be of good quality, that the Project would be free from defects, and that the Project would conform to the requirements of the contract documents.  Specifically, Plaintiffs would show that EBCO breached its warranty that services be performed in a good and workmanlike manner, because the Project is not fit for its intended use, was not constructed in accordance with the contract documents or industry standards, and is not free from defects.

57.     In the alternative, Plaintiffs assert that EBCO impliedly represented and warranted that the Project, and all of its incorporated elements and materials, would be of good quality, that the Project would be free from defects, and that the Project would conform to the requirements of the contract documents.  Specifically, Plaintiffs would show that EBCO breached its common law implied warranty that services be performed in a good and workmanlike manner, because the Project is not fit for its intended use, was not constructed in accordance with the contract documents or industry standards, and is not free from defects.

58.    As a direct, natural, probable, and foreseeable consequence associated with EBCO's breach of warranty, Plaintiffs have sustained damages for which they sue herein.

**D.    *Equitable Subrogation***

59.    Plaintiffs incorporate the foregoing paragraphs.

60.    Plaintiffs will show that EBCO had a duty to construct the Project without negligence, free from defects, in a manner consistent with construction industry standards for similar projects in this location, and to refrain from negligent misrepresentation concerning the Project. EBCO failed to meet its duties when performing its work on the Project, all of which caused or contributed to cause damages to Plaintiffs.

61.    Plaintiffs will also show that ESG had a duty to provide design plans and to administer the Project's construction in accordance with the Architectural Contract, without negligence, free from errors and omissions, and in a manner consistent with the applicable standard of professional skill and care. ESG also had a duty to refrain from negligent misrepresentation concerning the Project. ESG failed to meet its duties in performing the services for the Project, all of which caused or contributed to cause damages to Plaintiffs. *See* Exhibit A.

62.    Plaintiffs will show that Swenson owed a duty to provide design plans without negligence, free from errors and omissions, and in a manner consistent with the Architectural Contract and all applicable standards of professional skill and care. Swenson also had a duty to refrain from negligent misrepresentation concerning the Project. Swenson failed to meet his duties in performing the services for the Project, which caused or contributed to cause damages to Plaintiffs. *See* Exhibit A.

63.    Plaintiffs will show that HBC and Swoboda owed a duty to provide a geotechnical engineering study without negligence, free from errors and omissions, and in a

manner consistent with applicable standard of professional skill and care. Plaintiffs will also show HBC and Swoboda owed a duty to refrain from negligent misrepresentation concerning the Project. HBC and Swoboda failed to meet these duties in performing their services for the Project, which caused or contributed to cause damages to Plaintiffs. *See* Exhibit B, Certificate of Merit of Kirby Meyer, describing HBC or Swoboda's negligent acts, pursuant to the Certificate of Merit requirements of applicable state law. Terracon is responsible for HBC's and Swoboda's negligent acts, errors, or omissions as a result of its merger with HBC.

64. Plaintiffs will show that Terracon owed a duty to provide geotechnical engineering without negligence, free from errors and omissions, and in a manner consistent with applicable standard of professional skill and care. Plaintiffs will also show that Terracon owed a duty to refrain from negligent misrepresentation concerning the Project. Terracon failed to meet these duties in performing their services for the Project, which caused or contributed to cause damages to Plaintiffs. *See* Exhibit B, Certificate of Merit of Kirby Meyer, describing Terracon's negligent acts, pursuant to the Certificate of Merit requirements of applicable state law.

65. Plaintiffs will show that Terracon owed a duty to provide materials testing/construction inspection services without negligence, free from errors and omissions, and in a manner consistent with applicable standard of professional skill and care. Plaintiffs will also show that Terracon owed a duty to refrain from negligent misrepresentation concerning the Project. Terracon failed to meet these duties in performing their services for the Project, which caused or contributed to cause damages to Plaintiffs. *See* Exhibit B, Certificate of Merit of Kirby Meyer, describing Terracon's negligent acts, pursuant to the Certificate of Merit requirements of applicable state law.

66.     Plaintiffs will show that MBA owed a duty to provide structural engineering services in accordance with its contract without negligence, free from errors and omissions, and in a manner consistent with applicable standard of professional skill and care. Plaintiffs will also show MBA owed a duty to refrain from negligent misrepresentation concerning the Project. MBA failed to meet its duties in performing these services for the Project, which caused or contributed to cause damages to Plaintiffs. *See* Exhibit C, Certificate of Merit of Dean Read, describing MBA's negligent acts, pursuant to the Certificate of Merit requirements of applicable state law.

67.     Plaintiffs will show that DaVinci owed a duty to provide its labor, material, and services in accordance with its contract, without negligence, free from errors and omissions, and in a manner consistent with the applicable standards of care. Plaintiffs will show that DaVinci also owed a duty to refrain from negligent misrepresentation concerning the Project. DaVinci failed in these duties, which caused or contributed to cause damage to Plaintiffs.

68.     Plaintiffs will show that Bridgeview owed a duty to provide its labor, material, and services in accordance with its contract, without negligence, free from errors and omissions, and in a manner consistent with the applicable standards of care. Plaintiffs will show that Bridgeview also owed a duty to refrain from negligent misrepresentation concerning the Project. Bridgeview failed in these duties, which caused or contributed to cause damage to Plaintiffs.

69.     Plaintiffs will show that Champion owed a duty to provide its labor, material, and services in accordance with its contract, without negligence, free from errors and omissions, and in a manner consistent with the applicable standards of care. Plaintiffs will show that Champion also owed a duty to refrain from negligent misrepresentation concerning the Project. Champion failed in these duties, which caused or contributed to cause damage to Plaintiffs.

70. EBCO, ESG, Swenson, MBA, Terracon (and HBC), Swoboda, DaVinci, Bridgeview, and Champion all deviated from the applicable standards of care in the provisions of their respective work or services. In addition, EBCO failed to perform its contract in a good and workmanlike manner and to construct the project in accordance with its fiduciary duty or the General Contract. As a direct result, Plaintiffs suffered damages from the costs to correct or compensate for the Defendants' acts, errors, and omissions. Plaintiffs were contractually and otherwise obligated to undertake costly repair to the Project, and to pay those costs, for which the Defendants are responsible. Each of the Defendants benefited from these payments, for which they are actually responsible, and any related claims they might have had regarding the Project are assigned to Plaintiffs as a matter of law. Thus, Plaintiffs are entitled to an equitable subrogation recovery of those Project remediation costs actually paid as of the date of the trial in this matter from Defendants.

**E.    *Negligence/Tort***

71.    Plaintiffs incorporate the foregoing paragraphs.

72.    Breach of a Fiduciary Duty is a tort, grounded in negligence principles. EBCO owed a fiduciary duty to construct the Project in a manner consistent with the owner's interests. The rights to the cause of action for EBCO's breach of this negligence/tort duty were assigned to RLJ. EBCO breached this duty, causing damage to the Project and RLJ.

## VI. <u>DAMAGES</u>

73.    As a result of the breaches of contract, breach of fiduciary duties, breach of warranty, tort/negligence breaches, and negligent acts alleged above, Plaintiffs have sustained damages in excess of the minimal jurisdictional requirements of this court. The appropriate measure of damages for the breach of contract and breach of warranty claims is the difference in value between the building as constructed, and the value of the building had it been designed and

constructed pursuant to the respective contracts. In the alternative, the measure of damages is the cost to fully and completely repair the Project.

74. The measure of damages for the tort/negligence causes of action are all out-of-pocket costs, plus all current and future lost revenue, profits, diminution in value, future repair costs, along with all other direct, special or consequential damages. Plaintiffs also request that EBCO be required to disgorge and forfeit all fees from the Project, as a result of the breach of its fiduciary duty.

75. Plaintiffs further seek a declaration that the geotechnical engineering services provided by Terracon during and after construction of the Project, in 2005 and thereafter are not subject to a contractual limitation of liability, thereby not limiting the damages sought herein.

## VII. CONDITIONS PRECEDENT

76. All conditions precedent to the Plaintiffs' rights to recover as herein alleged have been performed, have occurred, or have been waived or excused.

## VIII. ATTORNEY'S FEES

77. Plaintiffs are entitled to recover their attorneys' fees pursuant to Chapters 37.009 and 38 of the Texas Civil Practice and Remedies Code.

78. Plaintiffs will further seek to recover their attorney's fees for declaratory relief sought against Terracon pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code.

## IX. REQUEST FOR JURY TRIAL

79. Plaintiffs assert their right to a trial by jury, under Texas Constitution, article 1, section 15, and make this demand for a jury trial at least thirty (30) days before the date this case is set for trial, in accordance with Texas Rules of Civil Procedure 216. Plaintiffs have tendered the fee of $30.00 to the clerk of this court, as required by Texas Government Code section 51.604.

WHEREFORE, PREMISES CONSIDERED, Plaintiff's request that upon final hearing, they have judgment against the Defendants, jointly and severally, for their damages, interest, attorneys' fees, costs, and any other relief to which they may be entitled.

Respectfully submitted,

By: _____

Benton T. Wheatley
Texas Bar No. 24015171
Tracy McCreight
Texas Bar No. 24037064
Jessica C. Neufeld
Texas Bar No. 24059270
Munsch Hardt Kopf & Harr, P.C.
401 Congress Avenue, Suite 3050
Austin, Texas 78701
Telephone: 512.391.6100
Facsimile: 512.391.6149
Email: bwheatley@munsch.com
Email: tmccreight@munsch.com
Email: jneufeld@munsch.com

*ATTORNEYS FOR RLJ II-C AUSTIN AIR, LP,*
*RLJ II-C AUSTIN AIR LESSEE, LP; RLJ*
*LODGING FUND II ACQUISITIONS, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of February, 2014, a true and correct copy of the foregoing was forwarded via *__facsimile__*, U.S. First Class mail, certified mail, return receipt requested, and/or hand-delivery to the following:

David P. Benjamin
Brent A. Biggs
Benjamin, Vana, Martinez & Biggs, LLP
2161 N.W. Military Highway, Suite 111
San Antonio, Texas 78213
Fax: 210.881.0668
dbenjamin@benlawsa.com
bbiggs@benlawsa.com

*Attorneys for EBCO General Contractor, Ltd. and EBCO/Warrior Management, LLC*

Gregory N. Ziegler
Matthew Mumm
Macdonald Devin, P.C.
3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-52130
Fax: 214.747.0942
gziegler@macdonalddevin.com
mmumm@macdonalddevin.com

*Attorneys for Elness, Swenson, Graham Architects, Inc. and Mark Swenson, Individually*

Stephen K. Yungblut
Pratt & Yungblut, P.C.
2221 East Lamar Blvd., Suite 150
Arlington, Texas 76006
Fax: 817.633.6188
steve@pratt-yungblut.com

*Co-Counsel for Terracon Consultants, Inc. and Todd E. Swoboda, P.E., Individually*

William S. Rhea
DuBois Bryant & Campbell, LLP
700 Lavaca Street, Suite 1300
Austin, TX 78701
Fax: 512.457.8008
brhea@dbcllp.com

*Lead Counsel for Terracon Consultants, Inc. and Todd E. Swoboda, P.E., Individually*

Jeffrey G. House
Curney, Farmer, House & Osuna, P.C.
411 Heimer Road
San Antonio, Texas 78232-4854
Fax: 210.377.1065
jhouse@cgfph.com

*Attorneys for Alcadio Chapa, Jr. formerly d/b/a JR's Concrete Construction*

_____
Benton T. Wheatley

# EXHIBIT A

AFFIDAVIT OF JOHN V. NYFELER

STATE OF TEXAS

COUNTY OF TRAVIS

BEFORE ME, the undersigned authority, on this day personally appeared John V. Nyfeler, who being duly sworn, deposed as follows:

1. My name is John V. Nyfeler. I am of sound mind and capable of making this affidavit. I am personally acquainted with the facts herein stated and they are true and correct.

2. This matter relates to the building project: RLJ/Marriott Courtyard Hotel, Austin Airport, located at 7809 Ben White Boulevard, Austin, Texas 78744-1774.

3. I am President of The Nyfeler Organization, Inc. d/b/a/ John Nyfeler, FAIA and have worked in that capacity since February 1, 2010. For the previous ten years I worked for Aguirre Roden, Inc., a Texas based architect, engineer firm, in the capacity of Senior Vice President. I have been a registered architect in the State of Texas since 1970.

4. I have reviewed the construction documents for the referenced building project, prepared by Elness Swenson Graham Architects, Inc. and its Principal, Mark G. Swenson; Texas Architect Registration No. 13193, (collectively "Architect") and its sub-consultants and have reviewed other related documents provided to me. During the year 2009 and 2010, I have visited the site of the building and have visually examined the building and have made inspections of the construction at selected locations in the building. The documents that I reviewed and my observations and inspections of the site and of the building form the factual basis for the professional opinion that the Architect's acts, errors and omissions deviated from the appropriate standard of care for example:

1

a. The Architect and its consultants in the design of the building foundation failed to follow the recommendations of the Geotechnical Engineering Study dated November 21, 2000 prepared by HBC Engineering, Inc., which failure to follow the recommendations in the Geotechnical Engineering Study caused or contributed to the physical damage to the building including:

1      The Architect failed to advise the geotechnical consultant of the final finished floor elevations.

2      The Architect failed to take into account that the geotechnical borings  were taken before the site excavation was done.

3      The Architect did not take into account the admonition set out in 6.3 of the Geotechnical Report, "...zones of shallow groundwater seepage are possible along pervious seams/fissures of the near surface soils (particularly during or soon after periods of wet weather)."

4      The Architect accepted the estimated potential vertical rise (PVR) of three inches (3") and designed the building to that unacceptable range.

5      The Architect failed to advise the geotechnical consultant of the design which would set finished floor elevation more than two feet below the existing grade even though the geotechnical report states: "If finished grade is planned to be more than two feet above or below existing grade, HBC should be contacted to revise our recommendations."

6      The Architect failed to provide effective drainage around the building even though the geotechnical report (p.8) states: "...moisture variations in the sub-grade soils due to poor drainage, leakage of utilities, etc. could induce volumetric changes resulting in movements which are in excess of those estimated by the PVR procedure."

7      The Architect failed to design a wall drain recommended by the geotechnical report (p.14). The report states: "A wall drain is recommended for collection and removal of surface water percolation along the base of the walls."

2

8       The Architect failed to specify backfill of cohesive (clay) soil around the building to control surface water percolation which backfill will help to prevent buildup of higher wall pressures even though the geotechnical report (p.14) states: "The final 12 inches of backfill should preferably consist of cohesive soil to help reduce percolation of surface water into the backfill.

9       The Architect failed to have HBC Engineering, Inc. to review the final construction documents for concurrence that the documents conformed with the geotechnical report even though the geotechnical report states (p.19, Art.8.0) "HBC should be provided the opportunity to review the final plans and specifications to check that these and subsequent recommendations are properly interpreted." There is no record of this final review being done.

10      The Architect failed to design the surface water drainage around the building to prevent ponding of water near the building even though the geotechnical report states (p.15, Art.7.7) "...we highly recommend that the site drainage be developed so that ponding of surface water runoff near the structure does not occur."

b. The Architect and its consultants may have committed other acts, errors or omissions in its professional services rendered in connection with the project which acts, errors or omissions deviate from the applicable standard of carte.

These statements of fault made herein are true and correct of my own personal knowledge.

Further Affiant Sayeth Not.

_____
John V. Nyfeler

SWORN AND SUBSCRIBED BEFORE ME, this 18 day of June, 2010.



T. DECKER
Notary Public, State of Texas
My Commission Expires
MAY 21, 2012

3

# EXHIBIT B

# CERTIFICATE OF MERIT OF KIRBY T. MEYER, P.E.

STATE OF TEXAS                    §
COUNTY OF TRAVIS                  §

BEFORE ME, the undersigned notary public, on this day personally appeared Kirby T. Meyer, P.E. known to me to be the person whose name is subscribed to the following instrument, and having been by me duly sworn, upon oath, deposes and states as follows:

1. My name is Kirby T. Meyer. I am over 21 years of age and a resident of Austin, Texas. I am fully competent and able to testify herein, and do hereby state under oath that I am fully aware and cognizant of all the facts set forth herein below. I hereby do swear that all of said facts and statements made herein below are true and correct and of my own personal knowledge based on the available information.

2. I am a Professional Engineer licensed to practice in Texas and actively engaged in the practice of geotechnical engineering, foundation design, analysis and investigation which is the same relevant area of practice as HBC Engineering, Inc. (HBC). I have designed, analyzed and investigated foundations throughout Texas. I am also licensed as a Professional Engineer in Colorado.

3. In addition to being an owner and Chairman of MLAW Consultants & Engineers, I am also an owner and Chairman of MLA Labs, Inc. and Geostructural Tool Kit, Inc.

CERTIFICATE OF MERIT OF KIRBY T. MEYER, P.E.
Page 1 of 4

4. Based on my education and experience in the field of geotechnical engineering, I am familiar with and competent to testify on the standard of care which an engineer of ordinary knowledge and skill should employ in geotechnical investigation, analysis and reporting relative to the foundation constructed for the Courtyard Austin Airport located at 7809 East Ben White Blvd. My opinions are based on available documents and geotechnical investigations of this site. I reserve the right to modify my opinions if additional information becomes available.

5. HBC, the geotechnical engineer of record for the Courtyard Austin Airport, identified highly expansive soils which will change volume with changing moisture conditions at the site. The highly expansive nature of the soil was independently confirmed during MLAW's investigation.

6. In their geotechnical report, HBC recommended a stiffened slab-on-ground foundation supported on a select fill pad. The stiffened slab-on-ground foundation was to be designed based on the Department of Housing and Urban Development (HUD) Building Research Advisory Board's Report #33 (BRAB #33) titled "Criteria for Selection and Design of Residential Slabs-on-Ground" and dated 1968. HBC's geotechnical report was signed and sealed by Todd E. Swoboda, P.E. on November 21, 2000.

7. At the time of the HBC geotechnical report, the City of Austin had adopted the 1994 Uniform Building Code (UBC) for the design and construction of buildings such as this hotel. Section 1806.5 of the 1994 UBC indicates that slab-on-ground foundations on expansive soils should be designed using the Wire

CERTIFICATE OF MERIT OF KIRBY T. MEYER, P.E.
Page 2 of 4

Reinforcing Institute's (WRI's) or the Post-Tensioning Institute's (PTI's) design procedures. The BRAB #33 procedure recommended by HBC has not been widely used in Central Texas for many years. In addition, the BRAB #33 procedure was developed for the design of small residential foundations, not commercial buildings such as this hotel.

8. This site was excavated as much as 7 feet to provide a level construction pad. Had HBC accounted for the up to 7 feet of site cut, the predicted Potential Vertical Rise (PVR) for the site with no remove and replace modifications would have been as much as 7.6 inches, not the 3 inches stated in their report.

9. HBC failed to take into account the site cut in the geotechnical recommendations. Cutting the site reduces the overburden and exposes the deeper soils to higher levels of moisture change than would have been experienced prior to the cutting. Cutting results in a significant increase in the swell potential. HBC failed to determine final site elevations or notice site excavation while on site during construction.

10. HBC overestimation of the effect of 5 feet of remove and replace with select fill. Based on MLAW's PVR analysis, 5 feet of remove and replace would have only reduced the PVR to 2.7 inches, not less than 1 inch as reported in HBC's report. Had the site cut of up to 7 feet been considered, the value would be 4.8 inches.

11. HBC failed to recommend adequate measures to drain or prevent water from penetrating the underslab fill. Since the underslab fill's permeability is significantly higher than the surrounding clay, any water that infiltrates the

underslab fill would become trapped and slowly penetrate into the underlying clays that, due to their depth, would not have normally been exposed to significant levels of moisture changes. Free water was observed draining from the fill behind the exterior footing in one test pit and found in monitor wells. The trapping of water below the building significantly contributed to the foundation distress suffered by the structure.

12. Based on the above facts, HBC's geotechnical services and report signed and sealed by Todd E. Swoboda, P.E. proved to be inadequate for the soil conditions and did not met the standard of care for foundation recommendations for an expansive soil site.

FURTHER AFFIANT SAITH NOT,

_____
KIRBY T. MEYER, P.E.
MLAW Consultants & Engineers

SUBSCRIBED AND SWORN TO BEFORE ME on this the 18th day of June 2010 to certify which witness my hand and seal of office.

G. K. BROWN
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
11-8-2013

6/18/10
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

CERTIFICATE OF MERIT OF KIRBY T. MEYER, P.E.
Page 4 of 4

212

# EXHIBIT C

## CERTIFICATE OF MERIT OF DEAN R. READ, P.E.

**STATE OF TEXAS** §
**COUNTY OF TRAVIS** §

BEFORE ME, the undersigned notary public, on this day personally appeared Dean R. Read, P.E. known to me to be the person whose name is subscribed to the following instrument, and having been by me duly sworn, upon oath, deposes and states as follows:

1. "My name is Dean R. Read, Jr. I am over 21 years of age and a resident of Austin, Texas. I am fully competent and able to testify herein, and do hereby state under oath that I am fully aware and cognizant of all the facts set forth herein below. I hereby do swear that all of said facts and statements made herein below are true and correct and of my own personal knowledge based on the available information.

2. "I am a Professional Engineer licensed to practice in Texas and actively engaged in the practice of foundation design, analysis and investigation which is the same relevant area of practice as MBA Structural Engineers. I have designed, analyzed and investigated foundations throughout Texas. I am also licensed as a Professional Engineer in New Mexico, Louisiana, Mississippi, Oklahoma and the Commonwealth of the Northern Mariana Islands.

3. "In addition to being an owner and Vice President of MLAW Consultants & Engineers, I am also an owner, President and Chief Software Programmer of Geostructural Tool Kit, Inc. Through GTK, I developed the engineering software

titled PTISLab and VOLFLO that are used throughout the United States to analyze and design foundations on expansive soils.

4. "Based on my education and experience in the design and analysis of foundations, I am familiar with and competent to testify on the standard of care which an engineer of ordinary knowledge and skill should employ in the design of a foundation such as the one designed by MBA Structural Engineers (MBA) for the Courtyard Austin Airport located at 7809 East Ben White Blvd. My opinions are based on available documents and I reserve the right to modify my opinions if additional information becomes available.

5. "The MBA foundation plans for the Courtyard Austin Airport are signed and sealed by Andrew T. Marlin, P.E. and dated August 3, 2005. Several revised sheets were dated October 19, 2005. The MBA foundation plan generally consisted of a 4 inch thick flat slab foundation with spot and strip footings under load bearing elements.

6. "HBC Engineering, Inc. (HBC), the geotechnical engineer of record for the Courtyard Austin Airport, identified highly expansive soils which will change volume with changing moisture conditions at the site. The highly expansive nature of the soil was independently confirmed during MLAW's investigation.

7. "In their geotechnical report, HBC recommended a stiffened slab-on-ground foundation supported on a select fill pad. The stiffened slab-on-ground foundation was to be designed based on the Department of Housing and Urban Development (HUD) Building Research Advisory Board's Report #33 (BRAB #33) titled "Criteria for Selection and Design of Residential Slabs-on-Ground" and

CERTIFICATE OF MERIT OF DEAN R. READ, P.E.
Page 2 of 5

215

dated 1968.

8. "At the time of the MBA design, the City of Austin had adopted the 1994 Uniform Building Code (UBC) for the design and construction of buildings such as this hotel. Section 1806.5 of the 1994 UBC indicates that slab-on-ground foundations on expansive soils should be designed using the Wire Reinforcing Institute's (WRI's) or the Post-Tensioning Institute's (PTI's) design procedures. Future versions of the UBC and the International Building Code reference the same procedures.

9. "While the 1994 UBC does provide an exception to the WRI and PTI design procedures based on geotechnical recommendations as approved by the building official, the BRAB #33 procedure recommended by HBC has not been widely used in Central Texas for many years. In addition, the BRAB #33 procedure was developed for the design of small residential foundations not commercial buildings such as this hotel.

10. "Both the HBC recommended BRAB #33 and the code required WRI procedures are empirical methods for designing stiffened slab-on-ground foundations on expansive soils. A stiffened slab-on-ground foundation consists of stiffening ribs (or beams) in a "waffle" type pattern that structurally resists slab deformation (bending) due to soil movement. A stiffened foundation with deep and closely spaced ribs will have more strength and stiffness than a foundation with shallow widely spaced ribs. A thin uniform thickness lightly reinforced foundation with no stiffening ribs will have by comparison significantly less strength and stiffness and therefore will not be able to structurally resist

CERTIFICATE OF MERIT OF DEAN R. READ, P.E.
Page 3 of 5

deformations due to soil movement.

11. "Due to being non-continuous and not uniformly spaced, the strip footings on the MBA foundation plan will provide very little resistance to the bending forces presented by shrinking and swelling of the underlying clay soils. The MBA foundation design is not in compliance with the recommendations of the HBC report or the applicable building code requirements.

12. "The Floor Construction Notes on Sheet S2.1 indicate that the slab is to be reinforced with polypropylene fibers uniformly dispersed in the concrete mixture using the manufacturer's recommendations. Polypropylene fibers are not commonly used as structural reinforcement in Central Texas. During MLAW's investigation, polypropylene fibers were not found in the concrete. Further, the Reinforcing Notes on Sheet S1.0 indicate that the WWF is to be 6x6-W1.4xW1.4 unless otherwise noted (the 6x6 indicates a 6" by 6" grid while W1.4 indicates wire with a cross-sectional area of 0.014 square inches). The Typical Slab Bar Diagram detail on Sheet S2.0 indicates the WWF is to be 6x6 W2.1xW2.1 (W2.1 has a cross-sectional area per wire of 0.021 square inches) placed 1 inch from the top of the slab. Either level of WWF reinforcement is extremely light and is commonly used in sidewalks and driveways in central Texas not commercial buildings.

13. The American Concrete Institute's Building Code Requirements for Reinforced Concrete (ACI 318-92) indicates that the minimum steel area for shrinkage and temperature reinforcement (not minimum flexural reinforcement) of a slab shall be 0.0018 times the gross concrete area. For a 4 inch thick slab,

the minimum steel area for shrinkage and temperature reinforcement is 0.086 square inches which is approximately 2 times what was provided for on the MBA foundation plans. 6x6 W2.1xW2.1 WWF has a steel area of approximately 0.042 square inches per foot.

14. "The MBA Structural Engineers foundation design as signed and sealed by Andrew T. Marlin, P.E. for the Courtyard Austin Airport located at 7809 East Ben White Boulevard in Austin, Texas is inadequate for the soil conditions and does not meet the standard of care of an engineered foundation on expansive soil. The failure of the MBA foundation design to meet the standard of care for an engineered foundation has contributed to the unacceptable performance of the foundation as exhibited through excessive floor slopes and finishing material distress."

FURTHER AFFIANT SAITH NOT,

DEAN R. READ, P.E.
MLAW Consultants & Engineers

SUBSCRIBED AND SWORN TO BEFORE ME on this the 18th day of June 2010 to certify which witness my hand and seal of office.

G. K. BROWN
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
11-8-2013

6/18/10
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

CERTIFICATE OF MERIT OF DEAN R. READ, P.E.
Page 5 of 5

218

# APPENDIX B



CAUSE NO. D-1-GN-10-002325

| | | |
|---|---|---|
| RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; and RLJ LODGING FUND II ACQUISITIONS, LLC, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § § | |
| EBCO GENERAL CONTRACTOR, LTD; EBCO ADVANCED BUILDING SYSTEMS, LTD; EBCO/WARRIOR MANAGEMENT LLC; ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. | § § § § § § | TRAVIS COUNTY, TEXAS |
| | § § § § § § § | |
| Defendants and Third-Party Defendants. | § | 200TH JUDICIAL DISTRICT |

**CHARGE OF THE COURT**

Members of the Jury:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. Rely on the Court Operations Officer to notify you if she receives a call for you on the emergency number she gave you.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should

1

May 14, 2014

Filed in The District Court
of Travis County, Texas

MAY 15 2014 BH
At_____9:07 A M.
Amalia Rodriguez-Mendoza, Clerk

Filed in The District Court
of Travis County, Texas

MAY 16 2014 BH
At_____3:07 P M.
Amalia Rodriguez-Mendoza, Clerk

rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Unless the instruction for a particular question tells you otherwise, a "yes" answer must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." When you answer a question that requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence, unless the instruction for that particular question tells you otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

8. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

9. Do not answer questions by drawing straws or by any method of chance.

10. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

2

May 14, 2014

11. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

12. To return a verdict, the **same** group of at least 10 of you must agree on each and every answer. You may **not** have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

3

May 14, 2014

## Instructions and Definitions

**Assignment.** White Lodging Services Corporation, Inc. (White Lodging) assigned the contracts and causes of action in this lawsuit to the RLJ Plaintiffs in this case. Therefore RLJ "steps into the shoes" of White Lodging and RLJ and White Lodging should be considered one and the same for the purposes of answering the questions below.

**"Architectural Contract"** means the AIA B141 – 1997 Standard Form of Agreement Between Owner and Architect entered into between White Lodging Services Corporation, Inc. and Elness Swenson Graham Architects, Inc. dated January 1, 2005, and all incorporated exhibits and attachments.

4

May 14, 2014

# QUESTION 1

Did ESG fail to comply with the Architectural Contract by failing to coordinate as required by the contract?

Answer "Yes" or "No."

Answer: _____ *NO* _____

5

May 14, 2014

## QUESTION 2

Did ESG fail to comply with the Architectural Contract regarding the structural engineering services required by the contract?

Answer "Yes" or "No."

Answer: _____Yes_____

6

May 14, 2014

If you answered "Yes" to Questions 1 and/or 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION 3

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate White Lodging for its damages, if any, that resulted from ESG's failure to comply with the Architectural Contract that you found in answer to Questions 1 and/or 2?

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Consider only the following elements of damages, if any, and none other. Answer separately in dollars and cents for damages, if any:

a) The difference, if any, between the value of the hotel as constructed and the value of the hotel had ESG complied with the Architectural Contract. The difference in value, if any, shall be determined as of August 31, 2010.

Answer: $700,000.00

b) The reasonable and necessary cost, if any, for barrier remediation that you find is due to ESG's failure to comply.

Answer: $70,000.00

c) The reasonable and necessary cost of repairs to the hotel, if any, made through August 31, 2010 that you find is due to ESG's failure to comply.

Answer: $15,000.00

7

May 14, 2014

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

1) preside over your deliberations, meaning manage the discussions, and see that you follow these instructions
2) write down the answers you agree on;
3) write down and give to the Court Operations Officer any questions you have for the judge without revealing any answers you have agreed on and without revealing any vote(s) taken in the jury room;
4) get the signatures for the verdict certificate; and
5) notify the Court Operations Officer that you have reached a verdict.

Do you understand the duties of the presiding juror?  If you do not, please tell me now.

**Instructions for Deliberating, Reaching a Verdict, & Signing the Verdict Certificate:**

1) All jurors should participate in the jury's deliberation on every question.
2) To return a verdict, the **same** group of at least 10 of you must agree on each and every answer. You may **not** have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.
3) Only those who agree on each and every answer should sign the verdict.  A juror who agrees with the answer to some questions, but not all, should *not* sign the verdict.

Do you understand these instructions?  If you do not, please tell me now.

Judge Presiding

8

May 14, 2014

# **Verdict Certificate**

Those of us who have signed below agree to each and every answer.


_____
Gregg Shirley

_____
Huong Bailie

_____
Marilyn Reed-Bridges

_____
Michael Boswell

_____
William Molloy

_____
Cynthia Collier

_____
Lindy Buckley

_____
Carin Peterson

_____
Eric Polzer

_____
Kathryn Foster- Cornelius

_____
Kimbrea Robinson

_____
Jaclyn Sandeen


9


May 14, 2014

# APPENDIX C

Filed in The District Court
of Travis County, Texas

ES JUN 1 3 2014

At _____ 4:38 _____ M.

Amalia Rodriguez-Mendoza, Clerk



**345TH DISTRICT COURT**
**TRAVIS COUNTY COURTHOUSE**
**P. O. BOX 1748**
**AUSTIN, TEXAS 78767**

**STEPHEN YELENOSKY**
Judge
(512) 854-9374
(512) 854-4540

**DANA LEWIS**
Staff Attorney
(512) 854-9892

**ANGELA RILEY**
Court Operations Officer
(512) 854-9712

**ALBERT ALVAREZ**
Official Reporter
(512) 854-9373

**BARI HENSON**
Court Clerk
(512) 854-5835

June 13, 2014

Mr. Benton T. Wheatley
Ms. Tracy McCreight
Munsch Hardt Kopf & Harr, PC
401 Congress Avenue, Suite 3050
Austin, Texas 78701
*VIA FAX: (512) 391-6149*

Mr. Gregory N. Ziegler
Mr. Matthew Mumm
Macdonald Devin, PC
3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
*VIA FAX: (214) 747-0942*

Re: Cause No. D-1-GN-10-002325; *RLJ II-C Austin Air, et al vs. EBCO General Contractor, Ltd., et al in the 200th Judicial District Court, Travis County Texas*

Dear Counsel:

I have sent you more than one letter such as this explaining my reasoning and cautioning you concerning the limited import of these letters, so I will not repeat that admonition here.

**The one-satisfaction rule as applied to contracts**

The cases contradict one another, holding the one-satisfaction rule does not apply to contracts, it applies to contracts only if two parties[1] breached the same promise, and it applies to contract claims regardless of the promises if the breaching parties caused the same injury.

In *CTTI*, the earlier of the two pertinent Third Court of Appeals decisions, the Court reasoned that because the Supreme Court, in *Crown Life,* spoke of "tortfeasors" and "joint and several liability," the one satisfaction rule does not apply to contracts. However, no contract was ultimately at issue in *Crown Life*; the plaintiffs "sued Casteel and Crown alleging DTPA, Article 21.21, and common-law causes of action." The same is true of *Ellender*. In *Galle*, the Third Court revisited the question again citing *Crown Life* but without referencing *CTTI*. In *Galle*, the

---

[1] The same principles will apply to more than two parties but as shorthand I will use "two" throughout this letter, particularly because there are two breaching parties at issue here.

court held that "the rule is not limited to tort claims and applied settlement credits to preclude a recovery in contract.

The cases following *CTTI*, identified by RLJ, are inapposite. *InvestIn.com*, *Moon Sun Kang*, and *Karbach* each construed but one contract, determined whether certain individuals were or were not parties to that contract, and say nothing about settlement credits. In a Memorandum Opinion, the court in *LJ Charter* recites the same law on one-satisfaction cited by the *Galle* court. This includes the principle that the single injury, not the cause of action, is determinative. However, with respect to the part of the *LJ Charter* opinion cited, the court does not seem to apply it. Stating that individuals who are not parties to the contract "could not be jointly liable for the breach of contract damages," focuses on the cause of action rather than the injury. If there is one single, indivisible injury caused by two entities – one breaching a common law duty and one breaching a contract, any award for that injury against one defendant should be credited against the other. Perhaps the court meant that under the facts of the case the contract damages were distinct, divisible damages.

In *Ellender*,[2] the Texas Supreme Court instructed courts to look to the settlement agreement exclusively to determine if settlement funds were apportioned between divisible or indivisible damages and in what amounts.[3]

Here, the settlement agreement merely states what would be true even if unstated – EBCO's settlement does not release any claims against ESG. To establish that all or some of the settlement funds were apportioned to divisible claims against EBCO, RLJ needed to identify that category of damages and state the amount apportioned to it.[4] Since RLJ did not do so, the court is required to presume that the entire settlement amount is credited to ESG.

The legal justification given for excluding contracts is that no party can be jointly liable for a breach of a contract that it did not enter. This is true but misses the point by conflating the breach from which liability arises with the damages arising from each breach. There are two distinct breaches of two separate contracts by separate parties. Neither party is held liable for the

---

[2] *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 929 (Tex. 1998)

[3] In *Galle*, the court stated the expansiveness of the release demonstrated that the settlement funds were not apportioned between types of damage. Since a paying party will always expect a full release, the scope of the release, if the determining factor, would always preclude apportionment. In any event, this part of the *Galle* opinion is *dicta* because the court found that the plaintiff had the burden to prove apportionment and had not done so; the court's ruling was not dependent on what the release said but what the settlement did *not* say. In *Ellender*, the Supreme Court looked for language of apportionment between types of damage rather than the scope of the release.

[4] Whether RLJ could have, consistent with the pleadings and the evidence, identified divisible damages is another question. There was evidence of repair costs due to EBCO's failure to build to specifications, but RLJ may not have presented those as divisible damages in its pleading or evidence. The damage question in the Charge asked for damages "due to ESG's failure to comply." The question had to ask specifically about damages resulting from *ESG's failure* to inquire about cause-in-fact. That specification, however, does not mean, without more, that the damages found were divisible and attributable only to ESG.

other's breach. Each party is liable for its own breach which by itself results in indivisible damages. Just as with joint tortfeasors who breach different common law duties that each proximately cause an indivisible damage. (As the Pattern Jury Charge states, there may be more than one proximate cause of an occurrence.)

Any perception that applying the one-satisfaction rule here would be unfair may arise from the fact that RLJ sought more in damages than the jury awarded and received more in settlement with EBCO alone than the jury awarded in damages. Had there been no settlement, though, the jury's determination of diminished value would be the amount owed jointly by EBCO and ESG, even less than what RLJ received in settlement from EBCO. The source of RLJ's disappointment regarding damages is the jury verdict, not the application of settlement credits to it.

## The one satisfaction rule as applied to attorney's fees

Regarding ESG's objection to Plaintiff's Motion for Attorney's fees, the only aspect before the court now is a pure question of law – when settlement credit equal or exceed the damages awarded against the non-settling party does it extinguish any claim for attorney's fees?

Historically, as RLJ has pointed out, the one-satisfaction rule has been discussed in both cases and commentary almost exclusively in the context of torts, which of course do not involve attorney's fee claims. The limitation to the full amount of damages, therefore, should be read in that context and not taken as a deliberate decision to disregard attorney's fees claims. There are but a few cases addressing the application of the one-satisfaction rule to an attorney's fees claim associated with a contract claim. Just as with the application to contract damages, the application to attorney's fees is new and developing. ESG is correct that the net-payment cases do not address settlement credits for the same claim and damages. However, in the primary authority relied upon by ESG, *Osborne,* there was a comparative fault question to which the jury answered that *Jauregi* was less than 50% liable. *Osborne* also involved a procedural background very different from the one here.

In neither *Osborne* nor any other case cited was there a settlement half-way through a jury trial after years of litigation. The *Osborne* opinion begins by noting, "[a]fter mold was discovered in the house, State Farm paid $1,874,687 in mold-related claims. Despite receiving those payments, the Osbornes sued Jauregi and numerous subcontractors, settling before trial for more than $1 million." Later in the analysis, the court again observes that the settlement was pre-trial. *Obsborne* and *Hamra* cite and rely upon *Blizzard* and quote this particular sentence, "[h]owever, it is quite another to allow attorney's fees on a claim that, although successful, was paid in full *before trial* [emphasis added]." By contrast, here, the settlement with EBCO came in the midst of trial, when RLJ was just days away from a verdict after incurring, it claims, hundreds of thousands in attorney's fees. ESG's position is effectively that RLJ, after settling with EBCO, should have abandoned the trial and non-suited ESG, which had conceded nothing and settled nothing. Or, RLJ should not have settled because they would have been much better

off with *the very same verdict* against both defendants. By such a verdict they would have been awarded the $700,000 against the defendants jointly, they would have prevailed and RLJ would have had the potential of a significant award in attorney's fees. If ESG is correct, RLJ has not prevailed, directly and only, because it reached a settlement with EBCO. This disincentive to settle is explained more fully below.

The procedural background aside, there is more than one reason a settlement credit exceeding damages should not automatically extinguish a claim for attorney's fees.

First, in contract, a plaintiff with an associated attorney's fees claim is not given one satisfaction by damages alone. The plaintiff is not made whole or returned to its position before the breach. Full satisfaction for RLJ would be the jury's verdict on damages, the fact-finder's (jury or judge by agreement as here) determination of fees shown to be incurred against the defendants jointly or segregated as to those incurred against ESG alone, less the settlement amount. The one-satisfaction rule is intended to limit a plaintiff to no more than full redress, not to restrict the plaintiff to less than that.

Second, the legislature has provided for the possibility of attorney's fees, even if not provided in the contract itself, to hold individuals and entities to their agreements. There are of course several factors to consider in awarding attorney's fees, but the law recognizes that fees equal to or exceeding damages may be properly awarded.[5] Otherwise, no agreement worth less than the attorney's fees required to enforce it would ever be enforced. That is the result if fees can be extinguished, not just reduced, by a verdict that is less than another defendant's settlement of indivisible damages. A plaintiff who settles with one defendant for the full amount it seeks in indivisible damages and the full amount of the fees attributable to that defendant (indivisible and segregated) would be foolish to continue to litigate against a remaining defendant with little or no divisible damages even if the plaintiff knew liability could be established and had a high expectation of proving significant fees. The remaining defendant does not receive a mere windfall but rather a free pass at the expense of contract enforceability.

Third, the possibility that attorney's fees will be extinguished by a settlement with one defendant skews the parties' calculation of probabilities and risks so as to greatly discourage all parties from settling. Litigants consciously or subconsciously conduct a calculation of the

---

[5] ESG's case law does not hold otherwise. The *Smith v. Tam* holding is that the appellate court erred in reversing a verdict for zero attorney's fees and rendering judgment for attorney's fees (1) as a matter of law (2) in an amount roughly equivalent to the total damages awarded and (3) equivalent to the full amount fees sought by plaintiffs (4) even though the plaintiffs were awarded less than a third of the damages sought, and (5) "in the absence of evidence that such fees were warranted due circumstances unique to this case." *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 548 (Tex. 2009). ESG's description of the holding included none of those four crucial points. *Barker* is unremarkable; a remand for redetermination of fees after the appellate court reduced the damages from $111,000 to $16,000. If the law were, as ESG claims, that a court simply compares the amount awarded to the amount of fees and make a determination the latter's reasonableness "on its face," surely there would be better authority for that proposition.

probabilities of gain and loss. Because attorney's fees in a contract case may equal or even exceed damages, the probability of significant fees cannot be disregarded based on the probable amount of damages alone. Defendants' calculations of course also entail this understanding. Because of the probability of an award of some attorney's fees that will not necessarily be reduced in proportion to the award in damages, the opposing parties' valuations of the case come closer to converging.

If, however, the award of attorney's fees becomes a function of receiving damages *above a certain amount*, it radically changes the equation all parties have employed to calculate the probabilities of gain and loss and *greatly discourages* settlement between the plaintiff and each defendant. A plaintiff with a large fee claim will hesitate to enter an otherwise reasonable settlement with one defendant because the entitlement to any fees (not already compensated) against the remaining, non-settling party, rides on a verdict for damages above the settlement. If the plaintiff, as here, nonetheless does settle with one defendant, the plaintiff and remaining defendant lose all incentive to settle. The plaintiff now compares the probability of a larger verdict with attorney's fees *versus the probability of receiving nothing in additional damages and nothing in fees*. The remaining defendant compares the probability of owing a larger verdict and fees *versus the probability of owing nothing*. It becomes a crap-shoot in which it would be only logical for both parties to roll the dice.

Judgment cannot be entered without a determination of attorney's fees, if any.

Sincerely,

Stephen Yelenosky
Judge, 345th District Court

SY/ar
Orig: Amalia Rodriguez Mendoza, District Clerk

# APPENDIX D

Notice sent: Final Interlocutory None
Disp Parties: ALL
Disp code: CVD / CLS 4618
Redact pgs:
Judge SAY Clerk BH

Filed in The District Court
of Travis County, Texas
At _____
AUG 14 2014 P.M.
Amalia Rodriguez-Mendoza, Clerk

## CAUSE NO. D-1-GN-10-002325

| | | |
|---|---|---|
| RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; and RLJ LODGING FUND II ACQUISITIONS, LLC, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| vs. | § § | |
| EBCO GENERAL CONTRACTOR, LTD; EBCO/WARRIOR MANAGEMENT LLC; ELNESS, SWENSON, GRAHAM ARCHITECTS, INC.; MARK SWENSON, Individually; TERRACON CONSULTANTS, INC.; TODD E. SWOBODA, P.E., Individually; and ALCADIO CHAPA, JR. formerly D/B/A JR'S CONCRETE CONSTRUCTION, | § § § § § § § § § § § § | TRAVIS COUNTY, TEXAS |
| Defendants and Third-Party Defendants. | § | 200TH JUDICIAL DISTRICT |

## <u>FINAL JUDGMENT</u>

On May 5, 2014, this case was called for trial. Plaintiffs RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; and RLJ LODGING FUND II ACQUISITIONS, LLC ("Plaintiffs") appeared through a representative and announced ready for trial. Defendants ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. ("ESG") and EBCO GENERAL CONTRACTOR, LTD and EBCO/WARRIOR MANAGEMENT LLC (collectively, "EBCO") each appeared through a representative and announced ready for trial.

Before trial, Plaintiffs asserted claims pursuant to the doctrine of equitable subrogation against defendants EBCO, ESG, and Terracon Consultants, Inc. ("Terracon"), which were disposed of on partial summary judgment that Plaintiffs take nothing on these claims against EBCO, ESG, and Terracon.

FINAL JUDGMENT                                                    Page 1
819658  402.122

1708

Plaintiffs also asserted claims against defendants MBA Structural Engineers, Inc. ("MBA"), Mark Swenson, and Todd Swoboda, which were disposed of before trial by partial summary judgment that Plaintiffs take nothing against MBA, Swenson, and Swoboda.

Before trial, Plaintiffs also non-suited all their claims against the following defendants: Andrew Marlin, Davinci Pools, LLC ("Davinci"), Bridgeview Plumbing, Inc. ("Bridgeview"), and Champion Site Prep, LP ("Champion").

Plaintiffs also asserted claims against EBCO Advanced Building Systems, Ltd. ("EBCO Systems") , which were disposed of before trial by partial summary judgment that Plaintiffs take nothing against EBCO Systems.

EBCO asserted third-party claims against third-party defendants Davinici, Bridgeview, and Champion, which were disposed of before trial by partial summary judgment that EBCO take nothing against Davinci, Bridgeview, and Champion.

Before trial, EBCO also non-suited all its claims against third-party defendants, White Lodging Services Corporation.

Before trial, EBCO also non-suited all its claims against third-party defendant Alacadio Chapa, Jr. formerly d/b/a JR's Concrete Construction.

EBCO also asserted claims against Andrew Marlin and MBA, which were disposed of before trial by summary judgment that EBCO take nothing against Marlin and MBA.

Before trial, ESG non-suited all its claims against third-party defendants Griffin Engineering and Gregory Griffin.

ESG also asserted claims against Andrew Marlin and MBA, which were disposed of before trial by summary judgment that ESG take nothing against Marlin and MBA.

---

**FINAL JUDGMENT**
819658  402.122

**Page 2**

Before trial, the Court dismissed Plaintiffs' claim against Terracon for breach of the Materials Testing Contract pursuant to Texas Civil Practice & Remedies Code section 150.002(e).

Before trial, Plaintiffs non-suited all their claims against Terracon and all remaining claims against Todd Swoboda.

Before trial, the Court rendered partial summary judgment that Plaintiffs take nothing on their tort claims against Defendants and thereby rendered moot all defendants' and third-party defendants' cross-claims for contribution.

During trial, Plaintiffs voluntarily dismissed all remaining claims that it had against EBCO pursuant to the agreement of the parties.

The remaining issues in the case proceeded to trial to the jury. After a jury was impaneled and sworn, it heard evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed, and entered of record. The questions submitted to the jury and the jury's findings are ~~attached as Exhibit A~~ *of record* and incorporated by reference. ⟨5.7.⟩

After a post-verdict hearing, the Court granted the motion of ESG for the application of the one-satisfaction rule to apply the sum of the amount of the settlements between Plaintiffs and EBCO and Plaintiffs and Terracon as credits ("the Settlement Credit") against the amount awarded by the jury to Plaintiffs as damages for ESG's failure to comply with the Architectural Contract. Accordingly, pursuant to the "one-satisfaction rule," the Court applies the Settlement Credit of $1,170,000 against the sum of the jury award of damages and the attorney's fees award.

By agreement of the parties, the matter of attorney's fees was submitted to the Court for determination. After considering the Plaintiffs' Amended Motion for Attorney's Fees and ESG's

---

**FINAL JUDGMENT**
819658   402.122

Page 3

Response to Plaintiffs' Amended Motion and the arguments of counsel, the Court overruled ESG's objections to Plaintiffs' Amended Motion for Attorney's fees and finds that $901,650.96 was a reasonable and necessary attorney's fee for the presentation of Plaintiffs' claims for breach of contract claim against ESG.

The Court also considered by submission only the issue of Plaintiffs' entitlement to attorney's fees despite the application of the Settlement Credit. The Court overruled ESG's objection to Plaintiffs' entitlement to attorney's fees despite the application of the Settlement Credit and found that Plaintiffs were entitled to attorney's fees and to present evidence of attorney's fees.

The Court hereby RENDERS judgment as follows:

1. The Court ORDERS that Plaintiffs collectively recover the following from ESG:

 a. The amount of <u>$516,650.96</u>, being the sum of the jury's award of $785,000 as actual damages and the attorney's fee award of $901,650.96, less the Settlements Credit of $1,170,000;

 b. Court costs; and

 c. Post-judgment interest on all of the above at the rate of 5% compounded annually from the date this judgment is signed until all amounts are paid in full.

2. The Court further ORDERS that if this judgment is appealed to an intermediate court of appeal and modified or reversed in favor of Plaintiffs, Plaintiffs will additionally recover from ESG the amount of $125,000, representing the anticipated reasonably and necessary fees and expenses that would be incurred by Plaintiffs.

---

3. The Court further ORDERS that if this judgment is appealed to the Texas Supreme Court and modified or reversed in favor of Plaintiffs, Plaintiffs will additionally recover from ESG the amount of $50,000, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiffs.

4. This judgment is intended to be an appealable judgment that fully and finally disposes of all claims between and among all parties to this proceeding and hereby finally disposes of all claims and all parties to this proceeding.

5. All relief requested by any party to this proceeding not expressly granted in this judgment is hereby denied. Such denial includes but is not limited to all declaratory relief sought by ESG pursuant to chapter 37 of the Texas Civil Practice and Remedies Code against Plaintiffs.

6. The Court ORDERS execution to issue for this judgment.

SIGNED on ___August 14___, 2014.

THE HONORABLE STEPHEN YELENOSKY

**FINAL JUDGMENT**                                                **Page 5**
819658 402.122

# APPENDIX E



**ENVIRONMENTAL, GEOTECHNICAL AND CONSTRUCTION MATERIALS SERVICES**

October 30, 2000

Mr. Scott Casanova
White Lodging Services Corporation
1000 East 80th Place, Suite 500 North
Merrillville, Indiana 46410

Telephone:    (219) 769-3267
Fax:               (219) 756-5484

Re:    Proposal for Geotechnical and Environmental Services
          Marriott Courtyard Hotel
          Highway 71 at Riverside Drive
          Austin, Texas
          HBC Proposal No. 62-6366.00



*SIGNED CONTRACT 10-31-2000*

Dear Mr. Casanova:

HBC Engineering, Inc. (HBC) appreciates the opportunity to submit this proposal to perform a geotechnical engineering study and environmental site assessment (ESA) for the above referenced property. This proposal outlines our understanding of the scope of services to be performed by HBC for this project and provides an estimate of the cost of our services.

## PROJECT INFORMATION

Plans are to construct a five-story hotel on a site located at the intersection of Highway 71 and Riverside Drive in Austin, Texas. We understand that the proposed structure is planned to consist of metal frame construction with steel studs. Based on discussions with the structural engineer, anticipated wall loads for the proposed structure are on the order of 5 to 6 kips per linear foot. Adjacent surface parking areas are also planned, along with a detention pond.

## SCOPE OF SERVICES

A brief summary of the services to be provided by HBC is presented in the following paragraphs.

### Geotechnical Services

The geotechnical study will be performed to develop geotechnical engineering recommendations for the project. The project will be performed by a registered professional engineer experienced in geotechnical engineering in the Austin area.

HBC 00172

\\AUSMAIL1\O:o\dox\prop\62-6366.00.doc

| Houston | Dallas | Fort Worth | Austin | Wichita Falls |
|---|---|---|---|---|
| 11555 Clay Road | 8901 Carpenter Frwy. | 2301 E. Loop 820 North | 3913 Todd Lane | 3100 Seymour Hwy. |
| Suite 101 | Suite 100 | Flagstone & Loop 820 | Suite 312 | Suite 105 |
| Houston, TX 77043 | Dallas, TX 75247 | Fort Worth, TX 76118 | Austin, TX 78744 | Wichita Falls, TX 76310 |
| (713) 690-8989 | (214) 630-1010 | (817) 268-8600 | (512) 442-1122 | (940) 766-6092 |
| Fax (713) 690-6767 | Fax (214) 630-7070 | Fax (817) 268-8602 | Fax (512) 442-1181 | Fax (940) 766-6093 |



EXHIBIT
PENGAD 800-631-6989

**PLAINTIFF'S EXHIBIT 3**



Mr. Scott Casanova
October 30, 2000
Page 2 of 6

Field Program. As requested by the client, a total of four test borings to depths of 25 feet are planned in the proposed building area. In addition, five borings are planned to depths of 5 feet in the proposed pavement areas, along with one boring to 10 feet in the proposed detention pond area.

During drilling, test samples will generally be collected utilizing either thin-walled tube samplers (shelby tubes) or the Standard Penetration Test. Once the samples have been collected and classified in the field, they will be properly prepared and placed in appropriate sample containers for transport to our laboratory.

This proposal assumes that the site can be accessed with standard truck-mounted drilling equipment and does not include services associated with site clearing, location of underground utilities, or site access for unusually soft or wet surface conditions. If such conditions are known to exist on the site, HBC should be notified so that we may adjust our scope of services, if necessary.

Laboratory Testing. The sample classifications will be reviewed by a geotechnical engineer in the laboratory, and a laboratory testing program will be assigned which will be specific to the project requirements and the subsurface conditions observed. The testing program could include, but may not be limited to, moisture contents, unit dry weights, Atterberg Limits, compressive strength tests, and grain-size analyses. The laboratory testing program will concur with the applicable ASTM standard procedures.

Engineering Report. The results of our field and laboratory programs will be evaluated by a registered professional geotechnical engineer. Based on the results of our evaluation, an engineering report will be prepared which details the results of the testing performed and provides Logs of Borings and a project layout. The report will also provide geotechnical engineering recommendations which will address the following:

- Site and subgrade preparation;
- Foundation design and construction;
- Retaining wall design guidelines; and
- Pavement design guidelines.

Separate reports will be provided for the geotechnical study and the ESA. The scope of the ESA is given in the following section.

HBC 00173



Mr. Scott Casanova
October 30, 2000
Page 3 of 6

**Environmental Site Assessment (ESA)**

An Environmental Site Assessment (ESA) will also be performed to gather data and render an opinion regarding the absence or presence of potential environmental concerns associated with past or current practices on or near the site. The scope of services is intended to meet American Society for Testing and Materials (ASTM) Standard Practices for ESA's (Designation: E1527-93). The following gives a brief explanation of each major element of the ESA.

Historical Review. A historical review of the site and surrounding properties will be conducted to evaluate past land use and to identify items of potential environmental concern. The following information, where applicable, will be acquired and reviewed:

- Chain of title;
- Readily available aerial photographs;
- City directories;
- Sanborn fire insurance maps;
- Interviews with prior landowners or site occupants; and,
- Interviews with current owner or owner's representative.

Environmental Setting. United States Geological Survey topographic quadrangle maps, geologic atlas maps, United States Department of Agriculture soil surveys, and other available published literature will be reviewed to evaluate the geologic and hydrogeologic conditions of the site. In addition, available published literature will be reviewed to evaluate the potential for elevated radon accumulation on the site. The information gathered will be correlated with field observations and an assessment of the environmental sensitivity of the site will be provided.

Site Inspection. HBC personnel will conduct a visual site inspection to document the current environmental condition of the site. In addition, adjacent properties will be observed from the boundaries of the site to evaluate potential off-site environmental concerns. HBC's on-site inspection will include, but not be limited to, a review of the following issues:

- Surficial staining and/or distressed vegetation;
- Underground/above ground storage tanks (including sumps);
- Dielectric fluid-containing equipment (i.e., transformers);
- Solid and/or hazardous waste disposal areas;
- Storage of hazardous substances; and,
- Potential jurisdictional wetland areas.

\\AUSMAIL1\Geo\dox\prop\62-6366.00.doc

HBC 00174



Mr. Scott Casanova
October 30, 2000
Page 4 of 6

Photographs of these and other potential items of environmental concern will be included in the report.

<u>Regulatory Agency Review.</u>  Regulatory databases will be reviewed to identify registered facilities on the site or in the site vicinity which may present an environmental concern to the site.  The following is a list of regulatory databases that will be reviewed:

| Regulatory Database | Search Radius |
|---|---|
| Environmental Protection Agency (EPA) National Priorities List (NPL) | 1 mile |
| EPA Open Dump Inventory | 1 mile |
| EPA Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS) | ½ mile |
| EPA Resource Conservation and Recovery Act (RCRA) | ¼ mile |
| EPA Emergency Response Notification System (ERNS) | onsite/adj. |
| State Superfund | 1 mile |
| State Solid Waste Management | ½ mile |
| State Leaking Petroleum Storage Tank (LPST) | ½ mile |
| State Petroleum Storage Tank (PST) | ¼ mile |
| State Reported Spills | onsite/adj. |
| Local Regulatory Agencies | as applicable |

<u>Preparation of Final Report.</u>  Upon completion of the site inspection and collection of historical and regulatory information, a final report will be prepared which documents potential areas of environmental concern, if present.  Conclusions and recommendations with regard to HBC's findings will be provided.  If additional investigation is recommended, appropriate justification will accompany the specific recommendation, and HBC personnel will contact the client representative prior to issuance of the final report.

### PROJECT BUDGET

The basis for billing is as follows:

Geotechnical Study ................................................................................................ $3,350
Phase I ESA ...................................................................................................... $2,000

Total ................................................................................................................. $5,350

\\AUSMAIL1\Geo\docs\prop\62-6366.00.doc

HBC 00175



Mr. Scott Casanova
October 30, 2000
Page 5 of 6

The above costs are based on the scope of services presented in this proposal. We will not exceed the above costs without your prior approval.

The costs above include one historical title search. If more than one search is necessary, additional fees may apply. In this case the client will be contacted prior to initiating additional title searches.

If, as a result of these services, unanticipated geotechnical conditions or environmental concerns are identified, additional work may be necessary. Detailed workplans and cost estimates for additional work will be provided upon request, and client approval will be obtained prior to commencement of any additional work outside the scope of this proposal.

## SCHEDULE

We can initiate our geotechnical field operations within three to six working days following authorization to proceed, if site access and weather conditions will permit. We anticipate completion of our services and submittal of our geotechnical report within three weeks of initiation of our field services. In situations where information is needed prior to submittal of our report, we can provide verbal information or recommendations for specific project requirements directly after we have completed our field and laboratory programs.

The ESA report will be delivered within two to three weeks of notification to proceed, assuming site access can be obtained within five days. If a more rapid turnaround is required, please contact me so that we can discuss alternatives to perform the project on an accelerated basis.

In order to comply with the proposed schedule, the following is required at the time of notification to proceed:

- An accurate legal description preferably including metes and bounds;
- Name of the current title holder;
- Site plan or drawing illustrating the site boundaries and major features;
- A fully executed agreement (attached); and,
- A contact name for site access (access available during normal business hours).

## AGREEMENT

This proposal may be accepted by executing the attached Agreement for Environmental Consulting Services and returning the executed copy to HBC. The Proposal for Services and accompanying limitations shall constitute the exclusive services to be performed for this project.

\\AUSMAIL1\Geo\dox\prop\62-6366.00.doc

HBC 00176


ENGINEERING, INC.

Mr. Scott Casanova
October 30, 2000
Page 6 of 6

We appreciate the opportunity to provide this proposal and look forward to working with you on this project. If you should have any questions or comments regarding this proposal, please give me a call.

Sincerely,

HBC ENGINEERING, INC.

Todd E. Swoboda, P.E.
Project Manager

Attachments: Agreement for Environmental Consulting Services

\\AUSMAIL1\Geo\dox\prop\52-6366.00.doc

HBC 00177

# APPENDIX F



FILE RECEIVED

JAN 2 3 2006

*Standard Form of Agreement Between Owner and General Contractor*

**AGREEMENT** made as of the 17th day of August, 2005.

**BETWEEN** the Owner:   White Lodging Services

And the General Contractor:   EBCO GENERAL CONTRACTOR, LTD

The Project is:   Austin Airport Courtyard by Marriott

The Architect is:   .ellness, swenson, graham architects, inc

The Owner and the General Contractor agree as set forth below.

## TABLE OF CONTENTS:

ARTICLE 1 GENERAL PROVISION
1.1    Relationship of Parties
1.2    General Conditions

ARTICLE 2 CONSTRUCITON MANAGER'S RESPONSIBILITIES
2.1    Preconstruction Phase
2:2    Guaranteed Maximum Price Proposal and Contract
2.3    Construction Phase
2.4    Professional Services
2.5    Unsafe Materials

ARTICLE 3 OWNER'S RESPONSIBILITIES
3.1    Information and Services
3.2    Owner's Designated Representative
3.3    Architect
3.4    Legal Requirements

ARTICLE 4 COMPENSATION AND PAYMENTS FOR PRE-CONSTRUCTION PHASE SERVICES
4.1    Compensation
4.2    Payments

ARTICLE 5 COMPENSATION FOR CONSTRUCTION PHASE SERVICES
5.1    Compensation
5.2    Guaranteed Maximum Price
5.3    Changes in the Work

ARTICLE 6 COST OF THE WORK FOR CONSTRUCTION PHASE
6.1    Costs To Be Reimbursed
6.2    Costs Not To Be Reimbursed
6.3    Discounts, Rebates and Refunds
6.4    Accounting Records

ARTICLE 7 CONSTRUCTION PHASE
7.1    Progress Payments



PLAINTIFF'S EXHIBIT 48



EXHIBIT 44
WIT
DATE
Rhonda Howard Weegar, CSR

EBCO 002801

7.2     Final Payment

ARTCILE 8 <sup>Redacted</sup>
Redacted

ARTICLE 9 MISCELLANEOUS PROVISIONS
9.1     Dispute Resolution for the Preconstruction Phase
9.2     Dispute Resolution for the Construction Phase
9.3     Other Provisions

ARTICLE 10 TERMINATIONS OR SUSPENSION
10.1    Termination Prior to Establishing Guaranteed Maximum Price
10.2    Termination Subsequent to Establishing Guaranteed Maximum Price
10.3    Suspension

ARTCILE 11 OTHER CONIDTIONS AND SERVICES

Attachment Number 1:    Amendment to Standard Form of Agreement between Owner and Construction Manager which establishes a Guaranteed Maximum Price.
Attachment Number 2:    Amendment to Standard Form of Agreement between Owner and Construction Manager which makes certain revisions to Articles 1 through Article 10.

EBCO 002802

# ARTICLE 1
## GENERAL PROVISIONS

### 1.1 RELATIONSHIP OF PARTIES

The Construction Manager accepts the fiduciary relationship of trust and confidence hereby established with the Owner by this Agreement, and covenants with the Owner to furnish the Construction Manager's best skill and judgment and to cooperate with the Architect in furthering the interests of the Owner. The Construction Manager shall furnish efficient construction manager best efforts to perform the Project in an expeditious and economical manner consistent with the interests of the Owner.

### 1.2 GENERAL AND SUPPLEMENTAL CONDTIONS

For the Construction Phase (a) the General Conditions of the Contract shall be the General Conditions, as modified, General Conditions of the Contract for Construction, which is incorporated herein by reference, and (b) the Supplemental Conditions shall be those attached hereto as Attachment A which is also incorporated herein by reference. For the Preconstruction Phase, or in the event that the Preconstruction and Construction Phases proceed concurrently, General Conditions, as modified, shall apply to the Preconstruction Phase only as specifically provided in this Agreement. The term "Contractor" as used in the General Conditions, as modified, shall mean the Construction Manager.

# ARTICLE 2
## CONSTRUCTION MANAGER'S RESPONSIBILITIES

The Construction Manager shall perform the services and responsibilities described in this Agreement including those documents incorporated herein and/or made a part hereof. The services to be provided under Paragraphs 2.1 and 2.2 constitute the Preconstruction Phase services. If the Owner and the Construction Manager agree in writing after consultation with the Architect, the Construction Phase may commence before the Preconstruction Phase is completed, in which case both phases shall proceed concurrently.

### 2.1 PRECONSTRUCTION PHASE

### 2.1.1 PRELIMINARY EVALUATION

The Construction Manager shall provide a preliminary evaluation of the Owner's program and Project budget requirements, each in terms of the other.

### 2.1.2 CONSULTATION

The Construction Manager with the Architect shall jointly schedule and attend regular meetings with the Owner. The Construction Manager shall consult with the Owner and the Architect regarding site use and improvements and the selection of materials, building systems and equipment. The Construction Manager shall provide recommendations on construction feasibility; actions designed to minimize adverse effects of labor or material shortages; time requirements for procurement, installation and construction completion; and factors related to construction cost including estimates of alternative designs or materials, preliminary budgets and possible economics. The Construction Manager shall use its best efforts throughout the Preconstruction Phase and shall diligently attempt to include in all bid packages detailed itemization of required items of work, thereby avoiding allowance items therein.

### 2.1.3 PRELIMINARY PROJECT SCHEDULE

When Project requirements described in Subparagraph 3.1.1 have been sufficiently identified, the Construction Manager shall prepare, and periodically update, a preliminary Project schedule for the Architect's review and the Owner's approval. The Construction Manager shall obtain the Architect's review and the Owner's approval of the portions of the preliminary Project schedule relating to the performance of the Architect's and the Owner's services and activities respectively. The Construction Manager shall coordinate and integrate the preliminary Project schedule with the services and activities of the Owner, the Architect and the Construction Manager. As design proceeds, the preliminary Project schedule shall be updated to indicate proposed activity sequences and durations, milestone dates

EBCO 002803

for receipt and approval of pertinent information, submittal of a Guaranteed Maximum Price proposal, preparation and processing of shop drawings and samples, delivery of materials or equipment requiring long-lead time procurements, the Owner having occupancy priority, and proposed date of Substantial Completion. If preliminary Project schedule updates indicate that previously approved schedules may not be met, the Construction Manager shall make appropriate recommendations to the Owner and Architect to recover the lost time to the extent practicable.

2.1.4    RESERVED

2.1.5    PRELIMINARY COST ESTIMATES

2.1.5.1    When the Owner has sufficiently identified the Project requirements and the Architect has prepared other basic design criteria, the Construction Manager shall prepare, for the review of the Architect and approval of the Owner, a preliminary cost estimate for the Work utilizing area, volume or similar conceptual estimating techniques.

2.1.5.2    When Schematic Design Documents have been prepared by the Architect and approved by the Owner, the Construction Manager shall prepare for the review of the Architect and approval of the Owner, a more detailed estimate of costs with supporting data. During the predation of the Design Development Documents, the Construction Manager shall update and refine the cost estimates at appropriate intervals agreed to by the Owner, Architect and the Construction Manager.

2.1.5.3    When Design Development Documents have been prepared by the Architect and approved by the Owner, the Construction Manager shall prepare a detailed cost estimate with supporting data for review by the Architect and approval by the Owner. During the preparation of the Construction Documents, the Construction Manager shall update and refine the cost estimates at appropriate intervals agreed to by the Owner, the Architect and the Construction Manager.

2.1.5.4    If any estimate submitted to the Owner exceeds previously approved estimates or the Owner's budget, the Construction Manager shall make recommendations to the Owner and the Architect.

2.1.6    SUBCONTRACTORS AND SUPPLIERS

The Construction Manager shall seek to develop subcontractor interest in the Project and shall furnish to the Owner and the Architect for their information a list of possible subcontractors, including suppliers who might furnish materials or equipment fabricated to a special design, from who proposals will be requested for any principal portion of the Work. The Architect will promptly reply in writing to the Construction Manager if the Architect knows or the Owner notifies the Architect of any objection to such subcontractor or supplier. The receipt of such list shall not require the Owner or the Architect to investigate the qualifications of proposed subcontractors or suppliers, nor shall it waive the right of the Owner or the Architect later to object to or reject any proposed subcontractor or supplier.

2.1.7    LONG-LEAD TIME ITEMS

The Construction Manager shall recommend to the Owner and the Architect a schedule for procurement of long-lead time items which will constitute part of the Work as required to meet the Project schedule. If such long-lead time items are procured by the Owner, they shall be procured on terms and conditions acceptable to the Construction Manager. Upon the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal, all contracts and/or purchase orders for such items shall be assigned by the Owner to the Construction Manager, who shall accept responsibility for such items as if procured by the Construction Manager. The Construction Manager shall expedite the delivery of long-lead time items in a manner consistent with the Project schedule.

2.1.8    EXTENT OF RESPONSIBILITY

The Construction Manager does not warrant or guarantee estimates and schedules except as may be included as part of the Guaranteed Maximum Price. The recommendations and advice of the Construction Manager concerning design alternatives shall be subject to the review and approval of the Owner and the Owner's professional consultants. If the Construction Manager recognizes that portions of the Drawings and Specifications are at variance with applicable laws, statutes, ordinances, building codes, rules or regulations, construction best practices, the Construction Manager shall promptly notify the Architect and the Owner in writing.

EBCO 002804

The Construction Manager shall, prior to commencing any related construction or ordering long-lead time procurement items; study the related Construction Documents in detail for accuracy, completeness and coordination with other requisite Construction Documents and shall promptly notify the Architect and the Owner in writing of any discrepancies contained therein. The Construction Manager shall not proceed to commence related construction or ordering long-lead time procurement items until any such discrepancies are rectified except at its own sole risk. The Owner shall have no liability to the Construction Manager for damage occurring to or sustained by the Construction Manager as a result of the Construction Manager's earlier commencement or such ordering. In no event shall the Owner be liable to the Construction Manager for breach of warranty, express or implied, or otherwise, for errors, omissions, inadequacies or lack of coordination of the Construction Documents.

2.1.9    EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION

The Construction Manager shall comply with applicable laws, regulations and any special requirements of the Contract Documents regarding equal employment opportunity and affirmative action programs.

2.2      GUARANTEED MAXIMUM PRICE PROPOSAL AND CONTRACT TIME

2.2.1    When the Drawings and Specifications are sufficiently complete, the Construction Manager shall propose a Guaranteed Maximum Price, which shall be the sum of the estimated Cost of the Work and the Construction Manager's Fee.

2.2.2    As the Drawings and Specifications may not be finished at the time the Guaranteed Maximum Price proposal is prepared, the Construction Manager shall provide in the Guaranteed Maximum Price proposal for further development of the Drawing and Specifications by the Architect that is consistent with the Contract Documents and reasonably inferable there from. Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.

2.2.3    The estimated Cost of the Work shall include a contingency for the Construction Manager's exclusive use to cover costs arising under Subparagraph 2.2.2 and other costs which are properly reimbursable as Cost of the Work but not the basis for a Change Order. However, no expenditures in excess of the ten thousand dollars ($10,000) shall be made out of the contingency without the Owner's written approval which written approval shall not be unreasonably withheld. The Construction Manager shall receive no Fee resulting from the use of the contingency without the Owner's written approval.

2.2.4    BASIS OF GUARANTEED MAXIMUM PRICE

The Construction Manager shall include with the Guaranteed Maximum Price proposal a written statement of its basis, which shall include:

.1       A list of the Drawings and Specifications, including all addenda thereto and the Conditions of the Contract, which were used in preparation of the Guaranteed Maximum Price proposal.

.2       A list of allowances, if any, and a statement of their basis.

.3       A list of the clarifications and assumptions, if any, made by the Construction Manager in the preparation of the Guaranteed Maximum Price proposal to supplement the information contained in the Drawings and Specifications.

.4       The proposed Guaranteed Maximum Price, including a statement of the estimated costs organized by trade categories, allowances, contingency, and other items and the fee which comprise the Guaranteed Maximum Price.

.5       The date of Substantial Completion upon which the proposed Guaranteed Maximum Price is based, and a schedule of the Construction Documents issuance dates upon which the date of Substantial Completion is based.

.6       The date upon which the proposal shall expire.

2.2.5    The Construction Manager shall meet with the Owner and the Architect to review the Guaranteed Maximum Price proposal and the written statement of its basis. In the event that the Owner or the Architect discovers any inconsistencies or inaccuracies in the information presented, it shall promptly notify the Construction Manager, who

EBCO 002805

shall make appropriate adjustments to the Guaranteed Maximum Price proposal, its basis or both.

2.2.6    Unless the Owner accepts the Guaranteed Maximum Price proposal in writing on or before the expiration date specified in the proposal for such acceptance and so notifies the Construction Manager, the Guaranteed Maximum Price proposal shall not be effective without written acceptance by the Construction Manager.

2.2.7    Prior to the Owner's acceptance of the Construction Manager's Guaranteed Maximum Price proposal and issuance of a Notice to Proceed, the Construction Manager shall not incur any cost to be reimbursed as part of the Cost of the Work, except as the Owner may specifically authorize in writing.

2.2.8    Upon acceptance by the Owner of the Guaranteed Maximum Price proposal, the Guaranteed Maximum Price and its basis shall be set forth in Amendment No. 1. The Guaranteed Maximum Price shall be subject to additions and deductions by a change in the Work as provided in the Contract Documents and the date of Substantial Completion shall be subject to adjustment as provided in the Contract Documents. In the event and to the extent that the Guaranteed Maximum Price is agreed upon prior to all subcontracts being executed, any reduction in the total amount payable to Subcontractors from the amount set forth in the Construction Manager's written statement of the basis of the Guaranteed Maximum Price for subcontractors shall cause the Guaranteed Maximum Price to be reduced by like amount.

2.2.9    The Owner shall authorize and cause the Architect to revise the Drawings and Specifications to the extent necessary to reflect any agreed-upon assumptions and clarifications contained in Amendment No. 1. Such revised Drawings and Specifications shall be furnished to the Construction Manager in accordance with schedules agreed to by the Owner, the Architect and the Construction Manager. The Construction Manager shall promptly notify the Architect and the Owner if such revised Drawings and Specifications are inconsistent with the agreed-upon assumptions and clarifications.

2.2.10   The Guaranteed Maximum Price shall include in the Cost of the Work only those taxes which are enacted at the time the Guaranteed Maximum Price is established.

2.3      CONSTRUCTION PHASE

2.3.1    GENERAL

2.3.1.1  The Construction Phase shall commence on the earlier of:
         (1)    The Owner's acceptance of the Construction Manager's Guaranteed
                Maximum Price proposal and issuance of a Notice to Proceed, or
         (2)    The Owner's first written authorization to the Construction Manager to:
                (a)    Award a subcontract, or
                (b)    Undertake construction Work with the Construction Manager's own forces, or
                (c)    Issue a purchase order for materials or equipment required for the Work.

2.3.2    ADMINISTRATION

2.3.2.1  The Construction Manager shall not self-perform any portion of the Work without the Owner's prior written consent. The Work shall be performed under subcontracts or by other appropriate agreements with the Construction Manager. The Construction Manager shall obtain bids from Subcontractors and from suppliers of materials or equipment fabricated to a special design for the Work from the list previously reviewed and, after analyzing such bids, shall deliver such bids to the Owner and the Architect. The Owner shall then determine, with the advice of the Construction Manager, which bids will be accepted. The Owner may designate specific persons or entities from whom the Construction Manager shall obtain bids; however, if the Guaranteed Maximum Price has been established, the Owner may not prohibit the Construction Manager from obtaining bids from other qualified bidders. The Construction Manager shall not be required to contract with anyone to whom the Construction Manager has reasonable objection.

2.3.2.2  If the Guaranteed Maximum Price has been established and a specific bidder among those whose bids are delivered by the Construction Manager to the Owner and the Architect (1) is recommended in writing to the Owner by the Construction Manager; (2) is qualified to perform that portion of the Work; (3) has submitted a bid which conforms to the requirements of the Contract Documents without reservations or exceptions, but the Owner requires that another

EBCO 002806

bid be accepted, then the Construction Manager may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Construction Manager and the amount of the subcontract or other agreement actually signed with the bidder designated by the Owner.

2.3.2.3 Subcontracts and agreements with suppliers furnishing materials or equipment fabricated to a special design shall conform to the applicable payment provisions of this Agreement, and shall not be awarded on the basis of cost plus a fee without the prior written consent of the Owner.

2.3.2.4 The Construction Manager shall schedule and conduct meetings at which the Owner, the Architect, the Construction Manager and appropriate Subcontractors can discuss the status of the Work. The Construction Manager shall prepare and promptly distribute accurate meeting minutes to all attendees.

2.3.2.5 Promptly after the Owner's acceptance of the Guaranteed Maximum Price proposal, the Construction Manager shall prepare a schedule in accordance with Paragraph 3.10 of General Conditions, as modified, and the Owner's occupancy requirements.

2.3.2.6 As a condition precedent to the Owner's obligation to make progress payments, (1) the Construction Manager shall provide monthly written reports to the Owner and the Architect on the progress of the entire Work and shall include with each report not less than three (3) digital photographs depicting the progress of the Work, and (2) the Construction Manager shall prepare and submit updates to the Construction Schedule   The Construction Manager shall maintain a daily log containing a record of weather at the site, Subcontractors working on the site, number of workers on the site, the Work accomplished, problems encountered and other similar relevant data as the Owner may reasonably require or request. The log shall be available to the Owner and the Architect at all times.

2.3.2.7 The Construction Manager shall develop a system of cost control for the Work, including regular monitoring of actual costs for activities in progress and estimates for uncompleted tasks and proposed changes. The Construction Manager shall identify variances between actual and estimated costs and report the variances to the Owner and the Architect at regular intervals, and no less frequently than monthly.

2.4    PROFESSIONAL SERVICES

The Construction Manager shall not be required to provide professional services which constitute the practice of architecture or engineering, unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Construction Manager has specifically agreed in writing to provide such services. In such event, the Construction Manager shall cause such services to be performed by appropriately licensed professionals.

2.5    UNSAFE MATERIALS

If the Construction Manager reasonably believes, is notified of or encounters on or about the Site, the presence of asbestos, PCB or any other toxic or hazardous material, the Construction Manager shall:

2.5.1    Immediately stop the Work in the affected area while proceeding with Work in all unaffected areas and taking all available steps to avoid or minimize any adverse impact on the Schedule, Budget and/or Program.

2.5.2    Give the Owner and the Architect immediate verbal and written notice that the Work has been stopped, including a detailed description of the area or areas of the Site affected, and recommend appropriate action to remedy the situation.

2.5.3    To the extent the Program, Budget and/or Schedule is affected, proceed in accordance with the provisions of this Agreement to take appropriate action, and if proper, request equitable adjustment thereto.

2.5.4    Limitations on Construction Manager's Responsibilities. This Agreement does not require the Construction Manager to perform and the Construction Manager shall not perform services directly involved in the handling, abatement, replacement or removal of products or processes involving asbestos, PCB or any other toxic or hazardous material. If such products or materials are present and require abatement, the Owner shall retain and pay for specialists who shall specify, supervise and perform the abatement, replacement or removal procedures.

EBCO 002807

2.5.5 Scheduling of Abatement Procedures and Other Work on the Project. The Construction Manager's sole responsibility with respect to abatement activities shall be to make recommendations and schedule the work of the abatement specialist(s) with respect to the Project and/or abatement activities and, unless otherwise prohibited by law, schedule and maintain progress of other Work on the Site where such Work is not prevented or hampered by the abatement, replacement or removal procedures. The Construction Manager shall require all Subcontractors involved with the Project to comply with all applicable laws relating to hazardous materials or known hazardous waste and all restrictions applicable to the areas undergoing abatement.

2.5.6 Indemnification. To the extent permitted by law, the Owner agrees to defend, indemnify and hold harmless the Construction Manager from all claims, lawsuits, expenses or damages arising from or related to the exposure, handling, use, treatment, purchase, sale, storage, or disposal of asbestos, asbestos products or any toxic or hazardous materials, in any of its various forms as defined by the EPA, unless the Construction Manager is responsible for or knew of or suspected the existence of hazardous substances and failed to comply with paragraphs 2.5.1 and/or 2.5.2. Unless claims or lawsuits are caused by the negligent acts of the Construction Manager and/or a Subcontractor, in which event the Owner's indemnity shall not apply, the Owner's obligation to defend, indemnify and hold harmless the Construction Manager shall survive the completion of the Project

2.5.7 Extension of Time. If the Construction Manager is delayed by the abatement or removal of any hazardous waste or materials through no fault or negligence on the part of the Construction Manager or its Subcontractors, the Owner agrees that the time for completion of the Work shall be extended for a period equal to the reasonably estimated period of delay, as determined by agreement between the Construction Manager and the Owner. The Construction Manager shall utilize best efforts to mitigate delays and make up time lost created by the delay. If acceleration of construction activity or activities is the selected remedy to make up lost time created by the delay, and is approved in writing by the Owner, the Owner will be responsible for fair and equitable compensation for the acceleration of construction activity or activities.

ARTICLE 3
OWNER'S RESPONSIBILITIES

3.1     INFORMATION AND SERVICES

3.1.1   The Owner shall provide full information in a timely manner regarding the requirements of the Project, including a program which sets forth the Owner's objectives, constraints and criteria, including space requirements and relationships, flexibility and expandability requirements, special equipment and systems, and site requirements.

3.1.2   The Owner, upon written request from the Construction Manager, shall furnish evidence of Project financing prior to the start of the Construction Phase. Furnishing of such requested evidence shall be a condition precedent to commencement of the Work.

3.1.3   The Owner shall establish and update an overall budget for the Project, based on consultation with the Construction Manager and the Architect, which may include contingencies for change in the Work and other costs which are the responsibility of the Owner.

3.1.4   STRUCTURAL AND ENVIRONMENTAL TESTS, SURVEYS AND REPORTS

        In the Preconstruction Phase, the Owner shall furnish the following with reasonable promptness and at the Owner's expense, and the Construction Manager shall be entitled to rely upon the accuracy of any such information, reports, surveys, drawings and tests described in Clauses 3.1.4.1 through 3.1.4.4, except to the extent that the Construction Manager knows or has reason to know of any inaccuracy:

3.1.4.1 Reports, surveys, drawings and tests concerning the conditions of the site which are required by law.

3.1.4.2 Surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable: grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data pertaining to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All

EBCO 002808

information on the survey shall be referenced to a project benchmark.

3.1.4.3 The services of geotechnical engineers when such services are reasonably requested by the Construction Manager. Such services may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate professional recommendations.

3.1.4.4 Structural, mechanical, chemical, air and water pollution tests, tests for hazardous materials, and other laboratory and environmental tests, inspections and reports which are required by law.

3.1.4.5 The services of other consultants when such services are reasonably required by the scope of the Project and are requested by the Construction Manager.

3.2    OWNER'S DESIGNATED REPRESENTATIVE

The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. This representative shall have the authority to make decisions on behalf of the Owner concerning estimates and schedules, construction budgets, and changes in the Work, and shall render such decisions promptly and furnish information expeditiously, so as to avoid unreasonable delay in the services or Work of the Construction Manager.

3.3    ARCHITECT

The Owner shall retain an Architect to provide the services, including normal structural, mechanical and electrical engineering services, other than cost estimating services, described in the edition of AIA Document B41-1997, as modified. The Owner shall authorize and cause the Architect to provide other services reasonably requested by the Construction Manager, in writing, necessary for the Preconstruction and Construction Phase of the Work. Such services shall be provided in accordance with time schedules agreed to by the Owner, the Architect and the Construction Manager. Upon request of the Construction Manager, the Owner shall furnish to the Construction Manager a copy of the Owner's Agreement with the Architect, from which compensation provisions may be deleted.

3.4    LEGAL REQUIREMENTS

The Owner shall determine and advise the Architect and the Construction Manager of any special legal requirements relating specifically to the Project which differ from those generally applicable to construction in the jurisdiction of the Project. The Owner shall furnish such legal services as are reasonably necessary to provide the information and services required under Paragraph 3.1.

ARTICLE 4
COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION
PHASE SERVICES

The Owner shall compensate and make payments to the Construction Manager for Preconstruction Phase services as follows:

4.1    COMPENSATION

4.1.1    For the services described in Paragraphs 2.1 and 2.2 the Construction Manager's compensation shall be calculated as follows:

4.1.2    Compensation for Preconstruction Phase services shall be equitably adjusted if the originally contemplated scope of services is significantly increased.

4.1.3    RESERVED.

4.2    PAYMENTS

4.2.1    Payments shall be made monthly within thirty days following presentation of the Construction Manager's appropriate invoice and, where applicable, shall be in proportion to services properly performed.

EBCO 002809

4.2.2   Amounts unpaid after the date on which payment is due shall bear interest at the rate of 6% per annum or if lower at the legal rate prevailing from time to time at the place where the Project is located.

**ARTICLE 5**
**COMPENSATION FOR CONSTRUCTION PHASE SERVICES**

5.1     COMPENSATION

5.1.1   For the Construction Manager's performance of the Work, the Owner shall pay the Construction Manager, subject to the Guaranteed Maximum Price as provided in Paragraph 5.2, the Contract Sum consisting of the Cost of the Work as defined in Article 6 and the Construction Manager's Fee determined as follows:

5.2     GUARANTEED MAXIMUM PRICE

5.2.1   The Sum of the Cost of the Work and the Construction Manager's Fee are guaranteed by the Construction Manager not to exceed the amount provided in Amendment No. 1, subject to additions and deductions by changes in the Work as provided in the Contract Documents. Such maximum sum is referred to in the Contract Documents as the "Guaranteed Maximum Price". Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Construction Manager without reimbursement by the Owner. Any savings realized below the Guaranteed Maximum Price shall accrue to Owner. Notwithstanding the provisions of the paragraph, the Construction Manager shall not be eligible for any bonus if it has defaulted in its performance under or with respect to this Agreement and no bonus will be due until such time as the Construction Manager has fully and completed performed its obligations under or with respect to this Agreement and the Construction Documents.

5.3     CHANGES IN THE WORK

5.3.1   The Construction Manager shall receive no fee for any Changes in the Work.

5.3.2   In calculating adjustments to subcontracts (except those awarded with the Owner's prior written consent on the basis of cost plus a fee), the terms "cost" and "fee" as used in Clause 7.3.3.3 of the General Conditions and the terms "costs" and "a reasonable allowance for overhead and profit" as used in Subparagraph 7.3.6 of the General Conditions shall have the meanings assigned in that document and shall not be modified by this Article 5. Adjustments to subcontracts awarded with the Owner's prior written consent on the basis of cost plus a fee shall be calculated in accordance with the terms of those subcontracts.

5.3.3   In calculating adjustments to the Guaranteed Maximum Price, the terms "cost" and "costs" as used in the above-referenced provisions of the General Conditions shall mean the Cost of the Work as defined in Article 6 of this Agreement and the terms "and a reasonable allowance for overhead and profit" shall mean the Construction Manager's Fee as defined in Subparagraph 5.1.1 of this Agreement.

5.3.4   If no specific provision is made in Subparagraph 5.1.1 of this Agreement or the General Conditions Guaranteed Maximum Cost, as defined in Article 6, in the case of changes in the Work, the General Conditions Guaranteed Maximum Cost shall be equitably adjusted and the Guaranteed Maximum Price shall be adjusted accordingly; provided, however, that Construction the General Conditions Guaranteed Maximum Cost shall not be increased unless the total amount of payments made, or to be made, to Subcontractors in the aggregate ("Subcontract Costs") is increased by Change Orders and/or Construction Change Directives by more than ten percent (10%) in which event such equitable adjustment shall be derived with reference only to that part of the increased Subcontract Costs which exceeds one hundred ten percent (110%) of the original Subcontract Costs.

**ARTICLE 6**
**COST OF THE WORK FOR CONSTRUCTION PHASE**

6.1     COSTS TO BE REIMBURSED

EBCO 002810

6.1.1   Except as otherwise provided in this Agreement or the Contract Documents, the term "Cost of the Work" shall mean costs necessarily incurred by the Construction Manager in the proper performance of the Work. Such costs shall be at rates not higher than those customarily paid at the place of the Project except with prior written consent of the Owner. The Cost of the Work shall include only the items set forth in this Article 6. The Cost of the Work, excluding those costs described in Clause 6.1.2.1, Clause 6.1.4.1 and in Subparagraph 6.1.3, constitutes the Cost of the General Conditions. The Costs of the General Conditions is guaranteed by the Construction Manager not to exceed the amount provided in Amendment No. 1, subject to additions and deductions by changes in the Work as provided in the Contract Documents. Such maximum Costs of the General Conditions is referred to in the Contract Documents as the "General Conditions Guaranteed Maximum Cost". Costs of the General Conditions which would cause the General Conditions Guaranteed Maximum Cost to be exceeded shall be paid by the Construction Manager without reimbursement by the Owner. In the event that actual Costs of the General Conditions is less than the General Conditions Guaranteed Maximum Cost, Owner shall pay the Construction Manager <u>forty percent (40%)</u> of the savings

6.1.2   LABOR COSTS

.1 Wages of construction workers directly employed by the Construction Manager to perform the construction of the Work at the site or, with the Owner's agreement, at off-site workshops.

.2 Wages or salaries of the Construction Manager's supervisory and administrative personnel when stationed at the site with the Owner's written approval; provided that bonuses and the like paid to such personnel shall be excluded.

.3 Wages and salaries of the Construction Manager's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work; provided that bonuses and the like paid to such personnel shall be excluded.

.4 Costs paid or incurred by the Construction Manager for payroll taxes,<sup>Redacted</sup> contributions, assessments and benefits required by law or collective bargaining agreements, and, for personnel not covered by such agreements, sick leave, medical and health benefits, holidays, vacations and pensions, provided that such costs are based on wages and salaries included in the Cost of the Work under Clauses 6.1.2.1 through 6.1.2.3.

6.1.3   SUBCONTRACT COSTS

Payments made by the Construction Manager to Subcontractors in accordance with the requirements of the subcontracts.

6.1.4   COSTS OF MATERIALS AND EQUIPMENT INCORPORATED IN THE COMPLETED CONSTRUCTION

.1 Costs, including transportation, of materials and equipment incorporated or to be incorporated in the completed construction.

.2 Costs of materials described in the preceding Clause 6.1.4.1 in excess of those actually installed but required to provide reasonable allowance for waste and for spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Construction Manager; amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

6.1.5   COSTS OF OTHER MATERIALS AND EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS

.1 Costs, including transportation, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by the Construction Manager at the site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by the Construction Manager. Cost for items previously used by the Construction Manager shall mean fair market value at the time of such use.

EBCO 002811

.2 RESERVED.

.3 Costs of removal of debris from the site

.4 Reproduction costs, facsimile transmissions and long-distance telephone calls, postage and express delivery charges, telephone service at the site and necessary and reasonable petty cash expenses of the site office.

.5 That portion of the necessary and reasonable travel and subsistence expenses of the Construction Manager's personnel incurred while traveling in discharge of duties directly connected with the Work.

6.1.6 MISCELLANEOUS COSTS

.1 Redacted
Redacted

.2 Sales, use or similar taxes imposed by a governmental authority which are related to the Work and for which the Construction Manager is liable.

.3 Fees and assessments for the building permit and for other permits, licenses and inspections for which the Construction Manager is required by the Contract Documents to pay.

.4 Fees of testing laboratories for tests required by the Contract Documents and paid by the Construction Manager, except those related to nonconforming Work, other than that for which payment is permitted by Clause 6.1.8.2.

.5 Royalties and license fees paid by Construction Manager for the use of a particular design, process or product required by the Contract Documents; the reasonable and necessary cost of defending suits or claims for infringement of patent or other intellectual property rights arising from such requirement by the Contract Documents; payments made in accordance with legal judgments against the Construction Manager resulting from such suits or claims and payments of settlements made with the Owner's written consent; provided, however, that such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Construction Manager's Fee or the Guaranteed Maximum Price and provided that such royalties, fees and costs are not excluded by the last sentence of Subparagraph 3.17.1 of General Conditions, as modified, or other provisions of the Contract Documents.

.6 Data processing costs directly related to the Work, provided that such costs shall not include any hardware, software, or CADD costs unless previously approved by the Owner in writing.

.7 RESERVED.

.8 RESERVED.

.9 Expenses incurred in accordance with the Construction Manager's standard personnel policy for relocation and temporary living allowances of personnel required for the Work, if approved in writing by the Owner.

6.1.7 OTHER COSTS

.1 Other costs properly incurred in the performance of the Work if and to the extent approved in advance why in advance here and not elsewhere in writing by the Owner.

6.1.8 EMERGENCIES AND REPAIRS TO DAMAGED OR NONCONFORMING WORK

The cost of the Work shall also include costs described in Subparagraph 6.1.1 which are reasonably incurred by the Construction.Manager:

.1 In taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property, as provided in Paragraph 10.6 of General Conditions, as modified, and not resulting from the negligence of the Construction Manager, its subcontractors, or the Construction Manager's failure to properly perform its duties under this Agreement or the Construction Documents.

EBCO 002812

.2 In repairing or correcting damaged or nonconforming Work executed by the Construction Manager or the Construction Manager's Subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by the negligence or failure to fulfill a specific responsibility to the Owner set forth in this Agreement, of the Construction Manager or the Construction Manager's foremen, engineers or superintendents, or other supervisory, administrative, or managerial personnel of the Construction Manager, or the failure of the Construction Manager's personnel to supervise adequately the Work of the Subcontractors or suppliers, and only to the extent that the cost of repair or correction is not recoverable by the Construction Manager from<sup>Redacted</sup> Subcontractors or suppliers.

6.1.9   The costs described in Subparagraphs 6.1.1 through 6.1.8 shall, subject to the provisions hereof, be included in the Cost of the Work notwithstanding any provision of General Conditions, as modified, which may require the Construction Manager to pay such costs, unless such costs are excluded by the provisions of Paragraph 6.2.

6.2     COSTS NOT TO BE REIMBURSED

6.2.1   The Cost of the Work shall not include:

.1 Salaries and other compensation of the Construction Manager's personnel stationed at the Construction Manager's principal office or offices other than the site office, except as specifically provided in Clauses 6.1.2.2 and 6.1.2.3.

.2 Expenses of the Construction Manager's principal office and offices other than the site office except as specifically provided in Paragraph 6.1.

.3 Overhead and general expenses, except as may be expressly included in Paragraph 6.1.

.4 The Construction Manager's capital expenses, including interest on the Construction Manager's capital employed for the Work.

.5 Rental costs of machinery and equipment, except as, and if, specifically provided in Subparagraph 6.1.5.2.

.6 Except as provided in Clause 6.1.8.2, costs due to the negligence of the Construction Manager or to the failure of the Construction Manager to fulfill a specific responsibility to the Owner as set forth in this Agreement.

.7 Costs incurred in the performance of Preconstruction Phase Services.

.8 Except as provided in Clause 6.1.7.1, any costs not specifically and expressly described in Paragraph 6.1.

.9 Costs which would cause the Guaranteed Maximum Price to be exceeded.

.10 Costs of the General Conditions which would cause the General Conditions Guaranteed Maximum Cost to be exceeded.

6.3     DISCOUNTS, REBATES AND REFUNDS

6.3.1   Cash discounts available to the Construction Manager shall accrue to the Owner if (1) before making the payment, the Construction Manager received payment therefore from the Owner during the cash discount period and in sufficient time for the Construction Manager to obtain such discount, or (2) the Owner has deposited funds with the Construction Manager with which to make payments; otherwise, cash discounts shall accrue to the Construction Manager. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Construction Manager shall make provisions so that they will be available to the owner.

6.3.2   Amounts which accrue to the Owner in accordance with the provisions of Subparagraph 6.3.1 shall be credited to the Owner as a deduction from the Cost of the Work.

6.4     ACCOUNTING RECORDS

6.4.1   The Construction Manager shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management under this Agreement; the accounting and control systems shall be satisfactory to the

EBCO 002813

Owner. The Owner and the Owner's accountants and agents shall be afforded access to, and shall be permitted to audit and copy, the Construction Manager's records, books, correspondence, instructions, drawings, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to this Project, and the Construction Manager shall preserve all such items for a period of no less than three years after final payment under this Agreement, or for such longer period as may be required by law.

## ARTICLE 7
## CONSTRUCTION PHASE

### 7.1    PROGRESS PAYMENTS

7.1.1    Based upon Applications for Payment properly submitted to the Architect and the Owner by the Construction Manager and Recommendations for Payment issued by the Architect to the Owner the Owner shall make progress payments on account of the Contract Sum to the Construction Manager as provided below and elsewhere in the Contract Documents.

7.1.2    The period covered by each Application for Payment shall be one calendar month ending on the last day of the month.

7.1.3    Provided an Application for Payment is received by the Architect and Owner, not later than 1st, the Owner shall make payment to the Construction Manager not later than the 30th. If an Application for Payment is received by the Architect or Owner, or both, after the application date fixed above, payment shall be made by the Owner not later than 35_ days after the Architect and Owner receive the Application for Payment.

7.1.4    With each Application for Payment, the Construction Manager shall submit certified payrolls for itself and all subcontractors of any tier with subcontract prices of $250,000 or more, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner or the Architect to demonstrate that cash disbursements already made by the Construction Manager on account of the Cost of the Work equal or exceed (1) progress payments already received by the Construction Manager; less (2) that portion of those payments attributable to the Construction Manager's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

7.1.5    Each Application for Payment shall be based upon the most recent schedule of values submitted by the Construction Manager and approved in writing by the Architect and the Owner in accordance with the Contract Documents. The schedule of values shall allocate the entire Guaranteed Maximum Price among the various portions of the Work, except that the Construction Manager's Fee shall be shown as a single separate item. The schedule of values shall be prepared in such form and supported by such data as to substantiate its accuracy as the Architect and the Owner may require. This schedule, when, and only when, approved in writing by the Architect and the Owner, shall be used as a basis for reviewing the Construction Manager's Applications for Payment.

7.1.6    Applications for Payment shall set forth the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment. The percentage of completion shall be the lesser of: (1) the percentage of that portion of the Work which has actually been completed; or (2) the percentage obtained by dividing (a) the expense which has actually been incurred by the Construction Manager on account of that portion of the Work for which the Construction Manager has made or intends to make actual payments prior to the next Application for Payment by (b) the share of the Guaranteed Maximum Price allocated to that portion of the Work in the schedule of values.

7.1.7    Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1  Take that portion of the Guaranteed Maximum Price properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Guaranteed Maximum Price allocated to that portion of the Work in the approved schedule of values less retainage of ten percent (10%). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute may be included as provided in Subparagraphs 7.3.7 and 7.3.8 of General Conditions, as modified, even though the Guaranteed Maximum Price has not yet been adjusted by Change Order.

.2  Add that portion of the Guaranteed Maximum Price properly allocable to materials and equipment delivered and

suitably stored at the site for subsequent incorporation in the Work or, if approved in writing in advance by the Owner, suitably stored off the site at a location agreed upon in writing, less retainage of ten percent (10%).

.3  Add an appropriate portion of the Construction Manager's Fee, less retainage of ten percent (10%). An appropriate portion of the Construction Manager's fee shall be computed upon the Cost of the Work described in the two preceding Clauses at the rate stated in Subparagraph 5.1.1 or, if the Construction Manager's Fee is stated as a fixed sum in that Subparagraph, shall be an amount which bears the same ratio to that fixed-sum Fee as the Cost of the Work in the two preceding Clauses bears to the Architect's reasonable estimate of the probable Cost of the Work upon its completion.

.4  Subtract the aggregate of previous payments made by the Owner.

.5  Subtract the shortfall, if any, indicated by the Construction Manager in the documentation required by Subparagraph 7.1.4 to substantiate prior Applications for Payment, or resulting from errors subsequently discovered by the Owner's accountants in such documentation.

.6  Subtract amounts, if any, for which the Architect has withheld or nullified a Recommendation for Payment as provided in Paragraph 9.5 of General Conditions, as modified.

.7  Subtract amounts, if any, being withheld by the Owner as provided in the Contract Documents.

7.1.8   Except with the Owner's prior approval, payments to Subcontracts shall be subject to retention of not less than ten percent (10%).

7.1.9   Except with the Owner's prior approval, the Construction Manager shall not make advance payments to suppliers for materials or equipment which have not been delivered to and stored at the site.

7.1.10   In taking action on the Construction Manager's Applications for Payment, the Architect and the Owner shall be entitled to rely on the accuracy and completeness of the information furnished by the Construction Manager. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's accountants acting in the sole interest of the Owner.

7.2   FINAL PAYMENT

7.2.1   Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Construction Manager when: (1) the Contract has been fully performed by the Construction Manager except for the Construction Manager's responsibility to correct nonconforming Work, as provided in Subparagraph 12.2.2 of General Conditions, as modified, and to satisfy other requirements, if any, which necessarily survive final payment; (2) a final Application for Payment and a final accounting for the Cost of the Work have been submitted by the Construction Manager and reviewed by the Owner's accountants; and (3) a final Recommendation for Payment has then been issued by the Architect. Such final payment shall be made by the Owner not more than thirty (30) days after the issuance of the Architect's final Recommendation for Payment.

7.2.2   RESERVED.

7.2.3.1   Upon the Owner's Direction, the Owner's accountants will review and report in writing on the Construction Manager's final accounting within thirty (30) days after delivery of the final accounting to the Architect and Owner by the Construction Manager. Based upon the Cost of Work as acknowledged by the Owner, or, if the Owner has directed its accountants to report thereon, based upon such Cost of Work as the Owner's accountants report to be substantiated by the Construction Manager's final accounting, and provided the other conditions of Subparagraph 7.2.1 have been met, the Architect will, within thirty (30) days after receipt of the Construction Manager's final accounting either issue to the Owner a final Recommendation for Payment with a copy to the Construction Manager, or notify the Construction Manager and Owner in writing of the Architect's reasons for withholding the recommendation as provided in Subparagraph 9.5.1 of the General Conditions. The time periods stated in the Paragraph 7.2 supersede those stated in Subparagraph 9.4.1 of the General Conditions.

7.2.3.2   If the Owner disputes the Cost of Work as substantiated by the Construction Manager's final accounting, the Construction Manager shall be entitled to assert a claim in accordance with Article 4 of the General Conditions. The

Owner shall, pending resolution of any such dispute, pay the Construction Manager all sums otherwise payable and not in dispute.

7.2.3.3 If, subsequent to final payment and at the Owner's request, the Construction Manager incurs costs described in Paragraph 6.1 and not excluded by Paragraph 6.2 to correct nonconforming Work, the Owner shall reimburse the Construction Manager such costs and Construction Manager's Fee, if any, related thereto on the same basis as if such costs had been incurred prior to final payment, but not in excess of the Guaranteed Maximum Price. If the Construction Manager has participated in savings, the amount of such savings shall be recalculated and appropriate credit given to the Owner in determining the net amount to be paid by the Owner to the Construction Manager.

## ARTICLE 8
Redacted

Redacted

Redacted

EBCO 002816

Redacted

## ARTILCE 9
## MISCELLANEOUS PROVISIONS

9.1     DISPUTE RESOLUTION FOR THE PRECONSTRUCTION PHASE

9.1.1.1  Claims, disputes or other matters in question between the parties to this Agreement which arise prior to the commencement of the Construction Phase or which relate solely to the Preconstruction phase services of the Construction Manager or the Owner's obligations to the Construction Manager during the Preconstruction Phase, shall be resolved by mediation or by litigation or, at the sole option of the Owner, by arbitration.

9.1.1.2  Any mediation conducted pursuant to this Paragraph 9.1 shall be held in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect, unless the parties mutually agree otherwise. Demand for mediation shall be filed in writing with the other party to the Agreement and with the American Arbitration Association. Any demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question arises. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based upon such claim, dispute or other matter in question would be barred by the applicable statute of limitations or repose.

9.1.1.3  Any claim, dispute or other matter in question not resolved by mediation shall be decided by litigation or, at the sole option of the Owner, by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise.

9.1.1.4  At the sole option of the Owner, any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. Any such arbitration may include, at the sole option of the Owner, by consolidation, joiner or otherwise, one or more persons or entities who, although not a party to this Agreement, have consented to such inclusion. In the event Owner becomes a party in a separate arbitration proceeding and chooses to add the Construction Manager as a party to such arbitration proceedings, the Construction Manager consents to being so added.

9.1.2    RESERVED

9.1.2.1  The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

9.1.2.2  Waiver of Trial by Jury. The Owner and the Construction Manager, both of whom are represented by counsel, believe that the complex commercial and professional aspects of the their dealing with one another make a trial by jury and any disputes between them neither desirable nor appropriate. Accordingly, the Owner and the Construction Manager each specifically waives any right to a trial by jury in any court with respect to any contractual, tortuous or statutory claim, counterclaim or cross-claim against the other arising out of, or connected in any way to, the Project or this Agreement or any of the Construction Documents.

9.2     DISPUTE RESOLUTION FOR THE CONSTRUCTION PHASE

9.2.1.1  Any other claim, dispute or other matter in question arising out of or related to this Agreement or breach thereof shall be settled in accordance with Paragraph 4.4 of the General Conditions.

EBCO 002817

9.3    OTHER PROVISIONS

9.3.1.1  Unless otherwise noted, the terms used in this Agreement shall have the same meaning as those in the General Conditions of the Contract.

9.3.2   EXTENT OF THE CONTRACT

This Agreement, which includes this Agreement and the other documents incorporated herein by reference, represents the entire and integrated agreement between the Owner and the Construction Manager and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both the Owner and the Construction Manager. If anything in any document incorporated into this Agreement is inconsistent with Agreement, this Agreement shall govern.

9.3.3   OWNERSHIP AND USE OF DOCUMENTS

The Drawings and Specifications prepared by the Architect for the Work shall be and remain the property of the Owner. Upon the termination of this Agreement, the Construction Manager shall furnish the Owner with copies of all schedules, budgets, Shop Drawings, samples, and other work papers and Contract Documents prepared by the Construction Manager in connection with the Project, as property of the Owner.

9.3.4   GOVERNING LAW

This Agreement shall be governed by the law of the place where the Project is located.

9.3.5   ASSIGNMENT

In the event this Agreement is terminated by the Owner for cause, the Owner shall be entitled upon demand, and at no additional cost, to an assignment of the Construction Manager's rights in and to any or all of the Construction Manager's contracts with its Subcontractors and the Construction Manager shall promptly deliver such assignment. In each of its contracts with its Subcontractors, the Construction Manager shall provide for such assignments and the consent thereto by each such Subcontractor.


ARTICLE 10
TERMINATION OR SUSPENSION

10.1    TERMINATION PRIOR TO ESTABLISHING GUARANTEED MAXIMUM PRICE

10.1.1.1  Prior to execution by both parties of Amendment No. 1 establishing the Guaranteed Maximum Price, the Owner may terminate this Agreement at any time without cause, and the Construction Manager may terminate this Agreement for any of the reasons described in Subparagraph 14.1.1, 14.1.2 and 14.1.4 of the General Conditions.

10.1.1.2  If the Owner or the Construction Manager terminates this Agreement pursuant to this Paragraph 10.1 prior to commencement of the Construction Phase, the Construction Manager shall be equitably compensated for Preconstruction Phase services performed prior to receipt of notice of termination; provided, however, that the compensation for such services shall not exceed the compensation set forth in Subparagraph 4.1.1.

10.1.3   If the Owner or the Construction Manager terminates this Agreement pursuant to this Paragraph 10.1 after commencement of the Construction Phase, the Construction Manager shall, in addition to the compensation provided in Subparagraph 10.1.2, be paid an amount calculated as follows:

.1 Take the Cost of the Work incurred by the Construction Manager.
.2 Add the Construction Manager's Fee computed upon the Cost of Work to the date of termination the rate stated in Paragraph 5.1 or, if the Construction Manager's Fee is stated as a fixed sum in the Paragraph, an amount which bears the same ratio to the fixed-sum Fee as the Cost of Work at the time of termination bears to the Architect's estimate of the probable Cost of the Work upon its completion.
.3 Subtract the aggregate of previous payments made by the Owner on account of the Construction Phase.

EBCO 002818

The Owner shall also pay the Construction Manager fair compensation, either by purchase or rental at the election of the Owner, for any equipment owned by the Construction Manager which the Owner elects to retain and which is not otherwise included in the Cost of the Work under Clause 10.1.3.1. To the extent that the Owner elects to take legal assignment of subcontracts and purchase orders (including rental agreements), the Construction Manager shall, as a condition of receiving the payments referred to in this Article 10, execute and deliver all such papers and take all such steps, including the legal assignment of such subcontracts and other contractual rights of the Construction Manager, as the Owner may require for the purpose of fully vesting in the Owner the rights and benefits of the Construction Manager under such subcontracts or purchase orders.

Subcontracts, purchase orders and rental agreements entered into by the Construction Manager with the Owner's written approval prior to the execution of Amendment No. 1 shall contain provisions permitting assignment to the Owner as described above. If the Owner accepts such assignment, the Owner shall reimburse or indemnify the Construction Manager with respect to all costs arising under the subcontract, purchase order or rental agreement except those which would not have been reimbursable as Cost of the Work if this Agreement had not been terminated. If the Owner elects not to accept the assignment of any subcontract, purchase order or rental agreement which would have constituted a Cost of the Work had this Agreement not been terminated, the Construction Manager shall terminate such subcontract, purchase order or rental agreement and the Owner shall pay the Construction Manager the costs necessarily incurred by the Construction Manager by reason of such termination.

10.2    TERMINATION SUBSEQUENT TO ESTABLISHING GUARANTEED MAXIMUM PRICE

Subsequent to execution by both parties of Amendment No.1, this Agreement may be terminated as provided in Article 14 of the General Conditions.

10.2.1.1 In the event of termination, any amount payable to the Construction Manager shall not exceed the amount the Construction Manager would have been entitled to receive pursuant to Subparagraphs 10.1.2 and 10.1.3 of this Agreement, and in no event shall the Guaranteed Maximum Price be exceeded, nor shall any contrary provisions of Subparagraph 14.2.4 of the General Conditions.

10.2.2    RESERVED

10.3    SUSPENSION

The Work may be suspended by the Owner as provided in Article 14 of the General Conditions; in such case, the Guaranteed Maximum Price, if established, may be increased as provided in Subparagraph 6.3.1 of the Supplemental Conditions.


ARTICLE 11
OTHER CONDITIONS AND SERVICES

This Agreement is entered into as of the day and year first written above.

|  | EBCO General Contractor, LTD. |
| OWNER | CONSTRUCTION MANAGER |

BY: _____

DATE: 9.12.05

ATTEST: _____

BY: John R. Egger, President of the General Partner
EBCO/Warrior Management, L.C.

DATE: 09 Sep 2005

ATTEST: _____

## Attachment Number 1 (One)

Pursuant to Paragraph 2.2 of the Agreement, dated August 17, 2005 between _____ ("Owner") and EBCO General Contractor, LTD. ("Construction Manager"), for construction of a Courtyard by Marriott hotel located at 7809 East Ben White Boulevard in Austin, Texas (the "Project"), the Owner and Construction Manager establish a Guaranteed Maximum Price and Contract Time for the Work as set forth below.

### ARTICLE I
### GUARANTEED MAXIMUM PRICE

The Construction Manager's Guaranteed Maximum Price for the Work, including the Cost of the Work as defined in Article 6 and the Construction Manager's Fee as defined in Article 5, is Seven Million Two Hundred Twenty-Five Thousand Dollars ($7,225,000.00).

This Price is for the performance of the Work in accordance with the Contract Documents listed and attached to this Amendment and marked Exhibits A through J, as follows:

Exhibit A:    Drawings, Specifications, addenda and General, Supplementary and Other Conditions of the Contract on which the Guaranteed Maximum Price is based;

Exhibit B:    Document List;

Exhibit C:    Assumptions and clarifications made in preparing the Guaranteed Maximum Price, dated August 8, 2005;

Exhibit D:    Allowance Summary;

Exhibit E:    Monthly Status Report – NOT APPLICABLE;

Exhibit F:    Owner Required Forms – NOT APPLICABLE;

Exhibit G:    Responsibility Matrix;

Exhibit H:    Value Engineering Items;

Exhibit I:    Miscellaneous Reports – NOT APPLICABLE;

Exhibit J:    Liquidated Damages.

### ARTICLE II
### CONTRACT TIME

Substantial Completion shall be achieved within three hundred thirty (330) calendar days after a "Notice to Proceed" is issued by the Owner and received by the Construction Manager. Substantial Completion shall be defined as issuance of a "Temporary Certificate of Occupancy" from the City of Austin, Texas. Owner may begin installation of Owner-provided furniture, fixtures, and equipment ("FF&E") prior to the issuance of a "Certificate of Occupancy." Final completion including completion of the punch list and the "Certificate of Occupancy" shall be achieved within three hundred sixty (360) calendar days from the date of commencement. In the event the Construction Manager, without excuse, fails to achieve Substantial Completion on or before the date for Substantial Completion described above, the Construction Manager shall pay to the Owner as liquidated damages, and not as a penalty, the applicable amount set forth in the matrix attached hereto as Exhibit J for each and every calendar day thereafter until final completion is achieved; provided that the Construction Manager shall not be liable for liquidated damages for a day, or days, of excusable delay occurring during such period.

In the event the Construction Manager, without excuse, fails to achieve final completion within sixty (60) days of achieving Substantial Completion, Construction Manager shall pay to the Owner as liquidated damages and not as a penalty, ten percent (10%) of the applicable daily liquidated damage amount set forth in said Exhibit A for each and every calendar day thereafter until final completion is achieved; provided that the Construction Manager shall not be liable for such liquidated damages for a day, or days, or excusable delay occurring during such period.

EBCO 002820

## ARTICLE III
## GENERAL CONDITIONS GUARANTEED MAXIMUM COST

The General Conditions Guaranteed Maximum Cost is three hundred fifty thousand three hundred twenty-five dollars ($350,325.00).

|  | EBCO General Contractor, LTD. |
|---|---|
| **OWNER** | **CONSTRUCTION MANAGER** |

BY: _____

DATE: 9·12·05

ATTEST: _____

BY: John R. Egger, President of the General Partner
EBCO/Warrior Management, L. C.

DATE: 09 Sep 2005

ATTEST: _____

EBCO 002821

Attachment Number 2 (Two)
to Standard Form of Agreement Between Owner and General Contractor

**Paragraph 1.2 shall be modified to delete the second (2nd) to last sentence:** *"For the Preconstruction Phase, or in the event that the Preconstruction and Construction Phases proceed concurrently, General Conditions, as modified, shall apply to the Preconstruction Phase only as specifically provided in this Agreement.*

**Paragraph 2.1 – PRECONSTUCTION PHASE:**
*This section shall be deleted in its entirety, including sub-paragraphs 2.1.1, 2.1.2, 2.1.3, 2.1.4, 2.1.5, 2.1.5.1, 2.1.5.2, 2.1.5.3, 2.1.5.4, 2.1.6, 2.1.7, 2.1.8, and 2.1.9.*

**Paragraph 2.3.2.1:**
*In the fourth (4th) line, place a 'period' after the work "Work" and delete the following wording: "from the list previously reviewed and, after analyzing such bids, shall deliver such bids to the Owner and Architect. The Owner shall then determine, with the advice of the Construction Manager, which bids will be accepted. [role of the architect? Why is it getting the bids?]"*

**Paragraph 2.3.2.2:**
*In the first (1st) line after the words "specific bidder", delete the following wording: "among those whose bids are delivered by the Construction Manager to the Owner and the Architect".*

**Paragraph 2.3.2.5:**
*In the second (2nd) line after the words "prepare a schedule", place a 'period' and delete the following wording: "in accordance with Paragraph 3.10 of the General Conditions, as modified, and the Owner's occupancy requirements".*

**Paragraph 3.1.4:**
*In the first (1st) sentence, replace the words "In the Preconstruction" with "Before the Construction".*

## Article 4 – COMPENSATION AND PAYMENTS FOR PRECONSTRUCTION PHASE SERVICES

*Delete Article 4 in its entirety, including paragraphs 4.1, 4.1.1, 4.1.2, 4.1.3, 4.2, 4.2.1, and 4.2.2.*

## Paragraph 5.2.1:

*The fourth (4th) sentence shall be changed to read: "Any savings realized, up to a maximum of five hundred thousand dollars ($500,000.00), below the Guaranteed Maximum Price shall be shared sixty percent (60%) to the Owner and forty (40%) to the Contractor. All savings above five hundred thousand dollars ($500,000.00) below the Guaranteed Maximum Price shall belong 100% to the Owner." (The effect of this sentence is to place a limit of two hundred thousand dollars ($200,000) on the amount of savings to be paid to the Contractor.) The remainder of this paragraph shall be deleted in its entirety.*

## Paragraph 5.3.1:

*Shall be changed to read as follows: "The Construction Manager shall receive a ten percent (10%) fee for any Changes in the Work."*

## Paragraph 6.1.1:

*At the end of the paragraph, insert forty percent (40%) as the amount of savings to be paid to the Construction Manager.*

## Paragraph 6.1.4.2:

*In the third (3rd) line, add a 'period' at the end of the wording "completion of the Work". Delete the remaining wording: "or, at the Owner's option, shall be sold by the Construction Manager; amounts realized, if any, from such sales shall be credited to the Owner as a deduction from the Cost of the Work."*

## Paragraph 6.1.5.2 – "RESERVED"

*Delete the word 'Reserved' and add the following wording: "Rental charges for temporary facilities, machinery, and hand tools not customarily owned by construction workers that are provided by the Contractor at the site, whether rented from the Contractor or Others, and costs of transportation, installation, minor repairs and replacements, dismantling, and removal thereof."*

**Add Paragraph 6.1.5.6 as follows:**
*"Costs of materials and equipment suitably stored off-site, provided such off-site storage facility meets requirements of the Owner's Lender* <sup>Redacted</sup>
Redacted
."

**Paragraph 6.1.6.7 – RESERVED shall be changed as follows:**
*Delete the word 'Reserved' and add the following wording: "Deposits, previously approved by Owner, lost for causes other than the Contractor's negligence or failure to fulfill a specific responsibility to the Owner as set forth in the Contract Documents.*

**Paragraph 6.1.6.8 – RESERVED shall be changed as follows:**
*Delete the word 'Reserved' and add the following wording: "Legal, mediation, and arbitration costs, including attorney's fees, other than those arising from disputes between the Owner and the Contractor, reasonably incurred by the Contractor in the performance of the Work and with the Owner's prior written approval; which approval shall not be unreasonably withheld."*

**Paragraph 6.1.8.2**
*Change the wording of the entire paragraph to read as follows: "In repairing or correcting damaged or nonconforming Work executed by the Construction Manager or the Construction Manager's subcontractors or suppliers, provided that such damaged or nonconforming Work was not caused by the negligence of the Construction Manager or failure to fulfill a specific responsibility to the Owner set forth in the Agreement, and only to the extent that cost of repair or correction is not recoverable by the Construction Manager from* <sup>Redacted</sup>*, Subcontractors, Suppliers, and*
Redacted

**Paragraph 6.2.1.7**
*Delete this paragraph in its entirety.*

**Paragraph 6.2.1.9**
*Add the following wording at the end of the sentence: "; unless such additional costs are approved by Owner."*

**Paragraph 6.2.1.10**
*Add the following wording at the end of the sentence: "; unless such additional costs are approved by Owner."*

Exhibit K to Standard form of Agreement between Owner and General Contractor
Page 3 of 5

EBCO 002824

**Paragraph 7.1.4**
*Add the following wording: "Certified payrolls will not be required from the Construction Manager nor from any subcontractor of any tier. In addition, Construction Manager shall not be required to attach to each Application for Payment petty cash accounts, receipted invoices or invoices with check vouchers attached. Construction Manager's Pay Application shall attach subcontractor invoicing as back-up."*

**Paragraph 7.1.5**
*Delete the last two (2) sentences of this paragraph. Add the following wording: "The Schedule of Values will be agreed upon between the Owner and the Construction Manager."*

**Paragraph 7.1.7.1**
*Add the following wording: "Retainage shall be as stated in paragraph 7.1.8."*

**Paragraph 7.1.7.2**
*Add the following wording: "Retainage shall be as stated in paragraph 7.1.8."*

**Paragraph 7.1.7.3**
*Add the following wording: "Retainage shall be as stated in paragraph 7.1.8."*

**Paragraph 7.1.7.7**
*Delete this paragraph in its entirety.*

**Paragraph 7.1.8**
*Delete this paragraph in its entirety and add the following wording: "Retainage shall be ten percent (10%) until the work is fifty percent (50%) complete, after which the retainage shall become zero percent (0%)." Furthermore, upon Owner's approval, early release of retainage may be granted for specific subcontractors. Also, upon Owner's approval, no retainage will be withheld for certain "stored materials"."*

**Paragraph 7.2.1**
*In the fourth (4ʰ) line after the words 'General Conditions', delete the words: "as modified". In the fourth (4ʰ) line, change the wording*

Exhibit K to Standard form of Agreement between Owner and General Contractor
Page 4 of 5

EBCO 002825

*'necessarily survive'* to *"extend beyond".* In the sixth (6th) line, delete the words: *"and reviewed by Owner's accountants".*

## Paragraph 7.2.2 – RESERVED
*Delete the word 'Reserved' and add the following: "The Owner's final payment to the Contractor shall be made in full no later than thirty (30) days after issuance of the Architect's final Certificate of Payment, or not later than thirty (30) days after completion of corrected punch list items as noted on the Architect's compete Punch List."*

## Article 8 – Redacted
Redacted

Redacted

## Paragraph 9.1 – Dispute Resolution for the Preconstruction Phase
*Delete this paragraph in its entirety, including sub-paragraphs 9.1.1, 9.1.2, 9.1.3, 9.1.4, 9.1.5, 9.1.6, and 9.1.7.*

## Paragraph 9.2.1
*Delete the wording: "Paragraph 4.4" and replace with "Article 4".*

# Exhibit A - Construction Documents

- Architectural Drawings ("Permit Set"), dated April 15, 2005
- Structural Drawings ("Permit Set"), dated April 15, 2005
- Civil Drawings, sealed by the Engineer on April 5, 2005
- Landscape Drawings, sealed by the Landscape Architect on April 4, 2005
- Plumbing Drawings, dated April 14, 2005
- Mechanical Drawings, dated April 14, 2005
- Electrical Drawings, dated April 14, 2005
- Specification Book ("Permit Set"), dated April 15, 20005
- Addenda - None Issued.

EBCO 002827



## EXHIBIT B

## PLANS & SPECIFICATIONS

### Courtyard by Marriott
### Austin, Texas

| SHEET | | DATE | DESCRIPTION | SHEET NO. | REV. DATE | Δ # |
|---|---|---|---|---|---|---|
| A | 0.0 | 4/15/2005 | COVER SHEET | | | |
| A | 0.1 | 4/15/2005 | CODE SUMMARY | | | |
| | | | | | | |
| | | | CIVIL PLANS | | | |
| 1 | | 4/15/2005 | CIVIL COVER SHEET | | | |
| 2 | | 4/15/2005 | SITE PLAN | | | |
| 3 | | 4/15/2005 | SITE PLAN (CALCULATIONS and NOTES) | | | |
| 4 | | 4/15/2005 | LANDSCAPE PLAN | | | |
| 5 | | 4/15/2005 | LANDSCAPE DETAILS | | | |
| 6 | | 4/15/2005 | SITE GRADING PLAN | | | |
| 7 | | 4/15/2005 | DRAINAGE CALCULATIONS & EXISTING AREA DRAINAGE | | | |
| 8 | | 4/15/2005 | SITE DRAINAGE PLAN | | | |
| 9 | | 4/15/2005 | EROSION & SEDIMENTATION CONTROL and TREE PROTECT | | | |
| 10 | | 4/15/2005 | WATER & WASTEWATER PLAN | | | |
| 11 | | 4/15/2005 | WATER & WASTEWATER DETAILS | | | |
| 12 | | 4/15/2005 | ENVIROMENTAL DETAILS | | | |
| 13 | | 4/15/2005 | CONSTRUCTION DETAILS | | | |
| 14 | | 4/15/2005 | CONSTRUCTION DETAILS | | | |
| | | | | | | |
| | | | ARCHITECTURAL PLANS | | | |
| A | 1.1 | 4/15/2005 | FIRST LEVEL FLOOR PLAN | | | |
| A | 1.2 | 4/15/2005 | SECOND LEVEL FLOOR PLAN | | | |
| A | 1.3 | 4/15/2005 | THIRD LEVEL FLOOR PLAN | | | |
| A | 1.4 | 4/15/2005 | FORTH LEVEL FLOOR PLAN | | | |
| A | 1.5 | 4/15/2005 | FIFTH LEVEL FLOOR PLAN | | | |
| A | 1.6 | 4/15/2005 | ROOF PLAN | | | |
| A | 2.1 | 4/15/2005 | FIRST LEVEL CEILING PLAN | | | |
| A | 2.2 | 4/15/2005 | TYPICAL LEVEL CEILING PLAN | | | |
| A | 3.1 | 4/15/2005 | EXTERIOR ELEVATIONS | | | |
| A | 3.2 | 4/15/2005 | EXTERIOR ELEVATIONS | | | |
| A | 5.1 | 4/15/2005 | WALL SECTIONS | | | |
| A | 5.2 | 4/15/2005 | WALL SECTIONS | | | |
| A | 6.1 | 4/15/2005 | EXTERIOR DETAILS | | | |
| A | 6.2 | 4/15/2005 | EXTERIOR DETAILS | | | |
| A | 6.3 | 4/15/2005 | EXTERIOR DETAILS | | | |
| A | 7.1 | 4/15/2005 | ELEVATOR AND STAIR DETAIL | | | |
| A | 8.1 | 4/15/2005 | ENLARGED PLANS | | | |
| A | 8.2 | 4/15/2005 | UNIT PLANS | | | |
| A | 9.1 | 4/15/2005 | INTERIOR ELEVATIONS | | | |
| A | 9.2 | 4/15/2005 | GUESTROOM INTERIOR ELEVATIONS | | | |
| A | 10.1 | 4/15/2005 | INTERIOR DETAILS | | | |
| A | 10.2 | 4/15/2005 | INTERIOR DETAILS | | | |
| A | 10.3 | 4/15/2005 | INTERIOR DETAILS | | | |
| A | 10.4 | 4/15/2005 | INTERIOR DETAILS | | | |
| A | 11.1 | 4/15/2005 | WINDOW, DOOR, FRAME, AND LOUVER TYPES AND DETAILS | | | |
| | | | | | | |

EBCO 002828



**EXHIBIT B**

**PLANS & SPECIFICATIONS**

**Courtyard by Marriott**
**Austin, Texas**

| SHEET | | DATE | DESCRIPTION | SHEET NO. | REV. DATE | Δ # |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | STRUCTURAL PLANS | | | |
| S | 1.0 | 4/15/2005 | GENERAL NOTES AND TYPICAL DETAILS | | | |
| S | 2.1 | 4/15/2005 | FOUNDATION AND FIRST FLOOR PLAN | | | |
| S | 2.2 | 4/15/2005 | SECOND FLOOR FRAMING PLAN | | | |
| S | 2.3 | 4/15/2005 | THIRD - FIFTH FRAMING PLAN | | | |
| S | 2.4 | 4/15/2005 | ROOF FRAMING PLAN | | | |
| S | 2.5 | 4/15/2005 | ENLARGED STAIR AND ELEVATOR PLANS | | | |
| S | 3.0 | 4/15/2005 | SCHEDULES AND TYPICAL DETAILS | | | |
| S | 4.1 | 4/15/2005 | SECTIONS | | | |
| S | 4.2 | 4/15/2005 | SECTIONS | | | |
| S | 4.3 | 4/15/2005 | SECTIONS | | | |
| S | 4.4 | 4/15/2005 | SECTIONS | | | |
| S | 4.5 | 4/15/2005 | SECTIONS | | | |
| | | | | | | |
| | | | MECHANICAL/ELECTRICAL/PLUMBING | | | |
| 8.01 | | 4/14/2005 | FIRST FLOOR UNDERFLOOR PLUMBING PLAN | | | |
| 8.02 | | 4/14/2005 | FIRST FLOOR PLUMBNIG PLAN | | | |
| 8.03 | | 4/14/2005 | SECOND FLOOR PLUMBING PLAN | | | |
| 8.04 | | 4/14/2005 | THIRD FLOOR PLUMBING PLAN | | | |
| 8.05 | | 4/14/2005 | WASTEWATER RISER DIAGRAGMS | | | |
| 8.063 | | 4/14/2005 | CW & HW RISER DIAGRAMS | | | |
| 8.07 | | 4/14/2005 | FORTH AND FIFTH FLOOR PLUMBING PLAN | | | |
| 8.08 | | 4/14/2005 | ROOF PLUMBING PLAN | | | |
| | | | | | | |
| 9.01 | | 4/14/2005 | FIRST FLOOR MECHANICAL PLAN | | | |
| 9.02 | | 4/14/2005 | SECOND FLOOR MECHANICAL PLAN | | | |
| 9.03 | | 4/14/2005 | THIRD FLOOR MECHANICAL PLAN | | | |
| 9.04 | | 4/14/2005 | FOURTH & FIFTH FLOOR MECHANICAL PLAN | | | |
| 9.05 | | 4/14/2005 | ROOF MECHANICAL PLAN | | | |
| | | | | | | |
| 10.01 | | 4/14/2005 | FIRST FLOOR ELECTRICAL LIGHTING PLAN | | | |
| 10.02 | | 4/14/2005 | FIRST FLOOR ELECTRICAL POWER PLAN | | | |
| 10.03 | | 4/14/2005 | SECOND FLOOR ELECTRICAL PLAN | | | |
| 10.04 | | 4/14/2005 | THIRD FLOOR ELECTRICAL PLAN | | | |
| 10.05 | | 4/14/2005 | FOURTH AND FIFTH FLOOR ELECTRICAL PLAN | | | |
| 10.06 | | 4/14/2005 | ROOF ELECTRICAL PLAN | | | |
| 10.07 | | 4/14/2005 | ELECTRICAL UNIT FLOOR PLAN | | | |
| 10.08 | | 4/14/2005 | PANEL SCHEDULES AND ELECTRICAL RISERS | | | |
| 10.09 | | 4/14/2005 | PANEL SCHEDULES | | | |
| | | | | | | |
| | | | SPECIFICATIONS | | | |
| | | 4/15/2005 | PROJECT MANUAL (PERMIT SET) | | | |
| | | | | | | |

EBCO 002829

# Exhibit C
## Statement of Contractor's Qualifications, Exclusions and Substitutions

| Div. | Description | Status |
|------|-------------|--------|
| 01 | Redacted | Excluded |
| 01 | Redacted | Excluded |
| 01 | Permits. | Excluded |
| 01 | Storm Water Pollution Prevention Plan. Contractor to install and maintain complete system, as required by City Approved Civil Drawings and City of Austin Environmental Kick-Off Meeting. | Excluded |
| 01 | Sewer and Water Taps and Fees. | Excluded |
| 01 | Utility Fees and Impact Fees. | Excluded |
| 01 | Temporary Utilities After Temp CO. | Excluded |
| 01 | Construction Testing by Owner (Except HVAC Test & Balance). | Excluded |
| 02 | Subsurface Dewatering. | Excluded |
| 02 | Rock Excavation. | Excluded |
| 02 | 1-1/2" Asphalt Paving over 9" of base material in parking areas and 2" of asphalt paving over 10" of base material in drive lanes in lieu of Concrete Paving. | Included |
| 02 | Curb & Gutter @ perimeter of paving except @ sidewalk - turned down edge. | Included |
| 07 | Dampproofing @ Shower Bases & Elevator Pit Only. | Included |
| 08 | Champagne Finish on Door Hardware | Excluded |
| 08 | Window package to be All Seasons Model No. 3000HS | Included |
| 09 | Stucco system will be a One Coat System (Magna-Wall of Equal) with Acrylic or Elastomeric finish in lieu of EIFS. | Included |
| 09 | Carpet & Pad Materials. | Excluded |
| 09 | Vinyl Wall Covering Materials. | Excluded |
| 10 | Interior and Exterior Signage. | Excluded |
| 10 | Deposit Boxes and Safe. | Excluded |
| 11 | Commercial Laundry Equipment. | Excluded |
| 11 | Food Service Equipment. | Excluded |
| 11 | Residential Equipment. | Excluded |
| 12 | FF&E Installation. | Excluded |
| 13 | Lightning Protection. | Excluded |
| 13 | Security & Video Surveillance System by Others. | Excluded |
| 13 | Fire Protection System to meet NFPA 13 and Marriott's Module 14.. PVC Piping to be used where allowed by NFPA. | Included |
| 13 | Fire Water Pump & Fire Water Storage Tanks. | Excluded |
| 15 | Guest Room PTAC condensate drain system. | Excluded |
| 15 | PTAC Perimeter Drain System. | Excluded |
| 15 | Gas Service to Meter. | Excluded |
| 15 | Water Softeners. | Excluded |
| 15 | Hot and cold piping insulation on mains and branches only (Pipe insulation is to be "rubatex" type). No insulation on pipe in wall cavity or on condensate drain piping. | Excluded |
| 16 | Communications, Data, Sound, Video, TV & Security Wiring by Others. | Excluded |
| 16 | Conduit for Data, Sound, Video, TV, Security & Fire Alarm. | Excluded |
| 16 | Owner Provided Light Fixtures. | Excluded |
| 16 | Fire Alarm System to meet minimum requirements of City of Austin and Marriott's Module 14. | Included |
| | | |
| 15 & 16 | Note: Mechanical (Div. 15) or Electrical (Div. 16) specification are printed on the MEP drawings. | |
| | | |
| | | |
| 02 | Note: Revision of landscape package (WLS VE #5) may require plan revisions for the | |
| | City of Austin. Plan revisions are excluded. | |
| | | |
| 01 | Allowances included in the contract are as follows: | |
| | - Owner Contingency $192,205.00 | |
| | - Millwork $150,000. (All public area and guest room millwork including staining & finishing) | |
| | - Electrical Fixtures $100,000. (All fixtures including exterior and site lighting) | |
| | - Decorative Fixture Allowance - Deleted at Owner's Request. | |
| | - Dimming System Allowance - Deleted at Owner's Request. | |

EBCO 002830

## Exhibit D - Allowance Summary

| Allowances included in the contract are as follows: | |
|---|---|
| - Owner Contingency $192,205.00 | |
| - Millwork $150,000. (All public area and guest room millwork, including staining & finishing) | |
| - Electrical Fixtures $100,000. (All fixtures including exterior and site lighting) | |
| - Decorative Fixture Allowance - Deleted at Owner's Request. | |
| - Dimming System Allowance - Deleted at Owner's Request. | |

EBCO 002831

COURTYARD, AUSTIN TEXAS
FURNITURE, FIXTURES AND EQUIPMENT SCHEDULE

| Item Number | Specification Section | Description | Quantity from GC | Source | Required Date | Installation Date | Owner Responsibility | GC Responsibility |
|---|---|---|---|---|---|---|---|---|
| 1 | 08710 | Saflock - Lock Sets | | | 3/14/2005 | | Furnish/Install | |
| 2 | 09680 | Carpet | | | 3/14/2005 | | Furnish | Install |
| 3 | 09680 | Carpet Pad | | | 3/14/2005 | | Furnish | Install |
| 4 | 09950 | Wall Coverings | | | 3/14/2005 | | Furnish | Install |
| 5 | - | Food Services Equipment & Accessor. | | | 5/2/2005 | | Furnish/Install | |
| 6 | - | Laundry Equipment & Accessories | | | 5/2/2005 | | Furnish/Install | |
| 7 | - | Audio Visual Equipment | | | 5/9/2005 | | Furnish/Install | conduits/intercom |
| 8 | - | Security Equipment | | | 5/9/2005 | | Furnish/Install | conduits/intercom |
| 9 | - | CCTV Equipment | | | 5/9/2005 | | Furnish/Install | conduits/intercom |
| 10 | - | Framed Mirrors | | | 6/6/2005 | | Furnish/Install | |
| 11 | - | Furniture | | | 6/6/2005 | | Furnish/Install | |
| 12 | - | Artwork | | | 6/6/2005 | | Furnish/Install | Blocking - Install |
| 13 | - | Linens | | | 6/6/2005 | | Furnish/Install | |
| 14 | - | Lighting - Plug-ins | | | 5/16/2005 | | Furnish/Install | |
| 15 | - | Bath Linens | | | 6/6/2005 | | Furnish/Install | |
| 16 | - | Interior Plants/Planters | | | 6/6/2005 | | Furnish/Install | |
| 17 | - | Fixed Planters | | | 6/6/2005 | | | Furnish/Install |
| 18 | - | Moveable Planters | | | 6/6/2005 | | Furnish/Install | |
| 19 | - | Signage | | | 5/2/2005 | | Furnish/Install | |
| 20 | - | Portable Safe | | | 6/6/2005 | | Furnish/Install | |
| 21 | - | Built-in Safe | | | 6/6/2005 | | Furnish/Install | |
| 22 | - | Safety Deposit Box | | | 6/6/2005 | | Furnish/Install | |
| 23 | - | Floor Safe | | | 6/6/2005 | | | |
| 24 | - | Valances | | | 6/6/2005 | | Furnish/Install | Blocking - Install |
| 25 | - | Filing Cabinets | | | 6/6/2005 | | Furnish/Install | |
| 26 | - | Graphics | | | 6/6/2005 | | Furnish/Install | |
| 27 | - | Decorative Lighting | | | 5/2/2005 | | Furnish | Install |
| 28 | - | Ice/Vending Machines | | | 5/23/2005 | | Furnish/Install | |
| 29 | - | Wall Sconces - Lobby/Public Areas | | | 5/2/2005 | | Furnish | Install |
| 30 | - | Chandeliers - Lobby/Public Areas | | | 5/2/2005 | | Furnish | install |
| 31 | - | Wall tapestries/Artwork | | | 6/6/2005 | | Furnish/Install | Blocking - Install |
| 32 | - | Locker Room Shower Curtains | | | 6/6/2005 | | Furnish/Install | |
| 33 | - | Cash Registers | | | 6/6/2005 | | Furnish/Install | |
| 34 | - | Maintenance Equipment, Shelves, Furniture, Tools, etc. | | | 6/6/2005 | | Furnish/Install | |
| 35 | - | Platform Scale | | | 6/6/2005 | | Furnish/Install | |

EBCO 002832

| WLS # | DIV | TYPE | AUSTIN COURTYARD VALUE ENGINEERING ITEMS | |
|---|---|---|---|---|
| | | | EBCO GENERAL CONTRACTORS LTD. | AUG 8,2005 |
| | | | DESCRIPTION | |
| 4 | 2 | SITE | ~~Earthwork—Balance Site cuts & fills (Raise building approximately 2' & revise site grading accordingly)~~ | Not Accepted due to site restrictions. |
| 5 | 2 | SITE | Revise landscape design to City minimums | |
| 7 | 2 | SITE | DELETE SCREEN WALL at courtyard area. Mechanical screen remains. | |
| 9 | 3 | CONC | Use CMU block at stairs & elevator shaft in lieu of concrete walls (Finish of stair walls to be painted CMU) | |
| 10 | 3 | CONC | Use fibermesh concrete in lieu of wire mesh reinforcing | |
| 12 & 14 | 5 | DECK | Replace galvanized Epicore deck with standard 3" type B metal deck | |
| 15 | 5 | DECK | DELETE SOME DECK SHORING COST ASSOCIATED WITH EPICORE DECK-MUST BE IN CONJUNCTION WITH 3" DECK | |
| 18 | 5 | STRUCT | Use either "panelized" wall framing or conventional stud framing. | |
| 23 | 7 | ROOF | Revise EPDM coating from white to black | |
| 24 | 7 | SKIN | Provide Stucco in lieu of stone (stone as per elevations on permit drawings) - stone is Austin white chopped limestone | |
| 26 | 7 | SKIN | DELETE STUCCO @ SCREEN WALL- PAINT ONLY | |
| 27 | 8 | DOORS | Use flush wood doors at guest baths and closets | |
| 28 | 8 | DOORS | Provide "Timely" or "Redi-Frames" in manufacturer's standard colors in lieu of hollow metal frames | |
| 29 | 8 | DOORS | Provide automatic door opener by Nabco in lieu of Stanley | |
| 30 | 8 | DOORS | GRADE 2 HARDWARE in lieu of GRADE 1 | |
| 31 | 8 | WIND | DELETE ANODIZED BRONZE WINDOW FINISH AND PROVIDE PAINTED WINDOW FINISH. | |
| 35 | 9 | CT | CHANGE LOBBY FLOOR TILE - Owner to provide new specs. | |
| 36 | 9 | CT | CHANGE BAHTROOM TILE - Owner to provide new specs. | |
| 37 | 9 | CT | USE Ceramic Tile in lieu of TUB SURROUNDS - Owner to provide specs. | |
| 44 | 12 | MISC | Delete "snow guard" from porte cochere roof Not Available if VE #33 is accepted | |
| 45 | 5 | MISC | Radiused Glulam beams at Porte Cochere in lieu of radiused steel beams. | |
| 50 | 14 | ELEV | Elevator - Use powder coat in lieu of stainless steel at hoistway entrances | |
| 62 | 15 | PLUMB | PROVIDE MOEN SINGLE HANDLE SINK FAUCETS OR SYMMONS T/S FAUCETS | |
| 63 | 15 | PLUMB | USE TOTO WATER CLOSETS, LAVS AND BATHTUBS INCLUDING STEEL TUBS | |
| 64 | 15 | PLUMB | DELETE POWER FLUSH VALVES, except in Public Areas. | |
| 66 | 15 | PLUMB | ABOVE GROUND SANITARY FROM CAST TO PVC (all sanitary and waste/vent piping to be PVC above and below grade) | |
| 67 | 16 | ELECT | Electrical - Use MC cable where allowed by code | |
| 69 | 16 | ELECT | CHANGE LIGHT FIXTURE ALLOWANCE TO $100,000 | |

EBCO 002833

## Exhibit J - Liquidated Damages

The Owner and Construction Manager agree that the Owner shall be entitled to retain two thousand five hundred dollars ($2,500) per calendar day, as "Liquidated Damages" should the Construction Manager fails to complete the Project within the time limitations as set forth in Article II of Exhibit 1 of the Standard Form of Agreement between Owner and General Contractor.

# *General Conditions of the Contract for Construction*

## TABLE OF ARTICLES

1.  GENERAL PROVISIONS

2.  OWNER

3.  CONTRACTOR

4.  ADMINISTRATION OF THE CONTRACT

5.  SUBCONTRACTORS

6.  CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7.  CHANGES IN THE WORK

8.  TIME

9.  PAYMENTS AND COMPLETION

10. PROTECTION OF PERSONS AND PROPERTY

11. Redacted

12. UNCOVERING AND CORRECTION OF WORK

13. MISCELLANEOUS PROVISIONS

14. TERMINATION OR SUSPENSION OF THE CONTRACT

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



## INDEX

Acceptance of Nonconforming Work
9.6.6, 9.9.3, **12.3**
Acceptance of Work
9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
Access to Work
**3.16**, 6.2.1, 12.1
Accident Prevention

4.2.3, 10
Acts and Omissions
3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1,
8.3.1, 9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
1.1.1, 3.11
Additional Costs, Claims for
4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Additional Inspections and Testing
    9.8.3, 12.2.1, 13.5
Additional Time, Claims for
    4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
    3.1.3, 4, 9.4, 9.5
Advertisement or Invitation to Bid
    1.1.1
Aesthetic Effect
    4.2.13, 4.5.1
Allowances
    **3.8**
Redacted
    11.4.1.1
Applications for Payment
    4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1,
    9.8.5, 9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
    2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2,
    13.4.2, 13.5
Arbitration
    4.3.3, 4.4, 4.5.1, 4.5.2, **4.6**, 8.3.1, 9.7.1,
    11.4.9, 11.4.10
Architect
    **4.1**
Architect, Definition of
    4.1.1
Architect, Extent of Authority
    2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2,
    7.3.6, 7.4, 9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1,
    9.10.3, 12.1, 12.2.1, 13.5.1, 13.5.2, 14.2.2,
    14.2.4
Architect, Limitations of Authority and
Responsibility
    2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2,
    4.2.1, 4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10,
    4.2.12, 4.2.13, 4.4, 5.2.1, 7.4, 9.4.2, 9.6.4,
    9.6.6
Architect's Additional Services and Expenses
    2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
Architect's Administration of the Contract
    3.1.3, **4.2**, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
    2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
    3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
    1.6
Architect's Decisions

4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4,
    4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8,
    8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1,
    13.5.2, 14.2.2, 14.2.4
Architect's Inspections
    4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2,
    9.10.1, 13.5
Architect's Instructions
    3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1,
    13.5.2
Architect's Interpretations
    4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
    4.2.10
Architect's Relationship with Contractor
    1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1,
    3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16,
    3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7,
    5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7,
    9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
    13.4.2, 13.5
Architect's Relationship with Subcontractors
    1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4,
    11.4.7
Architect's Representations
    9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
    4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2,
    9.10.1, 13.5
Asbestos
    10.3.1
Attorneys' Fees
    3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
    6.1.1, 6.1.2
Award of Subcontracts and Other Contracts for
Portions of the Work
    **5.2**
Basic Definitions
    **1.1**
Bidding Requirements
    1.1.1, 1.1.7, 5.2.1, 11.5.1
Redacted
    11.4.2
Redacted
    9.10.2
Redacted
    7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by
The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial
quotation of its provisions without written permission of the AIA violates the copyright laws of the United States
and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright
laws and will subject the violator to legal prosecution. This document was electronically produced with
permission of the AIA and can be reproduced in accordance with your license without violation until the date of
expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

3.7.1

Capitalization
**1.3**

Certificate of Substantial Completion
9.8.3, 9.8.4, 9.8.5

Certificates for Payment
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6,
9.7.1, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4

Certificates of Inspection, Testing or Approval
13.5.4

Redacted
9.10.2, 11.1.3

Change Orders
1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8,
4.2.8, 4.3.4, 4.3.9, 5.2.3, 7.1, 7.2, 7.3, 8.3.1,
9.3.1.1, 9.10.3, 11.4.1.2, 11.4.4, 11.4.9,
12.1.2

Change Orders, Definition of
7.2.1

**CHANGES IN THE WORK**
3.11, 4.2.8, **7**, 8.3.1, 9.3.1.1, 11.4.9

Claim, Definition of
**4.3.1**

Claims and Disputes
3.2.3, **4.3**, 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8,
9.3.3, 9.10.4, 10.3.3

Claims and Timely Assertion of Claims
**4.6.5**

Claims for Additional Cost
3.2.3, 4.3.4, **4.3.5**, 4.3.6, 6.1.1, 7.3.8,
10.3.2

Claims for Additional Time
3.2.3, 4.3.4, **4.3.7**, 6.1.1, 8.3.2, 10.3.2

Claims for Concealed or Unknown Conditions
**4.3.4**

Claims for Damages
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1,
9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3,
14.2.4

Claims Subject to Arbitration
4.4.1, 4.5.1, 4.6.1

Cleaning Up
**3.15**, 6.3

Commencement of Statutory Limitation Period
**13.7**

Commencement of the Work, Conditions
Relating to
2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6,
4.3.5, 5.2.1, 5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1,

11.1, 11.4.1, 11.4.6, 11.5.1

Commencement of the Work, Definition of
8.1.2

Communications Facilitating Contract
Administration
3.9.1, **4.2.4**

Completion, Conditions Relating to
1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2,
9.4.2, 9.8, 9.9.1, 9.10, 12.2, 13.7, 14.1.2

**COMPLETION, PAYMENTS AND**
**9**

Completion, Substantial
4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1,
9.10.3, 9.10.4.2, 12.2, 13.7

Compliance with Laws
1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1,
4.4.8, 4.6.4, 4.6.6, 9.6.4, 10.2.2, 11.1, 11.4,
13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14.1.1,
14.2.1.3

Concealed or Unknown Conditions
4.3.4, 8.3.1, 10.3

Conditions of the Contract
1.1.1, 1.1.7, 6.1.1, 6.1.4

Consent, Written
1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4,
9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1,
13.2, 13.4.2

**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
1.1.4, **6**

Construction Change Directive, Definition of
7.3.1

Construction Change Directives
1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, **7.3**, 9.3.1.1

Construction Schedules, Contractor's
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3

Contingent Assignment of Subcontracts
**5.4**, 14.2.2.2

Continuing Contract Performance
**4.3.3**

Contract, Definition of
1.1.2

**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
5.4.1.1, 11.4.9, 14

Contract Administration
3.1.3, 4, 9.4, 9.5

Contract Award and Execution, Conditions
Relating to



*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by
The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial
quotation of its provisions without written permission of the AIA violates the copyright laws of the United States
and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright
laws and will subject the violator to legal prosecution. This document was electronically produced with
permission of the AIA and can be reproduced in accordance with your license without violation until the date of
expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
Contract Documents, The
    **1.1**, 1.2
Contract Documents, Copies Furnished and Use of
    1.6, 2.2.5, 5.3
Contract Documents, Definition of
    1.1.1
Contract Sum
    3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4,
    **9.1**, 9.4.2, 9.5.1.4, 9.6.7, 9.7, 10.3.2,
    11.4.1, 14.2.4, 14.3.2
Contract Sum, Definition of
    9.1
Contract Time
    4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4,
    8.1.1, 8.2, 8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1,
    14.3.2
Contract Time, Definition of
    8.1.1
**CONTRACTOR**
    **3**
Contractor, Definition of
    3.1, 6.1.2
Contractor's Construction Schedules
    1.4.1.2, **3.10**, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees
    3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6,
    10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1,
Redacted
    **11.1**
Contractor's Relationship with Separate
Contractors and Owner's Forces
    3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2,
    12.2.4
Contractor's Relationship with Subcontractors
    1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7,
    9.10.2, 11.4.1.2, 11.4.7, 11.4.8
Contractor's Relationship with the Architect
    1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1,
    3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16,
    3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7,
    5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7,
    9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
    13.4.2, 13.5
Contractor's Representations
    1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3,
    9.8.2
Contractor's Responsibility for Those

Performing the Work
    3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2,
    6.3, 9.5.1, 10
Contractor's Review of Contract Documents
    1.5.2, 3.2, 3.7.3
Contractor's Right to Stop the Work
    9.7
Contractor's Right to Terminate the Contract
    4.3.10, 14.1
Contractor's Submittals
    3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6,
    9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3,
    11.1.3, 11.5.2
Contractor's Superintendent
    3.9, 10.2.6
Contractor's Supervision and Construction
Procedures
    1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3,
    6.1.3, 6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 12,
    14
Redacted
    11.1.1.8, 11.2, 11.3
Coordination and Correlation
    1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and
Specifications
    1.6, 2.2.5, 3.11
Copyrights
    1.6, 3.17
Correction of Work
    2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3,
    9.9.1, 12.1.2, 12.2, 13.7.1.3
Correlation and Intent of the Contract
Documents
    **1.2**
Cost, Definition of
    7.3.6
Costs
    2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2,
    6.1.1, 6.2.3, 7.3.3.3, 7.3.6, 7.3.7, 7.3.8,
    9.10.2, 10.3.2, 10.5, 11.3, 11.4, 12.1,
    12.2.1, 12.2.4, 13.5, 14
Cutting and Patching
    6.2.5, **3.14**
Damage to Construction of Owner or Separate
Contractors
    3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6,
    11.1, 11.4, 12.2.4
Damage to the Work

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4, 12.2.4

Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1, 9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3, 14.2.4

Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2

Date of Commencement of the Work, Definition of
8.1.2

Date of Substantial Completion, Definition of
8.1.3

Day, Definition of
8.1.4

Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4, 4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8, 8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1, 13.5.2, 14.2.2, 14.2.4

Decisions to Withhold Certification
9.4.1, **9.5**, 9.7, 14.1.1.3

Defective or Nonconforming Work, Acceptance, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2, 9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3

Defective Work, Definition of
3.5.1

Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3, 4.1.1, 4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6, 8.1, 9.1, 9.8.1

Delays and Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3.1, 7.4.1, 7.5.1, **8.3**, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8

Documents and Samples at the Site
**3.11**

Drawings, Definition of
1.1.5

Drawings and Specifications, Use and Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3

Redacted
8.2.2, 11.1.2

Emergencies
4.3.5, **10.6**, 14.1.1.2

Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6, 10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1

Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4, 14.2.1.2

Execution and Progress of the Work
1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4, 3.5, 3.7, 3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3, 6.2.2, 7.1.3, 7.3.4, 8.2, 9.5, 9.9.1, 10.2, 10.3, 12.2, 14.2, 14.3

Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1, 7.3, 7.4.1, 9.5.1, 9.7.1, 10.3.2, 10.6.1, 14.3.2

Failure of Payment
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3, 14.2.1.2, 13.6

Faulty Work
(See Defective or Nonconforming Work)

Final Completion and Final Payment
4.2.1, 4.2.9, 4.3.2, 9.8.2, **9.10**, 11.1.2, 11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4, 14.4.3

Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5

Redacted
11.4

**GENERAL PROVISIONS**
**1**

Governing Law
**13.1**

Guarantees (See Warranty)

Hazardous Materials
10.2.4, **10.3**, 10.5

Identification of Contract Documents
1.5.1

Identification of Subcontractors and Suppliers
5.2.1

Indemnification
3.17, **3.18**, 9.10.2, 10.3.3, 10.5, 11.4.1.2, 11.4.7

Information and Services Required of the Owner
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7, 4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4, 9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1,

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

13.5.2, 14.1.1.4, 14.1.4
Injury or Damage to Person or Property
   **4.3.8**, 10.2, 10.6
Inspections
   3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2,
   9.8.2, 9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
   1.1.1
Instructions to the Contractor
   3.2.3, 3.3.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2,
   13.5.2
Redacted
   3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4,
   9.9.1, 9.10.2, 9.10.5, 11
Redacted
   11.4.2
Redacted
   **11.1**
Redacted
   8.2.2, 11.1.2
Redacted
   11.4.3
Redacted
   11.2
Redacted      Redacted
Redacted
   11.3
Redacted
   10.2.5, **11.4**
Redacted
   9.3.2, 11.4.1.4
Redacted
   **11**
Redacted
Redacted
   9.9.1, 11.4.1.5
Redacted
   11.4.10
Intent of the Contract Documents
   1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
Interest
   **13.6**
Interpretation
   1.2.3, **1.4**, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written
   4.2.11, 4.2.12, 4.3.6
Joinder and Consolidation of Claims Required
   4.6.4
Judgment on Final Award

   **4.6.6**
Labor and Materials, Equipment
   1.1.3, 1.1.6, **3.4**, 3.5.1, 3.8.2, 3.8.3, 3.12,
   3.13, 3.15.1, 42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6,
   9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4,
   14.2.1.2
Labor Disputes
   8.3.1
Laws and Regulations
   1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1,
   4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4,
   13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14
Liens
   2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10
Limitation on Consolidation or Joinder
   **4.6.4**
Limitations, Statutes of
   4.6.3, 12.2.6, 13.7
Limitations of Liability
   2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10,
   3.17, 3.18, 4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2,
   9.6.4, 9.6.7, 9.10.4, 10.3.3, 10.2.5, 11.1.2,
   11.2.1, 11.4.7, 12.2.5, 13.4.2
Limitations of Time
   2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11,
   3.12.5, 3.15.1, 4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2,
   5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1,
   9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10,
   11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5,
   13.7, 14
Redacted
   **11.4.3**
Material Suppliers
   1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2,
   9.6, 9.10.5
Materials, Hazardous
   10.2.4, 10.3, 10.5
Materials, Labor, Equipment and
   1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23,
   3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1,
   7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1,
   10.2.4, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
   3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
   4.4.8
Mediation
   4.4.1, 4.4.5, 4.4.6, 4.4.8, **4.5**, 4.6.1, 4.6.2,

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

8.3.1, 10.5

Minor Changes in the Work
    1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, **7.4**

**MISCELLANEOUS PROVISIONS**
    **13**

Modifications, Definition of
    1.1.1

Modifications to the Contract
    1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3,
    7, 8.3.1, 9.7, 10.3.2, 11.4.1

Mutual Responsibility
    **6.2**

Nonconforming Work, Acceptance of
    9.6.6, 9.9.3, **12.3**

Nonconforming Work, Rejection and
Correction of
    2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2,
    9.9.3, 9.10.4, 12.2.1, 13.7.1.3

Notice
    2.2.1, 2.3, 2.4, 3.2.3, 3.3.1, 3.7.2, 3.7.4,
    3.12.9, 4.3, 4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7,
    9.10, 10.2.2, 11.1.3, 11.4.6, 12.2.2, 12.2.4,
    13.3, 13.5.1, 13.5.2, 14.1, 14.2

Notice, Written
    2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3,
    4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2,
    10.3, 11.1.3, 11.4.6, 12.2.2, 12.2.4, **13.3,**
    14

Notice of Testing and Inspections
    13.5.1, 13.5.2

Notice to Proceed
    8.2.2

Notices, Permits, Fees and
    2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2

Observations, Contractor's
    1.5.2, 3.2, 3.7.3, 4.3.4

Occupancy
    2.2.2, 9.6.6, 9.8, 11.4.1.5

Orders, Written
    1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1,
    12.2, 13.5.2, 14.3.1

**OWNER**
    **2**

Owner, Definition of
    2.1

Owner, Information and Services Required of
the
    2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7,
    4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4,
    9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1,
    13.5.2, 14.1.1.4, 14.1.4

Owner's Authority
    1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10,
    3.14.2, 4.1.2, 4.1.3, 4.2.4, 4.2.9, 4.3.6,
    4.4.7, 5.2.1, 5.2.4, 5.4.1, 6.1, 6.3, 7.2.1,
    7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1, 9.9.1,
    9.10.2, 10.3.2, 11.1.3, 11.3.1, 11.4.3,
    11.4.10, 12.2.2, 12.3.1, 13.2.2, 14.3, 14.4

Owner's Financial Capability
    2.2.1, 13.2.2, 14.1.1.5

Redacted
    **11.2**

Redacted
    11.4.3

Owner's Relationship with Subcontractors
    1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2

Owner's Right to Carry Out the Work
    **2.4**, 12.2.4, 14.2.2.2

Owner's Right to Clean Up
    **6.3**

Owner's Right to Perform Construction and to
Award Separate Contracts
    **6.1**

Owner's Right to Stop the Work
    **2.3**

Owner's Right to Suspend the Work
    14.3

Owner's Right to Terminate the Contract
    14.2

Ownership and Use of Drawings, Specifications
and Other Instruments of Service
    1.1.1, **1.6**, 2.2.5, 3.2.1, 3.11.1, 3.17.1,
    4.2.12, 5.3

Partial Occupancy or Use
    9.6.6, **9.9**, 11.4.1.5

Patching, Cutting and
    **3.14**, 6.2.5

Patents
    3.17

Payment, Applications for
    4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3,
    9.7.1, 9.8.5, 9.10.1, 9.10.3, 9.10.5, 11.1.3,
    14.2.4, 14.4.3

Payment, Certificates for
    4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6,
    9.7.1, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4

Payment, Failure of
    4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3,

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

14.2.1.2, 13.6
Payment, Final
4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2,
11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4,
14.4.3
Redacted
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
Payments, Progress
4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3
**PAYMENTS AND COMPLETION**
**9**
Payments to Subcontractors
5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7,
11.4.8, 14.2.1.2
PCB
10.3.1
Redacted
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**
Permits, Fees and Notices
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2
**PERSONS AND PROPERTY,**
**PROTECTION OF**
**10**
Polychlorinated Biphenyl
10.3.1
Product Data, Definition of
3.12.2
Product Data and Samples, Shop Drawings
3.11, **3.12**, 4.2.7
Progress and Completion
4.2.2, 4.3.3, **8.2**, 9.8, 9.9.1, 14.1.4
Progress Payments
4.3.3, 9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3
Project, Definition of the
1.1.4
Redacted
Redacted
**11.3**
Project Manual, Definition of the
1.1.7
Project Manuals
2.2.5
Project Representatives
4.2.10
Redacted
10.2.5, **11.4**
**PROTECTION OF PERSONS AND**
**PROPERTY**
**10**

Regulations and Laws
1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1,
4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4,
13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14
Rejection of Work
3.5.1, 4.2.6, 12.2.1
Releases and Waivers of Liens
9.10.2
Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3,
9.4.2, 9.5.1, 9.8.2, 9.10.1
Representatives
2.1.1, 3.1.1, 3.9, 4.1.1, 4.3.1, 4.2.10, 5.1.1,
5.1.2, 13.2.1
Resolution of Claims and Disputes
**4.4**, 4.5, 4.6
Responsibility for Those Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2,
6.3, 9.5.1, 10
Retainage
9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3
Review of Contract Documents and Field
Conditions by Contractor
1.5.2, **3.2**, 3.7.3, 3.12.7, 6.1.3
Review of Contractor's Submittals by Owner
and Architect
3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3,
9.2, 9.8.2
Review of Shop Drawings, Product Data and
Samples by Contractor
3.12
Rights and Remedies
1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4,
4.5, 4.6, 5.3, 5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1,
9.7, 10.2.5, 10.3, 12.2.2, 12.2.4, 13.4, 14
Royalties, Patents and Copyrights
**3.17**
Rules and Notices for Arbitration
4.6.2
Safety of Persons and Property
**10.2**, 10.6
Safety Precautions and Programs
3.3.1, 4.2.2, 4.2.7, 5.3.1, 10.1, 10.2, 10.6
Samples, Definition of
3.12.3
Samples, Shop Drawings, Product Data and
3.11, **3.12**, 4.2.7
Samples at the Site, Documents and
3.11

THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES. CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401. This document has been
endorsed by The Associated General
Contractors of America.

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by
The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial
quotation of its provisions without written permission of the AIA violates the copyright laws of the United States
and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright
laws and will subject the violator to legal prosecution. This document was electronically produced with
permission of the AIA and can be reproduced in accordance with your license without violation until the date of
expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION
The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Schedule of Values
   **9.2**, 9.3.1
Schedules, Construction
   1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Separate Contracts and Contractors
   1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6,
   8.3.1, 11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
   3.12.1
Shop Drawings, Product Data and Samples
   3.11, **3.12**, 4.2.7
Site, Use of
   3.13, 6.1.1, 6.2.1
Site Inspections
   1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2,
   9.10.1, 13.5
Site Visits, Architect's
   4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2,
   9.10.1, 13.5
Special Inspections and Testing
   4.2.6, 12.2.1, 13.5
Specifications, Definition of the
   1.1.6
Specifications, The
   1.1.1, **1.1.6**, 1.1.7, 1.2.2, 1.6, 3.11,
   3.12.10, 3.17
Statute of Limitations
   4.6.3, 12.2.6, 13.7
Stopping the Work
   2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
   6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
   5.1.1
**SUBCONTRACTORS**
   **5**
Subcontractors, Work by
   1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4,
   9.3.1.2, 9.6.7
Subcontractual Relations
   **5.3,** 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7,
   11.4.8, 14.1, 14.2.1, 14.3.2
Submittals
   1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3,
   7.3.6, 9.2, 9.3, 9.8, 9.9.1, 9.10.2, 9.10.3,
   11.1.3
Redacted
   6.1.1, 11.4.5, **11.4.7**
Substantial Completion

4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1,
   9.10.3, 9.10.4.2, 12.2, 13.7
Substantial Completion, Definition of
   9.8.1
Substitution of Subcontractors
   5.2.3, 5.2.4
Substitution of Architect
   4.1.3
Substitutions of Materials
   3.4.2, 3.5.1, 7.3.7
Sub-subcontractor, Definition of
   5.1.2
Subsurface Conditions
   4.3.4
Successors and Assigns
   **13.2**
Superintendent
   **3.9**, 10.2.6
Supervision and Construction Procedures
   1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3,
   6.1.3, 6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2,
   10, 12, 14
Redacted
   4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2
Redacted
   9.10.2, 9.10.3
Surveys
   2.2.3
Suspension by the Owner for Convenience
   **14.4**
Suspension of the Work
   5.4.2, 14.3
Suspension or Termination of the Contract
   4.3.6, 5.4.1.1, 11.4.9, 14
Taxes
   **3.6**, 3.8.2.1, 7.3.6.4
Termination by the Contractor
   4.3.10, **14.1**
Termination by the Owner for Cause
   4.3.10, 5.4.1.1, **14.2**
Termination of the Architect
   4.1.3
Termination of the Contractor
   14.2.2
**TERMINATION OR SUSPENSION OF**
**THE CONTRACT**
   **14**
Tests and Inspections
   3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3,

*THIS DOCUMENT HAS IMPORTANT*
*LEGAL CONSEQUENCES.*
*CONSULTATION WITH AN*
*ATTORNEY IS ENCOURAGED WITH*
*RESPECT TO ITS COMPLETION OR*
*MODIFICATION. AUTHENTICATION*
*OF THIS ELECTRONICALLY*
*DRAFTED AIA DOCUMENT MAY BE*
*MADE BY USING AIA DOCUMENT*
*D401.*

*This document has been approved and*
*endorsed by The Associated General*
*Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

9.9.2, 9.10.1, 10.3.2, 11.4.1.1, 12.2.1,**13.5**
**TIME**
   **8**
Time, Delays and Extensions of
   3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1,
   7.3.1, 7.4.1, 7.5.1, **8.3**, 9.5.1, 9.7.1, 10.3.2,
   10.6.1, 14.3.2
Time Limits
   2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11,
   3.12.5, 3.15.1, 4.2, 4.3, 4.4, 4.5, 4.6, 5.2,
   5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1,
   9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10,
   11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2,
   13.5, 13.7, 14
Time Limits on Claims
   **4.3.2**, 4.3.4, 4.3.8, 4.4, 4.5, 4.6
Title to Work
   9.3.2, 9.3.3
**UNCOVERING AND CORRECTION OF
WORK**
   **12**
Uncovering of Work
   **12.1**
Unforeseen Conditions
   4.3.4, 8.3.1, 10.3
Unit Prices
   4.3.9, 7.3.3.2
Use of Documents
   1.1.1, 1.6, 2.2.5, 3.12.6, 5.3
Use of Site
   **3.13**, 6.1.1, 6.2.1
Values, Schedule of
   **9.2**, 9.3.1
Waiver of Claims by the Architect
   13.4.2
Waiver of Claims by the Contractor
   4.3.10, 9.10.5, 11.4.7, 13.4.2

Waiver of Claims by the Owner
   4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5,
   11.4.7, 12.2.2.1, 13.4.2, 14.2.4
Waiver of Consequential Damages
   **4.3.10**, 14.2.4
Waiver of Liens
   9.10.2, 9.10.4
Redacted
   6.1.1, 11.4.5, **11.4.7**
Warranty
   **3.5,** 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1,
   9.10.4, 12.2.2, 13.7.1.3
Weather Delays
   4.3.7.2
Work, Definition of
   1.1.3
Written Consent
   1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4,
   9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1,
   13.2, 13.4.2
Written Interpretations
   4.2.11, 4.2.12, 4.3.6
Written Notice
   2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3,
   4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2,
   10.3, 11.1.3, 11.4.6, 12.2.2, 12.2.4, **13.3,**
   14
Written Orders
   1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1,
   12.2, 13.5.2, 14.3.1

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*

## ARTICLE 1 GENERAL PROVISIONS
### 1.1    BASIC DEFINITIONS
### 1.1.1   THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement,



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements).

### 1.1.2  THE CONTRACT
The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

### 1.1.3  THE WORK
The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### 1.1.4  THE PROJECT
The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### 1.1.5  THE DRAWINGS
The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### 1.1.6  THE SPECIFICATIONS
The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### 1.1.7  THE PROJECT MANUAL
The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

### 1.2  CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS
**1.2.1**  The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**1.2.2** Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

**1.2.3** Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

## 1.3 CAPITALIZATION
**1.3.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles and identified references to Paragraphs, Subparagraphs and Clauses in the document or (3) the titles of other documents published by the American Institute of Architects.

## 1.4 INTERPRETATION
**1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

## 1.5 EXECUTION OF CONTRACT DOCUMENTS
**1.5.1** The Contract Documents shall be signed by the Owner and Contractor. If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.

**1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

## 1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE
**1.6.1** The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.

## ARTICLE 2 OWNER
### 2.1    GENERAL
**2.1.1**    The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Subparagraph 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

**2.1.2**    The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### 2.2    INFORMATION AND SERVICES REQUIRED OF THE OWNER
**2.2.1**    The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

**2.2.2**    Except for permits and fees, including those required under Subparagraph 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

**2.2.3**    The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

**2.2.4**    Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

**2.2.5** Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

## 2.3 OWNER'S RIGHT TO STOP THE WORK
**2.3.1** If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Paragraph 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Subparagraph 6.1.3.

## 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
**2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3 CONTRACTOR
### 3.1 GENERAL
**3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

### 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR
**3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Subparagraph 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

**3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.

**3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Subparagraphs 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Subparagraphs 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Subparagraphs 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

## 3.3  SUPERVISION AND CONSTRUCTION PROCEDURES
**3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

**3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

15

**3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## 3.4 LABOR AND MATERIALS

**3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.4.2** The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

**3.4.3** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

## 3.5 WARRANTY

**3.5.1** The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## 3.6 TAXES

**3.6.1** The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## 3.7 PERMITS, FEES AND NOTICES

**3.7.1** Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

**3.7.2** The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

**3.7.3** It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

**3.7.4** If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## 3.8    ALLOWANCES
**3.8.1** The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

**3.8.2** Unless otherwise provided in the Contract Documents:

  .1  allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

  .2  Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;

  .3  whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Clause 3.8.2.1 and (2) changes in Contractor's costs under Clause 3.8.2.2.

**3.8.3** Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## 3.9    SUPERINTENDENT
**3.9.1** The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## 3.10    CONTRACTOR'S CONSTRUCTION SCHEDULES
**3.10.1** The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**3.10.2** The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Architect reasonable time to review submittals.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect.

## 3.11 DOCUMENTS AND SAMPLES AT THE SITE

**3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

## 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Subparagraph 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

**3.12.5** The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.

**3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice the Architect's approval of a resubmission shall not apply to such revisions.

**3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Subparagraph 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

### 3.13   USE OF SITE
**3.13.1** The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

### 3.14   CUTTING AND PATCHING
**3.14.1** The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**3.14.2** The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

### 3.15 CLEANING UP
**3.15.1** The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

**3.15.2** If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

### 3.16 ACCESS TO WORK
**3.16.1** The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

### 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
**3.17.1** The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

### 3.18 INDEMNIFICATION
**3.18.1** To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are Redacted

Redacted , the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 3.18.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**3.18.2**  In claims against any person or entity indemnified under this Paragraph 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Subparagraph 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 4  ADMINISTRATION OF THE CONTRACT

### 4.1    ARCHITECT

**4.1.1**    The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

**4.1.2**    Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

**4.1.3**    If the employment of the Architect is terminated, the Owner shall employ a new Architect against whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the former Architect.

### 4.2    ARCHITECT'S ADMINISTRATION OF THE CONTRACT

**4.2.1**    The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Paragraph 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

**4.2.2**    The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Subparagraph 3.3.1.

**4.2.3**    The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**4.2.4   Communications Facilitating Contract Administration.**   Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

**4.2.5**   Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

**4.2.6**   The Architect will have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Subparagraphs 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

**4.2.7**   The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Paragraphs 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**4.2.8**   The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Paragraph 7.4.

**4.2.9**   The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**4.2.10** If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

**4.2.11** The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Paragraph 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

**4.2.12** Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

**4.2.13** The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

## 4.3    CLAIMS AND DISPUTES

**4.3.1    Definition.** A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

**4.3.2    Time Limits on Claims.** Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

**4.3.3    Continuing Contract Performance.** Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Subparagraph 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

**4.3.4    Claims for Concealed or Unknown Conditions.** If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

23

observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Paragraph 4.4.

**4.3.5 Claims for Additional Cost.** If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Paragraph 10.6.

**4.3.6** If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Paragraph 4.3.

**4.3.7 Claims for Additional Time**
**4.3.7.1** If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

**4.3.7.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

**4.3.8 Injury or Damage to Person or Property.** If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**4.3.9** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**4.3.10  Claims for Consequential Damages.** The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1  damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2  damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Subparagraph 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

## 4.4  RESOLUTION OF CLAIMS AND DISPUTES

**4.4.1  Decision of Architect.** Claims, including those alleging an error or omission by the Architect but excluding those arising under Paragraphs 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.

**4.4.2**  The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.

**4.4.3**  In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.

**4.4.4**  If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

**4.4.5**  The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 · 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.

**4.4.6** When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

**4.4.7** Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify Redacted , if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify Redacted and request Redacted assistance in resolving the controversy.

**4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Architect, by mediation or by arbitration.

## 4.5 MEDIATION
**4.5.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

**4.5.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

## 4.6 ARBITRATION
**4.6.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Paragraph 4.5.



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**4.6.2** Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.

**4.6.3** A demand for arbitration shall be made within the time limits specified in Subparagraphs 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Paragraph 13.7.

**4.6.4 Limitation on Consolidation or Joinder.** No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**4.6.5 Claims and Timely Assertion of Claims.** The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**4.6.6 Judgment on Final Award.** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 5 SUBCONTRACTORS
### 5.1 DEFINITIONS
**5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

## 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

**5.2.1** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

**5.2.2** The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**5.2.3** If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

**5.2.4** The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitute.

## 5.3 SUBCONTRACTUAL RELATIONS

**5.3.1** By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

## 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

**5.4.1** Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

>   **.1** assignment is effective only after termination of the Contract by the Owner for cause pursuant to Paragraph 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and
>
>   **.2** assignment is subject to the prior rights of the Redacted if any, obligated under Redacted relating to the Contract.

**5.4.2** Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

## ARTICLE 6 CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS
### 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS

**6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these Redacted
Redacted . If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Paragraph 4.3.

**6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**6.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Other until subsequently revised.

**6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

### 6.2 MUTUAL RESPONSIBILITY

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

**6.2.1** The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**6.2.2** If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**6.2.3** The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

**6.2.4** The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Subparagraph 10.2.5.

**6.2.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Subparagraph 3.14.

**6.3 OWNER'S RIGHT TO CLEAN UP**
**6.3.1** If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Architect will allocate the cost among those responsible.

## ARTICLE 7 CHANGES IN THE WORK
### 7.1 GENERAL
**7.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**7.1.2** A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.

**7.1.3** Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

## 7.2 CHANGE ORDERS

**7.2.1** A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:

.1 change in the Work;
.2 the amount of the adjustment, if any, in the Contract Sum; and
.3 the extent of the adjustment, if any, in the Contract Time.

**7.2.2** Methods used in determining adjustments to the Contract Sum may include those listed in Subparagraph 7.3.3.

## 7.3 CONSTRUCTION CHANGE DIRECTIVES

**7.3.1** A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:

.1 mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
.2 unit prices stated in the Contract Documents or subsequently agreed upon;
.3 cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
.4 as provided in Subparagraph 7.3.6.

**7.3.4** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**7.3.5** A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**7.3.6** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Clause 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Documents, costs for the purposes of this Subparagraph 7.3.6 shall be limited to the following:

    .1  costs of labor, including social security, old age and Redacted fringe benefits required by agreement or custom, and Redacted Redacted ;

    .2  costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

    .3  rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

    .4  Redacted , permit fees, and sales, use or similar taxes related to the Work; and

    .5  additional costs of supervision and field office personnel directly attributable to the change.

**7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**7.3.8** Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

**7.3.9** When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## 7.4 MINOR CHANGES IN THE WORK
**7.4.1** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

## ARTICLE 8 TIME
### 8.1 DEFINITIONS
**8.1.1** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**8.1.2** The date of commencement of the Work is the date established in the Agreement.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**8.1.3** The date of Substantial Completion is the date certified by the Architect in accordance with Paragraph 9.8.

**8.1.4** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

## 8.2 PROGRESS AND COMPLETION
**8.2.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**8.2.2** Redacted

Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

**8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

## 8.3 DELAYS AND EXTENSIONS OF TIME
**8.3.1** If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

**8.3.2** Claims relating to time shall be made in accordance with applicable provisions of Paragraph 4.3.

**8.3.3** This Paragraph 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9 PAYMENTS AND COMPLETION
### 9.1 CONTRACT SUM
**9.1.1** The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### 9.2 SCHEDULE OF VALUES
**9.2.1** Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

## 9.3   APPLICATIONS FOR PAYMENT

**9.3.1**   At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents.

**9.3.1.1** As provided in Subparagraph 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

**9.3.1.2** Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

**9.3.2**   Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable^Redacted , storage and transportation to the site for such materials and equipment stored off the site.

**9.3.3**   The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## 9.4   CERTIFICATES FOR PAYMENT

**9.4.1**   The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Subparagraph 9.5.1.

**9.4.2**   The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## 9.5 DECISIONS TO WITHHOLD CERTIFICATION

**9.5.1** The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Subparagraph 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Subparagraph 3.3.2, because of:

    .1   defective Work not remedied;

    .2   third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

    .3   failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

    .4   reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

    .5   damage to the Owner or another contractor;

    .6   reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

    .7   persistent failure to carry out the Work in accordance with the Contract Documents.

**9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

## 9.6 PROGRESS PAYMENTS

**9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

35

**9.6.2**  The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**9.6.3**  The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

**9.6.4**  Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**9.6.5**  Payment to material suppliers shall be treated in a manner similar to that provided in Subparagraphs 9.6.2, 9.6.3 and 9.6.4.

**9.6.6**  A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

**9.6.7**  Unless the Contractor provides the Owner with Redacted                   in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

## 9.7  FAILURE OF PAYMENT

**9.7.1**  If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

## 9.8  SUBSTANTIAL COMPLETION

**9.8.1**  Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

**9.8.3** Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

**9.8.4** When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and Redacted , and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

**9.8.5** The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of Redacte , if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

## 9.9    PARTIAL OCCUPANCY OR USE
**9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the Redacted as required under Clause 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and Redacted ., and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Subparagraph 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**9.9.2** Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

## 9.10 FINAL COMPLETION AND FINAL PAYMENT

**9.10.1** Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Subparagraph 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

**9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) Redacted
Redacted

*This document has been approved and endorsed by The Associated General Contractors of America.*

Redacted           (3) Redacted

(4) consent of Redacted, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a Redact satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if Redacted have been furnished, the written consent of Redacted to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

 .1   liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;

 .2   failure of the Work to comply with the requirements of the Contract Documents; or

 .3   terms of special warranties required by the Contract Documents.

**9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10 PROTECTION OF PERSONS AND PROPERTY
### 10.1   SAFETY PRECAUTIONS AND PROGRAMS
**10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### 10.2   SAFETY OF PERSONS AND PROPERTY
**10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

 .1   employees on the Work and other persons who may be affected thereby;

 .2   the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

 .3   other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss Redacted required by the Contract Documents) to property referred to in Clauses 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Clauses

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 3.18.

**10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

## 10.3   HAZARDOUS MATERIALS

**10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

**10.3.2** The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

**10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Subparagraph 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**10.4** The Owner shall not be responsible under Paragraph 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

**10.5** If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

### 10.6 EMERGENCIES

**10.6.1** In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Paragraph 4.3 and Article 7.

### ARTICLE 11 Redacted
Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Redacted

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by AIA DOCUMENT A201 - 1997
The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial GENERAL CONDITIONS OF THE
quotation of its provisions without written permission of the AIA violates the copyright laws of the United States CONTRACT FOR CONSTRUCTION
and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright
laws and will subject the violator to legal prosecution. This document was electronically produced with The American Institute of Architects
permission of the AIA and can be reproduced in accordance with your license without violation until the date of 1735 New York Avenue, N.W.
expiration as noted below. Washington, D.C. 20006-5292
This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.

Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

## ARTICLE 12 UNCOVERING AND CORRECTION OF WORK

### 12.1 UNCOVERING OF WORK

**12.1.1** If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

**12.1.2** If a portion of the Work has been covered which the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### 12.2 CORRECTION OF WORK

### 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION

**12.2.1.1** The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

### 12.2.2 AFTER SUBSTANTIAL COMPLETION

**12.2.2.1** In addition to the Contractor's obligations under Paragraph 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Subparagraph 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Paragraph 2.4.

**12.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

**12.2.2.3** The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Paragraph 12.2.

**12.2.3** The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

**12.2.4** The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

**12.2.5** Nothing contained in this Paragraph 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Subparagraph 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

### 12.3 ACCEPTANCE OF NONCONFORMING WORK
**12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

## ARTICLE 13 MISCELLANEOUS PROVISIONS
### 13.1 GOVERNING LAW
**13.1.1** The Contract shall be governed by the law of the place where the Project is located.

### 13.2 SUCCESSORS AND ASSIGNS
**13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Subparagraph 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**13.2.2** The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

### 13.3   WRITTEN NOTICE
**13.3.1**  Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

### 13.4   RIGHTS AND REMEDIES
**13.4.1**   Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**13.4.2**  No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

### 13.5   TESTS AND INSPECTIONS
**13.5.1**  Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

**13.5.2**  If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Subparagraph 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in Subparagraph 13.5.3, shall be at the Owner's expense.

**13.5.3**  If such procedures for testing, inspection or approval under Subparagraphs 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

repeated procedures and compensation for the Architect's services and expenses shall be at the Contractor's expense.

**13.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

**13.5.5** If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

**13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

## 13.6 INTEREST

**13.6.1** Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

## 13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD

**13.7.1** As between the Owner and Contractor:

*This document has been approved and endorsed by The Associated General Contractors of America.*

    **.1 Before Substantial Completion.** As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

    **.2 Between Substantial Completion and Final Certificate for Payment.** As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment; and

    **.3 After Final Certificate for Payment.** As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Paragraph 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Paragraph 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

## ARTICLE 14 TERMINATION OR SUSPENSION OF THE CONTRACT
### 14.1 TERMINATION BY THE CONTRACTOR

**14.1.1** The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

.1  issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;

.2  an act of government, such as a declaration of national emergency which requires all Work to be stopped;

.3  because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Subparagraph 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents; or

.4  the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Subparagraph 2.2.1.

**14.1.2** The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Paragraph 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

**14.1.3** If one of the reasons described in Subparagraph 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

**14.1.4** If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Subparagraph 14.1.3.

**14.2     TERMINATION BY THE OWNER FOR CAUSE**

**14.2.1**  The Owner may terminate the Contract if the Contractor:

.1  persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

.2  fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.3  persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

.4  otherwise is guilty of substantial breach of a provision of the Contract Documents.

**14.2.2**  When any of the above reasons exist, the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's Redacted  if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of Redacted  :

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

 **.1** take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

 **.2** accept assignment of subcontracts pursuant to Paragraph 5.4; and

 **.3** finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**14.2.3** When the Owner terminates the Contract for one of the reasons stated in Subparagraph 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

## 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

**14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Subparagraph 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

 **.1** that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

 **.2** that an equitable adjustment is made or denied under another provision of the Contract.

## 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

**14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

 **.1** cease operations as directed by the Owner in the notice;

 **.2** take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

 **.3** except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

# APPENDIX G

# ▓AIA° Document B141™ – 1997 Part 1

## Standard Form of Agreement Between Owner and Architect
### with Standard Form of Architect's Services

TABLE OF ARTICLES

1.1     INITIAL INFORMATION

1.2     RESPONSIBILITIES OF THE PARTIES

1.3     TERMS AND CONDITIONS

1.4     SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS

1.5     COMPENSATION

AGREEMENT made as of the First day of January in the year Two Thousand Five.
*(In words, indicate day, month and year)*

BETWEEN the Architect's client identified as the Owner:
*(Name, address and other information)*

White Lodging Services Corporation, Inc.
1000 East 80th Place, Suite 500 North
Merrillville, IN 46410-5666

and the Architect:
*(Name, address and other information)*

Elness Swenson Graham Architects, Inc.
500 Washington Avenue South
Minneapolis, MN 55415

• RCVD 3/28/05
• REVISED FROM
  ORIG CONT. 2/1/05
• REVISIONS PER
  EMAILS DATED
  2/22/05
  3/01/05
  3/25/05

For the following Project:
*(Include detailed description of Project)*

Design, documentation and limited contract administration for the construction of a Courtyard by Marriott in Austin, Texas.

The Owner and Architect agree as follows:

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA° Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA° Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                             1

SCANNED

SEP 22 2007


PLAINTIFF'S
EXHIBIT
15

ESG001454

## ARTICLE 1.1 INITIAL INFORMATION

§ 1.1.1 This Agreement is based on the following information and assumptions.
*(Note the disposition for the following items by inserting the requested information or a statement such as "not applicable," "unknown at time of execution" or "to be determined later by mutual agreement.")*

### § 1.1.2 PROJECT PARAMETERS
§ 1.1.2.1 The objective or use is:
*(Identify or describe, if appropriate, proposed use or goals.)*

A Courtyard by Marriott - a limited-service, prototypical hotel.

§ 1.1.2.2 The physical parameters are:
*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports about the site.)*

§ 1.1.2.3 The Owner's Program is:
*(Identify documentation or state the manner in which the program will be developed.)*

The hotel program calls for a five-story building. The project will contain 148 guestrooms and the other prototypical Courtyard Hotel functions - a lobby/lounge, dining, kitchen, a reception desk with sundries display area and offices, meeting space, swimming pool and whirlpool, exercise room, back-of-house storage, laundry, mechanical and electrical spaces and a guest laundry floor. Further definition of the Project Program is contained in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A" with further clarification contained in Elness Swenson Graham Architects' schematic design documents dated January 28, 2005, which are attached by reference as "Exhibit B."

§ 1.1.2.4 The legal parameters are:
*(Identify pertinent legal information, including, if appropriate, land surveys and legal descriptions and restrictions of the site.)*

Legal Description of Property:
Lot 5-D, Block C, RESUBDIVISION OF LOTS 4 AND 5, BLOCK C, METRO CENTRE SECTION 5, a subdivision in Austin, Travis County, Texas, according to the map or plat thereof recorded as Document 199900265 in the Plats Records of Travis County, Texas.

§ 1.1.2.5 The financial parameters are as follows.
.1      Amount of the Owner's overall budget for the Project, including the Architect's compensation, is: $48,000 per room or $7,000,000.
.2      Amount of the Owner's budget for the Cost of the Work, excluding the Architect's compensation, is: unknown at time of execution of this Agreement

§ 1.1.2.6 The time parameters are:
*(Identify, if appropriate, milestone dates, durations or fast track scheduling.)*

The following Milestone Dates are the same as those listed in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A," and herein reproduced:

| | | |
|---|---|---|
| January 28, 2005 | - | 30% Design Documents Check Set |
| March 11, 2005 | - | 75% Design Documents Check Set |
| April 25, 2005 | - | 99% Contract Documents; Foundation Building Permit |

§ 1.1.2.7 The proposed procurement or delivery method for the Project is:
*(Identify method such as competitive bid, negotiated contract, or construction management.)*

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:22:19 on 08/25/2005 under Order No.1000156203_2 which expires on 2/16/2006, and is not for resale.
User Notes:                                                                                    (3868894002)

SCANNED

SEP 22 2007

2

ESG001455

| Negotiated Contract.

**§ 1.1.2.8** Other parameters are:
*(Identify special characteristics or needs of the Project such as energy, environmental or historic preservation requirements.)*

**§ 1.1.3 PROJECT TEAM**
**§ 1.1.3.1** The Owner's Designated Representative is:
*(List name, address and other information.)*

Trent Barber
White Lodging Services Corporation, Inc,
1000 East 80th Place, Suite 500 North
Merrillville, IN 46410-5666

**§ 1.1.3.2** The persons or entities, in addition to the Owner's Designated Representative, who are required to review the Architect's submittals to the Owner are:
*(List name, address and other information.)*

Marriott International
Marriott Drive
Washington, D.C. 20058

**§ 1.1.3.3** The Owner's other consultants and contractors are:
*(List discipline and, if known, identify them by name and address.)*

CIVIL ENGINEER:
Griffin Engineering Group, Inc.
11711 North Lamar Boulevard
Austin, TX 78753

**§ 1.1.3.4** The Architect's Designated Representative is:
*(List name, address and other information.)*

Mark Swenson, AIA
Paul Mittendorff, AIA
James Timm, AIA
Elness Swenson Graham Architects, Inc,
500 Washington Avenue South
Minneapolis, MN 55415

**§ 1.1.3.5** The consultants retained at the Architect's expense are:
*(List discipline and, if known, identify them by name and address.)*

STRUCTURAL ENGINEERING:
Keith Owens, P.E.
Marlin, Bridges & Associates, Inc.
3620 Eighth Avenue South, Suite 110
Birmingham, AL 35222

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:
(3868894002)

3

SCANNED

SEP 22 2007

ESG001456

MECHANICAL, ELECTRICAL ENGINEERING:
Larry Lindsey, P.E.
Lindsey Engineers, Inc.
7703 Brodie Lane
Austin, TX 78745

§ 1.1.4 Other important initial information is:

§ 1.1.5 When the services under this Agreement include contract administration services, the General Conditions of the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement, or as follows:

§ 1.1.6 The information contained in this Article 1.1 may be reasonably relied upon by the Owner and Architect in determining the Architect's compensation. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Section 1.3.3.

## ARTICLE 1.2 RESPONSIBILITIES OF THE PARTIES

§ 1.2.1 The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

### § 1.2.2 OWNER

§ 1.2.2.1 Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

§ 1.2.2.2 The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality.

§ 1.2.2.3 The Owner's Designated Representative identified in Section 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

§ 1.2.2.4 The Owner shall furnish the services of consultants other than those designated in Section 1.1.3 or authorize the Architect to furnish them as a Change in Services when such services are requested by the Architect and are reasonably required by the scope of the Project.

§ 1.2.2.5 Unless otherwise provided in this Agreement, the Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

§ 1.2.2.6 The Owner shall furnish all legal[Redacted] and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

§ 1.2.2.7 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: 

4

SCANNED (3868894002)

SEP 22 2007

ESG001457

## § 1.2.3 ARCHITECT

§ 1.2.3.1 The services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Article 1.4.

§ 1.2.3.2 The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which initially shall be consistent with the time periods established in Section 1.1.2.6 and which shall be adjusted, if necessary, as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

§ 1.2.3.3 The Architect's Designated Representative identified in Section 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

§ 1.2.3.4 The Architect shall maintain the confidentiality of information specifically designated as confidential by the Owner, unless withholding such information would violate the law, create the risk of significant harm to the public or prevent the Architect from establishing a claim or defense in an adjudicatory proceeding. The Architect shall require of the Architect's consultants similar agreements to maintain the confidentiality of information specifically designated as confidential by the Owner.

§ 1.2.3.5 Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

§ 1.2.3.6 The Architect shall review laws, codes, and regulations applicable to the Architect's services. The Architect shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project.

§ 1.2.3.7 The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

## ARTICLE 1.3 TERMS AND CONDITIONS
### § 1.3.1 COST OF THE WORK

§ 1.3.1.1 The Cost of the Work shall be the total cost or, to the extent the Project is not completed, the estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

§ 1.3.1.2 The Cost of the Work shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, including the costs of management or supervision of construction or installation provided by a separate construction manager or contractor, plus a reasonable allowance for their overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work.

§ 1.3.1.3 The Cost of the Work does not include the compensation of the Architect and the Architect's consultants, the costs of the land, rights-of-way and financing or other costs that are the responsibility of the Owner.

### § 1.3.2 INSTRUMENTS OF SERVICE

§ 1.3.2.1 Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

§ 1.3.2.2 Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3968894002)

SCANNED

5

SEP 22 2007

ESG001458

with this Agreement. Any termination of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project.

**§ 1.3.2.3** Except for the licenses granted in Section 1.3.2.2, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license herein to another party without the prior written agreement of the Architect. However, the Owner shall be permitted to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work by license granted in Section 1.3.2.2. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants. The Owner shall not use the Instruments of Service for future additions or alterations to this Project or for other projects, unless the Owner obtains the prior written agreement of the Architect and the Architect's consultants. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

**§ 1.3.2.4** Prior to the Architect providing to the Owner any Instruments of Service in electronic form or the Owner providing to the Architect any electronic data for incorporation into the Instruments of Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement, attached as "Exhibit C.".

1.3.2.4.1 The Architect will make drawings or specifications in electronic form available to the Contractor, subcontractors, and material suppliers for a charge to compensate for their preparation. The electronic files are specifically for use in preparing shop drawings or other required submittals and for no other reason. The charge for each release of electronic documents for this use shall be $500. Each recipient shall sign the Architect's normal Electronic Media Release form prior to release of the documents. Each recipient is prohibited from sharing these documents.

1.3.2.4.2 The separate agreement governing the use of electronic Instruments of Service by those other than the Owner is attached as "Exhibit D."

**§ 1.3.3 CHANGE IN SERVICES**
**§ 1.3.3.1** Change in Services of the Architect, including services required of the Architect's consultants, may be accomplished after execution of this Agreement, without invalidating the Agreement, if mutually agreed in writing, if required by circumstances beyond the Architect's control, or if the Architect's services are affected as described in Section 1.3.3.2. In the absence of mutual agreement in writing, the Architect shall notify the Owner prior to providing such services. If the Owner deems that all or a part of such Change in Services is not required, the Owner shall give prompt written notice to the Architect, and the Architect shall have no obligation to provide those services. Except for a change due to the fault of the Architect, Change in Services of the Architect shall entitle the Architect to an adjustment in compensation pursuant to Section 1.5.2, and to any Reimbursable Expenses described in Section 1.3.9.2 and Section 1.5.5.

**§ 1.3.3.2** If any of the following circumstances affect the Architect's services for the Project, the Architect shall be entitled to an appropriate adjustment in the Architect's schedule and compensation:

.1 change in the instructions or approvals given by the Owner that necessitate revisions in Instruments of Service;

.2 enactment or revision of codes, laws or regulations or official interpretations which necessitate changes to previously prepared Instruments of Service;

.3 decisions of the Owner not rendered in a timely manner;

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:

6

SCANNED (3868894002)

SEP 22 2007

ESG001459

.4 significant change in the Project including, but not limited to, size, quality, complexity, the Owner's schedule or budget, or procurement method;

.5 failure of performance on the part of the Owner or the Owner's consultants or contractors;

.6 preparation for and attendance at a public hearing, a dispute resolution proceeding or a legal proceeding except where the Architect is party thereto;

.7 change in the information contained in Article 1.1.

### § 1.3.4 MEDIATION

§ 1.3.4.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by arbitration.

§ 1.3.4.2 The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

§ 1.3.4.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### § 1.3.5 ARBITRATION

§ 1.3.5.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Section 1.3.4.

§ 1.3.5.2 Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.

§ 1.3.5.3 A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

§ 1.3.5.4 No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

§ 1.3.5.5 The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:

7

SCANNED (3868894002)

SEP 22 2007

ESG001460

### § 1.3.6 CLAIMS FOR CONSEQUENTIAL DAMAGES

The Architect and the Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Section 1.3.8.

### § 1.3.7 MISCELLANEOUS PROVISIONS

§ 1.3.7.1 This Agreement shall be governed by the law of the principal place of business of the Architect, unless otherwise provided in Section 1.4.2.

§ 1.3.7.2 Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

§ 1.3.7.3 Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

Redacted

§ 1.3.7.5 Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

§ 1.3.7.6 Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site.

§ 1.3.7.7 The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.

§ 1.3.7.8 If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

§ 1.3.7.9 The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

### § 1.3.8 TERMINATION OR SUSPENSION

§ 1.3.8.1 If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:

SCANNED (3868894002)

SEP 22 2007

ESG001461

suspension of services, the Architect shall give seven days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 1.3.8.2 If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 1.3.8.3 If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice.

§ 1.3.8.4 This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

§ 1.3.8.5 This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

§ 1.3.8.6 In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Section 1.3.8.7.

§ 1.3.8.7 Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount for the Architect's anticipated profit on the value of the services not performed by the Architect.

§ 1.3.9 PAYMENTS TO THE ARCHITECT
§ 1.3.9.1 Payments on account of services rendered and for Reimbursable Expenses incurred shall be made monthly upon presentation of the Architect's statement of services. No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been adjudged to be liable.

§ 1.3.9.2 Reimbursable Expenses are in addition to compensation for the Architect's services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:

.1   transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;
.2   fees paid for securing approval of authorities having jurisdiction over the Project;
.3   reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;
.4   expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;
.5   renderings, models and mock-ups requested by the Owner;

Redacted

.7   reimbursable expenses as designated in Section 1.5.5;
.8   other similar direct Project-related expenditures.

§ 1.3.9.3 Records of Reimbursable Expenses, of expenses pertaining to a Change in Services, and of services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                        (3868894002)

9

SCANNED

SEP 22 2007

ESG001462

**§ 1.3.9.4** Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, Redacted sick leave, holidays, vacations, employee retirement plans and similar contributions.

**ARTICLE 1.4  SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS**

**§ 1.4.1** Enumeration of Parts of the Agreement. This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

**§ 1.4.1.1** Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997.

**§ 1.4.1.2** Standard Form of Architect's Services: Design and Contract Administration, AIA Document B141-1997, or as follows:
*(List other documents, if any, delineating Architect's scope of services.)*

Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A."

**§ 1.4.1.3** Other documents as follows:
*(List other documents, if any, forming part of the Agreement.)*

Elness Swenson Graham Architects' schematic design documents dated January 28, 2005, which are attached by reference as "Exhibit B."

**§ 1.4.2** Special Terms and Conditions. Special terms and conditions that modify this Agreement are as follows:

**ARTICLE 1.5  COMPENSATION**

**§ 1.5.1** For the Architect's services as described under Article 1.4, compensation shall be computed as follows:

Fixed fee for Architecture, Structural, Mechanical and Electrical Engineering = $112,500. See schedule for Phases of work:

| Discipline | M.P./S.D. | D.D. | C.D. | C.O. | Total Fees |
|---|---|---|---|---|---|
| Architecture | 10,800 | 18,000 | 28,800 | 14,400 | 72,000 |
| MEP Eng. | 3,750 | 4,550 | 7,200 | 0 | 15,500 |
| Struct. Eng. | 2,500 | 3,750 | 15,000 | 3,750 | 25,000 |
| Total Fees | 17,050 | 26,300 | 51,000 | 18,150 | $112,500 |

BY OWNER

BY IALS

72,000

97,000 HR

**§ 1.5.2** If the services of the Architect are changed as described in Section 1.3.3.1, the Architect's compensation shall be adjusted. Such adjustment shall be calculated as described below or, if no method of adjustment is indicated in this Section 1.5.2, in an equitable manner.
*(Insert basis of compensation, including rates and multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply.)*

See schedule of hourly rates attached as "Exhibit E."

**§ 1.5.3** For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of One ( 1.00 ) times the amounts billed to the Architect for such services.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3868894002)

10

SCANNED

SEP 22 2007

ESG001463

**§ 1.5.4** For Reimbursable Expenses as described in Section 1.3.9.2, and any other items included in Section 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of One ( 1.00 ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

**§ 1.5.5** Other Reimbursable Expenses, if any, are as follows:

**§ 1.5.6** The rates and multiples for services of the Architect and the Architect's consultants as set forth in this Agreement shall be adjusted in accordance with their normal salary review practices.

**§ 1.5.7** An initial payment of Zero Dollars and Zero Cents ($ 0.00 ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

**§ 1.5.8** Payments are due and payable immediately zero ( 0.00 ) days from the date of the Architect's invoice. Amounts unpaid sixty ( 60 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect. *(Insert rate of interest agreed upon.)*

U.S. Federal Reserve Prime Rate plus 2%.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

**§ 1.5.9** If the services covered by this Agreement have not been completed within Three ( 3 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Section 1.5.2.

This Agreement entered into as of the day and year first written above.

| OWNER | ARCHITECT |
|---|---|
| 3/30/05 | |
| *(Signature)* | *(Signature)* |
| | Paul Mittendorff, AIA |
| TRENT BARBER | Principal and Vice President |
| *(Printed name and title)* | *(Printed name and title)* |

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3868894002)

11

SCANNED

SEP 22 2007

ESG001464

# ▓AIA® Document B141™ – 1997 Part 2

## Standard Form of Architect's Services:
Design and Contract Administration

### TABLE OF ARTICLES

2.1     PROJECT ADMINISTRATION SERVICES

2.2     SUPPORTING SERVICES

2.3     EVALUATION AND PLANNING SERVICES

2.4     DESIGN SERVICES

2.5     CONSTRUCTION PROCUREMENT SERVICES

2.6     CONTRACT ADMINISTRATION SERVICES

2.7     FACILITY OPERATION SERVICES

2.8     SCHEDULE OF SERVICES

2.9     MODIFICATIONS

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

### ARTICLE 2.1  PROJECT ADMINISTRATION SERVICES

§ 2.1.1 The Architect shall manage the Architect's services and administer the Project. The Architect shall consult with the Owner, research applicable design criteria, attend Project meetings, communicate with members of the Project team and issue progress reports. The Architect shall coordinate the services provided by the Architect and the Architect's consultants with those services provided by the Owner and the Owner's consultants.

§ 2.1.2 When Project requirements have been sufficiently identified, the Architect shall prepare, and periodically update, a Project schedule that shall identify milestone dates for decisions required of the Owner, design services furnished by the Architect, completion of documentation provided by the Architect, commencement of construction and Substantial Completion of the ~~Work~~ Work, subject to the limitations indicated in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A." OK ## 

~~§ 2.1.3 The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program, budget and aesthetics in developing the design for the Project.~~ OK ##

§.

~~§ 2.1.4 Upon request of the Owner, the Architect shall make a presentation to explain the design of the Project to representatives of the Owner.~~

§

§ 2.1.5 The Architect shall submit design documents to the Owner at intervals appropriate to the design process for purposes of evaluation and approval by the Owner. The Architect

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

1

SCANNED (12094700)

SEP 22 2007

ESG001465

shall be entitled to rely on approvals received from the Owner in the further development of the design.

§ 2.1.6 The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the ~~Project.~~Project, subject to the following limitations:

2.1.6.1 Site layout, submittals and approvals will be by others. The Architect will perform one set of revisions to the scope building drawings included by reference as "Exhibit B" and one set of revisions to the documents submitted for permit from input received from the Owner pursuant to requirements of the municipal authorities having jurisdiction over the Project. Beyond those revisions, the Architect will not create any special drawings or exhibits. Documents or other work efforts required for planning submittals or governmental agency review after the initial submission will be identified immediately by the Owner and may result in a revision to our schedule and compensation.

OK
HB

§ 2.1.7 EVALUATION OF BUDGET AND COST OF THE WORK
§ 2.1.7.1 When the Project requirements have been sufficiently identified, the Architect shall prepare a preliminary estimate of the Cost of the Work. This estimate may be based on current area, volume or similar conceptual estimating techniques. As the design process progresses through the end of the preparation of the Construction Documents, the Architect shall update and refine the preliminary estimate of the Cost of the Work. The Architect shall advise the Owner of any adjustments to previous estimates of the Cost of the Work indicated by changes in Project requirements or general market conditions. If at any time the Architect's estimate of the Cost of the Work exceeds the Owner's budget, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality or budget, and the Owner shall cooperate with the Architect in making such adjustments.

§

§ 2.1.7.2 Evaluations of the Owner's budget for the Project, the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work prepared by the Architect represent the Architect's judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Project or from any estimate of the Cost of the Work or evaluation prepared or agreed to by the Architect.

§ 2.1.7.3 In preparing estimates of the Cost of the Work, the Architect shall be permitted to include contingencies for design, bidding and price escalation; to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents; to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget for the Cost of the Work. If an increase in the Contract Sum occurring after execution of the Contract between the Owner and the Contractor causes the budget for the Cost of the Work to be exceeded, that budget shall be increased accordingly.

§ 2.1.7.4 If bidding or negotiation has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the construction industry.

§ 2.1.7.5 If the budget for the Cost of the Work is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:
.1 give written approval of an increase in the budget for the Cost of the Work;
.2 authorize rebidding or renegotiating of the Project within a reasonable time;
.3 terminate in accordance with Section 1.3.8.5; or
.4 cooperate in revising the Project scope and quality as required to reduce the Cost of the Work.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

2

SCANNED (12094700)

SEP 22 2007

ESG001466

§ 2.1.7.6 If the Owner chooses to proceed under Section 2.1.7.5.4, the Architect, without additional compensation, shall modify the documents for which the Architect is responsible under this Agreement as necessary to comply with the budget for the Cost of the Work. The modification of such documents shall be the limit of the Architect's responsibility under this Section 2.1.7. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not construction is commenced.

## ARTICLE 2.2  SUPPORTING SERVICES

§ 2.2.1 Unless specifically designated in Section 2.8.3, the services in this Article 2.2 shall be provided by the Owner or the Owner's consultants and contractors.

§ 2.2.1.1 The Owner shall furnish a program setting forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, special equipment, systems and site requirements.

§ 2.2.1.2 The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

§ 2.2.1.3 The Owner shall furnish services of geotechnical engineers which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.

## ARTICLE 2.3  EVALUATION AND PLANNING SERVICES

§ 2.3.1 The Architect shall provide a preliminary evaluation of the information furnished by the Owner under this Agreement, including the Owner's program and schedule requirements and budget for the Cost of the Work, each in terms of the other. The Architect shall review such information to ascertain that it is consistent with the requirements of the Project and shall notify the Owner of any other information or consultant services that may be reasonably needed for the Project.

§ 2.3.2 The Architect shall provide a preliminary evaluation of the Owner's site for the Project based on the information provided by the Owner of site conditions, and the Owner's program, schedule and budget for the Cost of the Work.

§ 2.3.3 The Architect shall review the Owner's proposed method of contracting for construction services and shall notify the Owner of anticipated impacts that such method may have on the Owner's program, financial and time requirements, and the scope of the Project.

## ARTICLE 2.4  DESIGN SERVICES

§ 2.4.1 The Architect's design services shall include normal structural, mechanical and electrical engineering services.

### § 2.4.2 SCHEMATIC DESIGN DOCUMENTS

§ 2.4.2.1 The Architect shall provide Schematic Design Documents based on the mutually agreed-upon program, schedule, and budget for the Cost of the Work. The documents shall establish the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents shall include a conceptual site plan, if appropriate, and preliminary building plans, sections and elevations. At the Architect's option, the Schematic Design Documents may include study models, perspective sketches, electronic modeling or combinations of these media. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

3

SCANNED (12094700)

SEP 22 2007

ESG001467

### § 2.4.3 DESIGN DEVELOPMENT DOCUMENTS

**§ 2.4.3.1** The Architect shall provide Design Development Documents based on the approved Schematic Design Documents and updated budget for the Cost of the Work. The Design Development Documents shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts. The Design Development Documents shall include specifications that identify major materials and systems and establish in general their quality levels.

### § 2.4.4 CONSTRUCTION DOCUMENTS

**§ 2.4.4.1** The Architect shall provide Construction Documents based on the approved Design Development Documents and updated budget for the Cost of the Work. The Construction Documents shall set forth in detail the requirements for construction of the Project. The Construction Documents shall include Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.

§ 2.4.4.2 During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of: (1) bidding and procurement information which describes the time, place and conditions of bidding; bidding or proposal forms; and the form of agreement between the Owner and the Contractor; and (2) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect also shall compile the Project Manual that includes the Conditions of the Contract for Construction and Specifications and may include bidding requirements and sample forms.

### ARTICLE 2.5 CONSTRUCTION PROCUREMENT SERVICES

§ 2.5.1 The Architect shall assist the Owner in obtaining either competitive bids or negotiated proposals and shall assist the Owner in awarding and preparing contracts for construction.

§ 2.5.2 The Architect shall assist the Owner in establishing a list of prospective bidders or contractors.

§ .

§ 2.5.3 The Architect shall assist the Owner in bid validation or proposal evaluation and determination of the successful bid or proposal, if any. If requested by the Owner, the Architect shall notify all prospective bidders or contractors of the bid or proposal results.

### § 2.5.4 COMPETITIVE BIDDING

§ 2.5.4.1 Bidding Documents shall consist of bidding requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.4.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Bidding Documents for distribution to prospective bidders. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.4.3 If requested by the Owner, the Architect shall distribute the Bidding Documents to prospective bidders and request their return upon completion of the bidding process. The Architect shall maintain a log of distribution and retrieval, and the amounts of deposits, if any, received from and returned to prospective bidders.

§ 2.5.4.4 The Architect shall consider requests for substitutions, if permitted by the Bidding Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective bidders.

§ 2.5.4.5 The Architect shall participate in or, at the Owner's direction, shall organize and conduct a pre-bid conference for prospective bidders.

§ 2.5.4.6 The Architect shall prepare responses to questions from prospective bidders and provide clarifications and interpretations of the Bidding Documents to all prospective bidders in the form of addenda.

§ 2.5.4.7 The Architect shall participate in or, at the Owner's direction, shall organize and conduct the opening of the bids. The Architect shall subsequently document and distribute the bidding results, as directed by the Owner.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

4

SCANNED (12094700)

SEP 22 2007

ESG001468

§ 2.5.5 NEGOTIATED PROPOSALS
§ 2.5.5.1 Proposal Documents shall consist of proposal requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.5.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Proposal Documents for distribution to prospective contractors. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.5.3 If requested by the Owner, the Architect shall organize and participate in selection interviews with prospective contractors.

§ 2.5.5.4 The Architect shall consider requests for substitutions, if permitted by the Proposal Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective contractors.

§ 2.5.5.5 If requested by the Owner, the Architect shall assist the Owner during negotiations with prospective contractors. The Architect shall subsequently prepare a summary report of the negotiation results, as directed by the Owner.

ARTICLE 2.6 CONTRACT ADMINISTRATION SERVICES
§ 2.6.1 GENERAL ADMINISTRATION
§ 2.6.1.1 The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. Modifications made to the General Conditions, when adopted as part of the Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect. Site visits by the Architect will be limited to the number of meetings indicated in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004, attached as "Exhibit A."

§ 2.6.1.2 The Architect's responsibility to provide the Contract Administration Services under this Agreement commences with the award of the initial Contract for Construction and terminates at the issuance to the Owner of the final Certificate for Payment. However, the Architect shall be entitled to a Change in Services in accordance with Section 2.8.2 when Contract Administration Services extend 60 days after the date of Substantial Completion of the Work.

§ 2.6.1.3 The Architect shall be a representative of and shall advise and consult with the Owner during the provision of the Contract Administration Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

§ 2.6.1.4 Duties, responsibilities and limitations of authority of the Architect under this Article 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent will not be unreasonably withheld.

§ 2.6.1.5 The Architect shall review properly prepared, timely requests by the Contractor for additional information about the Contract Documents. A properly prepared request for additional information about the Contract Documents shall be in a form prepared or approved by the Architect and shall include a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested.

§ 2.6.1.6 If deemed appropriate by the Architect, the Architect shall on the Owner's behalf prepare, reproduce and distribute supplemental Drawings and Specifications in response to requests for information by the Contractor.

§ 2.6.1.7 The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

5

SCANNED (12094700)

SEP 22 2007

ESG001469

**§ 2.6.1.8** Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for the results of interpretations or decisions so rendered in good faith.

**§ 2.6.1.9** The Architect shall render initial decisions on claims, disputes or other matters in question between the Owner and Contractor as provided in the Contract Documents. However, the Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

## § 2.6.2 EVALUATIONS OF THE WORK

**§ 2.6.2.1** The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 2.8, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**§ 2.6.2.2** The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

**§ 2.6.2.3** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**§ 2.6.2.4** Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

**§ 2.6.2.5** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

**§ 2.6.3 CERTIFICATION OF PAYMENTS TO CONTRACTOR** ~~OK~~

~~§ 2.6.3.1 The Architect shall review and certify the amounts due the Contractor and shall issue Certificates for Payment in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Section 2.6.2 and on the data comprising the Contractor's Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject (1) to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) to results of subsequent tests and inspections, (3) to correction of minor deviations from the Contract Documents prior to completion, and (4) to specific qualifications expressed by the Architect.~~

§

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

SCANNED   (12094700)

SEP 22 2007

6

ESG001470

§ 2.6.3.2 ~~The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.~~

§ 2.6.3.3 ~~The Architect shall maintain a record of the Contractor's Applications for Payment.~~

## § 2.6.4 SUBMITTALS

§ 2.6.4.1 The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 2.6.4.2 The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

§ 2.6.4.3 If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify appropriate performance and design criteria that such services must satisfy. Shop Drawings and other submittals related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval when submitted to the Architect. The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

## § 2.6.5 CHANGES IN THE WORK

§ 2.6.5.1 ~~The Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents. The Architect may authorize minor changes in the Work not involving an adjustment in Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents. If necessary, the Architect shall prepare, reproduce and distribute Drawings and Specifications to describe Work to be added, deleted or modified, as provided in Section 2.8.2.~~ OK HB

£

§ 2.6.5.2 The Architect shall review properly prepared, timely requests by the Owner or Contractor for changes in the Work, including adjustments to the Contract Sum or Contract Time. A properly prepared request for a change in the Work shall be accompanied by sufficient supporting data and information to permit the Architect to make a reasonable determination without extensive investigation or preparation of additional drawings or specifications. If the Architect determines that requested changes in the Work are not materially different from the requirements of the Contract Documents, the Architect may issue an order for a minor change in the Work or recommend to the Owner that the requested change be denied.

§ 2.6.5.3 If the Architect determines that implementation of the requested changes would result in a material change to the Contract that may cause an adjustment in the Contract Time or Contract Sum, the Architect shall make a recommendation to the Owner, who may authorize further investigation of such change. Upon such authorization, and based upon information furnished by the Contractor, if any, the Architect shall estimate the additional cost and time that might result from such change, including any additional costs attributable to a Change in Services of the Architect. With the Owner's approval, the Architect shall incorporate those estimates into a Change Order or other appropriate documentation for the Owner's execution or negotiation with the Contractor.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes: (1209470)

SCANNED

SEP 22 2007

ESG001471

§ 2.6.5.4 The Architect shall maintain records relative to changes in the Work.

§ 2.6.6 PROJECT COMPLETION
§ 2.6.6.1 The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.

§ 2.6.6.2 The Architect's inspection shall be conducted with the Owner's Designated Representative to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.

§ 2.6.6.3 When the Work is found to be substantially complete, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including any amounts needed to pay for final completion or correction of the Work.

§ 2.6.6.4 The Architect shall receive from the Contractor and forward to the Owner: (1) consent       Redact ε, if any, to reduction in or partial release of retainage or the making of final payment and (2) affidavits, receipts, releases and waivers of liens or Redac indemnifying the Owner against liens.

ARTICLE 2.7 FACILITY OPERATION SERVICES
§ 2.7.1 The Architect shall meet with the Owner or the Owner's Designated Representative promptly after Substantial Completion to review the need for facility operation services.

§ 2.7.2 Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall conduct a meeting with the Owner and the Owner's Designated Representative to review the facility operations and performance and to make appropriate recommendations to the Owner.

ARTICLE 2.8 SCHEDULE OF SERVICES
§ 2.8.1 Design and Contract Administration Services beyond the following limits shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:

.1    up to One ( 1 ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor.   OK

.2    up to Two ( 2 ) visits to the site by the Architect over the duration of the Project during construction.   OK

.3    up to Zero ( 0 ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents.   OK

.4    up to Zero ( 0 ) inspections for any portion of the Work to determine final completion.   OK

§ 2.8.2 The following Design and Contract Administration Services shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:

.1    review of a Contractor's submittal out of sequence from the submittal schedule agreed to by the Architect;

.2    responses to the Contractor's requests for information where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;

.3    Change Orders and Construction Change Directives requiring evaluation of proposals, including the preparation or revision of Instruments of Service;

.4    providing consultation concerning replacement of Work resulting from fire or other cause during construction;

.5    evaluation of an extensive number of claims submitted by the Owner's consultants, the Contractor or others in connection with the Work;

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

8

SCANNED    (12094700)

SEP 22 2007

ESG001472

.6     evaluation of substitutions proposed by the Owner's consultants or contractors and making subsequent revisions to Instruments of Service resulting therefrom;

.7     preparation of design and documentation for alternate bid or proposal requests proposed by the Owner; or

.8     Contract Administration Services provided 60 days after the date of Substantial Completion of the Work.

§ 2.8.3 The Architect shall furnish or provide the following services only if specifically designated:

| Services | Responsibility (Architect, Owner or Not Provided) | Location of Service Description |
|---|---|---|
| .1   Programming | O | |
| .2   Land Survey Services | O | |
| .3   Geotechnical Services | O | |
| .4   Space Schematics/Flow Diagrams | NP | |
| .5   Existing Facilities Surveys | NP | |
| .6   Economic Feasibility Studies | NP | |
| .7   Site Analysis and Selection | NP | |
| .8   Environmental Studies and Reports | O | |
| .9   Owner-Supplied Data Coordination | O | |
| .10   Schedule Development and Monitoring | O | |
| .11   Civil Design | O | |
| .12   Landscape Design | O | |
| .13   Interior Design | O | |
| .14   Special Bidding or Negotiation | O | |
| .15   Value Analysis | O | |
| .16   Detailed Cost Estimating | O | |
| .17   On-Site Project Representation | O | |
| .18   Construction Management | O | |
| .19   Start-up Assistance | O | |
| .20   Record Drawings | NP | |
| .21   Post-Contract Evaluation | NP | |
| .22   Tenant-Related Services | NP | |
| .23 | | |
| .24 | | |
| .25 | | |

Description of Services:
(Insert descriptions of the services designated.)

ARTICLE 2.9  MODIFICATIONS
§ 2.9.1 Modifications to this Standard Form of Architect's Services: Design and Contract Administration, if any, are as follows:

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

9

SCANNED    (12094700)

SEP 2 2 2007

ESG001473

By its execution, this Standard Form of Architect's Services: Design and Contract Administration and modifications hereto are incorporated into the Standard Form of Agreement Between the Owner and Architect, AIA Document B141-1997, that was entered into by the parties as of the date:

OWNER _____ 3/30/05

(Signature)

TRENT BARTEK

(Printed name and title)

ARCHITECT _____

(Signature)

Paul Mittendorff, AIA

Principal and Vice President

(Printed name and title)

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1957, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                    (12094700)

10

SCANNED

SEP 22 2007

ESG001474



November 12, 2004
Revised January 21, 2005

**Mr. Trent Barber**
**White Lodging Services Corporation**
**1000 East 80th Place**
**Suite 500 North**
**Merrillville, IN 46410**

RE:     **Courtyard by Marriott**
        **Austin, Texas**

Dear Trent,

Thank you for the opportunity to present this proposal for professional Architectural services for the Courtyard Hotel by Marriott in Austin, Texas. Jim Timm has created a sketch of the current approved site plan showing the Courtyard Hotel superimposed so we can see that the only real change required to the Site Plan is the patio in the courtyard. The entrances, port cochere canopy, service bay, parking and driveway areas all stay the same.

### • Scope of Work •

Elness Swenson Graham Architects, Inc. (ESG) will provide overall Architecture, Civil and Structural Engineering design, document preparation and coordination for the Courtyard Hotel building for White Lodging Services (WLS). Our Structural Engineering firm is Marlin Bridges Associates, Inc. Mechanical, Electrical and Plumbing Engineering will be provided by Lindsey Engineers, Inc. who are located in Austin, Texas.

Our proposal is based on utilizing the prototypical Courtyard Hotel as built in          ESG anticipates the following schedule for delivery of services and achieving the construction permit.

| Work Phases | S.D. 30% Set | D.D. 60% Set | C.D./Permit 90% Set | Constr. Set 100% Set |
|---|---|---|---|---|
| Length of Time | 1 weeks (5 days)[1] | 3 weeks (15 days) | 3 weeks (15 days) | 3 weeks (15 days) |
| Cumulative | 1 weeks | 4 weeks | 7 weeks | 10 Weeks |
| Probable Dates | Jan 24 – Jan 28 | Jan 31 – Feb 18 | Feb 21 – Mar 11 | Mar 14 – Apr 1 |

[1] Based on 5 working days per week.

500 washington avenue south · suite 1080 · minneapolis, mn 55415 · p: 612.339.5508 · f: 612.339.5382 · www.esgarchitects.com

SCANNED

NOV 07 2007

ESG001703

This schedule offers the opportunity of meeting WLS's goal of receiving the building permit April 15ᵗʰ with start of construction as soon after that as possible.

This schedule **does not offer** the opportunity to fast-track the documents and submittals – there is simply not enough time for ESG to complete the change over of the documents from the                 project to work at the Austin site any faster than this indicates.

### • Assumptions •

We based our fee proposal on the following assumptions about the site conditions, the constitution and roles for the Design Team, the Owner, the General Contractor and other consultants.

1. Civil, Landscape Architecture and Interior Design services are not a part of this proposal. ESG can provide any of these design services as needed. ESG will coordinate the work of these or any of your other consultants.

2. ESG will make adjustments to the                 Courtyard fit within the existing site plan that will accommodate a re-application for Planning and Zoning approval.

3. The existing report by your Geotechnical Engineer is adequate and current enough for this new project and their recommendations for foundation design still hold true. WLS will initiate an update to this report – which will be prepared and submitted in a timely manner for the design process.

4. ESG will use the current prototypical CAD drawing files for the Courtyard Hotel just completed in                 .

5. The structural system will NOT match the prototypical design as documented in the drawings provided from Marriott Corporation. You are contemplating a light gage steel framing system as documented in the                 project.

6. Identifying and satisfying the requirements of the local planning department as to site layout and approvals will be by others. ESG will provide one set of building plan and elevation exhibits depicting extent and appearance of the project for planning submittals. ESG will incorporate the requirements for building massing, exterior materials and amenities as communicated by you or your consultants.

7. Any changes to the documents after completion of the Schematic Design may result in a revision to our schedule and compensation.

8. Other than planning submittal documents, ESG will not create any special drawings or exhibits. Additional documents or other work efforts required after planning submittals or for further governmental agency review will be

SCANNED

NOV 07 2007

ESG001704

identified immediately upon acceptance of this proposal and may result in a revision to our schedule and compensation.

9. WLS will select a highly qualified General Contractor who will provide and be responsible for all cost estimating and construction coordination services during bidding and construction.

10. The cost of reproduction of construction drawings and specifications will be borne by WLS or the Contractor. ESG will provide periodic check sets for WLS' review, at the 30%, 60% and 90% incremental Marriott Corporation reviews and for the consultant's use. Additional print sets will be supplied at cost as a reimbursable expense.

11. Site visits by the design team will be provided on an hourly basis as requested by WLS or Regulatory Agencies having jurisdiction on the project. See attached schedule of hourly rates.

12. Upon your acceptance of this proposal, ESG will put together an experienced team of Architects and support staff to execute this project and will keep the team together as long as there are no delays in the progress of the work for the design and document preparation phases.

• **Compensation** •

The following breakdown indicates the extent of the design fees for this project:

| Discipline | M.P./S.D. | D.D. | C.D. | C.O. | Total Fees |
|------------|-----------|------|------|------|------------|
| Architecture | 10,800 | 18,000 | 28,800 | 14,400 | 72,000 |
| MEP Eng. | 3,750 | 4,550 | 7,200 | 0 | 15,500 |
| Struct. Eng. | 2,500 | 3,750 | 15,000 | 3,750 | 25,000 |
| Total Fees | 17,050 | 26,300 | 51,000 | 18,150 | $ 112,500 |

• **Reimbursable Expenses** •

We will bill reimbursable expenses at direct cost. We don't anticipate any visits for the Design Team will be required for this project. The following is an estimate of our reimbursable expenses:

- Reproduction of documents (G.C. does bid set printing)     $6,500
- Express mail, mail, deliveries     $3,000
- Photography, miscellaneous     + $2,000
  - Total Estimated Reimbursables     $11,500

We anticipate that each trip to the job site by ESG's design team members would cost about $1,200. Any changes in the project schedule or our scope of services will be performed with your authorization, either verbally or in writing. We will perform

SCANNED

NOV 07 2007

ESG001705

such services on an hourly basis at our current compensation rates or revise our schedule and contract fee.

If you have any questions, concerns, or comments please call Paul. If this proposal meets with your approval, we will execute an AIA B141 - Owner Architect agreement and get started immediately.

Sincerely,
Elness Swenson Graham Architects Inc.

Paul Mittendorff, AIA
Principal
Enc.
cc:     Mark Swenson
        Pam Stenzel
        Jim Timm
        File: 205302.00 – 15.1

SCANNED
NOV 07 2007

ESG001706



# White Lodging Services Corporation

Courtyard Hotel by Marriott                                    Austin, Texas

**Project Team**

**Project Location**
Austin, Texas

**Sheet Index**

**Code & Building Data**

A0.0

SCANNED

NOV 07 2007

ESG001712



SCANNED

NOV 07 2007

A1.1

ESG001713



SCANNED
NOV 07 2007

A1.2

ESG001714



SCANNED
NOV 07 2007

A1.3

ESG001715



SCANNED
NOV 07 2007

A1.4

ESG001716



SCANNED

NOV 07 2007

A1.5

ESG001717



SCANNED
NOV 07 2007

A1.6

ESG001718



SCANNED

NOV 07 2007

A2.1

ESG001719



SCANNED

NOV 07 2007

A2.1

ESG001720



SCANNED

NOV 07 2007

A3.1

ESG001721



SCANNED

NOV 07 2007

A3.2

ESG001722



SCANNED

NOV 07 2007

A5.1

ESG001723



SCANNED

NOV 07 2007

A5.2

ESG001724



SCANNED

NOV 07 2007

A10.1

ESG001725



SCANNED

NOV 07 2007

A7.1

ESG001726



SCANNED

NOV 07 2007

A8.1

ESG001727



ESG001728



FOUNDATION AND FIRST FLOOR PLAN

SCANNED

NOV 07 2007

S2.1

ESG001729



SECOND FLOOR FRAMING PLAN

SCANNED

NOV 07 2007

MBA structural engineers, inc.

S2.2

Courtyard by
Marriott

esg

30%
Review Submittal
January 28, 2005

ESG001730



THIRD AND FOURTH FLOOR FRAMING PLAN

SCANNED

NOV 07 2007

Courtyard by
Marriott

30%
Review Submittal
January 28, 2005

MBA
structural engineers, inc.

S2.3

ESG001731



ROOF FRAMING PLAN

Courtyard by
Marriott

ESG

30%
Review Submittal
January 28, 2005

SCANNED
NOV 07 2007

MBA
structural engineers, inc.

S2.4

ESG001732







ENLARGED STAIR PLAN

ENLARGED STAIR PLAN

ENLARGED ELEVATOR PLAN



SCANNED

NOV 07 2007

S2.5

ESG001733

## EXHIBIT "C"

### Elness Swenson Graham Architects Inc.
### ELECTRONIC MEDIA RELEASE – CLIENT

This release for electronic media is dated as of the 1st day of January, 2005, between White Lodging Services, Inc. ("Client") and Elness Swenson Graham Architects, Inc. (ESG).

It is understood that the Client has requested ESG to supply the Client with electronic media (disks, tapes, optical disk, etc.) containing information on the Courtyard Hotel by Marriott in Austin, Texas ("Project") for use by the Client or the Client's agents, representatives of consultants as the Client deems appropriate. ESG desires to accommodate Client's request, therefore, in consideration of the release of the materials, and according to the terms of the Agreement between ESG and the Client, Client and ESG agree as follows:

1. The electronic files provided to Client by ESG for the Project are limited to floor plans and reflected ceiling plans only.

2. The electronic files may be used by Client solely for use on the Project or for the maintenance of the Project. If the Client chooses to use or alter in any way, in whole or in part, the electronic files provided for the Project, the Client agrees to indemnify ESG and hold ESG harmless from all claims, injuries, losses, damages, costs and expenses (including without limitation, attorneys' fees) arising out of such alteration or use.

3. Because information and data provided electronically may be altered, whether inadvertently or otherwise, ESG reserves the right to retain copies of the electronic file(s) and to remove from the electronic files provided to Client, all identification (such as logo, surveyor's seal, engineer's certifications, etc.) reflecting the involvement of ESG in the preparation of the electronic files.

4. The electronic files are provided solely as a convenience to Client by ESG and shall NOT be considered "Drawings of Record," "Contract Documents" or "Construction Documents" as defined in the Agreement. All documents considered "Drawings of Record," "Contract Documents" or "Construction Documents" shall be hard copies and shall be accompanied by the Design Professional's stamp and signature. The hard copy shall be referred to as the "Contract Documents" and shall govern in the event of any inconsistency between the hard copy and the electronic files.

5. The Client is advised to check all electronic media for computer viruses before loading the files. The Client is fully responsible for intercepting and disabling viruses, if any, that may be inadvertently transmitted with the electronic files. The Client hereby agrees to indemnify and hold ESG, and its Consultants, harmless from and against all claims of any type or nature asserted by Client or any third party as a result of viruses inadvertently transmitted with the electronic media.

SCANNED

SEP 22 2007

ESG001475

6. Files distributed electronically are subject to data erosion, erasure and/or alteration, and computer systems and software become obsolete in time. By accepting these electronic files, Client acknowledges these risks and agrees to waive all claims against ESG should data erosion, erasure and/or alteration of these electronic files occur.

7. Issuance of this information in no way relieves the Client of any contractual requirements of independent shop drawing preparation and submittal.

8. This release in no way construes an agreement to allow distribution of this data to any other individual, agency or entity, either for this project or at any future date. The Client is expressly forbidden to distribute this data without the express written consent of ESG.

Elness Swenson Graham Architects Inc.

Signed: _____

Printed Name: Paul Mittendorff, AIA

Title: Vice President     Date: 1/1/2005

Client:

Signed: _____

Printed Name: TRET BARKER

Title: Exec MAN   Date: 3/30/05

SCANNED

SEP 22 2007

ESG001476

## EXHIBIT "D"

### Elness Swenson Graham Architects Inc.
### ELECTRONIC MEDIA RELEASE – CONTRACTOR

This release for electronic media is dated as of the _____ day of_____, between _____
_____("Contractor") and Elness Swenson Graham
Architects, Inc. (ESG).

It is understood that the Contractor has requested ESG to supply the Contractor with electronic media (disks, tapes, optical disk, etc.) containing information on the Courtyard Hotel by Marriott in Austin, Texas ("Project") for use by the Contractor as the Contractor deems appropriate. ESG desires to accommodate Contractor's request, therefore, in consideration of the release of the materials, Contractor and ESG agree as follows:

1. ESG will release the electronic files to the Contractor upon payment of $500 to ESG.

2. The electronic files provided to Contractor by ESG for the Project are limited to floor plans and reflected ceiling plans only.

3. The electronic files may be used by Contractor solely for use on the Project.

4. If the Contractor chooses to use or alter in any way, in whole or in part, the electronic files provided for the Project, the Contractor agrees to indemnify ESG and hold ESG harmless from all claims, injuries, losses, damages, costs and expenses (including without limitation, attorneys' fees) arising out of such alteration or use.

5. Because information and data provided electronically may be altered, whether inadvertently or otherwise, ESG reserves the right to retain copies of the electronic file(s) and to remove from the electronic files provided to Contractor, all identification (such as logo, surveyor's seal, engineer's certifications, etc.) reflecting the involvement of ESG in the preparation of the electronic files.

6. The electronic files are provided solely as a convenience to Contractor by ESG and shall NOT be considered "Drawings of Record," "Contract Documents" or "Construction Documents" as defined in the Agreement. All documents considered "Drawings of Record," "Contract Documents" or "Construction Documents" shall be hard copies and shall be accompanied by the Design Professional's stamp and signature. The hard copy shall be referred to as the "Contract Documents" and shall govern in the event of any inconsistency between the hard copy and the electronic files.

7. The Contractor is advised to check all electronic media for computer viruses before loading the files. The Contractor is fully responsible for intercepting and disabling viruses, if any, that may be inadvertently transmitted with the electronic files. The Contractor hereby agrees to indemnify and hold ESG, and its Consultants, harmless from and against all claims of any type or nature asserted by Contractor or any third

SCANNED

NOV 07 2007

ESG001709

party as a result of viruses inadvertently transmitted with the electronic media.

8. Files distributed electronically are subject to data erosion, erasure and/or alteration, and computer systems and software become obsolete in time. By accepting these electronic files, Contractor acknowledges these risks and agrees to waive all claims against ESG should data erosion, erasure and/or alteration of these electronic files occur.

9. Issuance of this information in no way relieves the Contractor of any contractual requirements of independent shop drawing preparation and submittal.

10. This release and associated fee payment in no way construes an agreement to allow distribution of this data to any other individual, agency or entity, either for this project or at any future date. The Contractor is expressly forbidden to distribute this data without the express written consent of ESG.

| Elness Swenson Graham Architects, Inc. | Contractor: |
|---|---|
| Signed: | Signed: |
| Printed Name: Paul Mittendorff, AIA | Printed Name: |
| Title: Vice President Date: 1/1/2005 | Title: Date: |

R:\205302\Docs\Electronic Release Form Contractor.doc

SCANNED

NOV 07 2007

ESG001710

## "EXHIBIT E"

## ELNESS SWENSON GRAHAM ARCHITECTS, INC.

### Schedule of Hourly Rates

| CLASSIFICATION | HOURLY RATE |
|---|---|
| Principal | $165.00 |
| Vice President | $125.00 |
| Senior Associate | $110.00 |
| Associate | $ 95.00 |
| Senior Consultant | $ 80.00 |
| Consultant II | $ 75.00 |
| Consultant I | $ 65.00 |
| Staff Level V | $ 75.00 |
| Staff Level IV | $ 60.00 |
| Staff Level III | $ 55.00 |
| Staff Level II | $ 50.00 |
| Staff Level I | $ 40.00 |

10/2004

SCANNED

NOV 07 2007

ESG001711

1997 Edition - Electronic Format

## AIA Document A201 - 1997

# *General Conditions of the Contract for Construction*

## TABLE OF ARTICLES

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

1. GENERAL PROVISIONS

2. OWNER

3. CONTRACTOR

4. ADMINISTRATION OF THE CONTRACT

5. SUBCONTRACTORS

6. CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7. CHANGES IN THE WORK

8. TIME

9. PAYMENTS AND COMPLETION

10. PROTECTION OF PERSONS AND PROPERTY

11. Redacted

12. UNCOVERING AND CORRECTION OF WORK

13. MISCELLANEOUS PROVISIONS

14. TERMINATION OR SUSPENSION OF THE CONTRACT



DEPOSITION EXHIBIT

**INDEX**

Acceptance of Nonconforming Work
    9.6.6, 9.9.3, **12.3**
Acceptance of Work
    9.6.6, 9.8.2, 9.9.3, 9.10.1, 9.10.3, 12.3
Access to Work
    **3.16,** 6.2.1, 12.1
Accident Prevention

4.2.3, 10
Acts and Omissions
    3.2, 3.3.2, 3.12.8, 3.18, 4.2.3, 4.3.8, 4.4.1, 8.3.1, 9.5.1, 10.2.5, 13.4.2, 13.7, 14.1
Addenda
    1.1.1, 3.11
Additional Costs, Claims for
    4.3.4, 4.3.5, 4.3.6, 6.1.1, 10.3

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Additional Inspections and Testing
9.8.3, 12.2.1, 13.5
Additional Time, Claims for
4.3.4, 4.3.7, 8.3.2
**ADMINISTRATION OF THE CONTRACT**
3.1.3, **4**, 9.4, 9.5
Advertisement or Invitation to Bid
1.1.1
Aesthetic Effect
4.2.13, 4.5.1
Allowances
**3.8**
Redacted
11.4.1.1
Applications for Payment
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3, 9.7.1,
9.8.5, 9.10, 11.1.3, 14.2.4, 14.4.3
Approvals
2.4, 3.1.3, 3.5, 3.10.2, 3.12, 4.2.7, 9.3.2,
13.4.2, 13.5
Arbitration
4.3.3, 4.4, 4.5.1, 4.5.2, **4.6**, 8.3.1, 9.7.1,
11.4.9, 11.4.10
Architect
**4.1**
Architect, Definition of
4.1.1
Architect, Extent of Authority
2.4, 3.12.7, 4.2, 4.3.6, 4.4, 5.2, 6.3, 7.1.2,
7.3.6, 7.4, 9.2, 9.3.1, 9.4, 9.5, 9.8.3, 9.10.1,
9.10.3, 12.1, 12.2.1, 13.5.1, 13.5.2, 14.2.2,
14.2.4
Architect, Limitations of Authority and
Responsibility
2.1.1, 3.3.3, 3.12.4, 3.12.8, 3.12.10, 4.1.2,
4.2.1, 4.2.2, 4.2.3, 4.2.6, 4.2.7, 4.2.10,
4.2.12, 4.2.13, 4.4, 5.2.1, 7.4, 9.4.2, 9.6.4,
9.6.6
Architect's Additional Services and Expenses
2.4, 11.4.1.1, 12.2.1, 13.5.2, 13.5.3, 14.2.4
Architect's Administration of the Contract
3.1.3, **4.2**, 4.3.4, 4.4, 9.4, 9.5
Architect's Approvals
2.4, 3.1.3, 3.5.1, 3.10.2, 4.2.7
Architect's Authority to Reject Work
3.5.1, 4.2.6, 12.1.2, 12.2.1
Architect's Copyright
1.6
Architect's Decisions

Architect's Inspections
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.8.3, 9.9.2,
9.10.1, 13.5
Architect's Instructions
3.2.3, 3.3.1, 4.2.6, 4.2.7, 4.2.8, 7.4.1, 12.1,
13.5.2
Architect's Interpretations
4.2.11, 4.2.12, 4.3.6
Architect's Project Representative
4.2.10
Architect's Relationship with Contractor
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1,
3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16,
3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7,
5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7,
9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Architect's Relationship with Subcontractors
1.1.2, 4.2.3, 4.2.4, 4.2.6, 9.6.3, 9.6.4,
11.4.7
Architect's Representations
9.4.2, 9.5.1, 9.10.1
Architect's Site Visits
4.2.2, 4.2.5, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2,
9.10.1, 13.5
Asbestos
10.3.1
Attorneys' Fees
3.18.1, 9.10.2, 10.3.3
Award of Separate Contracts
6.1.1, 6.1.2
Award of Subcontracts and Other Contracts for
Portions of the Work
**5.2**
Basic Definitions
**1.1**
Bidding Requirements
1.1.1, 1.1.7, 5.2.1, 11.5.1
Redacted
11.4.2
Redacted
9.10.2
Redacted
7.3.6.4, 9.6.7, 9.10.3, 11.4.9, 11.5
Building Permit



*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

3.7.1
Capitalization
  **1.3**
Certificate of Substantial Completion
  9.8.3, 9.8.4, 9.8.5
Certificates for Payment
  4.2.5, 4.2.9, 9.3.3, **9.4,** 9.5, 9.6.1, 9.6.6,
  9.7.1, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4
Certificates of Inspection, Testing or Approval
  13.5.4
Redacted
  9.10.2, 11.1.3
Change Orders
  1.1.1, 2.4.1, 3.4.2, 3.8.2.3, 3.11.1, 3.12.8,
  4.2.8, 4.3.4, 4.3.9, 5.2.3, 7.1, 7.2, 7.3, 8.3.1,
  9.3.1.1, 9.10.3, 11.4.1.2, 11.4.4, 11.4.9,
  12.1.2
Change Orders, Definition of
  7.2.1
**CHANGES IN THE WORK**
  3.11, 4.2.8, **7,** 8.3.1, 9.3.1.1, 11.4.9
Claim, Definition of
  **4.3.1**
Claims and Disputes
  3.2.3, **4.3,** 4.4, 4.5, 4.6, 6.1.1, 6.3, 7.3.8,
  9.3.3, 9.10.4, 10.3.3
Claims and Timely Assertion of Claims
  **4.6.5**
Claims for Additional Cost
  3.2.3, 4.3.4, **4.3.5,** 4.3.6, 6.1.1, 7.3.8,
  10.3.2
Claims for Additional Time
  3.2.3, 4.3.4, **4.3.7,** 6.1.1, 8.3.2, 10.3.2
Claims for Concealed or Unknown Conditions
  **4.3.4**
Claims for Damages
  3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1,
  9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3,
  14.2.4
Claims Subject to Arbitration
  4.4.1, 4.5.1, 4.6.1
Cleaning Up
  **3.15,** 6.3
Commencement of Statutory Limitation Period
  **13.7**
Commencement of the Work, Conditions
Relating to
  2.2.1, 3.2.1, 3.4.1, 3.7.1, 3.10.1, 3.12.6,
  4.3.5, 5.2.1, 5.2.3, 6.2.2, 8.1.2, 8.2.2, 8.3.1,

11.1, 11.4.1, 11.4.6, 11.5.1
Commencement of the Work, Definition of
  8.1.2
Communications Facilitating Contract
Administration
  3.9.1, **4.2.4**
Completion, Conditions Relating to
  1.6.1, 3.4.1, 3.11, 3.15, 4.2.2, 4.2.9, 8.2,
  9.4.2, 9.8, 9.9.1, 9.10, 12.2, 13.7, 14.1.2
**COMPLETION, PAYMENTS AND**
  **9**
Completion, Substantial
  4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, 9.8, 9.9.1,
  9.10.3, 9.10.4.2, 12.2, 13.7
Compliance with Laws
  1.6.1, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1,
  4.4.8, 4.6.4, 4.6.6, 9.6.4, 10.2.2, 11.1, 11.4,
  13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14.1.1,
  14.2.1.3
Concealed or Unknown Conditions
  4.3.4, 8.3.1, 10.3
Conditions of the Contract
  1.1.1, 1.1.7, 6.1.1, 6.1.4
Consent, Written
  1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4,
  9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1,
  13.2, 13.4.2
**CONSTRUCTION BY OWNER OR BY**
**SEPARATE CONTRACTORS**
  1.1.4, **6**
Construction Change Directive, Definition of
  7.3.1
Construction Change Directives
  1.1.1, 3.12.8, 4.2.8, 4.3.9, 7.1, **7.3,** 9.3.1.1
Construction Schedules, Contractor's
  1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contingent Assignment of Subcontracts
  **5.4,** 14.2.2.2
Continuing Contract Performance
  **4.3.3**
Contract, Definition of
  1.1.2
**CONTRACT, TERMINATION OR**
**SUSPENSION OF THE**
  5.4.1.1, 11.4.9, **14**
Contract Administration
  3.1.3, 4, 9.4, 9.5
Contract Award and Execution, Conditions
Relating to

THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.

This document has been approved and
endorsed by The Associated General
Contractors of America.



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

3.7.1, 3.10, 5.2, 6.1, 11.1.3, 11.4.6, 11.5.1
Contract Documents, The
**1.1**, 1.2
Contract Documents, Copies Furnished and Use of
1.6, 2.2.5, 5.3
Contract Documents, Definition of
1.1.1
Contract Sum
3.8, 4.3.4, 4.3.5, 4.4.5, 5.2.3, 7.2, 7.3, 7.4,
**9.1**, 9.4.2, 9.5.1.4, 9.6.7, 9.7, 10.3.2,
11.4.1, 14.2.4, 14.3.2
Contract Sum, Definition of
9.1
Contract Time
4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1.3, 7.3, 7.4,
8.1.1, 8.2, 8.3.1, 9.5.1, 9.7, 10.3.2, 12.1.1,
14.3.2
Contract Time, Definition of
8.1.1
**CONTRACTOR**
**3**
Contractor, Definition of
3.1, 6.1.2
Contractor's Construction Schedules
1.4.1.2, **3.10**, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Contractor's Employees
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6,
10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1,
Redacted
**11.1**
Contractor's Relationship with Separate
Contractors and Owner's Forces
3.12.5, 3.14.2, 4.2.4, 6, 11.4.7, 12.1.2,
12.2.4
Contractor's Relationship with Subcontractors
1.2.2, 3.3.2, 3.18.1, 3.18.2, 5, 9.6.2, 9.6.7,
9.10.2, 11.4.1.2, 11.4.7, 11.4.8
Contractor's Relationship with the Architect
1.1.2, 1.6, 3.1.3, 3.2.1, 3.2.2, 3.2.3, 3.3.1,
3.4.2, 3.5.1, 3.7.3, 3.10, 3.11, 3.12, 3.16,
3.18, 4.1.2, 4.1.3, 4.2, 4.3.4, 4.4.1, 4.4.7,
5.2, 6.2.2, 7, 8.3.1, 9.2, 9.3, 9.4, 9.5, 9.7,
9.8, 9.9, 10.2.6, 10.3, 11.3, 11.4.7, 12,
13.4.2, 13.5
Contractor's Representations
1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3,
9.8.2
Contractor's Responsibility for Those

Performing the Work
3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2,
6.3, 9.5.1, 10
Contractor's Review of Contract Documents
1.5.2, 3.2, 3.7.3
Contractor's Right to Stop the Work
9.7
Contractor's Right to Terminate the Contract
4.3.10, 14.1
Contractor's Submittals
3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3, 7.3.6,
9.2, 9.3, 9.8.2, 9.8.3, 9.9.1, 9.10.2, 9.10.3,
11.1.3, 11.5.2
Contractor's Superintendent
3.9, 10.2.6
Contractor's Supervision and Construction
Procedures
1.2.2, 3.3, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3,
6.1.3, 6.2.4, 7.1.3, 7.3.4, 7.3.6, 8.2, 10, 12,
14
Redacted
11.1.1.8, 11.2, 11.3
Coordination and Correlation
1.2, 1.5.2, 3.3.1, 3.10, 3.12.6, 6.1.3, 6.2.1
Copies Furnished of Drawings and
Specifications
1.6, 2.2.5, 3.11
Copyrights
1.6, 3.17
Correction of Work
2.3, 2.4, 3.7.4, 4.2.1, 9.4.2, 9.8.2, 9.8.3,
9.9.1, 12.1.2, 12.2, 13.7.1.3
Correlation and Intent of the Contract
Documents
**1.2**
Cost, Definition of
7.3.6
Costs
2.4, 3.2.3, 3.7.4, 3.8.2, 3.15.2, 4.3, 5.4.2,
6.1.1, 6.2.3, 7.3.3.3, 7.3.6, 7.3.7, 7.3.8,
9.10.2, 10.3.2, 10.5, 11.3, 11.4, 12.1,
12.2.1, 12.2.4, 13.5, 14
Cutting and Patching
6.2.5, **3.14**
Damage to Construction of Owner or Separate
Contractors
3.14.2, 6.2.4, 9.2.1.5, 10.2.1.2, 10.2.5, 10.6,
11.1, 11.4, 12.2.4
Damage to the Work

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

3.14.2, 9.9.1, 10.2.1.2, 10.2.5, 10.6, 11.4,
12.2.4
Damages, Claims for
3.2.3, 3.18, 4.3.10, 6.1.1, 8.3.3, 9.5.1,
9.6.7, 10.3.3, 11.1.1, 11.4.5, 11.4.7, 14.1.3,
14.2.4
Damages for Delay
6.1.1, 8.3.3, 9.5.1.6, 9.7, 10.3.2
Date of Commencement of the Work,
Definition of
8.1.2
Date of Substantial Completion, Definition of
8.1.3
Day, Definition of
8.1.4
Decisions of the Architect
4.2.6, 4.2.7, 4.2.11, 4.2.12, 4.2.13, 4.3.4,
4.4.1, 4.4.5, 4.4.6, 4.5, 6.3, 7.3.6, 7.3.8,
8.1.3, 8.3.1, 9.2, 9.4, 9.5.1, 9.8.4, 9.9.1,
13.5.2, 14.2.2, 14.2.4
Decisions to Withhold Certification
9.4.1, **9.5**, 9.7, 14.1.1.3
Defective or Nonconforming Work,
Acceptance, Rejection and Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.5.2,
9.6.6, 9.8.2, 9.9.3, 9.10.4, 12.2.1, 13.7.1.3
Defective Work, Definition of
3.5.1
Definitions
1.1, 2.1.1, 3.1, 3.5.1, 3.12.1, 3.12.2, 3.12.3,
4.1.1, 4.3.1, 5.1, 6.1.2, 7.2.1, 7.3.1, 7.3.6,
8.1, 9.1, 9.8.1
Delays and Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1,
7.3.1, 7.4.1, 7.5.1, **8.3**, 9.5.1, 9.7.1, 10.3.2,
10.6.1, 14.3.2
Disputes
4.1.4, 4.3, 4.4, 4.5, 4.6, 6.3, 7.3.8
Documents and Samples at the Site
**3.11**
Drawings, Definition of
1.1.5
Drawings and Specifications, Use and
Ownership of
1.1.1, 1.3, 2.2.5, 3.11, 5.3
Redacted
8.2.2, 11.1.2
Emergencies
4.3.5, **10.6**, 14.1.1.2

Employees, Contractor's
3.3.2, 3.4.3, 3.8.1, 3.9, 3.18.2, 4.2.3, 4.2.6,
10.2, 10.3, 11.1.1, 11.4.7, 14.1, 14.2.1.1
Equipment, Labor, Materials and
1.1.3, 1.1.6, 3.4, 3.5.1, 3.8.2, 3.8.3, 3.12,
3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6,
9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4,
14.2.1.2
Execution and Progress of the Work
1.1.3, 1.2.1, 1.2.2, 2.2.3, 2.2.5, 3.1, 3.3, 3.4,
3.5, 3.7, 3.10, 3.12, 3.14, 4.2.2, 4.2.3, 4.3.3,
6.2.2, 7.1.3, 7.3.4, 8.2, 9.5, 9.9.1, 10.2,
10.3, 12.2, 14.2, 14.3
Extensions of Time
3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1,
7.3, 7.4.1, 9.5.1, 9.7.1, 10.3.2, 10.6.1,
14.3.2
Failure of Payment
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3,
14.2.1.2, 13.6
Faulty Work
(See Defective or Nonconforming Work)
Final Completion and Final Payment
4.2.1, 4.2.9, 4.3.2, 9.8.2, **9.10**, 11.1.2,
11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4,
14.4.3
Financial Arrangements, Owner's
2.2.1, 13.2.2, 14.1.1.5
Redacted
11.4
**GENERAL PROVISIONS**
**1**
Governing Law
**13.1**
Guarantees (See Warranty)
Hazardous Materials
10.2.4, **10.3**, 10.5
Identification of Contract Documents
1.5.1
Identification of Subcontractors and Suppliers
5.2.1
Indemnification
3.17, **3.18**, 9.10.2, 10.3.3, 10.5, 11.4.1.2,
11.4.7
Information and Services Required of the
Owner
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7,
4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4,
9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1,

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

13.5.2, 14.1.1.4, 14.1.4
Injury or Damage to Person or Property
    **4.3.8**, 10.2, 10.6
Inspections
    3.1.3, 3.3.3, 3.7.1, 4.2.2, 4.2.6, 4.2.9, 9.4.2,
    9.8.2, 9.8.3, 9.9.2, 9.10.1, 12.2.1, 13.5
Instructions to Bidders
    1.1.1
Instructions to the Contractor
    3.2.3, 3.3.1, 3.8.1, 4.2.8, 5.2.1, 7, 12, 8.2.2,
    13.5.2
Redacted
    3.18.1, 6.1.1, 7.3.6, 8.2.1, 9.3.2, 9.8.4,
    9.9.1, 9.10.2, 9.10.5, 11
Redacted
    11.4.2
Redacted
    **11.1**
Redacted
    8.2.2, 11.1.2
Redacted
    11.4.3
Redacted
    11.2
Redacted    Redacted
Redacted
    11.3
Redacted
    10.2.5, **11.4**
Redacted
    9.3.2, 11.4.1.4
Redacted
    **11**
Redacted
Redacted
    9.9.1, 11.4.1.5
Redacted
    11.4.10
Intent of the Contract Documents
    1.2.1, 4.2.7, 4.2.12, 4.2.13, 7.4
Interest
    **13.6**
Interpretation
    1.2.3, **1.4**, 4.1.1, 4.3.1, 5.1, 6.1.2, 8.1.4
Interpretations, Written
    4.2.11, 4.2.12, 4.3.6
Joinder and Consolidation of Claims Required
    4.6.4
Judgment on Final Award

**4.6.6**
Labor and Materials, Equipment
    1.1.3, 1.1.6, **3.4**, 3.5.1, 3.8.2, 3.8.3, 3.12,
    3.13, 3.15.1, 42.6, 4.2.7, 5.2.1, 6.2.1, 7.3.6,
    9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1, 10.2.4,
    14.2.1.2
Labor Disputes
    8.3.1
Laws and Regulations
    1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1,
    4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4,
    13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14
Liens
    2.1.2, 4.4.8, 8.2.2, 9.3.3, 9.10
Limitation on Consolidation or Joinder
    **4.6.4**
Limitations, Statutes of
    4.6.3, 12.2.6, 13.7
Limitations of Liability
    2.3, 3.2.1, 3.5.1, 3.7.3, 3.12.8, 3.12.10,
    3.17, 3.18, 4.2.6, 4.2.7, 4.2.12, 6.2.2, 9.4.2,
    9.6.4, 9.6.7, 9.10.4, 10.3.3, 10.2.5, 11.1.2,
    11.2.1, 11.4.7, 12.2.5, 13.4.2
Limitations of Time
    2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11,
    3.12.5, 3.15.1, 4.2.7, 4.3, 4.4, 4.5, 4.6, 5.2,
    5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1,
    9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10,
    11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2, 13.5,
    13.7, 14
Redacted
    **11.4.3**
Material Suppliers
    1.6, 3.12.1, 4.2.4, 4.2.6, 5.2.1, 9.3, 9.4.2,
    9.6, 9.10.5
Materials, Hazardous
    10.2.4, 10.3, 10.5
Materials, Labor, Equipment and
    1.1.3, 1.1.6, 1.6.1, 3.4, 3.5.1, 3.8.2, 3.8.23,
    3.12, 3.13, 3.15.1, 4.2.6, 4.2.7, 5.2.1, 6.2.1,
    7.3.6, 9.3.2, 9.3.3, 9.5.1.3, 9.10.2, 10.2.1,
    10.2.4, 14.2.1.2
Means, Methods, Techniques, Sequences and
Procedures of Construction
    3.3.1, 3.12.10, 4.2.2, 4.2.7, 9.4.2
Mechanic's Lien
    4.4.8
Mediation
    4.4.1, 4.4.5, 4.4.6, 4.4.8, **4.5**, 4.6.1, 4.6.2,

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

8.3.1, 10.5

Minor Changes in the Work
1.1.1, 3.12.8, 4.2.8, 4.3.6, 7.1, **7.4**

**MISCELLANEOUS PROVISIONS**
**13**

Modifications, Definition of
1.1.1

Modifications to the Contract
1.1.1, 1.1.2, 3.7.3, 3.11, 4.1.2, 4.2.1, 5.2.3,
7, 8.3.1, 9.7, 10.3.2, 11.4.1

Mutual Responsibility
**6.2**

Nonconforming Work, Acceptance of
9.6.6, 9.9.3, **12.3**

Nonconforming Work, Rejection and
Correction of
2.3, 2.4, 3.5.1, 4.2.6, 6.2.5, 9.5.1, 9.8.2,
9.9.3, 9.10.4, 12.2.1, 13.7.1.3

Notice
2.2.1, 2.3, 2.4, 3.2.3, 3.3.1, 3.7.2, 3.7.4,
3.12.9, 4.3, 4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7,
9.10, 10.2.2, 11.1.3, 11.4.6, 12.2.2, 12.2.4,
13.3, 13.5.1, 13.5.2, 14.1, 14.2

Notice, Written
2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3,
4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2,
10.3, 11.1.3, 11.4.6, 12.2.2, 12.2.4, **13.3,**
14

Notice of Testing and Inspections
13.5.1, 13.5.2

Notice to Proceed
8.2.2

Notices, Permits, Fees and
2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2

Observations, Contractor's
1.5.2, 3.2, 3.7.3, 4.3.4

Occupancy
2.2.2, 9.6.6, 9.8, 11.4.1.5

Orders, Written
1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1,
12.2, 13.5.2, 14.3.1

**OWNER**
**2**

Owner, Definition of
2.1

Owner, Information and Services Required of
the
2.1.2, **2.2**, 3.2.1, 3.12.4, 3.12.10, 4.2.7,
4.3.3, 6.1.3, 6.1.4, 6.2.5, 9.3.2, 9.6.1, 9.6.4,

9.9.2, 9.10.3, 10.3.3, 11.2, 11.4, 13.5.1,
13.5.2, 14.1.1.4, 14.1.4

Owner's Authority
1.6, 2.1.1, 2.3, 2.4, 3.4.2, 3.8.1, 3.12.10,
3.14.2, 4.1.2, 4.1.3, 4.2.4, 4.2.9, 4.3.6,
4.4.7, 5.2.1, 5.2.4, 5.4.1, 6.1, 6.3, 7.2.1,
7.3.1, 8.2.2, 8.3.1, 9.3.1, 9.3.2, 9.5.1, 9.9.1,
9.10.2, 10.3.2, 11.1.3, 11.3.1, 11.4.3,
11.4.10, 12.2.2, 12.3.1, 13.2.2, 14.3, 14.4

Owner's Financial Capability
2.2.1, 13.2.2, 14.1.1.5

Redacted

**11.2**

Redacted

11.4.3

Owner's Relationship with Subcontractors
1.1.2, 5.2, 5.3, 5.4, 9.6.4, 9.10.2, 14.2.2

Owner's Right to Carry Out the Work
**2.4**, 12.2.4. 14.2.2.2

Owner's Right to Clean Up
**6.3**

Owner's Right to Perform Construction and to
Award Separate Contracts
**6.1**

Owner's Right to Stop the Work
**2.3**

Owner's Right to Suspend the Work
14.3

Owner's Right to Terminate the Contract
14.2

Ownership and Use of Drawings, Specifications
and Other Instruments of Service
1.1.1, **1.6**, 2.2.5, 3.2.1, 3.11.1, 3.17.1,
4.2.12, 5.3

Partial Occupancy or Use
9.6.6, **9.9**, 11.4.1.5

Patching, Cutting and
**3.14**, 6.2.5

Patents
3.17

Payment, Applications for
4.2.5, 7.3.8, 9.2, **9.3**, 9.4, 9.5.1, 9.6.3,
9.7.1, 9.8.5, 9.10.1, 9.10.3, 9.10.5, 11.1.3,
14.2.4, 14.4.3

Payment, Certificates for
4.2.5, 4.2.9, 9.3.3, **9.4**, 9.5, 9.6.1, 9.6.6,
9.7.1, 9.10.1, 9.10.3, 13.7, 14.1.1.3, 14.2.4

Payment, Failure of
4.3.6, 9.5.1.3, **9.7**, 9.10.2, 14.1.1.3,

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by
The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial
quotation of its provisions without written permission of the AIA violates the copyright laws of the United States
and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright
laws and will subject the violator to legal prosecution. This document was electronically produced with
permission of the AIA and can be reproduced in accordance with your license without violation until the date of
expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

14.2.1.2, 13.6

Payment, Final
    4.2.1, 4.2.9, 4.3.2, 9.8.2, 9.10, 11.1.2,
    11.1.3, 11.4.1, 11.4.5, 12.3.1, 13.7, 14.2.4,
    14.4.3

Redacted
    7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**

Payments, Progress
    4.3.3, 9.3, 9.6, 9.8.5, 9.10.3, 13.6, 14.2.3

**PAYMENTS AND COMPLETION**
    **9**

Payments to Subcontractors
    5.4.2, 9.5.1.3, 9.6.2, 9.6.3, 9.6.4, 9.6.7,
    11.4.8, 14.2.1.2

PCB
    10.3.1

Redacted
    7.3.6.4, 9.6.7, 9.10.3, 11.4.9, **11.5**

Permits, Fees and Notices
    2.2.2, **3.7**, 3.13, 7.3.6.4, 10.2.2

**PERSONS AND PROPERTY,
PROTECTION OF**
    **10**

Polychlorinated Biphenyl
    10.3.1

Product Data, Definition of
    3.12.2

Product Data and Samples, Shop Drawings
    3.11, **3.12**, 4.2.7

Progress and Completion
    4.2.2, 4.3.3, **8.2**, 9.8, 9.9.1, 14.1.4

Progress Payments
    4.3.3, 9.3, **9.6**, 9.8.5, 9.10.3, 13.6, 14.2.3

Project, Definition of the
    1.1.4

Redacted

Redacted
    **11.3**

Project Manual, Definition of the
    1.1.7

Project Manuals
    2.2.5

Project Representatives
    4.2.10

Redacted
    10.2.5, **11.4**

**PROTECTION OF PERSONS AND
PROPERTY**
    **10**

Regulations and Laws
    1.6, 3.2.2, 3.6, 3.7, 3.12.10, 3.13, 4.1.1,
    4.4.8, 4.6, 9.6.4, 9.9.1, 10.2.2, 11.1, 11.4,
    13.1, 13.4, 13.5.1, 13.5.2, 13.6, 14

Rejection of Work
    3.5.1, 4.2.6, 12.2.1

Releases and Waivers of Liens
    9.10.2

Representations
    1.5.2, 3.5.1, 3.12.6, 6.2.2, 8.2.1, 9.3.3,
    9.4.2, 9.5.1, 9.8.2, 9.10.1

Representatives
    2.1.1, 3.1.1, 3.9, 4.1.1, 4.2.1, 4.2.10, 5.1.1,
    5.1.2, 13.2.1

Resolution of Claims and Disputes
    **4.4**, 4.5, 4.6

Responsibility for Those Performing the Work
    3.3.2, 3.18, 4.2.3, 4.3.8, 5.3.1, 6.1.3, 6.2,
    6.3, 9.5.1, 10

Retainage
    9.3.1, 9.6.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3

Review of Contract Documents and Field
Conditions by Contractor
    1.5.2, **3.2**, 3.7.3, 3.12.7, 6.1.3

Review of Contractor's Submittals by Owner
and Architect
    3.10.1, 3.10.2, 3.11, 3.12, 4.2, 5.2, 6.1.3,
    9.2, 9.8.2

Review of Shop Drawings, Product Data and
Samples by Contractor
    3.12

Rights and Remedies
    1.1.2, 2.3, 2.4, 3.5.1, 3.15.2, 4.2.6, 4.3.4,
    4.5, 4.6, 5.3, 5.4, 6.1, 6.3, 7.3.1, 8.3, 9.5.1,
    9.7, 10.2.5, 10.3, 12.2.2, 12.2.4, 13.4, 14

Royalties, Patents and Copyrights
    **3.17**

Rules and Notices for Arbitration
    4.6.2

Safety of Persons and Property
    **10.2**, 10.6

Safety Precautions and Programs
    3.3.1, 4.2.2, 4.2.7, 5.3.1, 10.1, 10.2, 10.6

Samples, Definition of
    3.12.3

Samples, Shop Drawings, Product Data and
    3.11, **3.12**, 4.2.7

Samples at the Site, Documents and
    **3.11**

THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.
This document has been approved and
endorsed by The Associated General
Contractors of America.

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by
The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial
quotation of its provisions without written permission of the AIA violates the copyright laws of the United States
and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright
laws and will subject the violator to legal prosecution. This document was electronically produced with
permission of the AIA and can be reproduced in accordance with your license without violation until the date of
expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION
GENERAL CONDITIONS
The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Schedule of Values
**9.2**, 9.3.1
Schedules, Construction
1.4.1.2, 3.10, 3.12.1, 3.12.2, 4.3.7.2, 6.1.3
Separate Contracts and Contractors
1.1.4, 3.12.5, 3.14.2, 4.2.4, 4.2.7, 4.6.4, 6,
8.3.1, 11.4.7, 12.1.2, 12.2.5
Shop Drawings, Definition of
3.12.1
Shop Drawings, Product Data and Samples
3.11, **3.12**, 4.2.7
Site, Use of
3.13, 6.1.1, 6.2.1
Site Inspections
1.2.2, 3.2.1, 3.3.3, 3.7.1, 4.2, 4.3.4, 9.4.2,
9.10.1, 13.5
Site Visits, Architect's
4.2.2, 4.2.9, 4.3.4, 9.4.2, 9.5.1, 9.9.2,
9.10.1, 13.5
Special Inspections and Testing
4.2.6, 12.2.1, 13.5
Specifications, Definition of the
1.1.6
Specifications, The
1.1.1, **1.1.6**, 1.1.7, 1.2.2, 1.6, 3.11,
3.12.10, 3.17
Statute of Limitations
4.6.3, 12.2.6, 13.7
Stopping the Work
2.3, 4.3.6, 9.7, 10.3, 14.1
Stored Materials
6.2.1, 9.3.2, 10.2.1.2, 10.2.4, 11.4.1.4
Subcontractor, Definition of
5.1.1
**SUBCONTRACTORS**
**5**
Subcontractors, Work by
1.2.2, 3.3.2, 3.12.1, 4.2.3, 5.2.3, 5.3, 5.4,
9.3.1.2, 9.6.7
Subcontractual Relations
**5.3**, 5.4, 9.3.1.2, 9.6, 9.10 10.2.1, 11.4.7,
11.4.8, 14.1, 14.2.1, 14.3.2
Submittals
1.6, 3.10, 3.11, 3.12, 4.2.7, 5.2.1, 5.2.3,
7.3.6, 9.2, 9.3, 9.8, 9.9.1, 9.10.2, 9.10.3,
11.1.3
Redacted
6.1.1, 11.4.5, **11.4.7**
Substantial Completion

4.2.9, 8.1.1, 8.1.3, 8.2.3, 9.4.2, **9.8**, 9.9.1,
9.10.3, 9.10.4.2, 12.2, 13.7
Substantial Completion, Definition of
9.8.1
Substitution of Subcontractors
5.2.3, 5.2.4
Substitution of Architect
4.1.3
Substitutions of Materials
3.4.2, 3.5.1, 7.3.7
Sub-subcontractor, Definition of
5.1.2
Subsurface Conditions
4.3.4
Successors and Assigns
**13.2**
Superintendent
**3.9**, 10.2.6
Supervision and Construction Procedures
1.2.2, **3.3**, 3.4, 3.12.10, 4.2.2, 4.2.7, 4.3.3,
6.1.3, 6.2.4, 7.1.3, 7.3.6, 8.2, 8.3.1, 9.4.2,
10, 12, 14
Redacte
d
4.4.7, 5.4.1.2, 9.8.5, 9.10.2, 9.10.3, 14.2.2
Redacted
9.10.2, 9.10.3
Surveys
2.2.3
Suspension by the Owner for Convenience
**14.4**
Suspension of the Work
5.4.2, 14.3
Suspension or Termination of the Contract
4.3.6, 5.4.1.1, 11.4.9, 14
Taxes
**3.6**, 3.8.2.1, 7.3.6.4
Termination by the Contractor
4.3.10, **14.1**
Termination by the Owner for Cause
4.3.10, 5.4.1.1, **14.2**
Termination of the Architect
4.1.3
Termination of the Contractor
14.2.2
**TERMINATION OR SUSPENSION OF
THE CONTRACT
14**
Tests and Inspections
3.1.3, 3.3.3, 4.2.2, 4.2.6, 4.2.9, 9.4.2, 9.8.3,

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA®
Contract Documents software for administrative purposes only and is not for other use or resale.**

9.9.2, 9.10.1, 10.3.2, 11.4.1.1, 12.2.1,**13.5**
**TIME**
   **8**
Time, Delays and Extensions of
   3.2.3, 4.3.1, 4.3.4, 4.3.7, 4.4.5, 5.2.3, 7.2.1,
   7.3.1, 7.4.1, 7.5.1, **8.3**, 9.5.1, 9.7.1, 10.3.2,
   10.6.1, 14.3.2
Time Limits
   2.1.2, 2.2, 2.4, 3.2.1, 3.7.3, 3.10, 3.11,
   3.12.5, 3.15.1, 4.2, 4.3, 4.4, 4.5, 4.6, 5.2,
   5.3, 5.4, 6.2.4, 7.3, 7.4, 8.2, 9.2, 9.3.1,
   9.3.3, 9.4.1, 9.5, 9.6, 9.7, 9.8, 9.9, 9.10,
   11.1.3, 11.4.1.5, 11.4.6, 11.4.10, 12.2,
   13.5, 13.7, 14
Time Limits on Claims
   **4.3.2**, 4.3.4, 4.3.8, 4.4, 4.5, 4.6
Title to Work
   9.3.2, 9.3.3
**UNCOVERING AND CORRECTION OF**
**WORK**
   **12**
Uncovering of Work
   **12.1**
Unforeseen Conditions
   4.3.4, 8.3.1, 10.3
Unit Prices
   4.3.9, 7.3.3.2
Use of Documents
   1.1.1, 1.6, 2.2.5, 3.12.6, 5.3
Use of Site
   **3.13**, 6.1.1, 6.2.1
Values, Schedule of
   **9.2**, 9.3.1
Waiver of Claims by the Architect
   13.4.2
Waiver of Claims by the Contractor
   4.3.10, 9.10.5, 11.4.7, 13.4.2

Waiver of Claims by the Owner
   4.3.10, 9.9.3, 9.10.3, 9.10.4, 11.4.3, 11.4.5,
   11.4.7, 12.2.2.1, 13.4.2, 14.2.4
Waiver of Consequential Damages
   **4.3.10**, 14.2.4
Waiver of Liens
   9.10.2, 9.10.4
Redacted
   6.1.1, 11.4.5, **11.4.7**
Warranty
   **3.5**, 4.2.9, 4.3.5.3, 9.3.3, 9.8.4, 9.9.1,
   9.10.4, 12.2.2, 13.7.1.3
Weather Delays
   4.3.7.2
Work, Definition of
   1.1.3
Written Consent
   1.6, 3.4.2, 3.12.8, 3.14.2, 4.1.2, 4.3.4, 4.6.4,
   9.3.2, 9.8.5, 9.9.1, 9.10.2, 9.10.3, 11.4.1,
   13.2, 13.4.2
Written Interpretations
   4.2.11, 4.2.12, 4.3.6
Written Notice
   2.3, 2.4, 3.3.1, 3.9, 3.12.9, 3.12.10, 4.3,
   4.4.8, 4.6.5, 5.2.1, 8.2.2, 9.7, 9.10, 10.2.2,
   10.3, 11.1.3, 11.4.6, 12.2.2, 12.2.4, **13.3**,
   14
Written Orders
   1.1.1, 2.3, 3.9, 4.3.6, 7, 8.2.2, 11.4.9, 12.1,
   12.2, 13.5.2, 14.3.1

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

## ARTICLE 1 GENERAL PROVISIONS
### 1.1   BASIC DEFINITIONS
### 1.1.1   THE CONTRACT DOCUMENTS

The Contract Documents consist of the Agreement between Owner and Contractor (hereinafter the Agreement), Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Contract, other documents listed in the Agreement and Modifications issued after execution of the Contract. A Modification is (1) a written amendment to the Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Architect. Unless specifically enumerated in the Agreement,



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

the Contract Documents do not include other documents such as bidding requirements (advertisement or invitation to bid, Instructions to Bidders, sample forms, the Contractor's bid or portions of Addenda relating to bidding requirements).

### 1.1.2  THE CONTRACT

The Contract Documents form the Contract for Construction. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Contract Documents shall not be construed to create a contractual relationship of any kind (1) between the Architect and Contractor, (2) between the Owner and a Subcontractor or Sub-subcontractor, (3) between the Owner and Architect or (4) between any persons or entities other than the Owner and Contractor. The Architect shall, however, be entitled to performance and enforcement of obligations under the Contract intended to facilitate performance of the Architect's duties.

### 1.1.3  THE WORK

The term "Work" means the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or a part of the Project.

### 1.1.4  THE PROJECT

The Project is the total construction of which the Work performed under the Contract Documents may be the whole or a part and which may include construction by the Owner or by separate contractors.

### 1.1.5  THE DRAWINGS

The Drawings are the graphic and pictorial portions of the Contract Documents showing the design, location and dimensions of the Work, generally including plans, elevations, sections, details, schedules and diagrams.

### 1.1.6  THE SPECIFICATIONS

The Specifications are that portion of the Contract Documents consisting of the written requirements for materials, equipment, systems, standards and workmanship for the Work, and performance of related services.

### 1.1.7  THE PROJECT MANUAL

The Project Manual is a volume assembled for the Work which may include the bidding requirements, sample forms, Conditions of the Contract and Specifications.

### 1.2  CORRELATION AND INTENT OF THE CONTRACT DOCUMENTS

**1.2.1**  The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work by the Contractor. The Contract Documents are complementary, and what is required by one shall be as binding as if required by all; performance by the Contractor shall be required only to the extent consistent with the Contract Documents and reasonably inferable from them as being necessary to produce the indicated results.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**1.2.2** Organization of the Specifications into divisions, sections and articles, and arrangement of Drawings shall not control the Contractor in dividing the Work among Subcontractors or in establishing the extent of Work to be performed by any trade.

**1.2.3** Unless otherwise stated in the Contract Documents, words which have well-known technical or construction industry meanings are used in the Contract Documents in accordance with such recognized meanings.

**1.3 CAPITALIZATION**
**1.3.1** Terms capitalized in these General Conditions include those which are (1) specifically defined, (2) the titles of numbered articles and identified references to Paragraphs, Subparagraphs and Clauses in the document or (3) the titles of other documents published by the American Institute of Architects.

**1.4 INTERPRETATION**
**1.4.1** In the interest of brevity the Contract Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

**1.5 EXECUTION OF CONTRACT DOCUMENTS**
**1.5.1** The Contract Documents shall be signed by the Owner and Contractor. If either the Owner or Contractor or both do not sign all the Contract Documents, the Architect shall identify such unsigned Documents upon request.

**1.5.2** Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become generally familiar with local conditions under which the Work is to be performed and correlated personal observations with requirements of the Contract Documents.

**1.6 OWNERSHIP AND USE OF DRAWINGS, SPECIFICATIONS AND OTHER INSTRUMENTS OF SERVICE**
**1.6.1** The Drawings, Specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service through which the Work to be executed by the Contractor is described. The Contractor may retain one record set. Neither the Contractor nor any Subcontractor, Sub-subcontractor or material or equipment supplier shall own or claim a copyright in the Drawings, Specifications and other documents prepared by the Architect or the Architect's consultants, and unless otherwise indicated the Architect and the Architect's consultants shall be deemed the authors of them and will retain all common law, statutory and other reserved rights, in addition to the copyrights. All copies of Instruments of Service, except the Contractor's record set, shall be returned or suitably accounted for to the Architect, on request, upon completion of the Work. The Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants, and copies thereof furnished to the Contractor, are for use solely with respect to this Project. They are not to be used by the Contractor or any Subcontractor, Sub-subcontractor or material or equipment supplier on other projects or for additions to this Project outside the scope of the Work without the specific written consent of the Owner, Architect and the Architect's consultants. The Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers are authorized to use and reproduce applicable portions

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

of the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants appropriate to and for use in the execution of their Work under the Contract Documents. All copies made under this authorization shall bear the statutory copyright notice, if any, shown on the Drawings, Specifications and other documents prepared by the Architect and the Architect's consultants. Submittal or distribution to meet official regulatory requirements or for other purposes in connection with this Project is not to be construed as publication in derogation of the Architect's or Architect's consultants' copyrights or other reserved rights.

## ARTICLE 2 OWNER
### 2.1 GENERAL
**2.1.1** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all matters requiring the Owner's approval or authorization. Except as otherwise provided in Subparagraph 4.2.1, the Architect does not have such authority. The term "Owner" means the Owner or the Owner's authorized representative.

**2.1.2** The Owner shall furnish to the Contractor within fifteen days after receipt of a written request, information necessary and relevant for the Contractor to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### 2.2 INFORMATION AND SERVICES REQUIRED OF THE OWNER
**2.2.1** The Owner shall, at the written request of the Contractor, prior to commencement of the Work and thereafter, furnish to the Contractor reasonable evidence that financial arrangements have been made to fulfill the Owner's obligations under the Contract. Furnishing of such evidence shall be a condition precedent to commencement or continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

**2.2.2** Except for permits and fees, including those required under Subparagraph 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

**2.2.3** The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

**2.2.4** Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**2.2.5** Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

**2.3 OWNER'S RIGHT TO STOP THE WORK**

**2.3.1** If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Paragraph 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Subparagraph 6.1.3.

**2.4 OWNER'S RIGHT TO CARRY OUT THE WORK**

**2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3 CONTRACTOR

**3.1 GENERAL**

**3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

**3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR**

**3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Subparagraph 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects 1735 New York Avenue, N.W. Washington, D.C. 20006-5292

affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

**3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.

**3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Subparagraphs 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Subparagraphs 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Subparagraphs 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

## 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES
**3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

**3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## 3.4 LABOR AND MATERIALS

**3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.4.2** The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

**3.4.3** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

## 3.5 WARRANTY

**3.5.1** The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## 3.6 TAXES

**3.6.1** The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## 3.7 PERMITS, FEES AND NOTICES

**3.7.1** Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

**3.7.2** The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

**3.7.3** It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

This document has been approved and endorsed by The Associated General Contractors of America.



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

**3.7.4**  If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## 3.8    ALLOWANCES
**3.8.1**  The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

**3.8.2**    Unless otherwise provided in the Contract Documents:

    **.1**    allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

    **.2**    Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;

    **.3**    whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Clause 3.8.2.1 and (2) changes in Contractor's costs under Clause 3.8.2.2.

**3.8.3**  Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## 3.9    SUPERINTENDENT
**3.9.1**  The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## 3.10    CONTRACTOR'S CONSTRUCTION SCHEDULES
**3.10.1**  The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

**3.10.2**  The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Architect reasonable time to review submittals.



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

©1997 AIA®
**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**3.10.3** The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect.

## 3.11 DOCUMENTS AND SAMPLES AT THE SITE

**3.11.1** The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

## 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

**3.12.1** Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

**3.12.2** Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

**3.12.3** Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**3.12.4** Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Subparagraph 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

**3.12.5** The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.

**3.12.6** By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

**3.12.7** The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**3.12.8** The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

**3.12.9** The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice the Architect's approval of a resubmission shall not apply to such revisions.

**3.12.10** The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Subparagraph 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

## 3.13 USE OF SITE

**3.13.1** The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

## 3.14 CUTTING AND PATCHING

**3.14.1** The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**3.14.2** The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

## 3.15   CLEANING UP
**3.15.1** The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

**3.15.2** If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

## 3.16   ACCESS TO WORK
**3.16.1** The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

## 3.17   ROYALTIES, PATENTS AND COPYRIGHTS
**3.17.1** The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such loss unless such information is promptly furnished to the Architect.

## 3.18   INDEMNIFICATION
**3.18.1** To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are Redacted
Redacted                                       , the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Paragraph 3.18.

<div style="float:right">
*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*
</div>



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**3.18.2** In claims against any person or entity indemnified under this Paragraph 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Subparagraph 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

## ARTICLE 4 ADMINISTRATION OF THE CONTRACT
### 4.1 ARCHITECT
**4.1.1** The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

**4.1.2** Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

**4.1.3** If the employment of the Architect is terminated, the Owner shall employ a new Architect against whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the former Architect.

### 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT
**4.2.1** The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Paragraph 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

**4.2.2** The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Subparagraph 3.3.1.

**4.2.3** The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**4.2.4 Communications Facilitating Contract Administration.** Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

**4.2.5** Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

**4.2.6** The Architect will have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Subparagraphs 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

**4.2.7** The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Paragraphs 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**4.2.8** The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Paragraph 7.4.

**4.2.9** The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
**GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**4.2.10** If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

**4.2.11** The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Paragraph 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

**4.2.12** Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

**4.2.13** The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

## 4.3 CLAIMS AND DISPUTES
**4.3.1 Definition.** A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

**4.3.2 Time Limits on Claims.** Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

**4.3.3 Continuing Contract Performance.** Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Subparagraph 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

**4.3.4 Claims for Concealed or Unknown Conditions.** If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Paragraph 4.4.

**4.3.5    Claims for Additional Cost.** If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Paragraph 10.6.

**4.3.6**    If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Paragraph 4.3.

**4.3.7    Claims for Additional Time**
**4.3.7.1** If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

**4.3.7.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

**4.3.8    Injury or Damage to Person or Property.** If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**4.3.9**    If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed  photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**4.3.10 Claims for Consequential Damages.** The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

    **.1** damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

    **.2** damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Subparagraph 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

## 4.4 RESOLUTION OF CLAIMS AND DISPUTES

**4.4.1 Decision of Architect.** Claims, including those alleging an error or omission by the Architect but excluding those arising under Paragraphs 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.

**4.4.2** The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.

**4.4.3** In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.

**4.4.4** If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

**4.4.5** The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
**GENERAL CONDITIONS OF THE**
**CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.

**4.4.6** When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

**4.4.7** Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify <sup>Redacted</sup> , if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify<sup>Redacted</sup> and request <sup>Redacted</sup> assistance in resolving the controversy.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

**4.4.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Architect, by mediation or by arbitration.

*This document has been approved and endorsed by The Associated General Contractors of America.*

## 4.5   MEDIATION
**4.5.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

**4.5.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

**4.5.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

## 4.6   ARBITRATION
**4.6.1** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Paragraph 4.5.



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

26

**4.6.2** Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.

**4.6.3** A demand for arbitration shall be made within the time limits specified in Subparagraphs 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Paragraph 13.7.

**4.6.4 Limitation on Consolidation or Joinder.** No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**4.6.5 Claims and Timely Assertion of Claims.** The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**4.6.6 Judgment on Final Award.** The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 5 SUBCONTRACTORS
### 5.1 DEFINITIONS
**5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

## 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK

**5.2.1** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

**5.2.2** The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**5.2.3** If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

**5.2.4** The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitute.

## 5.3 SUBCONTRACTUAL RELATIONS

**5.3.1** By appropriate agreement, written where legally required for validity, the Contractor shall require each Subcontractor, to the extent of the Work to be performed by the Subcontractor, to be bound to the Contractor by terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities, including the responsibility for safety of the Subcontractor's Work, which the Contractor, by these Documents, assumes toward the Owner and Architect. Each subcontract agreement shall preserve and protect the rights of the Owner and Architect under the Contract Documents with respect to the Work to be performed by the Subcontractor so that subcontracting thereof will not prejudice such rights, and shall allow to the Subcontractor, unless specifically provided otherwise in the subcontract agreement, the benefit of all rights, remedies and redress against the Contractor that the Contractor, by the Contract Documents, has against the Owner. Where appropriate, the Contractor shall require each Subcontractor to enter into similar agreements with Sub-subcontractors. The Contractor shall make available to each proposed Subcontractor, prior to the execution of the subcontract agreement, copies of the Contract Documents to which the Subcontractor will be bound, and, upon written request of the Subcontractor, identify to the Subcontractor terms and conditions of the proposed subcontract agreement which may be at variance with the Contract Documents.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Subcontractors will similarly make copies of applicable portions of such documents available to their respective proposed Sub-subcontractors.

## 5.4 CONTINGENT ASSIGNMENT OF SUBCONTRACTS

**5.4.1** Each subcontract agreement for a portion of the Work is assigned by the Contractor to the Owner provided that:

.1 assignment is effective only after termination of the Contract by the Owner for cause pursuant to Paragraph 14.2 and only for those subcontract agreements which the Owner accepts by notifying the Subcontractor and Contractor in writing; and

.2 assignment is subject to the prior rights of the Redacted if any, obligated under Redac relating to the Contract.

**5.4.2** Upon such assignment, if the Work has been suspended for more than 30 days, the Subcontractor's compensation shall be equitably adjusted for increases in cost resulting from the suspension.

## ARTICLE 6 CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

### 6.1 OWNER'S RIGHT TO PERFORM CONSTRUCTION AND TO AWARD SEPARATE CONTRACTS

**6.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these Redacted Redacted . If the Contractor claims that delay or additional cost is involved because of such action by the Owner, the Contractor shall make such Claim as provided in Paragraph 4.3.

**6.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Contractor" in the Contract Documents in each case shall mean the Contractor who executes each separate Owner-Contractor Agreement.

**6.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor, who shall cooperate with them. The Contractor shall participate with other separate contractors and the Owner in reviewing their construction schedules when directed to do so. The Contractor shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Contractor, separate contractors and the Other until subsequently revised.

**6.1.4** Unless otherwise provided in the Contract Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces, the Owner shall be deemed to be subject to the same obligations and to have the same rights which apply to the Contractor under the Conditions of the Contract, including, without excluding others, those stated in Article 3, this Article 6 and Articles 10, 11 and 12.

### 6.2 MUTUAL RESPONSIBILITY



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**6.2.1**   The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

**6.2.2**   If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Architect apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

**6.2.3**   The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Owner shall be responsible to the Contractor for costs incurred by the Contractor because of delays, improperly timed activities, damage to the Work or defective construction of a separate contractor.

**6.2.4**   The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors as provided in Subparagraph 10.2.5.

**6.2.5**   The Owner and each separate contractor shall have the same responsibilities for cutting and patching as are described for the Contractor in Subparagraph 3.14.

**6.3   OWNER'S RIGHT TO CLEAN UP**

**6.3.1**   If a dispute arises among the Contractor, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and the Architect will allocate the cost among those responsible.

**ARTICLE 7 CHANGES IN THE WORK**

**7.1   GENERAL**

**7.1.1**   Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.

**7.1.2**   A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.

**7.1.3**   Changes in the Work shall be performed under applicable provisions of the Contract Documents, and the Contractor shall proceed promptly, unless otherwise provided in the Change Order, Construction Change Directive or order for a minor change in the Work.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

## 7.2 CHANGE ORDERS

**7.2.1** A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:

 .1 change in the Work;
 .2 the amount of the adjustment, if any, in the Contract Sum; and
 .3 the extent of the adjustment, if any, in the Contract Time.

**7.2.2** Methods used in determining adjustments to the Contract Sum may include those listed in Subparagraph 7.3.3.

## 7.3 CONSTRUCTION CHANGE DIRECTIVES

**7.3.1** A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.

**7.3.2** A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**7.3.3** If the Construction Change Directive provides for an adjustment to the Contract Sum, the adjustment shall be based on one of the following methods:
 .1 mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;
 .2 unit prices stated in the Contract Documents or subsequently agreed upon;
 .3 cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or
 .4 as provided in Subparagraph 7.3.6.

**7.3.4** Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.

**7.3.5** A Construction Change Directive signed by the Contractor indicates the agreement of the Contractor therewith, including adjustment in Contract Sum and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**7.3.6** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Clause 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

Documents, costs for the purposes of this Subparagraph 7.3.6 shall be limited to the following:

  .1 costs of labor, including social security, old age and Redacted ;
     fringe benefits required by agreement or custom, and Redacted
     Redacted ;

  .2 costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

  .3 rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;

  .4 Redacted , permit fees, and sales, use or similar taxes related to the Work; and

  .5 additional costs of supervision and field office personnel directly attributable to the change.

**7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the Contract Sum shall be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**7.3.8** Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, the Architect will make an interim determination for purposes of monthly certification for payment for those costs. That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

**7.3.9** When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

**7.4 MINOR CHANGES IN THE WORK**
**7.4.1** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor. The Contractor shall carry out such written orders promptly.

**ARTICLE 8 TIME**
**8.1 DEFINITIONS**
**8.1.1** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, allotted in the Contract Documents for Substantial Completion of the Work.

**8.1.2** The date of commencement of the Work is the date established in the Agreement.



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**8.1.3** The date of Substantial Completion is the date certified by the Architect in accordance with Paragraph 9.8.

**8.1.4** The term "day" as used in the Contract Documents shall mean calendar day unless otherwise specifically defined.

## 8.2    PROGRESS AND COMPLETION

**8.2.1** Time limits stated in the Contract Documents are of the essence of the Contract. By executing the Agreement the Contractor confirms that the Contract Time is a reasonable period for performing the Work.

**8.2.2** Redacted

Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

**8.2.3** The Contractor shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

## 8.3    DELAYS AND EXTENSIONS OF TIME

**8.3.1** If the Contractor is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or Architect, or of an employee of either, or of a separate contractor employed by the Owner, or by changes ordered in the Work, or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Contractor's control, or by delay authorized by the Owner pending mediation and arbitration, or by other causes which the Architect determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Architect may determine.

**8.3.2** Claims relating to time shall be made in accordance with applicable provisions of Paragraph 4.3.

**8.3.3** This Paragraph 8.3 does not preclude recovery of damages for delay by either party under other provisions of the Contract Documents.

## ARTICLE 9 PAYMENTS AND COMPLETION
### 9.1    CONTRACT SUM

**9.1.1** The Contract Sum is stated in the Agreement and, including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents.

### 9.2    SCHEDULE OF VALUES

**9.2.1** Before the first Application for Payment, the Contractor shall submit to the Architect a schedule of values allocated to various portions of the Work, prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

## 9.3 APPLICATIONS FOR PAYMENT

**9.3.1** At least ten days before the date established for each progress payment, the Contractor shall submit to the Architect an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by such data substantiating the Contractor's right to payment as the Owner or Architect may require, such as copies of requisitions from Subcontractors and material suppliers, and reflecting retainage if provided for in the Contract Documents.

**9.3.1.1** As provided in Subparagraph 7.3.8, such applications may include requests for payment on account of changes in the Work which have been properly authorized by Construction Change Directives, or by interim determinations of the Architect, but not yet included in Change Orders.

**9.3.1.2** Such applications may not include requests for payment for portions of the Work for which the Contractor does not intend to pay to a Subcontractor or material supplier, unless such Work has been performed by others whom the Contractor intends to pay.

**9.3.2** Unless otherwise provided in the Contract Documents, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Contractor with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable<sup>Redacted</sup>, storage and transportation to the site for such materials and equipment stored off the site.

**9.3.3** The Contractor warrants that title to all Work covered by an Application for Payment will pass to the Owner no later than the time of payment. The Contractor further warrants that upon submittal of an Application for Payment all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Contractor's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Contractor, Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment relating to the Work.

## 9.4 CERTIFICATES FOR PAYMENT

**9.4.1** The Architect will, within seven days after receipt of the Contractor's Application for Payment, either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect determines is properly due, or notify the Contractor and Owner in writing of the Architect's reasons for withholding certification in whole or in part as provided in Subparagraph 9.5.1.

**9.4.2** The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on the Architect's evaluation of the Work and the data comprising the Application for Payment, that the Work has progressed to the point indicated

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

This document has been approved and endorsed by The Associated General Contractors of America.



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
**GENERAL CONDITIONS OF THE**
**CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

34

and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, to results of subsequent tests and inspections, to correction of minor deviations from the Contract Documents prior to completion and to specific qualifications expressed by the Architect. The issuance of a Certificate for Payment will further constitute a representation that the Contractor is entitled to payment in the amount certified. However, the issuance of a Certificate for Payment will not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) made examination to ascertain how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.

## 9.5 DECISIONS TO WITHHOLD CERTIFICATION

**9.5.1** The Architect may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the Owner, if in the Architect's opinion the representations to the Owner required by Subparagraph 9.4.2 cannot be made. If the Architect is unable to certify payment in the amount of the Application, the Architect will notify the Contractor and Owner as provided in Subparagraph 9.4.1. If the Contractor and Architect cannot agree on a revised amount, the Architect will promptly issue a Certificate for Payment for the amount for which the Architect is able to make such representations to the Owner. The Architect may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect's opinion to protect the Owner from loss for which the Contractor is responsible, including loss resulting from acts and omissions described in Subparagraph 3.3.2, because of:

.1 defective Work not remedied;

.2 third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Contractor;

.3 failure of the Contractor to make payments properly to Subcontractors or for labor, materials or equipment;

.4 reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

.5 damage to the Owner or another contractor;

.6 reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

.7 persistent failure to carry out the Work in accordance with the Contract Documents.

**9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

## 9.6 PROGRESS PAYMENTS

**9.6.1** After the Architect has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Contract Documents, and shall so notify the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**9.6.2** The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled, reflecting percentages actually retained from payments to the Contractor on account of such Subcontractor's portion of the Work. The Contractor shall, by appropriate agreement with each Subcontractor, require each Subcontractor to make payments to Sub-subcontractors in a similar manner.

**9.6.3** The Architect will, on request, furnish to a Subcontractor, if practicable, information regarding percentages of completion or amounts applied for by the Contractor and action taken thereon by the Architect and Owner on account of portions of the Work done by such Subcontractor.

**9.6.4** Neither the Owner nor Architect shall have an obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law.

**9.6.5** Payment to material suppliers shall be treated in a manner similar to that provided in Subparagraphs 9.6.2, 9.6.3 and 9.6.4.

**9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Contract Documents.

**9.6.7** Unless the Contractor provides the Owner with Redacted in the full penal sum of the Contract Sum, payments received by the Contractor for Work properly performed by Subcontractors and suppliers shall be held by the Contractor for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Contractor, shall create any fiduciary liability or tort liability on the part of the Contractor for breach of trust or shall entitle any person or entity to an award of punitive damages against the Contractor for breach of the requirements of this provision.

## 9.7 FAILURE OF PAYMENT
**9.7.1** If the Architect does not issue a Certificate for Payment, through no fault of the Contractor, within seven days after receipt of the Contractor's Application for Payment, or if the Owner does not pay the Contractor within seven days after the date established in the Contract Documents the amount certified by the Architect or awarded by arbitration, then the Contractor may, upon seven additional days' written notice to the Owner and Architect, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Contractor's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Contract Documents.

## 9.8 SUBSTANTIAL COMPLETION
**9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work for its intended use.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**9.8.2** When the Contractor considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Contractor shall prepare and submit to the Architect a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.

**9.8.3** Upon receipt of the Contractor's list, the Architect will make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Architect's inspection discloses any item, whether or not included on the Contractor's list, which is not sufficiently complete in accordance with the Contract Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Contractor shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Architect. In such case, the Contractor shall then submit a request for another inspection by the Architect to determine Substantial Completion.

**9.8.4** When the Work or designated portion thereof is substantially complete, the Architect will prepare a Certificate of Substantial Completion which shall establish the date of Substantial Completion, shall establish responsibilities of the Owner and Contractor for security, maintenance, heat, utilities, damage to the Work and Redacted , and shall fix the time within which the Contractor shall finish all items on the list accompanying the Certificate. Warranties required by the Contract Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

**9.8.5** The Certificate of Substantial Completion shall be submitted to the Owner and Contractor for their written acceptance of responsibilities assigned to them in such Certificate. Upon such acceptance and consent of Redacte, if any, the Owner shall make payment of retainage applying to such Work or designated portion thereof. Such payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Contract Documents.

## 9.9 PARTIAL OCCUPANCY OR USE
**9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor, provided such occupancy or use is consented to by the Redacted as required under Clause 11.4.1.5 and authorized by public authorities having jurisdiction over the Work. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Contractor have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and Redacted ;, and have agreed in writing concerning the period for correction of the Work and commencement of warranties required by the Contract Documents. When the Contractor considers a portion substantially complete, the Contractor shall prepare and submit a list to the Architect as provided under Subparagraph 9.8.2. Consent of the Contractor to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Contractor or, if no agreement is reached, by decision of the Architect.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

**AIA DOCUMENT A201 - 1997 GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**9.9.2**  Immediately prior to such partial occupancy or use, the Owner, Contractor and Architect shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**9.9.3**  Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Contract Documents.

### 9.10  FINAL COMPLETION AND FINAL PAYMENT

**9.10.1**  Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work has been completed in accordance with terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. The Architect's final Certificate for Payment will constitute a further representation that conditions listed in Subparagraph 9.10.2 as precedent to the Contractor's being entitled to final payment have been fulfilled.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

**9.10.2**  Neither final payment nor any remaining retained percentage shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) Redacted Redacted

*This document has been approved and endorsed by The Associated General Contractors of America.*

Redacted            (3) Redacted

(4) consent of Redacted, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. If a Subcontractor refuses to furnish a release or waiver required by the Owner, the Contractor may furnish a Redacted satisfactory to the Owner to indemnify the Owner against such lien. If such lien remains unsatisfied after payments are made, the Contractor shall refund to the Owner all money that the Owner may be compelled to pay in discharging such lien, including all costs and reasonable attorneys' fees.

**9.10.3**  If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Contractor or by issuance of Change Orders affecting final completion, and the Architect so confirms, the Owner shall, upon application by the Contractor and certification by the Architect, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Contract Documents, and if Redacted have been furnished, the written consent of Redacted to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

.1 liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;

.2 failure of the Work to comply with the requirements of the Contract Documents; or

.3 terms of special warranties required by the Contract Documents.

**9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10 PROTECTION OF PERSONS AND PROPERTY
### 10.1 SAFETY PRECAUTIONS AND PROGRAMS
**10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### 10.2 SAFETY OF PERSONS AND PROPERTY
**10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

.1 employees on the Work and other persons who may be affected thereby;

.2 the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

.3 other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss Redacted                                    required by the Contract Documents) to property referred to in Clauses 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Clauses

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 3.18.

**10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

## 10.3 HAZARDOUS MATERIALS

**10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

**10.3.2** The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

**10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Subparagraph 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
**GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

**10.4**  The Owner shall not be responsible under Paragraph 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

**10.5**  If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

## 10.6  EMERGENCIES
**10.6.1**  In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or extension of time claimed by the Contractor on account of an emergency shall be determined as provided in Paragraph 4.3 and Article 7.

### ARTICLE 11 Redacted
Redacted

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT 0401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Redacted

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation.of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

Redacted

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Redacted

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.

**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

Redacted

THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.

This document has been approved and
endorsed by The Associated General
Contractors of America.

## ARTICLE 12 UNCOVERING AND CORRECTION OF WORK

### 12.1 UNCOVERING OF WORK

**12.1.1** If a portion of the Work is covered contrary to the Architect's request or to requirements specifically expressed in the Contract Documents, it must, if required in writing by the Architect, be uncovered for the Architect's examination and be replaced at the Contractor's expense without change in the Contract Time.

**12.1.2** If a portion of the Work has been covered which the Architect has not specifically requested to examine prior to its being covered, the Architect may request to see such Work and it shall be uncovered by the Contractor. If such Work is in accordance with the Contract Documents, costs of uncovering and replacement shall, by appropriate Change Order, be at the Owner's expense. If such Work is not in accordance with the Contract Documents, correction shall be at the Contractor's expense unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs.

### 12.2 CORRECTION OF WORK

### 12.2.1 BEFORE OR AFTER SUBSTANTIAL COMPLETION

**12.2.1.1** The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections and compensation for the Architect's services and expenses made necessary thereby, shall be at the Contractor's expense.

### 12.2.2 AFTER SUBSTANTIAL COMPLETION

**12.2.2.1** In addition to the Contractor's obligations under Paragraph 3.5, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Subparagraph 9.9.1, or by terms of an applicable special warranty required by the Contract Documents, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. The Owner shall



©1997 AIA®
© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

give such notice promptly after discovery of the condition. During the one-year period for correction of Work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If the Contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Paragraph 2.4.

**12.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual performance of the Work.

**12.2.2.3** The one-year period for correction of Work shall not be extended by corrective Work performed by the Contractor pursuant to this Paragraph 12.2.

**12.2.3** The Contractor shall remove from the site portions of the Work which are not in accordance with the requirements of the Contract Documents and are neither corrected by the Contractor nor accepted by the Owner.

**12.2.4** The Contractor shall bear the cost of correcting destroyed or damaged construction, whether completed or partially completed, of the Owner or separate contractors caused by the Contractor's correction or removal of Work which is not in accordance with the requirements of the Contract Documents.

**12.2.5** Nothing contained in this Paragraph 12.2 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the one-year period for correction of Work as described in Subparagraph 12.2.2 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

## 12.3 ACCEPTANCE OF NONCONFORMING WORK
**12.3.1** If the Owner prefers to accept Work which is not in accordance with the requirements of the Contract Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

## ARTICLE 13 MISCELLANEOUS PROVISIONS
### 13.1 GOVERNING LAW
**13.1.1** The Contract shall be governed by the law of the place where the Project is located.

### 13.2 SUCCESSORS AND ASSIGNS
**13.2.1** The Owner and Contractor respectively bind themselves, their partners, successors, assigns and legal representatives to the other party hereto and to partners, successors, assigns and legal representatives of such other party in respect to covenants, agreements and obligations contained in the Contract Documents. Except as provided in Subparagraph 13.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**13.2.2** The Owner may, without consent of the Contractor, assign the Contract to an institutional lender providing construction financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under the Contract Documents. The Contractor shall execute all consents reasonably required to facilitate such assignment.

## 13.3 WRITTEN NOTICE
**13.3.1** Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice.

## 13.4 RIGHTS AND REMEDIES
**13.4.1** Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**13.4.2** No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

## 13.5 TESTS AND INSPECTIONS
**13.5.1** Tests, inspections and approvals of portions of the Work required by the Contract Documents or by laws, ordinances, rules, regulations or orders of public authorities having jurisdiction shall be made at an appropriate time. Unless otherwise provided, the Contractor shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Contractor shall give the Architect timely notice of when and where tests and inspections are to be made so that the Architect may be present for such procedures. The Owner shall bear costs of tests, inspections or approvals which do not become requirements until after bids are received or negotiations concluded.

**13.5.2** If the Architect, Owner or public authorities having jurisdiction determine that portions of the Work require additional testing, inspection or approval not included under Subparagraph 13.5.1, the Architect will, upon written authorization from the Owner, instruct the Contractor to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Contractor shall give timely notice to the Architect of when and where tests and inspections are to be made so that the Architect may be present for such procedures. Such costs, except as provided in Subparagraph 13.5.3, shall be at the Owner's expense.

**13.5.3** If such procedures for testing, inspection or approval under Subparagraphs 13.5.1 and 13.5.2 reveal failure of the portions of the Work to comply with requirements established by the Contract Documents, all costs made necessary by such failure including those of

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

repeated procedures and compensation for the Architect's services and expenses shall be at the Contractor's expense.

**13.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Contract Documents, be secured by the Contractor and promptly delivered to the Architect.

**13.5.5** If the Architect is to observe tests, inspections or approvals required by the Contract Documents, the Architect will do so promptly and, where practicable, at the normal place of testing.

**13.5.6** Tests or inspections conducted pursuant to the Contract Documents shall be made promptly to avoid unreasonable delay in the Work.

**13.6 INTEREST**

**13.6.1** Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.

**13.7 COMMENCEMENT OF STATUTORY LIMITATION PERIOD**

**13.7.1** As between the Owner and Contractor:

   **.1 Before Substantial Completion.** As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

   **.2 Between Substantial Completion and Final Certificate for Payment.** As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment; and

   **.3 After Final Certificate for Payment.** As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty provided under Paragraph 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Paragraph 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.

**ARTICLE 14 TERMINATION OR SUSPENSION OF THE CONTRACT**

   **14.1 TERMINATION BY THE CONTRACTOR**

   **14.1.1** The Contractor may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, for any of the following reasons:



*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*

© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

.1 issuance of an order of a court or other public authority having jurisdiction which requires all Work to be stopped;

.2 an act of government, such as a declaration of national emergency which requires all Work to be stopped;

.3 because the Architect has not issued a Certificate for Payment and has not notified the Contractor of the reason for withholding certification as provided in Subparagraph 9.4.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Contract Documents; or

.4 the Owner has failed to furnish to the Contractor promptly, upon the Contractor's request, reasonable evidence as required by Subparagraph 2.2.1.

**14.1.2** The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Paragraph 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

**14.1.3** If one of the reasons described in Subparagraph 14.1.1 or 14.1.2 exists, the Contractor may, upon seven days' written notice to the Owner and Architect, terminate the Contract and recover from the Owner payment for Work executed and for proven loss with respect to materials, equipment, tools, and construction equipment and machinery, including reasonable overhead, profit and damages.

*This document has been approved and endorsed by The Associated General Contractors of America.*

**14.1.4** If the Work is stopped for a period of 60 consecutive days through no act or fault of the Contractor or a Subcontractor or their agents or employees or any other persons performing portions of the Work under contract with the Contractor because the Owner has persistently failed to fulfill the Owner's obligations under the Contract Documents with respect to matters important to the progress of the Work, the Contractor may, upon seven additional days' written notice to the Owner and the Architect, terminate the Contract and recover from the Owner as provided in Subparagraph 14.1.3.

**14.2 TERMINATION BY THE OWNER FOR CAUSE**

**14.2.1** The Owner may terminate the Contract if the Contractor:

.1 persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials;

.2 fails to make payment to Subcontractors for materials or labor in accordance with the respective agreements between the Contractor and the Subcontractors;

.3 persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction; or

.4 otherwise is guilty of substantial breach of a provision of the Contract Documents.

**14.2.2** When any of the above reasons exist, the Owner, upon certification by the Architect that sufficient cause exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's Redacted if any, seven days' written notice, terminate employment of the Contractor and may, subject to any prior rights of Redacted :



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
**GENERAL CONDITIONS OF THE**
**CONTRACT FOR CONSTRUCTION**

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

 **.1** take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Contractor;

 **.2** accept assignment of subcontracts pursuant to Paragraph 5.4; and

 **.3** finish the Work by whatever reasonable method the Owner may deem expedient. Upon request of the Contractor, the Owner shall furnish to the Contractor a detailed accounting of the costs incurred by the Owner in finishing the Work.

**14.2.3** When the Owner terminates the Contract for one of the reasons stated in Subparagraph 14.2.1, the Contractor shall not be entitled to receive further payment until the Work is finished.

**14.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work, including compensation for the Architect's services and expenses made necessary thereby, and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Contractor. If such costs and damages exceed the unpaid balance, the Contractor shall pay the difference to the Owner. The amount to be paid to the Contractor or Owner, as the case may be, shall be certified by the Architect, upon application, and this obligation for payment shall survive termination of the Contract.

## 14.3 SUSPENSION BY THE OWNER FOR CONVENIENCE

**14.3.1** The Owner may, without cause, order the Contractor in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**14.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Subparagraph 14.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent:

 **.1** that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Contractor is responsible; or

 **.2** that an equitable adjustment is made or denied under another provision of the Contract.

## 14.4 TERMINATION BY THE OWNER FOR CONVENIENCE

**14.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**14.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Contractor shall:

 **.1** cease operations as directed by the Owner in the notice;

 **.2** take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and

 **.3** except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing subcontracts and purchase orders and enter into no further subcontracts and purchase orders.

**14.4.3** In case of such termination for the Owner's convenience, the Contractor shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

*THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401.*

*This document has been approved and endorsed by The Associated General Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
AIA DOCUMENT A201 - 1997
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

*THIS DOCUMENT HAS IMPORTANT
LEGAL CONSEQUENCES.
CONSULTATION WITH AN
ATTORNEY IS ENCOURAGED WITH
RESPECT TO ITS COMPLETION OR
MODIFICATION. AUTHENTICATION
OF THIS ELECTRONICALLY
DRAFTED AIA DOCUMENT MAY BE
MADE BY USING AIA DOCUMENT
D401.*

*This document has been approved and
endorsed by The Associated General
Contractors of America.*



© Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, 1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violate to legal prosecution. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced in accordance with your license without violation until the date of expiration as noted below.
**This document is not an original AIA® Contract Document, but a reproduction produced by AIA® Contract Documents software for administrative purposes only and is not for other use or resale.**

©1997 AIA®
**AIA DOCUMENT A201 - 1997**
GENERAL CONDITIONS OF THE
CONTRACT FOR CONSTRUCTION

The American Institute of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

# APPENDIX H

Filed
12 October 1 P4:20
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-10-002325

CAUSE NO. D-1-GN-10-002325

| | | |
|---|---|---|
| RLJ II-C AUSTIN AIR, LP; RLJ II-C AUSTIN AIR LESSEE, LP; AND RLJ LODGING FUND II ACQUISITIONS, LLC, | § § § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiffs/Counter-Defendants,* | § § | |
| vs. | § § | TRAVIS COUNTY, TEXAS |
| EBCO GENERAL CONTRACTOR, LTD; EBCO ADVANCED BUILDING SYSTEM, LTD; EBCO/WARRIOR MANAGEMENT LLC; ELNESS, SWENSON, GRAHAM ARCHITECTS, INC.; MARK G. SWENSON, INDIVIDUALLY, TERRACON CONSULTANTS, INC.; TODD E. SWOBODA, P.E., INDIVIDUALLY; MBA STRUCTURAL ENGINEERS AND ANDREW T. MARLIN, P.E. INDIVIDUALLY, | § § § § § § § § § § § § § § § | |
| *Defendants/Counter-Claimants.* | § | 200 TH JUDICIAL DISTRICT |

---

**ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S
SECOND AMENDED ANSWER AND ORIGINAL COUNTERCLAIM
FOR DECLARATORY JUDGMENT**

---

TO THE HONORABLE COURT:

COME NOW, Defendants and Counter-Claimants Elness, Swenson, Graham Architects, Inc. ("ESG") and Mark G. Swenson ("Swenson" and, together with ESG, collectively, "Defendants" or "Counter-Claimants") and file and serve this Second Amended Answer and Original Counterclaim for Declaratory Judgment in response to Plaintiffs' Sixth Amended Original Petition and, in support thereof, would respectfully show the Court as follows:

---

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 1
599603.1  402/122

46

# I.

## SECOND AMENDED ANSWER

### A. GENERAL DENIAL

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Defendants generally deny each and every, all and singular, the assertions alleged in Plaintiffs' Sixth Amended Original Petition and any amendments thereto and request that Plaintiffs be required to prove the charges and allegations against these Defendants by a preponderance of the evidence and/or by clear and convincing evidence, as required by the Constitution and the Laws of the State of Texas.

### B. SPECIFIC DENIAL

Pursuant to Rule 54 of the Texas Rules of Civil Procedure, Defendants specifically deny that all conditions precedent to the Plaintiffs' right to recover have been performed, have occurred, or have been waived or excused. In particular, Defendants specifically deny that Plaintiffs have presented their claims for payment to Defendants or Defendants' duly authorized agents as required by Section 38.002(2) of the Texas Civil Practice & Remedies Code.

### C. VERIFIED DENIALS

Pursuant to Rule 93 of the Texas Rules of Civil Procedure, Defendants make the following verified denials:

1. Defendants deny the assignment of the contract upon which Plaintiffs' claims against Defendants are founded. Specifically, Defendants deny that Defendants or Defendants' authorized representative(s) provided consent to assign the contract at issue to Plaintiffs. Therefore, any alleged assignment violates the anti-assignment clause of the contract and is null and void.

2. Defendants deny that Plaintiffs are entitled to recover in the capacity in which they sue. Defendants did not provide consent to assign the contract upon which Plaintiffs' claims are founded, and any such assignment is, therefore, made in violation of the anti-assignment. As such, Plaintiffs are not parties to the contract and lack standing to bring contract claims against Defendants.

3. Defendants deny that Swenson is liable in the capacity in which he has been sued. In particular, Swenson is not a signatory or a party to the contract upon which Plaintiffs' claims against Defendants are founded.

4. Defendants incorporate by reference herein the sworn verification of Paul Mittendorff, a Principal and Vice President of Elness, Swenson, Graham Architects, Inc., which is attached to Defendants' First Amended Answer and Original Counterclaim for Declaratory Judgment filed with the Court on or about December 30, 2011.

## D. AFFIRMATIVE DEFENSES

Pleading in the affirmative, if such is necessary, Defendants would further show as follows:

1. Plaintiffs' alleged injuries and damages, if any, resulted, if at all, from conditions unrelated to any act, omission or conduct of Defendants.

2. Plaintiffs' alleged injuries and damages, if any, were caused, if at all, in whole or in part by the acts or omissions of others for whose conduct Defendants are not legally responsible.

3. At all times material to Plaintiffs' allegations, Defendants' conduct conformed to the applicable standard of care.

4. Plaintiffs' tort claims are barred in whole or in part, by the economic loss rule.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 3**
599603.1  402/122

48

5.      Alternatively, if the economic loss rule does not completely bar all of Plaintiffs' tort claims, then, pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code, Defendants are entitled to a credit for any settlement Plaintiffs receive from any other person or entity. If Plaintiffs settle with any other person or entity, then Defendants reserve the right to make a written election of credit for settlement under §33.014 of the Texas Civil Practice and Remedies Code.

6.      Alternatively, if the economic loss rule does not completely bar all of Plaintiffs' tort claims, then, Plaintiffs' alleged injuries and damages, if any, were caused, if at all, in whole or in part, by Plaintiffs' own negligence. Plaintiffs are wholly barred from recovery to the extent the finder-of-fact determines Plaintiffs' comparative responsibility is 50% or greater, and, if Plaintiffs' comparative responsibility is less than 50%, any recovery must be reduced by Plaintiffs' percentage of responsibility determined by the finder-of-fact, in accordance with Chapter 33 of the Texas Civil Practice & Remedies Code.

7.      Plaintiffs cannot recover for any amount that could have been avoided by their exercise of reasonable care.

8.      Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate any alleged damages.

9.      Plaintiffs' alleged injuries and damages, if any, resulted, if at all, from independent, unforeseeable, intervening and/or superseding causes. Any alleged action or omission on the part of Defendants was not the proximate cause, producing cause, or cause-in-fact of Plaintiffs' alleged injuries or damages, if any.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 4**
599603.1  402/122

49

10. Defendants assert any and all defenses and seek any and all relief to which Defendants may be entitled in accordance with and pursuant to Chapter 150 of the Texas Civil Practice and Remedies Code.

11. Plaintiffs lack standing to sue on and are not parties to the contract on which Plaintiffs' claims against Defendants are founded. Assignment of the contract to Plaintiffs was made without consent of Defendants, in violation of the anti-assignment clause of the contract.

12. Plaintiffs' non-contract claims are barred by the appropriate statute of limitations.

13. Plaintiffs' non-contract claims, including claims for equitable subrogation, are barred by the economic loss doctrine.

14. Plaintiffs' recovery, if any, is limited to direct contract damages, if any, pursuant to the waiver of consequential damages clause in the contract upon which Plaintiffs' claims against Defendants are founded. More specifically, Plaintiffs' claims for current and future lost revenue, profits and diminution in value are barred by the consequential damages clause of the contract.

15. Plaintiffs' claims are barred against Defendants because Plaintiffs purchased the building in question "as is."

16. Defendants reserve the right to amend or supplement with any additional affirmative defenses or pleas of avoidance to which Defendants may be entitled.

**II.**

**COUNTERCLAIM FOR DECLARATORY JUDGMENT**

A. **INTRODUCTION**

1. Now as Counter-Claimants, ESG and Swenson bring this action pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001, *et. seq.*, the Uniform Declaratory Judgments Act, and seek a

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 5**
599603.1  402/122

50

declaration from the Court that RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC (collectively, "Counter-Defendants") may not recover contract damages under the contract at issue in this case.

2. As provided for by Chapter 37 of the Texas Civil Practice and Remedies Code, Counter-Claimants seek the following declarations from the Court:

a. That the "Anti-Assignment" clause of the contract is valid, enforceable and applies to Counter-Plaintiffs, making any ostensible assignment of the contract, in violation of the Anti-Assignment clause, null and void and of no effect;

b. That the "Statute of Limitations Accrual" clause of the contract is valid and enforceable and, to the effect that a party could enforce the contract against Counter-Claimants, such Statute of Limitations Accrual clause establishes the date upon which any cause of action against Counter-Claimants accrues, i.e., the date that Counter-Claimants' services were substantially completed, which such date time-bars all of Counter-Defendants' causes of action with a two-year limitations period;

c. That the "Waiver of Consequential Damages" clause of the Contract is valid and enforceable and, to the effect that a party could enforce the contract against Counter-Claimants, such Waiver of Consequential Damages clause bars Counter-Defendants from recovering any consequential damages from Counter-Claimants; and

d. That Swenson was not a signatory or a party to the contract at issue here and, as such, cannot be liable to the Counter-Defendants under the contract.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 6
599603.1   402/122

51

**B. DISCOVERY CONTROL PLAN**

Discovery in this action is intended to be conducted under a Level 3 Discovery Control Order pursuant to Texas Rule of Civil Procedure 190.3.

**C. PARTIES**

1.     ESG is a Minnesota corporation that is authorized to do business in Texas. ESG has made an appearance in this matter.

2.     Swenson is an individual who is a citizen of Minnesota and who has already appeared in this lawsuit.

3.     RLJ II-C Austin Air, LP ("RLJ II-C Austin Air") is a Delaware Limited Liability Company that is authorized to do business in Texas. RLJ II-C Austin Air has already appeared in this matter.

4.     RLJ II-C Austin Air Lessee, LP ("RLJ II-C Austin Air Lessee") is a Delaware Limited Partnership that is authorized to do business in Texas. RLJ II-C Austin Air Lessee has already made an appearance in this matter.

5.     RLJ Lodging Fund II Acquisitions, LLC ("RLJ Lodging") is a Delaware Limited Liability Company that is, upon information and belief, authorized to do business in Texas. RLJ Lodging has already appeared in this matter.

**D. JURISDICTION AND VENUE**

1.     The subject matter of this declaratory judgment action is within the jurisdiction of this Court and is authorized pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003.

2.     Pursuant to section 15.062(a) of the Texas Civil Practice and Remedies Code, venue is proper in Travis County, Texas.

## E.   FACTUAL BACKGROUND

1.   On or about January 1, 2005, White Lodging Services Corporation, Inc. ("White Lodging") and ESG entered into an agreement for architect services, as set forth in the following contracts: (i) AIA Document B141 – 1997 Part 1: Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services (the "Contract – 1997 Part 1"), attached hereto as **Exhibit "1;"** and (ii) AIA Document B141 – 1997 Part 2: Standard Form of Architect's Services: Design and Contract Administration (the "Contract – 1997 Part 2"), attached hereto as **Exhibit "2."**

2.   The Contract – 1997 Part 1 and the Contract – 1997 Part 2 (collectively, the "Contract") were both executed on March 30, 2005. The Contract was not signed by Swenson in either his individual or representative capacity.

3.   Section 1.3.7.9 of the Contract contains an Anti-Assignment clause, wherein "[n]either [White Lodging] nor [ESG] shall assign this Agreement without the written consent of the other, except that [White Lodging] may assign this Agreement to an institutional lender providing financing on the Project."

4.   Section 1.3.6 of the Contract contains a Waiver of Consequential Damages clause, under which both ESG and White Lodging "waive consequential damages for claims, disputes, or other matters in question arising out of or relating to this [Contract]."

5.   Section 1.3.7.3 of the Contract contains a clause commonly known as a "Statute of Limitations Accrual" clause, which provides the method to determine when a cause of action accrues for the purpose of starting the statute of limitations. Specifically, section 1.3.7.3 reads as follows:

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 8**
599603.1  402/122

53

Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statute of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. ***In no event shall such statute of limitations commence to run any later than the date when the Architect's services are substantially completed***.

(Emphasis added).

6. On or about March 16, 2006 White Lodging, *et al.* and Counter-Defendants entered into an agreement entitled *New Hotels Purchase and Sale Agreement by and between Whiteco Industries, Inc. and RLJ Lodging Fund II Acquisitions, LLC*, (the "New Hotels Purchase and Sale Agreement"), through which Counter-Defendants claim that the Contract was assigned to them.

7. ESG did not consent to an assignment of the Contract from White Lodging to Counter-Defendants, allegedly effectuated through the New Hotels Purchase and Sale Agreement.

8. ESG's services were substantially complete before the date the Certificate of Occupancy was issued for the Project, which was on October 12, 2006. Therefore, any causes of action against Counter-Claimants accrued, if at all, no later than October 12, 2006.

9. Counter-Defendants initiated this lawsuit and filed Plaintiffs' Original Petition and Request for Disclosure on July 7, 2010. Therefore, the negligence, negligent misrepresentation and equitable subrogation causes of action asserted by Counter-Defendants, each of which are governed by a two-year limitations period, are time-barred by the statute of limitations.

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 9**
599603.1  402/122

54

10. Counter-Defendants seek recovery from Counter-Claimants for, among other things, diminution in the Project's value, lost revenue and other consequential damages, which such recovery is barred by the Waiver of Consequential Damages clause in the Contract.

F. **CAUSE OF ACTION: APPLICATION FOR DECLARATORY RELIEF.**

1. Counter-Claimants incorporate by reference paragraphs II.A.1 through and including II.E.10 above as if fully set forth verbatim herein.

2. There exists an actual and justiciable controversy between Counter-Claimants and Counter-Defendants herein, within the jurisdiction of this Court, and involving rights, duties, legal obligations and relations of the parties under the Contract at issue.

3. Counter-Claimants petition this Court, pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, to declare that:

a. the Anti-Assignment clause of the Contract is valid, enforceable and applies to Counter-Plaintiffs, making the assignment of the Contract, which was in violation of the Anti-Assignment clause, null and void and of no effect;

b. the Statute of Limitations Accrual clause of the Contract is valid and enforceable and establishes the date upon which any cause of action against ESG accrued was on or before October 12, 2006, which is the latest date by which ESGs' services were substantially completed;

c. that all of Counter-Defendants' causes of action against ESG with a two-year limitations period are time-barred;

**ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 10**
599603.1  402/122

55

d.     the Waiver of Consequential Damages clause of the Contract is valid and enforceable and bars Counter-Defendants from recovering any consequential damages from Counter-Claimants; and

e.     Swenson was not a signatory or a party to the Contract and cannot be liable to the Counter-Defendants under such Contract.

## G.     COSTS AND ATTORNEYS' FEES

Counter-Claimants have retained the undersigned law firm to represent them in this action and have agreed to pay the firm all costs and reasonable and necessary attorneys' fees incurred in this matter. An award of costs and reasonable and necessary attorney's fees to Counter-Claimants is equitable and just and, therefore, authorized by Chapter 37 of the Texas Civil Practice and Remedies Code.

## III.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants and Counter-Claimants Elness, Swenson, Graham Architects, Inc. and Mark G. Swenson respectfully request that Plaintiffs and Counter-Defendants RLJ II-C Austin Air, LP; RLJ II-C Austin Air Lessee, LP; and RLJ Lodging Fund II Acquisitions, LLC be cited to appear and answer herein and that, on final hearing, the Court enter an Order as follows:

a.     That Plaintiffs and Counter-Defendants take nothing by their claims;

b.     A declaration that the assignment of the Contract to Plaintiffs and Counter-Defendants was made in violation of the Anti-Assignment clause, is null and void

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – **Page 11**
599603.1  402/122

56

and of no effect, and Defendants and Counter-Claimants are not liable to Plaintiffs and Counter-Defendants under such Contract;

c.  A declaration that Plaintiffs and Counter-Defendants' claims against ESG are time-barred, pursuant to the Statute of Limitations Accrual clause of the Contract;

d.  A declaration that Swenson was not a signatory or party to the Contract and cannot be liable to Plaintiffs and Counter-Defendants under the Contract;

e.  That Counter-Claimants be awarded their costs and all reasonable and necessary attorneys' fees; and

f.  All such other and further relief, both general and special, at law or in equity, to which Defendants and Counter-Claimants have shown themselves to be justly entitled.

**ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 12**
599603.1   402/122

57

Respectfully submitted,

**MACDONALD DEVIN, P.C.**

By: _____
  **Gregory N. Ziegler**
  State Bar No. 00791985
  gziegler@macdonalddevin.com
  **Russell E. Clinage**
  State Bar No. 00790473
  rclinage@macdonalddevin.com

  3800 Renaissance Tower
  1201 Elm Street
  Dallas, Texas 75270-2130
  (214) 744-3300 Telephone
  (214) 747-0942 Facsimile

  **ATTORNEYS FOR DEFENDANTS AND
  COUNTER-CLAIMANTS ELNESS,
  SWENSON, GRAHAM ARCHITECTS, INC.
  AND MARK G. SWENSON**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon all counsel of record in accordance with the Texas Rules of Civil Procedure, on this 1st day of October 2012.

_____
Gregory N. Ziegler

ELNESS, SWENSON, GRAHAM ARCHITECTS, INC. AND MARK G. SWENSON'S SECOND AMENDED
ANSWER AND ORIGINAL COUNTERCLAIM FOR DECLARATORY JUDGMENT – Page 13
599603.1 402/122

58

*205302.00*     *15.1*

# ⬛AIA® Document B141™ – 1997 Part 1

**Standard Form of Agreement Between Owner and Architect**
*with Standard Form of Architect's Services*

## TABLE OF ARTICLES

1.1   INITIAL INFORMATION

1.2   RESPONSIBILITIES OF THE PARTIES

1.3   TERMS AND CONDITIONS

1.4   SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS

1.5   COMPENSATION

AGREEMENT made as of the First day of January in the year Two Thousand Five.
*(In words, indicate day, month and year)*

BETWEEN the Architect's client identified as the Owner:
*(Name, address and other information)*

White Lodging Services Corporation, Inc.
1000 East 80th Place, Suite 500 North
Merrilville, IN 46410-5666

and the Architect:
*(Name, address and other information)*

Elness Swenson Graham Architects, Inc.
500 Washington Avenue South
Minneapolis, MN 55415

*handwritten notes:*
- RCVD 3/28/05
- REVISED From ORIG CONT. 2/1/05
- REVISIONS PER EMAILS DATED 2/22/05 3/01/05 3/25/05

For the following Project:
*(Include detailed description of Project)*

Design, documentation and limited contract administration for the construction of a Courtyard by Marriott in Austin, Texas.

The Owner and Architect agree as follows:

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:

1



SCANNED

SFP 22 2007

EXHIBIT
A

ESG001454

## ARTICLE 1.1 INITIAL INFORMATION

**§ 1.1.1** This Agreement is based on the following information and assumptions.
*(Note the disposition for the following items by inserting the requested information or a statement such as "not applicable," "unknown at time of execution" or "to be determined later by mutual agreement.")*

**§ 1.1.2 PROJECT PARAMETERS**
**§ 1.1.2.1** The objective or use is:
*(Identify or describe, if appropriate, proposed use or goals.)*

A Courtyard by Marriott - a limited-service, prototypical hotel.

**§ 1.1.2.2** The physical parameters are:
*(Identify or describe, if appropriate, size, location, dimensions, or other pertinent information, such as geotechnical reports about the site.)*

**§ 1.1.2.3** The Owner's Program is:
*(Identify documentation or state the manner in which the program will be developed.)*

The hotel program calls for a five-story building. The project will contain 148 guestrooms and the other prototypical Courtyard Hotel functions - a lobby/lounge, dining, kitchen, a reception desk with sundries display area and offices, meeting space, swimming pool and whirlpool, exercise room, back-of-house storage, laundry, mechanical and electrical spaces and a guest laundry floor. Further definition of the Project Program is contained in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A" with further clarification contained in Elness Swenson Graham Architects' schematic design documents dated January 28, 2005, which are attached by reference as "Exhibit B."

**§ 1.1.2.4** The legal parameters are:
*(Identify pertinent legal information, including, if appropriate, land surveys and legal descriptions and restrictions of the site.)*

Legal Description of Property:
Lot 5-D, Block C, RESUBDIVISION OF LOTS 4 AND 5, BLOCK C, METRO CENTRE SECTION 5, a subdivision in Austin, Travis County, Texas, according to the map or plat thereof recorded as Document 199900265 in the Plats Records of Travis County, Texas.

**§ 1.1.2.5** The financial parameters are as follows.
.1      Amount of the Owner's overall budget for the Project, including the Architect's compensation, is: $48,000 per room or $7,000,000.     OK
.2      Amount of the Owner's budget for the Cost of the Work, excluding the Architect's compensation, is:     HB
            unknown at time of execution of this Agreement

**§ 1.1.2.6** The time parameters are:
*(Identify, if appropriate, milestone dates, durations or fast track scheduling.)*

The following Milestone Dates are the same as those listed in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A," and herein reproduced:

| | | |
|---|---|---|
| January 28, 2005 | - | 30% Design Documents Check Set |
| March 11, 2005 - | | 75% Design Documents Check Set |
| April 25, 2005 | - | 99% Contract Documents; Foundation Building Permit |

OK HB

**§ 1.1.2.7** The proposed procurement or delivery method for the Project is:
*(Identify method such as competitive bid, negotiated contract, or construction management.)*

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:22:19 on 06/29/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                                (3868894002)

2

SCANNED

SEP 22 2007

ESG001455

| Negotiated Contract.

**§ 1.1.2.8 Other parameters are:**
*(Identify special characteristics or needs of the Project such as energy, environmental or historic preservation requirements.)*

**§ 1.1.3 PROJECT TEAM**
**§ 1.1.3.1 The Owner's Designated Representative is:**
*(List name, address and other information.)*

Trent Barber
White Lodging Services Corporation, Inc,
1000 East 80th Place, Suite 500 North
Merrilville, IN 46410-5666

**§ 1.1.3.2 The persons or entities, in addition to the Owner's Designated Representative, who are required to review the Architect's submittals to the Owner are:**
*(List name, address and other information.)*

Marriott International
Marriott Drive
Washington, D.C. 20058

**§ 1.1.3.3 The Owner's other consultants and contractors are:**
*(List discipline and, if known, identify them by name and address.)*

CIVIL ENGINEER:
Griffin Engineering Group, Inc.
11711 North Lamar Boulevard
Austin, TX 78753

**§ 1.1.3.4 The Architect's Designated Representative is:**
*(List name, address and other information.)*

Mark Swenson, AIA
Paul Mittendorff, AIA
James Timm, AIA
Elness Swenson Graham Architects, Inc,
500 Washington Avenue South
Minneapolis, MN 55415

**§ 1.1.3.5 The consultants retained at the Architect's expense are:**
*(List discipline and, if known, identify them by name and address.)*

STRUCTURAL ENGINEERING:
Keith Owens, P.E.
Marlin, Bridges & Associates, Inc.
3620 Eighth Avenue South, Suite 110
Birmingham, AL 35222

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3858894002)

3

SCANNED

SEP 22 2007

ESG001456

MECHANICAL, ELECTRICAL ENGINEERING:
Larry Lindsey, P.E.
Lindsey Engineers, Inc.
7703 Brodie Lane
Austin, TX 78745

§ 1.1.4 Other important initial information is:


§ 1.1.5 When the services under this Agreement include contract administration services, the General Conditions of the Contract for Construction shall be the edition of AIA Document A201 current as of the date of this Agreement, or as follows:


§ 1.1.6 The information contained in this Article 1.1 may be reasonably relied upon by the Owner and Architect in determining the Architect's compensation. Both parties, however, recognize that such information may change and, in that event, the Owner and the Architect shall negotiate appropriate adjustments in schedule, compensation and Change in Services in accordance with Section 1.3.3.

## ARTICLE 1.2  RESPONSIBILITIES OF THE PARTIES
§ 1.2.1 The Owner and the Architect shall cooperate with one another to fulfill their respective obligations under this Agreement. Both parties shall endeavor to maintain good working relationships among all members of the Project team.

### § 1.2.2 OWNER
§ 1.2.2.1 Unless otherwise provided under this Agreement, the Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

§ 1.2.2.2 The Owner shall periodically update the budget for the Project, including that portion allocated for the Cost of the Work. The Owner shall not significantly increase or decrease the overall budget, the portion of the budget allocated for the Cost of the Work, or contingencies included in the overall budget or a portion of the budget, without the agreement of the Architect to a corresponding change in the Project scope and quality.

§ 1.2.2.3 The Owner's Designated Representative identified in Section 1.1.3 shall be authorized to act on the Owner's behalf with respect to the Project. The Owner or the Owner's Designated Representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

§ 1.2.2.4 The Owner shall furnish the services of consultants other than those designated in Section 1.1.3 or authorize the Architect to furnish them as a Change in Services when such services are requested by the Architect and are reasonably required by the scope of the Project.

§ 1.2.2.5 Unless otherwise provided in this Agreement, the Owner shall furnish tests, inspections and reports required by law or the Contract Documents, such as structural, mechanical, and chemical tests, tests for air and water pollution, and tests for hazardous materials.

§ 1.2.2.6 The Owner shall furnish all legal, insurance and accounting services, including auditing services, that may be reasonably necessary at any time for the Project to meet the Owner's needs and interests.

§ 1.2.2.7 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 09/25/2005 under Order No.1000156203_2 which expires on 2/16/2006, and is not for resale.
User Notes:

4

SCANNED (3656694002)

SEP 22 2007


ESG001457

## § 1.2.3 ARCHITECT

§ 1.2.3.1 The services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Article 1.4.

§ 1.2.3.2 The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which initially shall be consistent with the time periods established in Section 1.1.2.6 and which shall be adjusted, if necessary, as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review, for the performance of the Owner's consultants, and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

§ 1.2.3.3 The Architect's Designated Representative identified in Section 1.1.3 shall be authorized to act on the Architect's behalf with respect to the Project.

§ 1.2.3.4 The Architect shall maintain the confidentiality of information specifically designated as confidential by the Owner, unless withholding such information would violate the law, create the risk of significant harm to the public or prevent the Architect from establishing a claim or defense in an adjudicatory proceeding. The Architect shall require of the Architect's consultants similar agreements to maintain the confidentiality of information specifically designated as confidential by the Owner.

§ 1.2.3.5 Except with the Owner's knowledge and consent, the Architect shall not engage in any activity, or accept any employment, interest or contribution that would reasonably appear to compromise the Architect's professional judgment with respect to this Project.

§ 1.2.3.6 The Architect shall review laws, codes, and regulations applicable to the Architect's services. The Architect shall respond in the design of the Project to requirements imposed by governmental authorities having jurisdiction over the Project.

§ 1.2.3.7 The Architect shall be entitled to rely on the accuracy and completeness of services and information furnished by the Owner. The Architect shall provide prompt written notice to the Owner if the Architect becomes aware of any errors, omissions or inconsistencies in such services or information.

## ARTICLE 1.3 TERMS AND CONDITIONS
### § 1.3.1 COST OF THE WORK

§ 1.3.1.1 The Cost of the Work shall be the total cost or, to the extent the Project is not completed, the estimated cost to the Owner of all elements of the Project designed or specified by the Architect.

§ 1.3.1.2 The Cost of the Work shall include the cost at current market rates of labor and materials furnished by the Owner and equipment designed, specified, selected or specially provided for by the Architect, including the costs of management or supervision of construction or installation provided by a separate construction manager or contractor, plus a reasonable allowance for their overhead and profit. In addition, a reasonable allowance for contingencies shall be included for market conditions at the time of bidding and for changes in the Work.

§ 1.3.1.3 The Cost of the Work does not include the compensation of the Architect and the Architect's consultants, the costs of the land, rights-of-way and financing or other costs that are the responsibility of the Owner.

### § 1.3.2 INSTRUMENTS OF SERVICE

§ 1.3.2.1 Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights.

§ 1.3.2.2 Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for purposes of constructing, using and maintaining the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. The Architect shall obtain similar nonexclusive licenses from the Architect's consultants consistent

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2006 under Order No.1000158203_2 which expires on 2/15/2008, and is not for resale.
User Notes: (3656394002)

SCANNED

SEP 22 2007

ESG001458

with this Agreement. Any termination of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If and upon the date the Architect is adjudged in default of this Agreement, the foregoing license shall be deemed terminated and replaced by a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing, using and maintaining the Project.

§ 1.3.2.3 Except for the licenses granted in Section 1.3.2.2, no other license or right shall be deemed granted or implied under this Agreement. The Owner shall not assign, delegate, sublicense, pledge or otherwise transfer any license granted herein to another party without the prior written agreement of the Architect. However, the Owner shall be permitted to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work by license granted in Section 1.3.2.2. Submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and the Architect's consultants. The Owner shall not use the Instruments of Service for future additions or alterations to this Project or for other projects, unless the Owner obtains the prior written agreement of the Architect and the Architect's consultants. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

§ 1.3.2.4 Prior to the Architect providing to the Owner any Instruments of Service in electronic form or the Owner providing to the Architect any electronic data for incorporation into the Instruments of Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement, attached as "Exhibit C.".

1.3.2.4.1 The Architect will make drawings or specifications in electronic form available to the Contractor, subcontractors, and material suppliers for a charge to compensate for their preparation. The electronic files are specifically for use in preparing shop drawings or other required submittals and for no other reason. The charge for each release of electronic documents for this use shall be $500. Each recipient shall sign the Architect's normal Electronic Media Release form prior to release of the documents. Each recipient is prohibited from sharing these documents.

1.3.2.4.2 The separate agreement governing the use of electronic Instruments of Service by those other than the Owner is attached as "Exhibit D."

§ 1.3.3 CHANGE IN SERVICES
§ 1.3.3.1 Change in Services of the Architect, including services required of the Architect's consultants, may be accomplished after execution of this Agreement, without invalidating the Agreement, if mutually agreed in writing, if required by circumstances beyond the Architect's control, or if the Architect's services are affected as described in Section 1.3.3.2. In the absence of mutual agreement in writing, the Architect shall notify the Owner prior to providing such services. If the Owner deems that all or a part of such Change in Services is not required, the Owner shall give prompt written notice to the Architect, and the Architect shall have no obligation to provide those services. Except for a change due to the fault of the Architect, Change in Services of the Architect shall entitle the Architect to an adjustment in compensation pursuant to Section 1.5.2, and to any Reimbursable Expenses described in Section 1.9.2 and Section 1.5.5.

§ 1.3.3.2 If any of the following circumstances affect the Architect's services for the Project, the Architect shall be entitled to an appropriate adjustment in the Architect's schedule and compensation:

    .1    change in the instructions or approvals given by the Owner that necessitate revisions in Instruments of Service;

    .2    enactment or revision of codes, laws or regulations or official interpretations which necessitate changes to previously prepared Instruments of Service;

    .3    decisions of the Owner not rendered in a timely manner;

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2006 under Order No.1000156208_2 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                    (3668894002)

SCANNED

SEP 22 2007

6

ESG001459

.4     significant change in the Project including, but not limited to, size, quality, complexity, the Owner's schedule or budget, or procurement method;

.5     failure of performance on the part of the Owner or the Owner's consultants or contractors;

.6     preparation for and attendance at a public hearing, a dispute resolution proceeding or a legal proceeding except where the Architect is party thereto;

.7     change in the information contained in Article 1.1.

### § 1.3.4 MEDIATION

§ 1.3.4.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by arbitration.

§ 1.3.4.2 The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

§ 1.3.4.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

### § 1.3.5 ARBITRATION

§ 1.3.5.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Section 1.3.4.

§ 1.3.5.2 Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.

§ 1.3.5.3 A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

§ 1.3.5.4 No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

§ 1.3.5.5 The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes:          (3868894002)

7

SCANNED

SEP 22 2007

ESG001460

## § 1.3.6 CLAIMS FOR CONSEQUENTIAL DAMAGES

The Architect and the Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Section 1.3.8.

## § 1.3.7 MISCELLANEOUS PROVISIONS

§ 1.3.7.1 This Agreement shall be governed by the law of the principal place of business of the Architect, unless otherwise provided in Section 1.4.2.

§ 1.3.7.2 Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

§ 1.3.7.3 Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

§ 1.3.7.4 To the extent damages are covered by property insurance during construction, the Owner and the Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner or the Architect, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

§ 1.3.7.5 Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

§ 1.3.7.6 Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site.

§ 1.3.7.7 The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.

§ 1.3.7.8 If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

§ 1.3.7.9 The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

## § 1.3.8 TERMINATION OR SUSPENSION

§ 1.3.8.1 If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3888694002)

8

SCANNED

SEP 22 2007

ESG001461

suspension of services, the Architect shall give seven days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to the Owner for delay or damage caused the Owner because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 1.3.8.2 If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 1.3.8.3 If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice.

§ 1.3.8.4 This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

§ 1.3.8.5 This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

§ 1.3.8.6 In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Section 1.3.8.7.

§ 1.3.8.7 Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated, plus an amount for the Architect's anticipated profit on the value of the services not performed by the Architect.

§ 1.3.9 PAYMENTS TO THE ARCHITECT
§ 1.3.9.1 Payments on account of services rendered and for Reimbursable Expenses incurred shall be made monthly upon presentation of the Architect's statement of services. No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been adjudged to be liable.

§ 1.3.9.2 Reimbursable Expenses are in addition to compensation for the Architect's services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:

.1 transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;
.2 fees paid for securing approval of authorities having jurisdiction over the Project;
.3 reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;
.4 expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;
.5 renderings, models and mock-ups requested by the Owner;
.6 expense of professional liability insurance dedicated exclusively to this Project or the expense of additional insurance coverage or limits requested by the Owner in excess of that normally carried by the Architect and the Architect's consultants;
.7 reimbursable expenses as designated in Section 1.5.5;
.8 other similar direct Project-related expenditures.

§ 1.3.9.3 Records of Reimbursable Expenses, of expenses pertaining to a Change in Services, and of services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/16/2006, and is not for resale.
User Notes:                                                                                                                      (3866894002)

9

SCANNED

SEP 22 2007

ESG001462

§ 1.3.9.4 Direct Personnel Expense is defined as the direct salaries of the Architect's personnel engaged on the Project and the portion of the cost of their mandatory and customary contributions and benefits related thereto, such as employment taxes and other statutory employee benefits, insurance, sick leave, holidays, vacations, employee retirement plans and similar contributions.

### ARTICLE 1.4 SCOPE OF SERVICES AND OTHER SPECIAL TERMS AND CONDITIONS
§1.4.1 Enumeration of Parts of the Agreement. This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect. This Agreement comprises the documents listed below.

§1.4.1.1 Standard Form of Agreement Between Owner and Architect, AIA Document B141-1997.

§1.4.1.2 Standard Form of Architect's Services: Design and Contract Administration, AIA Document B141-1997, or as follows:
*(List other documents, if any, delineating Architect's scope of services.)*

Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A."

§1.4.1.3 Other documents as follows:
*(List other documents, if any, forming part of the Agreement.)*

Elness Swenson Graham Architects' schematic design documents dated January 28, 2005, which are attached by reference as "Exhibit B."

§1.4.2 Special Terms and Conditions. Special terms and conditions that modify this Agreement are as follows:

### ARTICLE 1.5 COMPENSATION
§1.5.1 For the Architect's services as described under Article 1.4, compensation shall be computed as follows:

Fixed fee for Architecture, Structural, Mechanical and Electrical Engineering = $112,500. See schedule for Phases of work:

| Discipline | M.P./S.D. | D.D. | C.D. | C.O. | Total Fees |
|---|---|---|---|---|---|
| Architecture | 10,800 | 18,000 | 28,800 | 14,400 | 72,000 |
| MEP Eng. | 3,750 | 4,550 | 7,200 | 0 | 15,500 |
| Struct. Eng. | 2,500 | 3,750 | 15,000 | 3,750 | 25,000 |
| Total Fees | 17,050 | 26,300 | 51,000 | 18,150 | $112,500 |

BY OWNER

BY ESG

97,000 #R

§1.5.2 If the services of the Architect are changed as described in Section 1.3.3.1, the Architect's compensation shall be adjusted. Such adjustment shall be calculated as described below or, if no method of adjustment is indicated in this Section 1.5.2, in an equitable manner.
*(Insert basis of compensation, including rates and multiples of Direct Personnel Expense for Principals and employees, and identify Principals and classify employees, if required. Identify specific services to which particular methods of compensation apply.)*

See schedule of hourly rates attached as "Exhibit B."

§1.5.3 For a Change in Services of the Architect's consultants, compensation shall be computed as a multiple of One ( 1.00 ) times the amounts billed to the Architect for such services.

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale.
User Notes: (3868894002)

10

SCANNED

SEP 2 2 2007

ESG001463

68

§ 1.5.4 For Reimbursable Expenses as described in Section 1.3.9.2, and any other items included in Section 1.5.5 as Reimbursable Expenses, the compensation shall be computed as a multiple of One ( 1.00 ) times the expenses incurred by the Architect, and the Architect's employees and consultants.

§ 1.5.5 Other Reimbursable Expenses, if any, are as follows:

§ 1.5.6 The rates and multiples for services of the Architect and the Architect's consultants as set forth in this Agreement shall be adjusted in accordance with their normal salary review practices.

§ 1.5.7 An initial payment of Zero Dollars and Zero Cents ($ 0.00 ) shall be made upon execution of this Agreement and is the minimum payment under this Agreement. It shall be credited to the Owner's account at final payment. Subsequent payments for services shall be made monthly, and where applicable, shall be in proportion to services performed on the basis set forth in this Agreement.

§ 1.5.8 Payments are due and payable immediately zero ( 0.00 ) days from the date of the Architect's invoice. Amounts unpaid sixty ( 60 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect. *(Insert rate of interest agreed upon.)*

U.S. Federal Reserve Prime Rate plus 2%.

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Architect's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Specific legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

§ 1.5.9 If the services covered by this Agreement have not been completed within Three ( 3 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Section 1.5.2.

This Agreement entered into as of the day and year first written above.

| OWNER | ARCHITECT |
|---|---|
| _Bahn_ 3/30/05 | |
| *(Signature)* | *(Signature)* |
| TRENT BARBER | Paul Mittendorff, AIA |
| | Principal and Vice President |
| *(Printed name and title)* | *(Printed name and title)* |

AIA Document B141™ – 1997 Part 1. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:32:19 on 03/25/2005 under Order No.1000156203_2 which expires on 2/15/2006, and is not for resale. User Notes: (3688894002)

11

SCANNED

SEP 22 2007

ESG001464

205302.00 151

# ⚜️AIA® Document B141™ – 1997 Part 2

## Standard Form of Architect's Services:
Design and Contract Administration

TABLE OF ARTICLES

| | |
|---|---|
| 2.1 | PROJECT ADMINISTRATION SERVICES |
| 2.2 | SUPPORTING SERVICES |
| 2.3 | EVALUATION AND PLANNING SERVICES |
| 2.4 | DESIGN SERVICES |
| 2.5 | CONSTRUCTION PROCUREMENT SERVICES |
| 2.6 | CONTRACT ADMINISTRATION SERVICES |
| 2.7 | FACILITY OPERATION SERVICES |
| 2.8 | SCHEDULE OF SERVICES |
| 2.9 | MODIFICATIONS |

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

### ARTICLE 2.1 PROJECT ADMINISTRATION SERVICES

§ 2.1.1 The Architect shall manage the Architect's services and administer the Project. The Architect shall consult with the Owner, research applicable design criteria, attend Project meetings, communicate with members of the Project team and issue progress reports. The Architect shall coordinate the services provided by the Architect and the Architect's consultants with those services provided by the Owner and the Owner's consultants.

§ 2.1.2 When Project requirements have been sufficiently identified, the Architect shall prepare, and periodically update, a Project schedule that shall identify milestone dates for decisions required of the Owner, design services furnished by the Architect, completion of documentation provided by the Architect, commencement of construction and Substantial Completion of the ~~Work.~~Work, subject to the limitations indicated in Elness Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004 attached as "Exhibit A." OK ##

§ 2.1.3 ~~The Architect shall consider the value of alternative materials, building systems and equipment, together with other considerations based on program, budget and aesthetics in developing the design for the Project.~~ OK ##

§.

§ 2.1.4 ~~Upon request of the Owner, the Architect shall make a presentation to explain the design of the Project to representatives of the Owner.~~

§.

§ 2.1.5 The Architect shall submit design documents to the Owner at intervals appropriate to the design process for purposes of evaluation and approval by the Owner. The Architect

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

1

SCANNED (12094700)

SEP 22 2007

EXHIBIT
B

ESG001465

70

shall be entitled to rely on approvals received from the Owner in the further development of the design.

**§ 2.1.6** The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the ~~Project.~~ Project, subject to the following limitations:

2.1.6.1 Site layout, submittals and approvals will be by others. The Architect will perform one set of revisions to the scope building drawings included by reference as "Exhibit B" and one set of revisions to the documents submitted for permit from input received from the Owner pursuant to requirements of the municipal authorities having jurisdiction over the Project. Beyond those revisions, the Architect will not create any special drawings or exhibits. Documents or other work efforts required for planning submittals or governmental agency review after the initial submission will be identified immediately by the Owner and may result in a revision to our schedule and compensation.



~~§ 2.1.7 EVALUATION OF BUDGET AND COST OF THE WORK~~
~~§ 2.1.7.1 When the Project requirements have been sufficiently identified, the Architect shall prepare a preliminary estimate of the Cost of the Work. This estimate may be based on current area, volume or similar conceptual estimating techniques. As the design process progresses through the end of the preparation of the Construction Documents, the Architect shall update and refine the preliminary estimate of the Cost of the Work. The Architect shall advise the Owner of any adjustments to previous estimates of the Cost of the Work indicated by changes in Project requirements or general market conditions. If at any time the Architect's estimate of the Cost of the Work exceeds the Owner's budget, the Architect shall make appropriate recommendations to the Owner to adjust the Project's size, quality or budget, and the Owner shall cooperate with the Architect in making such adjustments.~~

~~§~~

~~§ 2.1.7.2 Evaluations of the Owner's budget for the Project, the preliminary estimate of the Cost of the Work and updated estimates of the Cost of the Work prepared by the Architect represent the Architect's judgment as a design professional familiar with the construction industry. It is recognized, however, that neither the Architect nor the Owner has control over the cost of labor, materials or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market or negotiating conditions. Accordingly, the Architect cannot and does not warrant or represent that bids or negotiated prices will not vary from the Owner's budget for the Project or from any estimate of the Cost of the Work or evaluation prepared or agreed to by the Architect.~~

~~§ 2.1.7.3 In preparing estimates of the Cost of the Work, the Architect shall be permitted to include contingencies for design, bidding and price escalation; to determine what materials, equipment, component systems and types of construction are to be included in the Contract Documents; to make reasonable adjustments in the scope of the Project and to include in the Contract Documents alternate bids as may be necessary to adjust the estimated Cost of the Work to meet the Owner's budget for the Cost of the Work. If an increase in the Contract Sum occurring after execution of the Contract between the Owner and the Contractor causes the budget for the Cost of the Work to be exceeded, that budget shall be increased accordingly.~~

~~§ 2.1.7.4 If bidding or negotiation has not commenced within 90 days after the Architect submits the Construction Documents to the Owner, the budget for the Cost of the Work shall be adjusted to reflect changes in the general level of prices in the construction industry.~~

~~§ 2.1.7.5 If the budget for the Cost of the Work is exceeded by the lowest bona fide bid or negotiated proposal, the Owner shall:~~
~~.1 give written approval of an increase in the budget for the Cost of the Work;~~
~~.2 authorize rebidding or renegotiating of the Project within a reasonable time;~~
~~.3 terminate in accordance with Section 1.3.8.5; or~~
~~.4 cooperate in revising the Project scope and quality as required to reduce the Cost of the Work.~~

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. **WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties.** Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

2

SCANNED (12094700)

SEP 22 2007

ESG001466

§ 2.1.7.6 If the Owner chooses to proceed under Section 2.1.7.5.4, the Architect, without additional compensation, shall modify the documents for which the Architect is responsible under this Agreement as necessary to comply with the budget for the Cost of the Work. The modification of such documents shall be the limit of the Architect's responsibility under this Section 2.1.7. The Architect shall be entitled to compensation in accordance with this Agreement for all services performed whether or not construction is commenced.

## ARTICLE 2.2 SUPPORTING SERVICES

§ 2.2.1 Unless specifically designated in Section 2.8.3, the services in this Article 2.2 shall be provided by the Owner or the Owner's consultants and contractors.

§ 2.2.1.1 The Owner shall furnish a program setting forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, special equipment, systems and site requirements.

§ 2.2.1.2 The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

§ 2.2.1.3 The Owner shall furnish services of geotechnical engineers which may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.

## ARTICLE 2.3 EVALUATION AND PLANNING SERVICES

§ 2.3.1 The Architect shall provide a preliminary evaluation of the information furnished by the Owner under this Agreement, including the Owner's program and schedule requirements and budget for the Cost of the Work, each in terms of the other. The Architect shall review such information to ascertain that it is consistent with the requirements of the Project and shall notify the Owner of any other information or consultant services that may be reasonably needed for the Project.

§ 2.3.2 The Architect shall provide a preliminary evaluation of the Owner's site for the Project based on the information provided by the Owner of site conditions, and the Owner's program, schedule and budget for the Cost of the Work.

§ 2.3.3 The Architect shall review the Owner's proposed method of contracting for construction services and shall notify the Owner of anticipated impacts that such method may have on the Owner's program, financial and time requirements, and the scope of the Project.

## ARTICLE 2.4 DESIGN SERVICES

§ 2.4.1 The Architect's design services shall include normal structural, mechanical and electrical engineering services.

### § 2.4.2 SCHEMATIC DESIGN DOCUMENTS

§ 2.4.2.1 The Architect shall provide Schematic Design Documents based on the mutually agreed-upon program, schedule, and budget for the Cost of the Work. The documents shall establish the conceptual design of the Project illustrating the scale and relationship of the Project components. The Schematic Design Documents shall include a conceptual site plan, if appropriate, and preliminary building plans, sections and elevations. At the Architect's option, the Schematic Design Documents may include study models, perspective sketches, electronic modeling or combinations of these media. Preliminary selections of major building systems and construction materials shall be noted on the drawings or described in writing.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

3

SCANNED (120094700)

SEP 22 2007

ESG001467

## § 2.4.3 DESIGN DEVELOPMENT DOCUMENTS

§ 2.4.3.1 The Architect shall provide Design Development Documents based on the approved Schematic Design Documents and updated budget for the Cost of the Work. The Design Development Documents shall illustrate and describe the refinement of the design of the Project, establishing the scope, relationships, forms, size and appearance of the Project by means of plans, sections and elevations, typical construction details, and equipment layouts. The Design Development Documents shall include specifications that identify major materials and systems and establish in general their quality levels.

## § 2.4.4 CONSTRUCTION DOCUMENTS

§ 2.4.4.1 The Architect shall provide Construction Documents based on the approved Design Development Documents and updated budget for the Cost of the Work. The Construction Documents shall set forth in detail the requirements for construction of the Project. The Construction Documents shall include Drawings and Specifications that establish in detail the quality levels of materials and systems required for the Project.

§ 2.4.4.2 During the development of the Construction Documents, the Architect shall assist the Owner in the development and preparation of: (1) bidding and procurement information which describes the time, place and conditions of bidding; bidding or proposal forms; and the form of agreement between the Owner and the Contractor; and (2) the Conditions of the Contract for Construction (General, Supplementary and other Conditions). The Architect also shall compile the Project Manual that includes the Conditions of the Contract for Construction and Specifications and may include bidding requirements and sample forms.

ARTICLE 2.5 CONSTRUCTION PROCUREMENT SERVICES

§ 2.5.1 The Architect shall assist the Owner in obtaining either competitive bids or negotiated proposals and shall assist the Owner in awarding and preparing contracts for construction.

§ 2.5.2 The Architect shall assist the Owner in establishing a list of prospective bidders or contractors.

§ ...

§ 2.5.3 The Architect shall assist the Owner in bid validation or proposal evaluation and determination of the successful bid or proposal, if any. If requested by the Owner, the Architect shall notify all prospective bidders or contractors of the bid or proposal results.

§ 2.5.4 COMPETITIVE BIDDING

§ 2.5.4.1 Bidding Documents shall consist of bidding requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.

§ 2.5.4.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Bidding Documents for distribution to prospective bidders. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.

§ 2.5.4.3 If requested by the Owner, the Architect shall distribute the Bidding Documents to prospective bidders and request their return upon completion of the bidding process. The Architect shall maintain a log of distribution and retrieval, and the amounts of deposits, if any, received from and returned to prospective bidders.

§ 2.5.4.4 The Architect shall consider requests for substitutions, if permitted by the Bidding Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective bidders.

§ 2.5.4.5 The Architect shall participate in or, at the Owner's direction, shall organize and conduct a pre-bid conference for prospective bidders.

§ 2.5.4.6 The Architect shall prepare responses to questions from prospective bidders and provide clarifications and interpretations of the Bidding Documents to all prospective bidders in the form of addenda.

§ 2.5.4.7 The Architect shall participate in or, at the Owner's direction, shall organize and conduct the opening of the bids. The Architect shall subsequently document and distribute the bidding results, as directed by the Owner.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/16/2006, and is not for resale.
User Notes:

4

SCANNED (12094700)

SEP 22 2007

ESG001468

~~§ 2.5.5 NEGOTIATED PROPOSALS~~
~~§ 2.5.5.1 Proposal Documents shall consist of proposal requirements, proposed contract forms, General Conditions and Supplementary Conditions, Specifications and Drawings.~~

~~§ 2.5.5.2 If requested by the Owner, the Architect shall arrange for procuring the reproduction of Proposal Documents for distribution to prospective contractors. The Owner shall pay directly for the cost of reproduction or shall reimburse the Architect for such expenses.~~

~~§ 2.5.5.3 If requested by the Owner, the Architect shall organize and participate in selection interviews with prospective contractors.~~

~~§ 2.5.5.4 The Architect shall consider requests for substitutions, if permitted by the Proposal Documents, and shall prepare and distribute addenda identifying approved substitutions to all prospective contractors.~~

~~§ 2.5.5.5 If requested by the Owner, the Architect shall assist the Owner during negotiations with prospective contractors. The Architect shall subsequently prepare a summary report of the negotiation results, as directed by the Owner.~~

## ARTICLE 2.6 CONTRACT ADMINISTRATION SERVICES
### § 2.6.1 GENERAL ADMINISTRATION
§ 2.6.1.1 The Architect shall provide administration of the Contract between the Owner and the Contractor as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. Modifications made to the General Conditions, when adopted as part of the Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect. Site visits by the Architect will be limited to the number of meetings indicated in Bloess Swenson Graham Architects' Proposal letter dated November 12, 2004, revised January 21, 2004, attached as "Exhibit A."

§ 2.6.1.2 The Architect's responsibility to provide the Contract Administration Services under this Agreement commences with the award of the initial Contract for Construction and terminates at the issuance to the Owner of the final Certificate for Payment. However, the Architect shall be entitled to a Change in Services in accordance with Section 2.8.2 when Contract Administration Services extend 60 days after the date of Substantial Completion of the Work.

§ 2.6.1.3 The Architect shall be a representative of and shall advise and consult with the Owner during the provision of the Contract Administration Services. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

§ 2.6.1.4 Duties, responsibilities and limitations of authority of the Architect under this Article 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent will not be unreasonably withheld.

§ 2.6.1.5 The Architect shall review properly prepared, timely requests by the Contractor for additional information about the Contract Documents. A properly prepared request for additional information about the Contract Documents shall be in a form prepared or approved by the Architect and shall include a detailed written statement that indicates the specific Drawings or Specifications in need of clarification and the nature of the clarification requested.

§ 2.6.1.6 If deemed appropriate by the Architect, the Architect shall on the Owner's behalf prepare, reproduce and distribute supplemental Drawings and Specifications in response to requests for information by the Contractor.

§ 2.6.1.7 The Architect shall interpret and decide matters concerning performance of the Owner and Contractor under, and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests shall be made in writing within any time limits agreed upon or otherwise with reasonable promptness.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:

5

SCANNED (12094700)

SEP 22 2007

ESG001469

**§ 2.6.1.8** Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for the results of interpretations or decisions so rendered in good faith.

**§ 2.6.1.9** The Architect shall render initial decisions on claims, disputes or other matters in question between the Owner and Contractor as provided in the Contract Documents. However, the Architect's decisions on matters relating to aesthetic effect shall be final if consistent with the intent expressed in the Contract Documents.

## § 2.6.2 EVALUATIONS OF THE WORK

**§ 2.6.2.1** The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 2.8, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

**§ 2.6.2.2** The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

**§ 2.6.2.3** The Architect shall at all times have access to the Work wherever it is in preparation or progress.

**§ 2.6.2.4** Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

**§ 2.6.2.5** The Architect shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

**§ 2.6.3 CERTIFICATION OF PAYMENTS TO CONTRACTOR**   O K

~~**§ 2.6.3.1** The Architect shall review and certify the amounts due the Contractor and shall issue Certificates for Payment in such amounts. The Architect's certification for payment shall constitute a representation to the Owner, based on the Architect's evaluation of the Work as provided in Section 2.6.2 and on the data comprising the Contractor's Application for Payment, that the Work has progressed to the point indicated and that, to the best of the Architect's knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents. The foregoing representations are subject (1) to an evaluation of the Work for conformance with the Contract Documents upon Substantial Completion, (2) to results of subsequent tests and inspections, (3) to correction of minor deviations from the Contract Documents prior to completion, and (4) to specific qualifications expressed by the Architect.~~

§

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156203_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                      (12094700)

6

SCANNED

SEP 22 2007

ESG001470

§ 2.6.3.2 ~~The issuance of a Certificate for Payment shall not be a representation that the Architect has (1) made exhaustive or continuous on-site inspections to check the quality or quantity of the Work, (2) reviewed construction means, methods, techniques, sequences or procedures, (3) reviewed copies of requisitions received from Subcontractors and material suppliers and other data requested by the Owner to substantiate the Contractor's right to payment, or (4) ascertained how or for what purpose the Contractor has used money previously paid on account of the Contract Sum.~~

§ 2.6.3.3 ~~The Architect shall maintain a record of the Contractor's Applications for Payment.~~

## § 2.6.4 SUBMITTALS

§ 2.6.4.1 The Architect shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be .taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 2.6.4.2 The Architect shall maintain a record of submittals and copies of submittals supplied by the Contractor in accordance with the requirements of the Contract Documents.

§ 2.6.4.3 If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify appropriate performance and design criteria that such services must satisfy. Shop Drawings and other submittals related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval when submitted to the Architect. The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

## § 2.6.5 CHANGES IN THE WORK

§ 2.6.5.1 ~~The Architect shall prepare Change Orders and Construction Change Directives for the Owner's approval and execution in accordance with the Contract Documents. The Architect may authorize minor changes in the Work not involving an adjustment in Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents. If necessary, the Architect shall prepare, reproduce and distribute Drawings and Specifications to describe Work to be added, deleted or modified, as provided in Section 2.8.2.~~   OK HB

§

§ 2.6.5.2 The Architect shall review properly prepared, timely requests by the Owner or Contractor for changes in the Work, including adjustments to the Contract Sum or Contract Time. A properly prepared request for a change in the Work shall be accompanied by sufficient supporting data and information to permit the Architect to make a reasonable determination without extensive investigation or preparation of additional drawings or specifications. If the Architect determines that requested changes in the Work are not materially different from the requirements of the Contract Documents, the Architect may issue an order for a minor change in the Work or recommend to the Owner that the requested change be denied.

§ 2.6.5.3 If the Architect determines that implementation of the requested changes would result in a material change to the Contract that may cause an adjustment in the Contract Time or Contract Sum, the Architect shall make a recommendation to the Owner, who may authorize further investigation of such change. Upon such authorization, and based upon information furnished by the Contractor, if any, the Architect shall estimate the additional cost and time that might result from such change, including any additional costs attributable to a Change in Services of the Architect. With the Owner's approval, the Architect shall incorporate those estimates into a Change Order or other appropriate documentation for the Owner's execution or negotiation with the Contractor.

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000150203_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                                    (1209470O)

SCANNED

SEP 22 2007

7

ESG001471

§ 2.6.5.4 The Architect shall maintain records relative to changes in the Work.

§ 2.6.6 PROJECT COMPLETION

§ 2.6.6.1 The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.

§ 2.6.6.2 The Architect's inspection shall be conducted with the Owner's Designated Representative to check conformance of the Work with the requirements of the Contract Documents and to verify the accuracy and completeness of the list submitted by the Contractor of Work to be completed or corrected.

§ 2.6.6.3 When the Work is found to be substantially complete, the Architect shall inform the Owner about the balance of the Contract Sum remaining to be paid the Contractor, including any amounts needed to pay for final completion or correction of the Work.

§ 2.6.6.4 The Architect shall receive from the Contractor and forward to the Owner: (1) consent of surety or sureties, if any, to reduction in or partial release of retainage or the making of final payment and (2) affidavits, receipts, releases and waivers of liens or bonds indemnifying the Owner against liens.

ARTICLE 2.7 FACILITY OPERATION SERVICES

§ 2.7.1 The Architect shall meet with the Owner or the Owner's Designated Representative promptly after Substantial Completion to review the need for facility operation services.

§ 2.7.2 Upon request of the Owner, and prior to the expiration of one year from the date of Substantial Completion, the Architect shall conduct a meeting with the Owner and the Owner's Designated Representative to review the facility operations and performance and to make appropriate recommendations to the Owner.

ARTICLE 2.8 SCHEDULE OF SERVICES
§ 2.8.1 Design and Contract Administration Services beyond the following limits shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:

.1  up to One ( 1 ) reviews of each Shop Drawing, Product Data item, sample and similar submittal of the Contractor. OK ₩

.2  up to Two ( 2 ) visits to the site by the Architect over the duration of the Project during construction. OK ₩

.3  up to Zero ( 0 ) inspections for any portion of the Work to determine whether such portion of the Work is substantially complete in accordance with the requirements of the Contract Documents. OK ₩

.4  up to Zero ( 0 ) inspections for any portion of the Work to determine final completion. OK ₩

§ 2.8.2 The following Design and Contract Administration Services shall be provided by the Architect as a Change in Services in accordance with Section 1.3.3:

.1  review of a Contractor's submittal out of sequence from the submittal schedule agreed to by the Architect;

.2  responses to the Contractor's requests for information where such information is available to the Contractor from a careful study and comparison of the Contract Documents, field conditions, other Owner-provided information, Contractor-prepared coordination drawings, or prior Project correspondence or documentation;

.3  Change Orders and Construction Change Directives requiring evaluation of proposals, including the preparation or revision of Instruments of Service;

.4  providing consultation concerning replacement of Work resulting from fire or other cause during construction;

.5  evaluation of an extensive number of claims submitted by the Owner's consultants, the Contractor or others in connection with the Work;

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2006 under Order No.1000166203_1 which expires on 2/15/2008, and is not for resale.
User Notes:                                                                                          (1209470O)

8

SCANNED

SEP 22 2007

ESG001472

.6    evaluation of substitutions proposed by the Owner's consultants or contractors and making subsequent revisions to Instruments of Service resulting therefrom;

.7    preparation of design and documentation for alternate bid or proposal requests proposed by the Owner; or

.8    Contract Administration Services provided 60 days after the date of Substantial Completion of the Work.

§ 2.8.3 The Architect shall furnish or provide the following services only if specifically designated:

| Services | | Responsibility (Architect, Owner or Not Provided) | Location of Service Description |
|---|---|---|---|
| .1 | Programming | O | |
| .2 | Land Survey Services | O | |
| .3 | Geotechnical Services | O | |
| .4 | Space Schematics/Flow Diagrams | NP | |
| .5 | Existing Facilities Surveys | NP | |
| .6 | Economic Feasibility Studies | NP | |
| .7 | Site Analysis and Selection | NP | |
| .8 | Environmental Studies and Reports | O | |
| .9 | Owner-Supplied Data Coordination | O | |
| .10 | Schedule Development and Monitoring | O | |
| .11 | Civil Design | O | |
| .12 | Landscape Design | O | |
| .13 | Interior Design | O | |
| .14 | Special Bidding or Negotiation | O | |
| .15 | Value Analysis | O | |
| .16 | Detailed Cost Estimating | O | |
| .17 | On-Site Project Representation | O | |
| .18 | Construction Management | O | |
| .19 | Start-up Assistance | O | |
| .20 | Record Drawings | NP | |
| .21 | Post-Contract Evaluation | NP | |
| .22 | Tenant-Related Services | NP | |
| .23 | | | |
| .24 | | | |
| .25 | | | |

Description of Services.
*(Insert descriptions of the services designated.)*


ARTICLE 2.9 MODIFICATIONS
§ 2.9.1 Modifications to this Standard Form of Architect's Services: Design and Contract Administration, if any, are as follows:

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156209_1 which expires on 2/15/2006, and is not for resale.
User Notes:    (1209470D)

9

SCANNED

SEP 22 2007

ESG001473

By its execution, this Standard Form of Architect's Services: Design and Contract Administration and modifications hereto are incorporated into the Standard Form of Agreement Between the Owner and Architect, AIA Document B141-1997, that was entered into by the parties as of the date:

OWNER _____ 3/30/05
*(Signature)*

TRENT BARBEK
*(Printed name and title)*

ARCHITECT _____
*(Signature)*
Paul Mittendorff, AIA
Principal and Vice President
*(Printed name and title)*

AIA Document B141™ – 1997 Part 2. Copyright © 1917, 1926, 1948, 1951, 1953, 1958, 1961, 1963, 1966, 1967, 1970, 1974, 1977, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:43:17 on 03/23/2005 under Order No.1000156209_1 which expires on 2/15/2006, and is not for resale.
User Notes:                                                                          (12094700)

10

SCANNED

SEP 22 2007

ESG001474

# APPENDIX I

# +Capitol Research Services

**Legislative Histories &
Intent Research Consulting**

1108 Lavaca St., No. 110-409
Austin, Texas 78701
(512)371-1440

www.CapitolResearch.US
www.CapitolResearch-Texas.com

# THE LEGISLATIVE HISTORY OF

# TEX. S.B. 890, 79TH LEG., R.S. (2005)

# REGARDING SETTLEMENT CREDIT

Copyright © 2005

Capitol Research Services

All Rights Reserved

Published by: Capitol Research Services

1108 Lavaca St., No. 110–409

Austin, Texas 78701

(512) 371-1440

lesbreed@CapitolResearch-Texas.com

# THE LEGISLATIVE HISTORY OF
# TEX. S.B. 890, 79TH LEG., R.S. (2005)
# REGARDING SETTLEMENT CREDIT

## TABLE OF CONTENTS

ABSTRACT ..................................................................................................................... I

BACKGROUND ................................................................................................................ 1

PRIOR HISTORY: 1973 – 2003 ......................................................................................... 1

1973 — H.B. 88 ............................................................................................................... 1

1985 – CODIFICATION OF THE CIVIL PRACTICE AND REMEDIES CODE ................................ 2

1987 — S.B. 5 ................................................................................................................ 3

1995 — S.B. 28 .............................................................................................................. 3

2003 – H.B. 4 ................................................................................................................. 4

2004 – INTERIM REPORT ................................................................................................. 6

2005— S.B. 890 .............................................................................................................. 6

  S.B. 890 FILED ........................................................................................................... 6
  SENATE COMMITTEE HEARINGS ON S.B. 890 ............................................................... 8
    Public Hearing: March 31 ...................................................................................... 8
    Public Hearing: April 4 ........................................................................................ 13
    Bill  Analysis ...................................................................................................... 15
  SENATE FLOOR DEBATE ON S.B. 890 ......................................................................... 17
    Second Reading: April 13 ..................................................................................... 17
    Third Reading: April 13 ....................................................................................... 17
  HOUSE COMMITTEE HEARINGS ON S.B. 890 ............................................................... 17
    Formal Meeting: May 13 ...................................................................................... 17
    House Committee Report ...................................................................................... 18
    Bill  Analysis ...................................................................................................... 19
    House Research Organization Report ..................................................................... 20

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Capitol Research Services
Austin, Texas
(512)371-1440

HOUSE FLOOR DEBATE ON S.B. 890 .................................................................................... 21
    Second Reading: May 24 ................................................................................................ 21
    Third Reading: May 25 .................................................................................................. 22
SENATE CONCURRENCE ON S.B. 890: MAY 27 ................................................................ 22
S.B. 890 SIGNED BY THE GOVERNOR ................................................................................... 22
S.B. 890: SESSION LAW ............................................................................................................ 23
S.B. 890: ENROLLED BILL ANALYSIS ................................................................................... 23
S.B. 890: ENROLLED SUMMARY ............................................................................................ 25

2005 — H.B. 2018 ............................................................................................................................ 25

CURRENT LAW (2007) ................................................................................................................... 26

LOCATION OF DOCUMENTS ....................................................................................................... 27

EXHIBITS .......................................................................................................................................... 28

Legislative History of                            Capitol Research Services
Tex. S.B. 890                                     Austin, Texas
79th Leg., R.S. (2005)                        (512)371-1440

# THE LEGISLATIVE HISTORY OF

# TEX. S.B. 890, 79TH LEG., R.S. (2005)

## REGARDING SETTLEMENT CREDIT

## ABSTRACT

In 2005, the 79th Texas Legislature passed S.B. 890 which amended the settlement credit provision of § 33.012, Civil Practice and Remedies Code.

Sec. 33.012, CPRC, originated in Section 2(b) of the former Art. 6686, Vernon's Revised Civil Statutes, which was first passed in 1973. This article was transferred into the Civil Practice and Remedies Code in 1985 and numbered as § 33.012. Major tort reform measures amended the provision in 1987, 1995, and 2003.

The 1987 amendment codified the "one-satisfaction" rule (the Bradshaw Rule). Subsequent amendments allowed a non-settling defendant to elect either a dollar-for-dollar credit for all settlements with the plaintiff, a credit based on the percentage of liability assigned to the parties by the trier of fact, or a statutory sliding scale. However, in 2003, H.B. 4 eliminated the election of the dollar-for-dollar or sliding scale credit, except for those sued for health care liability.

S.B. 890 restored the election of the dollar-for-dollar settlement credit.

Legislative History of         Page i         Capitol Research Services
Tex. S.B. 890         Austin, Texas
79th Leg., R.S. (2005)         (512)371-1440

# THE LEGISLATIVE HISTORY OF
# TEX. S.B. 890, 79TH LEG., R.S. (2005)
## REGARDING SETTLEMENT CREDIT

# BACKGROUND

## Prior History: 1973 – 2003

## 1973 — H.B. 88

What is now § 33.012 was originally enacted in 1973 with the passage of H.B. 88, "An Act relating to reform of civil suits based on negligence; establishing a system of comparative negligence and modifying existing rules as to the effect of contributory negligence; providing for contribution among certain joint tort-feasors…" Act of March 27, 1973, 63rd Leg., R.S., ch. 28, 1973 Tex. Gen. Laws, 41. [Exhibit 1.]

Subsection (b) of § 2 stated:

> (b) In a case in which there is more than one defendant, and the claimant's negligence does not exceed the total negligence of all defendants, contribution to the damages awarded to the claimant shall be in proportion to the percentage of negligence attributable to each defendant.

*Id.*

H.B. 88 was compiled as Art. 2212a, Vernon's Ann. Rev. Civ. Stat. *Id*.

[NOTE: For the complete legislative history, see CAPITOL RESEARCH, The Legislative History of H.B. 88, 63rd Leg., R.S. (1973).]

Legislative History of        Page 1        Capitol Research Services
Tex. S.B. 890        Austin, Texas
79th Leg., R.S. (2005)        (512)371-1440

# 1985 – Codification of the Civil Practice and Remedies Code

During its Regular Session, the 69th Texas Legislature enacted S.B. 797, "An Act relating to the adoption of a nonsubstantive revision of the statutes relating to civil procedure and civil remedies and liabilities; making conforming amendments and repeals; providing penalties." Civil Practice and Remedies Code, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws, 3242. [Exhibit 2.]

This bill was passed as a part of the Texas Statutory Revision Program which was created by a constitutional amendment passed in 1963.

> Sec. 43. REVISION OF LAWS. The first session of the Legislature under this Constitution shall provide for revising, digesting and publishing the laws, civil and criminal; and a like revision, digest and publication may be made every ten years thereafter; provided, that in the adoption of and giving effect to any such digest or revision, the legislature shall not be limited by section 35 and 36 of this Article.

TEXAS CONSTITUTION, Art. III, § 43.

The enabling legislation for the statutory revision program is § 323.007, Government Code. *Id*.

The bill contained a statement of legislative intent:

> SECTION 10. LEGISLATIVE INTENT. This Act is enacted pursuant to Article III, Section 43, of the Texas Constitution. This Act is intended as a recodification only, and no substantive change in the law is intended by this Act.

Civil Practice and Remedies Code, 69th Leg., R.S., ch. 959, 1995 Tex. Gen. Laws, 3242, 3322. [Exhibit 2.]

Article 2212a, V.A.C.S., was repealed, redrafted, and transferred to Chapter 33, Civil Practice and Remedies Code, during this revision. Civil Practice and Remedies Code, 69th Leg., R.S., ch. 959, 1995 Tex. Gen. Laws, 3242, 3270-3271. [Exhibit 2.]

Subsection (b) of Art. 2212a was revised and numbered as § 33.012, Civil Practice and Remedies Code.

> Sec. 33.012. DAMAGES IN PROPORTION. If there is more than one defendant and the claimant's negligence does not exceed the total negligence of all defendants, contribution must be in proportion to the percentage of negligence attributable to each defendant.

*Id*.

[NOTE: During the public hearings and floor debates for bills such as this that are nonsubstantive revisions drafted by Texas Legislative Council, the sponsors and expert witnesses only discuss the measures taken to ensure that only non-substantive changes were made. There is no discussion regarding the substance of the provisions of the bill.]

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 2

Capitol Research Services
Austin, Texas
(512)371-1440

# 1987 — S.B. 5

Sec. 33.012, Civil Practice and Remedies Code, was amended in 1987 during the First Called Session by S.B. 5, "An Act relating to revising the Civil Practice and Remedies Code to reform procedures and remedies in civil actions for personal injury, property damage, or death and civil actions based on tortious conduct, including revisions and additions to laws governing the determination of and limitations on liability and damages." Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, 1987 Tex. Gen. Laws, 37. [Exhibit 3.]

Section 2.08 of S.B. 5 deleted § 33.012 and substituted the following:

Sec. 33.012. AMOUNT OF RECOVERY. (a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, as elected in accordance with Section 33.014:

(1) the sum of the dollar amounts of all settlements; or

(2) a dollar amount equal to the sum of the following percentages of damages found by the trier of fact:

(A) 5 percent of those damages up to $200,000;

(B) 10 percent of those damages from $200,001 to $400,000;

(C) 15 percent of those damages from $400,001 to $500,000; and

(D) 20 percent of those damages greater than $500,000.

(c) The amount of damages recoverable by the claimant may only be reduced once by the credit provided for in Subsection (b).

*Id.* [Underlining indicates added text.]

# 1995 — S.B. 28

The 74th Legislature amended § 33.012 with the passage of S.B. 28, "An Act relating to responsibility for, and recover of, damages in certain civil actions." Act of May 8, 1995, 74th Leg., R.S., ch. 136, 1995 Tex. Gen. Laws, 971. [Exhibit 4.]

S.B. 28 amended Sec. 33.012 by adding a new subsection (d).

Legislative History of      Page 3      Capitol Research Services
Tex. S.B. 890      Austin, Texas
79th Leg., R.S. (2005)      (512)371-1440

Sec. 33.012. AMOUNT OF RECOVERY. (a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following, as elected in accordance with Section 33.014:

(1) the sum of the dollar amounts of all settlements; or

(2) a dollar amount equal to the sum of the following percentages of damages found by the trier of fact:

(A) 5 percent of those damages up to $200,000;

(B) 10 percent of those damages from $200,001 to $400,000;

(C) 15 percent of those damages from $400,001 to $500,000; and

(D) 20 percent of those damages greater than $500,000.

(c) The amount of damages recoverable by the claimant may only be reduced once by the credit provided for in Subsection (b).

(d) This section shall not apply to benefits paid by or on behalf of an employer to an employee pursuant to workers' compensation insurance coverage, as defined in Section 401.011(44), Labor Code, in effect at the time of the act, event, or occurrence made the basis of claimant's suit.

*Id*. [Underlining indicates added text.]

[NOTE: For the complete legislative history, see CAPITOL RESEARCH, The Legislative History of S.B. 28, 74th Leg., R.S. (1995).]

# 2003 – H.B. 4

The 78th Legislature amended § 33.012 with the passage of H.B. 4, "An Act relating to reform of certain procedures and remedies in civil actions." Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws, 847. [Exhibit 5.]

Section 4.06 of H.B. 4 amended § 33.012, Civil Practice and Remedies Code by amending Subsection (b) and adding Subsections (c) and (d).

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 4

Capitol Research Services
Austin, Texas
(512)371-1440

action by a <u>percentage equal to each settling person's percentage of responsibility</u> [credit equal to one of the following, as elected in accordance with Section 33.014:

[(1) the sum of the dollar amounts of all settlements; or

[(2) a dollar amount equal to the sum of the following percentages of damages found by the trier of fact:

[(A) 5 percent of those damages up to $200,000;

[(B) 10 percent of those damages from $200,001 to $400,000;

[(C) 15 percent of those damages from $400,001 to $500,000; and

[(D) 20 percent of those damages greater than $500,000].

<u>(c) Notwithstanding Subsection (b), if the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by an amount equal to one of the following, as elected by the defendant:</u>

<u>(1) the sum of the dollar amounts of all settlements; or</u>

<u>(2) a percentage equal to each settling person's percentage of responsibility as found by the trier of fact.</u>

<u>(d) An election made under Subsection (c) shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and when made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subsection (c)(1).</u>

*Id.*

See also TEXAS CIVIL PRACTICE & REMEDIES CODE, § 33.012 (Vernon 1997 & Supp. 2004-2005). [Exhibit 21.]

[The subsection (d) that was added by the 1995 act was not amended by the 2003 act, therefore § 33.012 had two subsection (d)'s from 2003 to 2005. This was rectified by the passage of H.B. 2018 in 2005 which corrected the lettering (*see below*).]

[NOTE: For the complete legislative history, see CAPITOL RESEARCH, The Legislative History of H.B. 4, 78th Leg., R.S. (2003).]

Legislative History of          Page 5          Capitol Research Services
Tex. S.B. 890          Austin, Texas
79th Leg., R.S. (2005)          (512)371-1440

# 2004 – Interim Report

During the interim between the Regular Sessions of the 78th and 79th Texas Legislatures, the House Civil Practices Committee completed an interim study and published its recommendations. HOUSE COMMITTEE ON CIVIL PRACTICES, "Report to the 79[th] Texas Legislature" (November, 2004). [Exhibit 6.]

The Civil Practices Committee was charged by the Speaker of the House with monitoring the implementation of H.B. 4 (2003).

> Charge Two

> Monitor the legislation passed by the 78[th] Legislature, with a particular emphasis on the implementation of and rulemaking for H.B. 4.

*Id.* 7.

The Interim Report recommended

> Settlement Credit

> The settlement credit change in H.B. 4 has created a major problem in multi-defendant lawsuits that do not involved medical liability. H.B. 4 rightly abolished the old sliding scale settlement credit, but it also eliminated the dollar-for-dollar credit that has been an integral part of Texas law for many, many years. H.B. 4 retained the dollar-for-dollar credit in medical liability cases, but not for other tort actions. This change in the law has put non-settling defendants at a serious disadvantage and in many cases will allow claimants to recover more than 100 percent of their damages. It also creates substantial conflicts between defendants, encourages collusive settlements, and makes it much more difficult to coordinate the defense of mass actions, especially in the toxic tort arena.

> The Committee recommends restoring the optional dollar-for-dollar credit and allowing the non-settling defendant to elect the appropriate credit after verdict. This solution would both preserve the claimant's recovery and allow defendants the full benefit of a settlement before trial.

*Id.* 7.

# 2005— S.B. 890

## S.B. 890 Filed

During the Regular Session of the 79th Texas Legislature, Sen. Williams filed S.B. 890, "An Act relating to the amount of recovery in a civil action." Tex. S.B. 890, As Introduced, 79th Leg., R.S. (2005). [Exhibit 8.]

Legislative History of       Page 6       Capitol Research Services
Tex. S.B. 890       Austin, Texas
79th Leg., R.S. (2005)       (512)371-1440

Section 1 of S.B. 890, As Introduced, amended § 33.012, Texas Civil Practice and Remedies Code.

Sec. 33.012. AMOUNT OF RECOVERY. (a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by [a percentage equal to each settling person's percentage of responsibility.

[(c) Notwithstanding Subsection (b), if the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by] an amount equal to one of the following, as elected by the defendant:

(1) the sum of the dollar amounts of all settlements; or

(2) a percentage equal to each settling person's percentage of responsibility as found by the trier of fact.

(c) [(d)] An election made under Subsection (b) [(e)] shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and when made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subsection (b) [(e)](1).

(d) This section shall not apply to benefits paid by or on behalf of an employer to an employee pursuant to workers' compensation insurance coverage, as defined in Section 401.011(44), Labor Code, in effect at the time of the act, event, or occurrence made the basis of claimant's suit.

*Id*. [Underlining indicates added text. Strikeouts indicate deleted text.]

[NOTE: § 33.012, Civil Practice and Remedies Code, contains two Subsection (d)'s due to a drafting error. One was passed in 1995 (S.B. 28) and the other in 2003 (H.B. 4).

Section 2 provided for the application of S.B. 890.

SECTION 2. (a) This Act applies to all actions:

(1) commenced on or after the effective date of this Act; or

(2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date.

(b) For an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on the effective date is governed by the law applicable to the trial, new trial, or retrial immediately before that date, and that law is continued in effect for that purpose.

*Id*.

Legislative History of          Page 7          Capitol Research Services
Tex. S.B. 890          Austin, Texas
79th Leg., R.S. (2005)          (512)371-1440

Section 3 provided for the effective date of S.B. 890.

SECTION 3. This Act takes effect September 1, 2005.

*Id.*

# Senate Committee Hearings on S.B. 890

## Public Hearing: March 31

S.B. 890 was referred to the Senate Committee on State Affairs, which held a public hearing for the bill on March 31. CAPITOL RESEARCH SERVICES, Hearings on S.B. 890 Before the Senate Committee on State Affairs, 79th Leg. R.S. (March 31, 2005). [Exhibit 13.]

Sen. Williams offered a committee substitute for S.B. 890. *Id.* [NOTE: A substitute is an amendment which replaces the text of the whole bill.]

Sen. Williams explained S.B. 890 to the committee.

> SEN. TOMMY WILLIAMS : The Committee Substitute to Senate Bill 890 – since the 1930's, Texas has recognized that an injured party's entitled to recover only once for an injury. Subsequent to 1987, Chapter 33 allowed the non-settling defendant to elect either a dollar-for-dollar credit for all settlements with the plaintiff, or a credit based on the percentage of liability assigned to parties by a trier of fact, or statutory sliding scale. House Bill 4, the Tort Reform Act of 2003, radically changed this scheme, and it eliminated the dollar-for-dollar sliding scale of credit, except for those sued for health care liability. Instead non-settling defendants now receive credit only for that percentage of fault that a trier of fact assigns to the settling person. Thus, if the jury finds no liability for a settling person, the court may not credit any prior settlements against the non-settling defendant's liability.

> House Bill 4 created an anomaly in Texas law by retaining the dollar-for-dollar credit in medical liability cases, but eliminating it for all others. There's not a policy rationale for this distinction, and the law as it stands now creates a privileged class of defendants.

> Senate Bill 890 solves the problem by restoring the election of the dollar-for-dollar credit, just as in medical liability cases.

> The committee substitute language is – has being agreed to by the Texas Association of Defense Council and the Texas Civil Justice League, and the Texas Trial Lawyer Association, and it removes the election provision and allows the percentage equal to each settling person's percentage responsibility as found by the trier of fact that was in the original bill as filed.

> Mr. Chairman, I think there are witnesses here that would probably be very valuable in trying to answer any questions that you or any of the other committee members might have.

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 8

Capitol Research Services
Austin, Texas
(512)371-1440

*Id.*

Chairman Duncan congratulated Sen. Williams for the agreement embodied in S.B. 890.

> CHAIR : I want to congratulate you on pulling together the coalition – in what I think what seems to be a kind of a monumental agreement on something that's always been an issue in civil jurisprudence.

*Id.*

David Chamberlain, representing the Texas Association of Defense Counsel, testified in favor of S.B. 890.

> DAVID E. CHAMBERLAIN : I'm David Chamberlain, and I'm president of the Texas Association of Defense Council, which has over 2100 civil defense lawyers practicing in the state every day handling cases of the nature that this bill will affect. We're the largest state association of defense lawyers in the country.

> I am here to testify in favor of this bill. As Sen. Williams pointed out, we have an anomaly in the system right now. We have basically two different systems, one for healthcare liability cases, one for general liability cases, or a different one for general liability cases. In the general liability cases, currently you can only take a percentage reduction for the negligence in the comparative fault of a settling co-defendant. On the other hand, in a medical malpractice lawsuit, you get a choice, and that choice is either that percentage reduction or a dollar credit. Our experience has been, since September of 2003, from the defense perspective, that it creates and encourages the discord and litigation among co-defendants, who were faced with the tasks of actually having to prove the negligence of what was a friendly – former friendly co-defendant, who has now settled out. And if you want to take – you can't take advantage of whatever they paid the plaintiff to reduce the overall judgment. You actually – actually have to prove the only negligent, you know, what was once your friend. That creates all sorts of situations and opportunities for malpractice, for conflicts of interest, particularly in toxic tort cases and multiple party cases. And I can – if the committee is interested, I could certainly give examples of that later on.

> We feel like that Senator – that Senate Bill 890, the substitute, will solve all of these problems. It'll switch everything over to a very simple dollar credit only reduction. It'll bring uniformity and symmetry to all the cases – civil cases. It'll quiet the discord and litigation among co-defendants. It'll reduce litigation expense considerably. It will take out the gamesmanship, the guessing about what's going to happen when you have to make an election in the health care liability field. Everybody'll know what the deal is going in. We think it'll greatly facilitate settlements. It'll reduce the opportunity for – for malpractice, which, again, reduces subsequent or satellite litigation. And we think quite clearly, that this comes as close as humanly possible to achieving the Bradshaw Rule, which we've been trying so hard to achieve over the past few decades, and that is only one satisfaction for one injury. And I want to thank the committee for that opportunity to speak today.

> CHAIR : Does that mean if we pass this bill, that we won't have to endure any more seminar lectures on settlement credit?

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 9

Capitol Research Services
Austin, Texas
(512)371-1440

CHAMBERLAIN : Yes, sir. Kirk Watson will be out of business. No more lawyers trying to do math, which is – sounds funny, Senator, but lawyers trying to do math is a very ugly thing.

CHAIR : It's usually lawyers are lawyers because they can't do math, as opposed to doctors, or engineers.

*Id*.

Guy Choate, representing the Texas Association of Trial Lawyers, testified in favor of S.B. 890.

GUY CHOATE : I'm Guy Choate, with Texas Trial Lawyers Association, and I don't believe I can say it any better than David said it.

This – this change will provide certainty in the law. It's fairness. Certainly there is the opportunity under the laws that exist today for plaintiffs to make essentially a double recovery, if they choose right. It encourages the plaintiff a lot of times to settle with the principal defendant, and sometimes just roll the dice on one that really don't have that much exposure, because they don't have that downside risk. This is a fair way to handle this problem. It enhances the opportunity and ability of plaintiffs and defendants to settle their litigation without the potential for either the plaintiff or the defendant being second-guessed or creating malpractice themselves by their conduct. We think this is a good law. We think that certainly momentum ought to develop around it, given the fact that the people who actually have to do this on a day-by-day basis all feel that this is the best way to handle it, and we appreciate the opportunity that the Senator has given us to work with him on this bill, because we think that this is a good response to this problem.

CHAIR : I note in your card that you filed the position in opposition to the bill as filed, but I think what you've told me now is that you would need to change that.

CHOATE : Yes, on the committee substitute, we're absolutely in favor, and I'm sorry. I wasn't clear how to do that.

*Id*.

Mike Slack, representing the Texas Association of Trial Lawyers, testified in favor of S.B. 890.

MIKE SLACK : Mr. Chairman, Sen. Williams. I'm Mike Slack. I'm a past president of TTLA, and regrettably, over the last 20 years, have had far too much time invested in dealing with Chapter 33 settlement credit issues, where Texas has migrated through some awfully unfortunate waters, resulting in a lot of gamesmanship, and resulting in a lot of what I call judicial experimentation gone bad. I think I can think of few moments where we have altered our laws that have been more positive than the bill, the substitute bill you have in front of you today. This is a very significant thing.

CHAIR : Feel the love. [Laughter.]

SLACK : Let me tell you, there's practicing lawyers out there, Senator, that have cases they would like to settle that have not been settled, because of the existing Chapter 33 impediments. And in talking to David, lawyers have been in

Legislative History of            Page 10            Capitol Research Services
Tex. S.B. 890                                                                          Austin, Texas
79th Leg., R.S. (2005)                                                        (512)371-1440

a real quandary since House Bill 4 particularly, and litigants have suffered the consequences, because settlements have not been occurring. And cases – people are taking cases into trial, that ordinarily, those litigants should be free to leave the litigation. And as we were talking early in our discussions, it's not a long bill, and there's very few words you're actually changing in Chapter 33, but it will be a tremendous benefit for predictability, uniformity, and efficient resolution of disputes. And I really – I want to commend the committee for taking this, and also, Mr. Chamberlain, in his group for their work and insight into historical problems we've had with settlement credits.

*Id.*

Mike Hull, representing the Texas Alliance for Patient Access, testified against the Committee Substitute for S.B. 890. Chairman Duncan and Mr. Hull discussed settlement credit examples.

MIKE HULL : My name is Mike Hull. I'm an attorney in private practice here in Austin, appearing on behalf of the Texas Alliance for Patient Access. I filed a card supporting Senate Bill 890 as filed. We, however, strongly oppose the committee substitute.

There's two reasons for this. One, the election, the ability to elect is something that's very, very important to our clients. It's really a dollar issue for us in healthcare liability claims. We – we are not opposed to the notion that everyone should get the election. We are only supportive of the notion that at least that we should. In the context of House Bill 4, there were – there are several provisions in House Bill 4 relating to, that have an impact on settlement credits that we were not entirely comfortable with during the process. And, in fact, the provision that this bill addresses was not in the engrossed version on the House side of the House Bill 4 at all. We in particular, would not have supported the third party practice, and the questions that raises about limitations. And we only ultimately supported of that part of the bill when the exception for healthcare and liability claims was inserted into House Bill 4 very late in the process in Chairman Nixon's office when a whole bunch of us were there. So, we don't oppose everyone having the election, we only want to attempt to make sure that we keep it.

CHAIR : Why, anecdotally, explain why the election is important in a healthcare claim?

HULL : Any case where we estimate that the sum of the settling defendant's percentage of responsibility, times the jury verdict, will be greater than the dollar-for-dollar credit paid by the settling defendant, it is to our advantage to take that percent. In any case, conversely, where the dollar-for-dollar credit we think will work to our advantage, then we would want to take that. And, so it becomes very much a dollar issue for us.

HULL : Under – under proportionate responsibility, as enacted in House Bill 4 –

HULL : Yes.

CHAIR : Don't you still get to reduce the liability by the sum of the total of the responsible individuals until you get the – unless you're, well, I mean you get – you still get to reduce the reliability under those percentages of responsibility, don't you? Even if they settle?

Legislative History of          Page 11          Capitol Research Services
Tex. S.B. 890          Austin, Texas
79th Leg., R.S. (2005)          (512)371-1440

HULL : We would get the – we would get the – under the House Bill 4 scenario, we would get the percent, if that's what we elected, or the dollar-for-dollar credit. The two examples I've sketched out where it makes a difference for us, is that if you assume the two defendants case, where the to-the-jury defendant got 40%, the settling defendant got 60%, and the verdict was $700,000 and there's a $500,000 settlement. Then it works to the advantage of the defendant that's tried to elect the dollar – to – to elect the percent credit. But, if on the other hand you think that the dollar-for-dollar credit is going to be less than the percent. And in particular, it's a problem for us because there is so many low limit positions. So still, if you have a $200,000 defendant, who settles out, who is going to get a much greater share, then we end up potentially picking that up depending on where our percent of the responsibility falls.

CHAIR : You may have just answered it. But, why would the healthcare claims be different than any other multiple defendant case?

HULL : I don't know that it is, and that's why I say, we were not really in favor of making it one way or the other exclusively, ever, because we think, I mean, I have other than health care clients, myself, and it can be a problem in those cases too. So –

CHAIR : Do you agree that, from time to time that the possibility of the option or the election causes an impediment to settlement of parties to the case?

HULL : It probably does. I can't tell you that it never does. I really think any way you go. I mean we went – There was testimony about this last time. We all have our experience of it. There is an advantage to one party or the other depending on the case, under any of these circumstances. If you're a dollar-for-dollar person, and you're on the plaintiff's side, you might think it works to your advantage to hold out because you can't get enough. So – there are advantages to one party or the other under any scenario that we have been thus far, able to come up with. We would just, and if we're going to re-visit this issue then, there is revisiting the issue of joining responsible third parties, which is a looming terrible problem for us. Once you can name a defendant against whom limitations has already expired, it raises substantial problems. So, unless there is further questions, I'm done.

*Id.*

George Scott Christian, representing the Texas Civil justice League, testified in favor of the Committee Substitute for S.B. 890.

GEORGE CHRISTIAN : Thank you, Mr. Chairman. My name is George Christian, and I'm an attorney representing the Texas Civil Justice League. We are in support of the Committee Substitute for Senate Bill 890 for many of the reasons that you've already heard. We think that it's the best overall solution to this problem that we've really been dealing with since 1987. As you know, Sen. Duncan, we've had these settlement credits issues repeatedly in the last almost 20 years. And we believe that the committee substitute is fair to everyone. I think the dollar-for-dollar credit in the vast majority of cases, if not all cases, always squares up the parties, and the plaintiff will get as close to one satisfaction rule as possible to do. Everybody gets full credit for the dollars that have already been settled. There's really no gamesmanship involved. I agree with a lot of what Mike Hull said, about you know the benefits of an election.

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 12

Capitol Research Services
Austin, Texas
(512)371-1440

Clearly, there is some benefits in certain cases where you do have a low limits situation. That is probably true. And – but, nevertheless, we believe that the law ought to be the same for all defendants, and for all plaintiffs. We think that this treats everybody equally. We think it squares the parties in the end of the day, which is what you want to do. And we do think the current system of bifurcated settlement credit is not justifiable from a policy standpoint and deters settlements. And that is a serious problem. And we would like to see if we can't get that addressed. And we appreciate you and Sen. Williams dealing with this.

*Id.*

Chairman Duncan read the names of persons in support of S.B. 890 who did not wish to testify. *Id.*

S.B. 890 was left pending. *Id.*

## Public Hearing: April 4

The Senate Committee on State Affairs held another public hearing for S.B. 890 on April 4. CAPITOL RESEARCH SERVICES, Hearings on S.B. 890 Before the Senate Committee on State Affairs, 79th Leg. R.S. (April 4, 2005). [Exhibit 14.]

Chairman Duncan reminded the committee of S.B. 890 and Sen. Williams briefly explained the bill.

> CHAIR : Members, the Chair pulls up Senate Bill 890, which is the settlement credits bill that we heard last week. This is the bill that has an agreement between Texas Civil Justice League and the Texas Trial Lawyers Association, which moves it to a dollar-for-dollar credit. Sen. Williams, you're recognized to explain the bill.
>
> SEN. TOMMY WILLIAMS : Thank you, Mr. Chairman. As you've already stated, this committee substitute would remove the election provision that allows for percentage credit equal to each settling person's percentage of responsibility as found by the trier of fact. The substitute language has been agreed to – to the Texas Association of Defense Counsel, the Texas Civil Justice League, and the Texas Trial Lawyers Association. And Mr. Chairman, I would move adoption – I move passage of the Committee Substitute to Senate Bill 890.

*Id.*

The committee favorably reported the Committee Substitute for S.B. 890 on a vote of 6 ayes and no nays. *Id.*

## Senate Committee Report for S.B. 890

The committee produced a report for S.B. 890 which contained the text of the bill, the public hearing witness list, and the fiscal note prepared by the Legislative Budget Board. Tex. S.B. 890, Senate Committee Report, 79th Tex. Leg., R.S. (2005). [Exhibit 9.]

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 13

Capitol Research Services
Austin, Texas
(512)371-1440

Section 1 of the Senate Committee Substitute for S.B. 890, As Introduced, further amended § 33.012, Texas Civil Practice and Remedies Code.

Sec. 33.012. AMOUNT OF RECOVERY. (a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by [a percentage equal to each settling person's percentage of responsibility.

[(c) Notwithstanding Subsection (b), if the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by] an amount equal to [one of the following, as elected by the defendant:

[(1)] the sum of the dollar amounts of all settlements[; or

[(2) a percentage equal to each settling person's percentage of responsibility as found by the trier of fact].

(c) [(d) An election made under Subsection (c) shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and when made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subsection (c)(1).

[(d)] This section shall not apply to benefits paid by or on behalf of an employer to an employee pursuant to workers' compensation insurance coverage, as defined in Section 401.011(44), Labor Code, in effect at the time of the act, event, or occurrence made the basis of claimant's suit.

*Id.*

Section 2 provided for the application of S.B. 890.

SECTION 2. (a) This Act applies to all actions:

(1) commenced on or after the effective date of this Act; or

(2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date.

(b) For an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on the effective date is governed by the law applicable to the trial, new trial, or retrial immediately before that date, and that law is continued in effect for that purpose.

*Id.*

Section 3 provided for conflict of laws.

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 14

Capitol Research Services
Austin, Texas
(512)371-1440

SECTION 3. To the extent of any conflict, this Act prevails over another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes.

*Id.*

Section 4 provided for the effective date. It was modified to allow immediate effect of the bill.

SECTION 4. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

*Id.*

## Bill Analysis

The Senate Committee Report contained a bill analysis prepared by the Senate Research Center. *Id*. [SENATE RESEARCH CENTER, Bill Analysis for S.B. 890 – Committee Report (Substituted) (April 5, 2005)]

The bill analysis reviewed the background and purpose of the bill.

AUTHOR'S/SPONSOR'S STATEMENT OF INTENT

Since the 1930s, Texas has recognized that an injured party is entitled to recover only once for an injury. (Bradshaw v. Baylor, 126 Tex. 99, 101; 84 S.W.2d 703, 704 (1935)). The "one-satisfaction" rule was codified by the Legislature in Chapter 33, Civil Practice and Remedies Code, in 1987. Subsequent to the 1987 amendments, Chapter 33 allowed a non-settling defendant to elect either a dollar-for-dollar credit for all settlements with the plaintiff, a credit based on the percentage of liability assigned to the parties by the trier of fact, or a statutory sliding scale. H.B. 4, the tort reform measure enacted by the 78th Legislature, Regular Session, 2003, radically changed this scheme. It eliminated the election of the dollar-for-dollar or sliding scale credit, except for those sued for health care liability. Instead, non-settling defendants now receive credit only for that percentage of fault that a trier of fact assigns to a settling person. Thus, if a jury finds no liability for a settling person, the court may not credit any prior settlements against the non-settling defendant's liability.

The settlement credit scheme created by H.B. 4 eliminates the one-satisfaction rule that has been part of Texas law for more than 70 years, except in medical liability cases. This creates the potential for unjust windfalls for plaintiffs, who can now recover far in excess of their total damages. This problem is acute in lawsuits involving multiple defendants. For example, if a plaintiff sues ten defendants for $1 million in damages, and nine defendants settle for $100,000 each, the plaintiff collects $900,000 in settlements. If a jury then finds little or no liability for the settling defendants, the tenth defendant is liable for the full $1 million. The plaintiff thus recovers $1.9 million, despite being awarded only $1 million in damages. This unjustly enriches the plaintiff and penalizes the defendant who went to trial.

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 15

Capitol Research Services
Austin, Texas
(512)371-1440

Eliminating the dollar-for-dollar credit also creates the potential for collusive settlements. For example, a defendant could agree to settle a claim at trial for less by agreeing with the plaintiff to wait to settle until after all sides have rested their cases. It would then be far too late for non-settling defendants to introduce evidence of the settling defendant's proportionate responsibility. Such collusion not only undermines the purpose of Texas' proportionate responsibility law, which is designed to ensure that parties only pay for their proportionate share of the plaintiff's harm, but it discourages defendants who believe they have little or no liability from trying the lawsuit to a jury. Current law thus undermines the jury system and will vastly increase the cost of litigation, especially in the mass tort arena.

Finally, H.B. 4 created an anomaly in Texas law by retaining the dollar-for-dollar credit in medical liability cases but eliminating it in all others. There is no policy rationale for this distinction. The law as it now stands creates a privileged class of defendants.

C.S.S.B. 890 restores the election of the dollar-for-dollar credit, just as in medical liability cases.

*Id.*

The analysis reviewed the rulemaking authority delegated by the bill. *Id.*

The analysis also summarized each section of the bill.

SECTION BY SECTION ANALYSIS

SECTION 1. Amends Section 33.012, Civil Practice and Remedies Code, as amended by Chapter 136, Acts of the 74th Legislature, Regular Session, 1995, and Chapter 204, Acts of the 78th Legislature, Regular Session, 2003, to delete existing text requiring the court to further reduce the amount of damages to be recovered by a claimant who has settled with one or more persons. Deletes text of existing Subsection (d) relating to a binding election made under Subsection (c). Makes conforming changes.

SECTION 2. Makes application of this Act prospective.

SECTION 3. Provides that, to the extent of any conflict, this Act prevails over another Act of the 79th Legislature, Regular Session, 2005, relating to nonsubstantive additions to and corrections in enacted codes.

SECTION 4. Effective date: upon passage or September 1, 2005.

*Id.*

Legislative History of         Page 16         Capitol Research Services
Tex. S.B. 890         Austin, Texas
79th Leg., R.S. (2005)         (512)371-1440

## Senate Floor Debate on S.B. 890

### Second Reading: April 13

On April 13, S.B. 890 was considered on the Senate floor. CAPITOL RESEARCH SERVICES, Debate on S.B. 890 On the Floor of the Senate (Second and Third Readings), 79th Leg. R.S. (April 13, 2005). [Exhibit 15.]

Sen. Williams briefly explained the bill to the Senate.

> SEN. TOMMY WILLIAMS : Thank you, Mr. President. I move to suspend the Senate's regular order of business and take up and consider the Committee Substitute to Senate Bill 890. At this time, Members, this is the settlement credits bill that I have been discussing with Members on the floor today. Mr. President, I – I move to suspend the regular order of business.

*Id.*

The normal procedure for bringing up a bill on the Senate floor on second reading is for the sponsor to briefly explain the bill and then move to suspend the regular order of business. Sen. Williams moved to suspend . The motion to suspend prevailed. *Id.*

S.B. 890 passed on second reading without further discussion. *Id.*

### Third Reading: April 13

Normally the Senate hears bills on second and third readings on the same day. Since Art. III, § 32 of the Texas Constitution requires readings of bills on three separate days, the Constitution must be suspended. Sen. Williams moved that the constitutional three-day rule be suspended. The motion prevailed on a record vote. CAPITOL RESEARCH SERVICES, Debate on S.B. 890 On the Floor of the Senate (Second and Third Readings), 79th Leg. R.S. (April 13, 2005). [Exhibit 15.]

S.B. 890 passed on third reading. *Id*. *See also* S.J. of Tex., 79th Leg., R.S. 972-973 (2005). [Exhibit 19.]

## House Committee Hearings on S.B. 890

### Formal Meeting: May 13

S.B. 890 crossed over to the House where it was referred to the House Civil Practices Committee. The committee did not hold a public hearing for S.B. 890. A formal meeting was held instead. Tex. S.B. 890, 79th Leg., R.S., Master Bill History Report (2005). [Exhibit 7.]

[NOTE: No testimony is taken at formal meetings and they are not tape recorded.]

The committee favorably reported a committee substitute for S.B. 890. *Id.*

[NOTE: A substitute is an amendment which replaces the entire bill.]

## House Committee Report

The committee prepared a report which included the text of the committee substitute, the committee's bill analysis, and the fiscal notes. Tex. S.B. 890, House Committee Report, 79th Leg., R.S. (2005). [Exhibit 10.]

Section 1 of the House Committee Substitute made further changes to § 33.012, Civil Practice and Remedies Code. Only Subsection (b) was amended.

> SECTION 1. Subsection (b), Section 33.012, Civil Practice and Remedies Code, is amended to read as follows:
>
> (b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by <u>the sum of the dollar amounts of all settlements</u> [a percentage equal to each settling person's percentage of responsibility.

*Id.*

Section 2 provided for the application of S.B. 890.

> SECTION 2. (a) This Act applies to all actions:
>
> (1) commenced on or after the effective date of this Act; or
>
> (2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date.
>
> (b) For an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on the effective date is governed by the law applicable to the trial, new trial, or retrial immediately before that date, and that law is continued in effect for that purpose.

*Id.*

There was no section providing for conflict of laws. *Id.*

Section 3 provided for the effective date. It allowed immediate effect of the bill.

> SECTION 4. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

*Id.*

Legislative History of            Page 18            Capitol Research Services
Tex. S.B. 890            Austin, Texas
79th Leg., R.S. (2005)            (512)371-1440

## Bill Analysis

The House committee prepared a bill analysis which reviewed the background and purpose of the bill.

> BACKGROUND AND PURPOSE
>
> H.B. 4, the tort reform measure enacted by the 78th Legislature, Regular Session, changed the settlement credit scheme used for decades in the state. It eliminated the election of the dollar-for-dollar or sliding scale credit, except for those sued for health care liability. Instead, non-settling defendants now receive credit only for that percentage of fault that a trier of fact assigns to a settling person. Thus, if a jury finds no liability for a settling person, the court may not credit any prior settlements against the non-settling defendant's liability.
>
> CSSB 890 restores the dollar-for-dollar settlement credit in civil actions, while maintaining current law for health care liability claims.

*Id*. Bill Analysis.

The analysis reviewed the rulemaking authority granted by S.B. 890. *Id*.

The analysis summarized each section of the bill and noted the effective date.

> ANALYSIS
>
> CSSB 890 amends Section 33.012(b), Civil Practice and Remedies Code, by adding "the sum of the dollar amounts of all settlements" and striking "a percentage equal to each settling person's percentage of responsibility".
>
> EFFECTIVE DATE
>
> Upon passage, or, if it the Act does not receive the necessary vote, the Act takes effect September 1, 2005.

*Id*.

The analysis also compared the "original" (S.B. 890 as filed) to the committee substitute.

> COMPARISON OF ORIGINAL TO SUBSTITUTE
>
> C.S.S.B. 890 differs from the original by restoring the current election of credit in health care liability cases. The substitute continues current law for health care liability claims, while restoring the dollar-for-dollar settlement credit in other civil actions.

*Id*.

Lastly, the analysis explained the actions of the committee. *Id*.

Legislative History of         Page 19         Capitol Research Services
Tex. S.B. 890         Austin, Texas
79th Leg., R.S. (2005)         (512)371-1440

## House Research Organization Report

The House Research Organization (HRO) also reviewed the bill. HRO is an agency of the Texas House which analyzes bills that come to the House floor for debate. HOUSE RESEARCH ORGANIZATION, S.B. 890 Bill Analysis (May 23, 2005). [Exhibit 20.]

The HRO analysis noted the subject of S.B. 890.

SUBJECT:

Dollar-for-dollar credit against amount of recovery in most civil actions

*Id.*

The HRO analysis reviewed the background of S.B. 890 and summarized its provisions.

BACKGROUND:

Civil Practice and Remedies Code, sec. 33.012, states that if a plaintiff settles with one or more defendants and goes to trial against any other defendant, then any amount the plaintiff is awarded against the defendant at trial must be reduced by a percentage equal to each settling party's percentage of responsibility. Defendants in health care liability claims may choose to have the amount t hey owe to the plaintiff reduced by either a percentage equal to each settling party's percentage of responsibility or by the total dollar sum of all settlements.

DIGEST:

SB 890 would amend sec. 33.012 to change the amount that an award against a defendant could be reduced from a percentage credit based on a party's responsibility to a dollar-for-dollar credit based on the sum of all settlements. Defendants in health care liability cases still could choose their reduction method.

The bill would take immediate effect if finally passed by a two –thirds record vote of the membership of each house. Otherwise, it would take effect September 1, 2005. The bill would apply to all actions commenced on or after the effective date, or pending on the effective date and in which the trial or any new trial or retrial begins on or after the effective date. For actions commenced before the effective date, the former law would continue in effect for any trial, new trial, or retrial in progress on the effective date.

*Id.*

The HRO analysis reviewed the arguments of the supporters and opponents of the bill.

SUPPORTERS SAY:

Requiring a dollar-for-dollar reduction of damage awards would be more fair. Plaintiffs are limited by law to only one full recovery, but under sec. 33.012 they are sometimes able to recover more than the amount authorized by the judge or jury. This could happen in a case where the plaintiff settled with defendant A and went to trial with defendant B, but the court found that defendant A was not responsible. The plaintiff would have collected from defendant A and would be entitled to a full

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 20

Capitol Research Services
Austin, Texas
(512)371-1440

recovery against defendant B because defendant A's responsibility was zero percent, so defendant B could not take a reduction. Requiring a dollar-for-dollar reduction would decrease the amount defendant B had to pay the plaintiff by the amount that defendant A already had paid. This could ensure that the plaintiff received only one recovery and no more.

Requiring dollar-for-dollar credits also would reduce litigation between co-defendants seeking to avoid having to pay part of the recovery to the plaintiff because the dollar-for-dollar system is straightforward and not capable of being abused or manipulated by any co-defendant.

OPPONENTS SAY:

There is no reasonable basis for defendants in health care liability cases to have a choice between a dollar-for-dollar credit and a percentage credit. For the sake of fairness and consistency, all defendants should be subject to the dollar-for-dollar credit, with no type of defendant receiving special treatment.

*Id.*

The HRO analysis also contained a notes section.

NOTES:

The Senate-passed version would have applied the dollar-for-dollar credit to all defendants, including defendants in health care liability cases.

*Id.*


# House Floor Debate on S.B. 890

## Second Reading: May 24

S.B. 890 came before the House on May 24. CAPITOL RESEARCH SERVICES, Debate on S.B. 890 On the Floor of the House (Second Reading), 79th Leg. R.S. (May 24, 2005). [Exhibit 16.]

Rep. Nixon briefly explained the bill.

> REP. JOE NIXON      : Mr. Speaker, Members, this alters the settlement credits from a percentage of a defendant's liability to a sum of the dollar amount of all settlements. Move passage.

*Id.*

S.B. 890 was passed on second reading. *Id*. *See also* H.J. of Tex., 79th Leg., R.S. 4213 (2005). [Exhibit 21.]

**Third Reading: May 25**

The next day S.B. 890 was laid out on third reading. CAPITOL RESEARCH SERVICES, Debate on S.B. 890 On the Floor of the House (Third Reading), 79th Leg. R.S. (May 25, 2005). [Exhibit 17.]

Rep. Nixon reminded the members of the bill.

> REP. JOE NIXON : This is – this settlement credit bill we passed yesterday. Move passage.

*Id.*

S.B. 890 passed on third reading on a record vote of 142 ayes and no nays. *Id. See also* H.J. of Tex., 79th Leg., R.S. 4476-4477 (2005). [Exhibit 21.]

# Senate Concurrence on S.B. 890: May 27

S.B. 890 returned to the Senate for approval of the amendments added by the House. On May 27, S.B. 890 with the House amendments came before the Senate. CAPITOL RESEARCH SERVICES, Debate on S.B. 890 On the Floor of the Senate (House Amendments), 79th Leg. R.S. (May 27, 2005). [Exhibit 18.]

Sen. Williams explained the House amendments.

> SEN. TOMMY WILLIAMS : Thank you, Mr. President. I move that we concur in the House Amendments to Senate Bill 890. Members, the House made one small change to Senate Bill 890. It satisfied the concerns of the health care industry which were raised when the Senate Bill removed a provision they currently enjoy in medical liability cases. All this bill does is switch from a percentage equal to each settling person's responsibility to a dollar-for-dollar settlement credit. I move that we concur on Senate Bill 890.

*Id.*

The motion to concurred prevailed by a vote of 29 ayes to no nays. *Id.* S.J. of Tex., 79th Leg., R.S. 4119-4120 (2005). [Exhibit 19.]

# S.B. 890 Signed by the Governor

The bill was sent to Gov. James Richard (Rick) Perry, who signed the bill on June 9. Since the bill had been passed by both chambers by a two-thirds majority, the bill was effective immediately. Tex. S.B. 890, 79th Leg., R.S., Master Bill History (2005). [Exhibit 7.]

[NOTE: Sec. 39 of Article 3 of the Texas Constitution governs the effective date of legislation.

> Section 39. Time of taking Effect of Laws; Emergencies; Entry on Journal.

> No law passed by the Legislature, except the general appropriations act, shall take effect or go into force until ninety days after the adjournment of the session at which it

Legislative History of
Tex. S.B. 890
79th Leg., R.S. (2005)

Page 22

Capitol Research Services
Austin, Texas
(512)371-1440

was enacted, unless the Legislature shall, by a vote of two-thirds of all the members elected to each House, otherwise direct; said vote to be taken by yeas and nays, and entered upon the journals.

Texas Constitution, § 39, Art. 3.

# S.B. 890: Session Law

The final version of S.B. 890 was published in the session laws.

SECTION 1. Subsection (b), Section 33.012, Civil Practice and Remedies Code, is amended to read as follows:

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements [a percentage equal to each settling person's percentage of responsibility].

SECTION 2. (a) This Act applies to all actions:

(1) commenced on or after the effective date of this Act; or

(2) pending on the effective date of this Act and in which the trial, or any new trial or retrial following motion, appeal, or otherwise, begins on or after that effective date.

(b) For an action commenced before the effective date of this Act, a trial, new trial, or retrial that is in progress on the effective date is governed by the law applicable to the trial, new trial, or retrial immediately before that date, and that law is continued in effect for that purpose.

SECTION 3. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution. If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2005.

Act of May 27, 2005, 79th Leg., R.S., ch. 277, 2005 Tex. Gen. Laws, 770. [Exhibit 22.]

# S.B. 890: Enrolled Bill Analysis

The Senate Research Center prepared a bill analysis for the final version of S.B. 890. SENATE RESEARCH CENTER, Bill Analysis for S.B. 890 – Enrolled (June 2, 2005). [Exhibit 12.]

The bill analysis reviewed the background and purpose of the bill.

AUTHOR'S/SPONSOR'S STATEMENT OF INTENT

Legislative History of            Page 23            Capitol Research Services
Tex. S.B. 890            Austin, Texas
79th Leg., R.S. (2005)            (512)371-1440

Since the 1930s, Texas has recognized that an injured party is entitled to recover only once for an injury. (Bradshaw v. Baylor, 126 Tex. 99, 101; 84 S.W.2d 703, 704 (1935)). The "one-satisfaction" rule was codified by the Legislature in Chapter 33, Civil Practice and Remedies Code, in 1987. Subsequent to the 1987 amendments, Chapter 33 allowed a non-settling defendant to elect either a dollar-for-dollar credit for all settlements with the plaintiff, a credit based on the percentage of liability assigned to the parties by the trier of fact, or a statutory sliding scale. H.B. 4, the tort reform measure enacted by the 78th Legislature, Regular Session, 2003, radically changed this scheme. It eliminated the election of the dollar-for-dollar or sliding scale credit, except for those sued for health care liability. Instead, non-settling defendants now receive credit only for that percentage of fault that a trier of fact assigns to a settling person. Thus, if a jury finds no liability for a settling person, the court may not credit any prior settlements against the non-settling defendant's liability.

The settlement credit scheme created by H.B. 4 eliminates the one-satisfaction rule that has been part of Texas law for more than 70 years, except in medical liability cases. This creates the potential for unjust windfalls for plaintiffs, who can now recover far in excess of their total damages. This problem is acute in lawsuits involving multiple defendants. For example, if a plaintiff sues ten defendants for $1 million in damages, and nine defendants settle for $100,000 each, the plaintiff collects $900,000 in settlements. If a jury then finds little or no liability for the settling defendants, the tenth defendant is liable for the full $1 million. The plaintiff thus recovers $1.9 million, despite being awarded only $1 million in damages. This unjustly enriches the plaintiff and penalizes the defendant who went to trial.

Eliminating the dollar-for-dollar credit also creates the potential for collusive settlements. For example, a defendant could agree to settle a claim at trial for less by agreeing with the plaintiff to wait to settle until after all sides have rested their cases. It would then be far too late for non-settling defendants to introduce evidence of the settling defendant's proportionate responsibility. Such collusion not only undermines the purpose of Texas' proportionate responsibility law, which is designed to ensure that parties only pay for their proportionate share of the plaintiff's harm, but it discourages defendants who believe they have little or no liability from trying the lawsuit to a jury. Current law thus undermines the jury system and will vastly increase the cost of litigation, especially in the mass tort arena.

Finally, H.B. 4 created an anomaly in Texas law by retaining the dollar-for-dollar credit in medical liability cases but eliminating it in all others. There is no policy rationale for this distinction. The law as it now stands creates a privileged class of defendants.

S.B. 890 restores the election of the dollar-for-dollar credit, just as in medical liability cases.

*Id.*

The analysis reviewed the rulemaking authority delegated by the bill. *Id.*

The analysis also summarized each section of the bill.

SECTION BY SECTION ANALYSIS

Legislative History of        Page 24        Capitol Research Services
Tex. S.B. 890        Austin, Texas
79th Leg., R.S. (2005)        (512)371-1440

SECTION 1. Amends Section 33.012(b), Civil Practice and Remedies Code, to reduce the amount of damages to be recovered by a claimant who has settled with one or more persons.

SECTION 2. Makes application of this Act prospective.

SECTION 3. Effective date: upon passage or September 1, 2005.

*Id.*

## S.B. 890: Enrolled Summary

Texas Legislature On-Line published a summary of the final version of S.B. 890.

Legislative Session: 79(R)

SENATE BILL 890                                      SENATE AUTHOR: Williams

EFFECTIVE: 6-9-05                                    HOUSE SPONSOR: Nixon

Senate Bill 890 amends the Civil Practice and Remedies Code to provide that if the claimant in a personal injury case has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant by the sum of the dollar amounts of all settlements. The bill also eliminates the option to reduce the amount of damages by a percentage equal to each settling person's percentage of responsibility.

TEXAS LEGISLATURE ON-LINE, Tex. S.B. 890, Enrolled Summary, 79th Leg., R.S. (205) (Available at: http://www.capitol.state.tx.us/BillLookup/BillSummary.aspx?LegSess =79R&Bill=SB890). [Exhibit 23.]

# 2005 — H.B. 2018

Also in 205, the 79th Legislature enacted H.B. 2018, "An Act relating to relating to nonsubstantive additions to and corrections in enacted codes, to the nonsubstantive codification or disposition of various laws omitted from enacted codes, and to conforming codifications enacted by the 78th Legislature to other Acts of that legislature." Act of May 24, 2005, 79th Leg., R.S., ch. 728, 2005 Tex. Gen. Laws, 2188. [Exhibit 24.]

Section 23.001 of H.B. 2018 renumbered sections and subsections that had been incorrectly numbered and corrected the two Subsection (d)'s in § 33.012, Civil Practice and Remedies Code.

SECTION 23.001. The following provisions of enacted codes are renumbered or relettered and appropriate cross-references are changed to eliminate duplicate citations or to relocate misplaced provisions:

….

(6) Subsection (d), Section 33.012, Civil Practice and Remedies Code, as added by Chapter 136, Acts of the 74th Legislature, Regular Session, 1995, is relettered as Subsection (e), Section 33.012, Civil Practice and Remedies Code.

*Id.* § 23.001.

# Current Law (2007)

Sec. 33.012, Civil Practice and Remedies Code currently states:

§ 33.012. Amount of Recovery

(a) If the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements.

(c) Notwithstanding Subsection (b), if the claimant in a health care liability claim filed under Chapter 74 has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by an amount equal to one of the following, as elected by the defendant:

(1) the sum of the dollar amounts of all settlements; or

(2) a percentage equal to each settling person's percentage of responsibility as found by the trier of fact.

(d) An election made under Subsection (c) shall be made by any defendant filing a written election before the issues of the action are submitted to the trier of fact and when made, shall be binding on all defendants. If no defendant makes this election or if conflicting elections are made, all defendants are considered to have elected Subsection (c)(1).

(e) This section shall not apply to benefits paid by or on behalf of an employer to an employee pursuant to workers' compensation insurance coverage, as defined in Section 401.011(44), Labor Code, in effect at the time of the act, event, or occurrence made the basis of claimant's suit.

Texas Civil Practice and Remedies Code, § 33.012 (Vernon 1997 & Supp. 2007). [Exhibit 25.]

Legislative History of                    Page 26                    Capitol Research Services
Tex. S.B. 890                                            Austin, Texas
79th Leg., R.S. (2005)                                 (512)371-1440

# LOCATION OF DOCUMENTS

The original documents compiled in this report can be found in several locations at the Texas Capitol Complex.

**Legislative Reference Library (LRL)**
Texas Capitol Building, 2nd Floor, Austin, Texas 78701
(512) 462-1252

The LRL is the repository for the official file for bills that have been considered by the Legislature since 1973. (Bills from 1836 to 1972 are stored at the State Archives.) These files include the various versions of the bill, floor amendments, and bill analyses. In addition, the LRL maintains copies of House and Senate committee interim reports and other documents produced by the Texas Legislature and Texas state agencies.

**Texas House of Representatives Video/Audio Services Department**
John H. Reagan Bldg., Room 330
105 West 15th St., Austin, Texas 78701
(512) 463-0920

This office maintains the original copies of tape recordings of the proceedings of the Texas House and its committees from 1973 to the present. It also maintains copies of committee minutes.

**Texas Senate Staff Services**
Sam Houston Bldg., Room 175
201 East 14th St., Austin, Texas 78701
(512) 463-0430

This office maintains the original copies of tape recordings of the proceedings of the Texas Senate and its committees for the last three sessions. (The remaining Senate tapes are at the State Library.) It also maintains copies of committee minutes that are extant from 1973 to the present. This office maintains copies of transcripts for Senate proceedings which have been transcribed from 1973 to the present.

**Texas State Library and Archives**
Lorenzo De Zavala Library & Archives Bldg.
1201 Brazos St., Austin, Texas 78701
Reference Room: (512) 463-5455
Archives: (512) 463-5480

The State Archives (1st floor) is the repository for the official files for bills that have been considered by the Legislature from the First Congress in 1836 until the 62nd Legislature in 1971–72. (Bills enacted since 1973 are stored at the Legislative Reference Library.)

The Reference Room (Room 300, 3rd floor) is the repository for original copies of tape recordings of proceedings of the Texas Senate and its committees since 1973, except the last three sessions (which are at the Senate Staff Services).